1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

WILLARD TODD HENSLEY,            )
          Plaintiff,             )
                                 ) CIVIL ACTION
     vs.                         ) FILE NO.: 4:19-CV-00267-TWT
                                 )
HON. GARY LANGFORD,              )
SHERIFF, Murray County, GA,      )
Individually and in his          )
Official Capacity; et al.,       )
          Defendants.            )
------------------------------/

          Zoom Video-Conference Deposition of GARY LANGFORD,

as 30 (b) (6) for Murray County, Georgia; taken on behalf

of the Plaintiff, for the purposes of cross-examination,

Discovery and for any and all other purposes provided by

the Georgia Civil Practice Act, pursuant to Notice and by

agreement of the parties, all formalities waived, before

Gaye D. Traynor, Certified Court Reporter, commencing

at 9:02 a.m. on Thursday, June 10, 2021.

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:
RALPH JAMES VILLANI, Esquire
VILLANI LAW FIRM
821 Dawsonville Highway
Suites 250-333
Gainesville, Georgia 30501-2634
PH:    770.985.6773
FAX:   770.979.5190
E-MAIL:  ralphjvillani@gmail.com

On behalf of the Defendants:
JASON C. WAYMIRE, Esquire
WILLIAMS, MORRIS & WAYMIRE, LLC
4330 South Lee Street
Building 400, Suite A
Buford, Georgia 30518
PH:    678.541.0790
E-MAIL:  jason@wmwlaw.com

Also Present:

Mamie Kimbrell, Zoom Host
Thompson Reporting Services, Inc.

                        * * *

        (In the following transcript, dashes (--)
are used to indicate an intentional or purposeful
interruption of a sentence and ellipsis (...) is used
to indicate halting speech or an unfinished sentence
in dialogue or an omission of word(s) when reading
written material. [sic] means exactly as said.)

3

INDEX TO PROCEEDINGS
EXAMINATION INDEX


WITNESS:
GARY LANGFORD


EXAMINATIONS:                                      PAGE
Examination by Mr. Villani                           4
_____

                    INDEX TO EXHIBITS

PLAINTIFF'S EXHIBITS MARKED:                       PAGE
 1-A Photo                                         136
 1-B Photo                                         136
 2 Photo                                           140
 3 Photo                                           143
 4-A Photo of Shower Area                          145
 4-B Photo                                         160
 5-A Booking Card                                  167
 5-B Page 2 of Booking Card                        167
 6 Taser Policy                                    172
 7 Taser Certification Schedule                    203
 8 Taser Certification Forms                       204
 9 Taser Certificates                              205
 10 Taser Activation Download Data                 206
 11 Sign Out Roster for Cartridges                 215
 12 Taser Out-of-Service Report                    217
 13-A Taser Sign Out Roster                        218
 13-B Taser Sign Out Roster                        219
 13-C Taser Sign Out Roster                        220
 14 Evidence Custody Receipt                       223
 15 Use of Force Policy                            226
 16 Training Form                                  234
 17 State Taser Law                                235

 18-A Report by Deputy West                        236
 18-B Amos Incident Report                         236
 19 Minor Disorderly Policy                        237
 20 Nurse Jenkins's Report                         251
 24 Video 1, West Dashcam One                       78
 25 Video 2, West Dashcam Two                       89
 26 Video 3, West Body Cam One                      90
 27 Video 4, West Body Cam Two                     103
 Exhibit E                                         248

(Reporter's disclosure presented and attached hereto.)

GARY LANGFORD

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. VILLANI:

Q    Sir, can you please state your name for the record and spell your name, please?

A    Gary Langford.  G-A-R-Y, L-A-N-G-F-O-R-D.

MR. VILLANI:  Okay.  Before -- since we're doing Zoom deposition, counsel, my problem with having you sit next to your client is that -- and I know you won't do this -- but you may pass him some notes or point to a document.  And that's my objection to having you in the same room or within -- within sight of him.

And your client's not allowed to communicate with anybody.  And normally during an in-person deposition I can see your communication, and I can comment on the record.  Here I can't. All I can see is your right shoulder.

And I would -- I would say that the having you in the room or within his sight is going to cause a problem with -- with the

deposition. I don't know. What do you think about that?

MR. WAYMIRE: I think you have the right to be here. You're welcome to be here, and you decided not to. I'm entitled to be in the same room with my client. You can note your objection. I disagree with it. And you can proceed or not proceed.

MR. VILLANI: Okay. Well, why don't you make the video so I can see both of you?

MR. WAYMIRE: 'Cause I can't do that. I don't have another device that will do that.

So you can ask your questions. I'll tell you, if you don't trust me to not instruct the witness or pass signals or whatever --

MR. VILLANI: Okay.

MR. WAYMIRE: -- then you need to come -- you need to come in the same room with us and just watch me. Okay? But I'm not going to be on the video and do all that rigamarole.

MR. VILLANI: Are you -- is this a camcorder that's attached to a laptop or attached to the computer and monitor?

MR. WAYMIRE: It's a USB device that's attached to a computer.

MR. VILLANI:  Okay.  Well, is there any way to move it back more and move it to the -- to your client's left so I can see you at the same time?  If you can have your client move slightly to the right, that would be perfect.

MR. WAYMIRE:  Does that make you happy?

MR. VILLANI:  That's fantastic.

MR. WAYMIRE:  All right.

MR. VILLANI:  And I'm sorry -- and I'm sorry to be such a pain, but I'm just trying to -- now...

MR. WAYMIRE:  Let me -- let me note that if -- if this video is for any reason used, I need to be cropped out of the video.  I don't want to be a movie star on your video.  Okay?

MR. VILLANI:  Okay.  Well, look, let -- let's go back to the way you were before, and I'll take your word as an officer of the court that you're not going to pass notes or comments to your client.

MR. WAYMIRE:  Okay.

MR. VILLANI:  And it'd make it easier for the court reporter if we -- if we decide to use the video.

BY MR. VILLANI:

Q    Do you have any objection to that, sheriff?

A    No.

Q    Okay.  And let -- let me just start off, sheriff.  Are you still the sheriff of Murray County?

A    No, I retired January the 1st of this year.

Q    Okay.  January.  And I hope you're enjoying your retirement.

A    Yes, sir.  I had 47 years, and that was enough.

Q    Well, God bless you.

A    Thank you.

Q    The -- I know a lot of police officers and sheriffs when they retire, they just go absolutely nuts.  And they either open their own security company or become night watchmen.

I hope you're able to enjoy your retirement.

A    Yeah, I'm -- I'm not doing nothing other than with my grandkids and enjoying.

Q    Okay.  Let me just ask you a couple of initial questions.  And have you been deposed before?

A    Yes, it's been several years ago, yes, sir.

Q    Okay.  And what kind of case was that, sir?

A    Well, Lord, I don't remember.  It's been so long.

Q    Was it a case against the sheriff's department?  Or is it another...

A    I -- I can't remember.  It's been so many years.

Q    Okay.

A    We've had some cases while I was the sheriff.  I was sheriff for two terms:  Eight years.

And then the rest of it was with the Georgia State Patrol and in a deputy back in the seventies.

Q    Now, you -- you -- you were sworn in and gave testimony in this case; is that true, sir?

A    Yes.

Q    Okay.  Now, and I do apologize.  My -- my phone is off, but it decides -- AT&T decides to make it ring.  And sometimes it makes a noise on my computer.  So I got my phone off.  It's supposed to be off, but AT&T doesn't like it when it's off.  So I apologize.

Now in the time that you were the -- the sheriff, your -- your job as the sheriff was as the

employer of all of the people who worked in the sheriff's department; is that a correct -- is that correct?

A   Yes, the ones that worked under me, yes.

Q   Yes.  And was there anybody in the sheriff's department that was not your employee?

A   No.

Q   Okay.  So everyone in the sheriff's department was your employee, as includes deputies and supervisors and captains, colonels, whatever -- whatever ranks you guys give in the Murray County Sheriff's Department office; is that correct?

A   Yes.

Q   And you're like Truman, the buck stopped right at your desk?

A   Yes, I'm the elected official:  The sheriff.

Q   Okay.  And you have the right to hire and fire anyone you want?

A   That's correct.

Q   And you -- you have the responsibility to train and supervise everyone under you?

A   Yes.

Q   And in -- and you're also the policymaker for the sheriff's department?

A    Well, that was done by myself and several of my employees when I took over as sheriff.  We kept the policy that was enacted then, and we updated it.

And, of course, it changes.  You update.  And I have like captains under me that helps draw the policy up and add and change it.

Q    But you were the one that gave the final okay on the policy?

A    Yes.

Q    Okay.  And I notice that several of the policies don't have your signature on it.  Does that make the policy less effective because it doesn't -- you haven't signed off on it?

A    No.  What we done on that was we updated them and put them on the computer, and then it just didn't have my signature on them.

Q    Okay.  And now you do the policy for all the -- the jail personnel; is that correct?  You did the policy -- you did the policy for all the jail personnel; is that correct?

A    Yes.

Q    And you did the policy for all the patrol personnel; is that correct?

A    Yes, we had the policy for the patrol side and for the detention center, yes, sir.

Q    And then what about for the administrator?  Did -- was there a policy for the administrator?

A    It falls under the policy, yes, which -- ever which department they're under.

Q    Okay.  And do you have a separate policy for internal investigation?

A    It falls under the patrol side.

Q    Patrol.  Okay.

So all -- all internal investigation, whether it's jail personnel, administrative personnel, or patrol, it's all under the patrol, the detectives in the patrol; is that correct?

A    Yes.

Q    Okay.  And, now, to what extent when an incident such as this happened, are you involved in reviewing the reports and the investigation?

A    I usually did not unless there was some extenuating circumstances.  It was viewed by the supervisors, like the sergeants and then up to the captains.

Q    Okay.  And what is the highest rank that would review any complaint by an inmate?

A    Well, my Chief Deputy would review most of the stuff, and then it would possibly come to me

if -- if needed be.

Q    All right.  And would you have a committee reviewing this, or would it be just you reviewing it after everybody else reviewed?

A    Usually the Chief Deputy and myself would review it.

Q    Okay.  And, now, you are aware being in the business almost 40 years, that there is quite a difference between an inmate and a detainee.  And what is your understanding the difference between those two:  Inmate and a detainee?

A    Detainee is when you detain the person maybe on the scene that you're trying to arrest.

The inmate is when they're actually in the facility and has been brought in and charged.

Q    Well, maybe I made myself unclear and I sometimes do that and I apologize.

When I'm talking about in the jail, you have two classes of people that are housed in the jail:  Inmates and detainees.  Did you know the difference between those two as they were housed in the jail?

MR. WAYMIRE:  Let me object to your -- I think --

MR. VILLANI:  Okay.  Say it again?

MR. WAYMIRE:  -- you may -- you may be using kind of legal terminology about pretrial detainees versus persons convicted.  That may be the distinction you're trying to make.

However, I think that as a matter of practice, anybody in the jail is a -- is an inmate.  Anybody -- well, anybody not working in the jail is an inmate, and they may be a detainee or they may be convicted.

MR. VILLANI:  Counsel, with all due respect, if you want to testify, I can have the court reporter swear you in.  I'm asking the sheriff if he knows in his -- in the jail the constitutional rights difference between an inmate and a detainee.

MR. WAYMIRE:  I'm telling you -- I'm telling you --

MR. VILLANI:  And it doesn't...

MR. WAYMIRE:  -- your question -- your question doesn't make a lot of sense.  That's what I'm telling you.  That's my objection.

MR. VILLANI:  Okay.

MR. WAYMIRE:  Because there is no such constitutional distinction.

A    (No response.)

BY MR. VILLANI:

Q   Well, do you -- do you -- do you in your mind as you sit here, sheriff -- and you don't know mind if I call you sheriff, do you?

A   No, that's fine.

Q   Okay.  And, sheriff, do you in your mind have a definition -- a difference in your mind as they were treated in the jail between an inmate who's been convicted and charged and now spending time in the jail because of a conviction or a detainee who's been a suspect and arrested and has not been convicted?  Is there a difference -- policy for each one?

A   Not to my knowledge.

Q   Okay.  So in your jail you have no -- there's no difference in policy for either one?

A   No, they're all treated basically the same when they're brought into the jail back there as a prisoner or a detainee or an inmate.  Or they're all -- you know, once you're processing them, the policy pretty well is -- was the same.

Q   Okay.  And, now, when you were sheriff, did you -- were you required to go through all the certification process as your deputies had gone through?

A    What?  I don't know what you're about here.

Q    Well, let me -- let me -- let me back up.

Are you POST searched?

A    Yes.

Q    Okay.  And during that POST certification, you went through training that's similar to other law enforcement officers?

A    Yes, I had -- Georgia law requires you to have a minimum of 20 hours of training every year.  I usually ended up with quite a bit more than that.

We had a policy for -- our supervisors got a minimum of 40 hours a year or more.

Q    Okay.  And when you talk about your going to classes for recertification, did you go through any class or recertification on Taser?

A    Yes.

Q    Okay.  And do you recall the first time that you were certified to be able to use the Taser?

A    No, I don't.  That would have been several years ago.  I don't know what year we started carrying the Tasers.

Q    Do you recall the requirement for a Taser policy that you -- you, yourself, had to be tased?

A    Yes.

Q    And do you recall being tased at that time?

A    Yes, I was.

Q    Okay.  And do you recall the circumstances on what you were tased?  The -- were they -- you were just in the middle of the room, and somebody came behind you and tased you?

Or were there people holding you up, and you were standing on a mat so you wouldn't hurt yourself?  How was it done?

A    Yes, we were standing on a mat, had two individual other employees holding you under the arms.

You had two options:  To either be shot with the Taser or the Taser would be clapped to you or taped to you, and then they would, you know, shoot you with the Taser.

Q    And would that be for a five-second duration or a one-second?

A    Yes, it was five seconds.

Q    Five seconds?  Okay.

And -- and the people that are holding you, did they wear gloves so they wouldn't get shocked?

A    Yes, it was where they would not get a

direct hit.

Q    And so they -- they -- they actually supported you so you wouldn't fall down and hurt yourself?

A    Correct.

Q    Okay.  Now, to your knowledge, was anyone holding and supporting Mr. Hensley when he was tased?

A    Not to my knowledge.

Q    Okay.  And, to your knowledge, did they have a mat or something soft under him so he wouldn't fall and hurt himself?

A    No, I'm -- I'm not familiar with that.

Q    Okay.  And, now, you are responsible as the head of the -- as the sheriff, for the health and safety of not only your employees but also for all of the inmates and detainees in the jail, all of those?

MR. WAYMIRE:  Object to form.

A    (No response.)

BY MR. VILLANI:

Q    You are responsible for the health and safety of all the people that are housed in your jail; is that correct?

MR. WAYMIRE:  Object to form:  Overbroad and vague.  You can answer.

THE WITNESS:  Yes, that's -- yes, I'm

responsible for that or was.

BY MR. VILLANI:

Q    Okay.  And the -- the thing that happened on the incident of October 26th, 2017, have you reviewed -- have you reviewed any of the records and the reports in that matter?

A    Yes, I went back and reviewed some of them, yes.

Q    And can you tell us today what you reviewed as far as the documents?

A    You're talking about the day of the incident?

Q    Yes.

A    Well, 9-1-1 had received a call of a suspicious vehicle on -- well, it was Ramsey Road.  Deputies responded.  And when the first deputy arrived...

Q    I'm sorry.  I'm sorry, sheriff.  I hate to interrupt you.  I just need to know what documents.  We'll go into what you were aware of about the incident.

A    Oh.

Q    The documents that you reviewed?

A    Oh, I just went over the -- the policies -- some of the policies of the jail:  The

Taser policy, the jail operation policy.

Q    Did you go over...

A    And the inspect reports, yes.

Q    And did you go over any of the testimony of the -- the deputy -- the personnel in the probation violation hearing and a trial?

A    I read my testimony, yes.

Q    Okay.  And, now, what about the -- Mr. Hensley's two Complaints?  Did you review those?

A    No, I have not.

Q    Okay.  And when you -- when you responded or answered for that, had you reviewed -- had you reviewed the Complaint before you answered it?

MR. WAYMIRE:  Well, his lawyers answered it on his behalf.

THE WITNESS:  Yes.

MR. VILLANI:  Yeah, but I'm asking him if he reviewed it before y'all answered it.

MR. WAYMIRE:  He wants to know whether the Complaint that was filed in federal court, whether you looked at that before it was -- before your lawyers filed an answer to it.  That's what he wants to know.

THE WITNESS:  Yes.

BY MR. VILLANI:

Q    Yes.  Okay.  And there was portions of the Complaint that mentioned the fact that Mr. Hensley was accusing you and your supervisor -- I guess Mr. Cherry -- of failure to train.  Do you remember that?

A    I don't remember it.

Q    Okay.  And what is your -- what is your responsibility as -- to ensure that your personnel under you are properly trained?  How do you -- how do you ensure that they're properly trained?

A    Well, the -- the captains under me, the captain over patrol, the captain over the jail and the captain over detectives, was all designated to handle all the training and make sure that everybody was trained.

Q    And did you have any responsibility of reviewing the training records or how they were conducted to training?

A    Yes, I could.  My Chief Deputy could. Chief Deputy usually checked all the -- the training records to make sure everything was up-to-date.

Q    So everyone -- everyone that was trained had somebody check over their training record to make sure it was done, other than the person that was training them?

A   Yes, and it had to be sent to the State of Georgia POST each -- each year to make sure that all officers were certified; and in the training, they had their hours.

Q   Now, are all your officers POST certified?

A   Yes.

Q   The ones that are on patrol?  The deputies are all POST certified?

A   Yes.

Q   And they had -- and you said supervisors had to do 40 hours a year of training?

A   Yes, that was just a department policy. A captain and above was required to get 20 -- 40 hours of training instead of 20.

Q   Okay.  And -- and you said you did a lot more than your 20 hours?

A   Yeah, I done the 40.  But most of the time with me going to school three times a year at sheriff's training, I ended up with quite a bit more than 40.

Q   Okay.  And you say you've been -- have you been the sheriff of Murray County for 37 years?

A   No, I've been the sheriff for eight years.

Q    Oh, eight years.

A    Eight years.

I was a state trooper for almost 27 and then a deputy sheriff in the seventies for, I think, 10.  So it totaled -- it totaled right at 47 years.

Q    Okay.  Wow!  God bless you.

I'm -- I'm hitting 30 years as an attorney after 25 years of teaching.  That's a long time to be working.

Now, when -- when you reviewed this incident, and there's -- and there's three separate incidents.  And what I'm going to refer to them as:  The arrest site, the Sally Port and the -- the shower.

And when I refer to those, is that -- are you understanding exactly what I'm talking about when I say the scene of the arrest, the Sally Port and the shower, Sheriff?

A    Yes, yes.

Q    Okay.  Now, you -- y'all have a policy on the use of force, and you also have a Taser policy; is that correct?

A    Yes.

Q    And on your policies for Taser and use of force, they have -- they're very specific guidelines

for the detectives and the officers -- I'm sorry --
for the officers and your -- and the supervisors; is
that correct?

    A   Yes.

    Q   And -- and when -- when they are required
to take the courses and the recertification for
Taser, these policies are -- are reimplemented, and
they're told that these policies are still in effect,
is that correct, when they take their
recertifications?

        MR. WAYMIRE:  Hold on.

        MR. VILLANI:  Let me rephrase the
  question.

        MR. WAYMIRE:  You refer to them?

    A   (No response.)

BY MR. VILLANI:

    Q   Let me rephrase the question.

        When your personnel are recertified in
Taser policy, are they also reminded of your policies
on your Taser policies for the jail and for the --
for patrol?

    A   Yes, they -- they are reminded that these
-- the policies is a -- this is a standard operating
procedure.  The policy is made to -- it's a
guideline.

Q    Yeah, I understand.  And -- and as a guideline, they are given parameters in which they can bust through the guideline; is that correct?

A    Yes.

Q    Okay.  And when -- when these parameters are set down, they're set down by you and maybe several other of your senior staff, and they are put into force to make sure that the sheriff's department is consistent throughout in the use of Tasers; is that correct?

A    Yes, a guideline for them to look at and to follow.  But there is certain situations that they may have to...

Q    Sure.  And I agree with you 100 percent that we're not standing in the shoes of the officer on the street.  All we can do is give them guidelines, and then it's up to the officers to follow those guidelines.

But the officer also has to protect his life, the life of any citizen around him and also the life of the suspect; is that correct?

A    That's correct.

Q    Okay.  So when an officer tases somebody, that's the next step -- the last step before using their weapon, their gun; is that correct?

A    That's possible, yes.

Q    Yeah.  And I know that you have -- the officers have Mace or -- or pepper spray.  But you can't use it at that time in the jail because I believe at that time there was somebody in the jail that was allergic to it?

A    That's correct.  They had an inmate that had some kind of breathing problem so they could not use the pepper spray at that time.

Q    Inside the jail, correct?

A    Correct.

Q    Yeah, but there was no restriction of using it outside the jail?

A    Now, that's up to the officer, the individual.

Q    I'm sorry?

A    That's up to the deputy.

Q    But there was no restrictions.  You said you can use pepper spray outside the jail, just...

A    No, no, that's -- that's up to them.

Q    Okay.  And so the thing is that they are -- when they go out on patrol, they have the baton, correct?

A    Yes.

Q    They have pepper spray, correct?

A   Yes.

Q   They have a Taser, correct?

A   Most of them does.  Not all of them.

Q   Okay.  And they have a side arm, correct?

A   Correct.

Q   Okay.  And they also have some training in use of physical force, like punching and kicking and elbow and, you know, hand-to-hand combat if they want to?

A   Yes.

Q   So when -- when they are approaching someone who's -- they -- they're about to arrest, are they trained to go through the steps of what should I do?  Should I lay hands on them?  Pepper-spray them?  Tase them?  And then kill them?

I mean, are there steps that -- are they trained in these steps to go through?

A   They have options gave to them.  But it's according to what the situation is, which situation they have to go to first.

Q   Okay.  Now, my grandfather once said that if you walk around with a sledgehammer in your hand, the only solution to your problem is to smash something.

And are you -- are your personnel trained

to use the least -- the least deadly or the least harmful solution to their problem first?

A    Yes.  But, again, that's their option of what they have to go to, you know.  We're not on the scene so we don't know.

Q    Yes.  Okay.  And so in -- in this situation, have you reviewed any of the videos in this situation?

A    I'm sorry.  I didn't hear you.

Q    Have you reviewed any of the videos?

A    Yes.

Q    The body cam?

Okay.  And the -- the videos that you were able to review, did you at any time see Mr. Hensley with any sort of weapon in his hand?

A    No, I didn't see a weapon.  You could see him putting his -- on the scene you could see him putting his hand out the window, but you couldn't tell what he was doing.

Q    Okay.  And it looked like he was shooting them the bird?

A    I really couldn't tell.

Q    Okay.  And but there was no weapon in his hand?

A    Not that I could tell.

Q   Okay.  And when the officers were on the scene at the arrest site, the first arrest site, there was three of your officers and an off-duty patrolman?

A   The off-duty Pickens County deputy.

Q   Yes.  Okay.  So there was four men there?

A   That's correct.

Q   Okay.  Now, can you -- if you remember, Sergeant Amos, do you know how tall and how -- how much he weighed?  How tall he was; how much he weighed approximately?

A   No, I don't.

Q   Was he a big man?  A small man?

A   Medium size.

Q   Okay.  And what about Newport -- Corporal Newport?  Is it Corporal Newport?

A   Corporal Newport?  He's -- he's tall and skinny.

Q   Okay.  And West?  What about LaDon West?

A   LaDon is -- he's medium size.

Q   Medium?  Okay.

And when you say medium, you're saying bigger or smaller than Mr. Hensley?  Or the same size as Mr. Hensley?

A   Probably a little bit more weight than

Mr. Hensley.

Q    Okay.  And, of course, your -- Mr. Webb you may not know.  But the video -- looking at the video, would you say he's -- he's about the same size as Mr. Hensley?

A    He's a small deputy, yes.

Q    A little smaller?  Yeah, okay.

So there -- there are four of them at the scene when Mr. Hensley was in the vehicle?

A    Yes.

Q    Okay.  And there's conflicting testimony as to what occurred.  And I was wondering if maybe you could answer a couple questions to your knowledge that you -- that you investigated or that you found out from your talking to the officers or your -- the people in your command.

It's my understanding that Sergeant Amos was just outside the driver's door between the two vehicles; is that correct?

A    Yes.

Q    And Sergeant West -- and I'm sorry -- was it patrolman or deputy -- Deputy Sheriff West and Corporal Newport were on the passenger side of the vehicle?

A    Yes, Newport was on the passenger side.

Q    Yeah.  And they were both there and shouting -- everybody was shouting commands at -- my understanding shouting commands at Mr. Hensley?

A    Yes.

Q    And Mr. Hensley was in the vehicle, and he refused to get out of the vehicle?

A    Yes, he had fled from the deputy around another vehicle and was attempting -- had the backup lights on attempting to try to leave in a motor vehicle, which is a deadly weapon.

Q    Yeah.  But the thing is, there was no -- no proof other than your deputy's supposition that he rammed another vehicle.  In fact, during the trial, the jury did not believe that either.

A    No, there was damage to the other vehicle.

Q    Yeah.  But don't forget now, the owner of that vehicle was for five months in jail.  So he couldn't tell whether somebody else rammed the vehicle.

There was no pictures taken of the vehicle, no forensics done on the vehicle to see the paint on Mr. Hensley's car matches whatever damage.

So there was nothing done.  There's no physical evidence that he rammed it other than your

deputy's supposition:  Well, it looked like he rammed it or rammed the vehicle or hit the tree.  So he -- he, himself, the deputy that was following him, didn't know.

MR. WAYMIRE:  Is there a question in here somewhere?

A    (No response.)

BY MR. VILLANI:

Q    Yeah, I'm asking him:  How did the sheriff know that he hit the vehicle when the deputy that was following it didn't even know?

A    That's -- that's what was told to me.

Q    Okay, that was told to you.

But so you're not -- you have no forensic -- there was no -- your detectives didn't go out or your -- your CIS or CID didn't go out and do a forensic on the vehicles, did they?

A    Not to my knowledge.  I don't know.

Q    And there's no pictures of the vehicles at all?

A    I don't remember.  I don't.

Q    Okay.  And -- and also the fact that you said that Mr. Hensley had a deadly weapon in his hand, his right front tire actually snapped off his vehicle, and his vehicle was sitting on his right

front tire.

A    That I don't know.  I just saw in the video is what I seen.

Q    Okay.  But your deputy testified that at -- and they didn't tell you that his right front tire was snapped off, and his vehicle was sitting on his right front tire?

A    They may have.  That's something I don't remember.

Q    You don't remember.  Okay.

And so now they're sitting -- they're -- they're -- they're standing on the outside of his vehicle, and they have -- Sergeant Amos has his -- a Taser in his hand.

And Newport and West have their service revolver, their guns, in their hands; is that correct?

A    Yes.

Q    Okay.  Now, let's back up a little bit. In your Taser policy, do you have a policy of that when an officer or anyone that is certified to use a Taser checks out the Taser, they must sign in and -- sign the Taser out?  Is that your policy?

MR. WAYMIRE:  Yes.  So you broke up in the middle of that question.

33

A    (No response.)

BY MR. VILLANI:

Q    Okay.  All right.  In your Taser policy, do you have any requirement that anyone who checks out a Taser must sign out on a sheet with the time they checked the Taser out and the Taser number?

A    When we first started issuing the Tasers, we didn't have enough, and they had to do that.  Then later on everybody was issued a Taser.

So I don't remember if they had to do that at that time and everybody had their own, or they had to check them out.

Q    Well, if -- if you in 2017 -- and we'll get -- we'll get to the exhibit -- but if I were to tell you that the exhibit showed a sign-in and sign-out at that time, October 26th, 2017, would you agree that that was your policy that because they weren't assigned a specific Taser, that they had to sign in and sign out those Tasers?

A    That's -- that's -- yeah, that's possible.  But then, like I said, at first we didn't have enough, and they did have to sign them out each shift.

Q    Yes.  Okay.  And what about the cartridges where -- where -- anyone able to go in and

grab a couple three cartridges, or did they have to also sign those out?

A   They should -- they were supposed to sign them out when -- when, of course.

Q   Okay.  Now, are the Tasers and the cartridges kept in a special area in -- in -- at the -- at the sheriff's department?

A   He froze again.

Q   I'm sorry?

MR. WAYMIRE:  You froze up again so please repeat it.

A   (No response.)

BY MR. VILLANI:

Q   Okay.  I'm sorry.  Are -- or at that time, October 2017, were the Tasers and the cartridges for those Tasers kept in a special location?

A   I think they were locked up, and a supervisor had the key to get them out of the evidence -- evidence rooms.

Q   Okay.  And so that when someone went in -- had to go in to get a Taser or extra cartridges, they had to be granted access to get into it by a supervisor?

A   Yes, should have, yes.

Q    And at that time was Sergeant Amos such a supervisor that had access to that room?

A    Yes.

Q    Okay.  And when they -- a cartridge was -- was signed out, was that cartridge if it was used, returned?

A    If it was used, they should have done a report on it.

Q    Okay.  Now, when those cartridges are used -- and I know that some cartridges are different so maybe you can -- and you would know the kind of Tasers that your sheriff's department used.  Did they shoot out any kind of confetti with markers on it?

'Cause some of the Tasers I know have laser sights, and some of them shoot out like a little confetti.  Like it'd show a trail, and the confetti has a little number on it which matches the cartridge number?

A    Some of them does.  Yes, it's according to what brand it is.

Q    Okay.  And did yours do that?

A    I'm not sure.

Q    Okay.  And were the -- were the cartridges and the Tasers made by -- I guess it's TASER International?

A    Yes, to my knowledge, that's the only ones we used.

Q    Okay.  And these -- now, what is the importance in your mind of having -- at that time when the officers weren't issued their own Taser, is to have the officers or whoever is using them, sign out the Taser?  What -- what is important in your mind for that?  Why is that important?

A    Well, to have a record to know who has the Taser and to keep up with them.

Q    Okay.  And -- and also on the cartridges, is that -- is that important to know who's using extra cartridges?

A    Yes.

Q    Okay.  Now, at the end of the shift or the end of the week, did you have anybody inventory the cartridges and Tasers?

A    That would have been up to the supervisor.  Captain Cherry was over that.  That would -- he was the one that would handle that.

Q    Okay.  And did you have a policy at how often they were inventoried?

A    I will have to look at my policy manual here.

Q    Okay.  And after an incident where at

least seven cartridges were deployed, would you think that that would heighten Mr. Cherry's or your responsibility to check out all of the lasers and cartridges to make sure that none were missing?

I think you froze up.  Hello?  Is Mamie there?

ZOOM HOST:  Yes, sir, I'm here.  It does look like they're frozen so I guess we can give them a second to see.

MR. VILLANI:  Yeah.  He looks very contemplative.  Is it -- I like him.  He's a nice gentleman.

ZOOM HOST:  Yeah, it looks like they got kicked off.  So we'll give them a second to come back in.

MR. VILLANI:  Okay.

ZOOM HOST:  I'll be watching for them. There he is.

MR. VILLANI:  Are you back?

MR. WAYMIRE:  Thank you very much.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  And I'm sorry.  Let me -- let me go -- go back to that question.

Were you aware that seven cartridges were

collected as evidence in this case that -- during the shower incident?

A    Yes, they -- they attempted seven times to tase him, and it was only like a couple of Tasers. They weren't successful in all of them.

Q    Yeah.  Well, you weren't there so you don't know if they were successful or not.  You're only -- only taking the word of your officers that were there at the time?

A    That -- that's correct, yes.

Q    Okay.  But there was -- to your knowledge, there was seven of them -- seven Taser cartridges that were collected?

A    Yes, I believe so.

Q    Now, in your policy it mentions specifically that the -- the prongs, the wires, the -- all of that's supposed to be collected together with the cartridges?

A    Yes.

Q    Put into evidence?  Was that done in this case?

A    I don't think all of it was done from what I understand.

Q    Okay.  And are you -- are you concerned that this was a violation of your own written policy?

A    Well, I don't -- I just -- I don't know what happened. I don't understand, no.

Q    Well, let's -- let's -- let's back up a little bit. Your policy are procedures and guidelines, correct?

A    Yes.

Q    And these procedures are to be followed except when an officer is presented with a situation that you or I or anybody in the world didn't think of? Something unique come up, and the officer has to use his training. And he may, quote unquote, violate the policy -- written policy because a unique situation came up. Would you agree with that?

A    Yes.

Q    Okay. Now, was there any threatening thing that was happening to the officers that they did not collect evidence correctly?

A    I was told that the evidence was collected. I don't know what happened to it. Sergeant Amos said he turned his in so I don't know.

Q    Okay. Wait, wait. I didn't hear after -- say that again?

A    I said: I was told that the evidence was collected. Now, what happened to it, I don't know.

Q    All right. And who is in charge of

retaining the evidence?

A    Captain Cherry.  That's...

Q    Captain Cherry?

A    Yes.

Q    And did he give you an explanation why all that evidence disappeared?

A    I don't remember.

MR. WAYMIRE:  Objection to the form of the question.  I don't know that there is a foundation that, quote, all the evidence disappeared or...

MR. VILLANI:  I said all that -- all of that evidence disappeared.

BY MR. VILLANI:

Q    All right, let -- let's go back.  Were each one of the cartridges placed in an evidence bag separately with the prongs and the wires and a report on that cartridge?

MR. WAYMIRE:  You -- you froze in the middle there, Mr. Villani, so...

MR. VILLANI:  I'm sorry.  Say it again?

MR. WAYMIRE:  You froze in the middle of that question.  I'm sorry.  It's a technology problem.

A    (No response.)

BY MR. VILLANI:

Q   All right.  All right.  Each one of those cartridges are supposed to be bagged separately in an evidence bag along with the prongs and the wires and along with the report of the use of that cartridge and who used it, when they used it and a report.

Was -- were those cartridges individually bagged and put into evidence as required by your own policy?

A   I can't answer that.  I don't remember.

Q   Then did you ever see any of those cartridges properly placed into evidence?

A   I did not, no.

Q   Do you know if they were?

A   No, I don't.

Q   Okay.  And do you think it would be important for you to know if the evidence was handled properly?

A   Well, I usually was told on situations like that.  But on this one, I don't know what happened.  I can't -- I can't answer it.

Q   No one told you where some of those cartridges went?

A   No, sir, I have no idea.

Q   And when you have a -- a Taser that's

deployed and either by trigger or contact, is there supposed to be a report made by that officer who deployed it either by trigger or drive stun -- drive base?

A    Yes, there was, yes.

Q    Okay.  And was there a report done by each officer?

A    I'm not familiar.

Q    So have you received any reports by any officer?

A    I couldn't tell you.  That was back in 2017.  I don't remember.

Q    Okay.  But -- but the thing is that you don't remember.  But when you were asked for those reports in the discovery, you said there were no reports?

MR. WAYMIRE:  Well, wait a minute.

A    (No response.)

BY MR. VILLANI:

Q    I'm sorry, I don't mean discovery.  I mean at trial you said that there was -- that you gave all the reports to Anna Johnson, Mr. Hensley's attorney during the criminal trial.

MR. WAYMIRE:  Are you talking about the criminal defense?

MR. VILLANI:  Criminal trial, yes, sir, criminal trial.  Yeah, yes.

MR. WAYMIRE:  All right.

THE WITNESS:  I don't remember.

BY MR. VILLANI:

Q    All right.  But you said you did look through your testimony at the criminal trial, didn't you?

A    Yes, I did.

Q    Okay.  And did you remember Ms. Johnson asking you questions about -- about the Tasers and about the cartridges and about the loss of reports and loss of cartridges and loss of Tasers?  Do you remember all that conversation between the two of you?

A    Some of it I do.  I'd have to refresh my memory with it.

Q    Okay.  We'll -- we'll go -- we'll go through that in a bit.  I just want to get some -- lay some groundwork.

So right as we sit here, you don't remember what evidence if anything was lost as it relates to this case?

A    Say it again?  I'm sorry.

Q    Okay.  As you sit here today, you do not

recall what evidence, if anything, was lost relevant to this case?

A    There was some, but I don't remember what it was.

Q    Okay.  And you don't have any reports or investigation into why those items were lost or misplaced?

A    You would have to check with Captain Cherry on that because he was the one that handles that part.

Q    Well, was there an internal investigation done on the loss of this evidence?

A    I can't remember.

Q    And if your records have an internal investigation, would you -- on the loss of these records, would you supply that to me?

A    If -- if we had one, yes.

MR. WAYMIRE:  Hold on.  We're not agreeing to provide any -- any evidence --

MR. VILLANI:  I'm sorry.  I can't hear you.

MR. WAYMIRE:  -- outside of...

MR. VILLANI:  I can't hear you.

MR. WAYMIRE:  We're not agreeing to provide any discovery outside of ordinary

discovery responses, and discovery is ending today -- or tomorrow so...

MR. VILLANI:  Yeah.  Well, we -- we asked for that and...

MR. WAYMIRE:  No, you didn't.  No, you didn't.

MR. VILLANI:  In -- in our discovery, sure, in our document requests we did and...

MR. WAYMIRE:  No, you didn't.

MR. VILLANI:  Okay.

MR. WAYMIRE:  You didn't send any document discovery requests.

MR. VILLANI:  Well, we'll go back.

BY MR. VILLANI:

Q    Now, is it important for you to make sure that each and every officer is following procedures when you were sheriff?

A    Yes.

Q    Okay.  So something like this occurrence, missing evidence, would be important to you?

A    Yes, it would.

Q    And it's for two reasons.  One, spoliation of evidence can be used against -- against the sheriff's department in a civil case such as this, correct?

A    Yes.

Q    And, also...

MR. WAYMIRE:  Again, that calls for a legal conclusion.

MR. VILLANI:  You're...

MR. WAYMIRE:  Yeah, I'm just going to object to the extent that calls for a legal conclusion.

MR. VILLANI:  Okay.  He answered it. He -- I'm sure he's aware of that.

A    (No response.)

BY MR. VILLANI:

Q    And, also, for retraining purposes; isn't that correct?  So this doesn't happen again?

A    Yes.

Q    Now, those officers that were involved with the, quote unquote, missing evidence, were they retrained?

A    Not from me.

Q    I'm sorry?

A    I'm not familiar.  Like I said, Captain Cherry handled the training.

Q    Okay.  Now, were they -- were they disciplined in any way?

A    And, again, I'm not familiar on that

because that was through -- Captain Cherry handled all the Taser training. I'm not familiar with what happened on that.

Q    Now, something that serious, would that be brought to your attention?

MR. WAYMIRE:  Something what serious?

MR. VILLANI:  The loss of evidence. Something -- loss of evidence is quite serious, would you agree?

THE WITNESS:  Yes.  To a certain extent, yes.

BY MR. VILLANI:

Q    Well, I don't know what you mean by a certain extent.  I mean, evidence in either a criminal case is -- or a civil case is -- is -- it's paramount.  Is that -- would you agree with that?

A    Well, the officers said they turned the evidence in to our evidence clerk.  But I don't know. I don't know what happened to it.

Q    Well, if -- if some -- if some officer is going to be accused or indicted for abuse of his authority, that evidence is critical to that officer's defense.

MR. WAYMIRE:  What evidence are you talking about?

A      (No response.)

BY MR. VILLANI:

Q    Well, the -- the cartridges, the loss of the cartridges to show what was -- cartridge was used when, how it was used, how long -- how many times it was reenergized.

Is that not important to an officer's safety and -- and the safety of the public?  Don't you -- don't you -- wouldn't you agree to have exact information so you can tell your officers how you should never do this again?

Or if the District Attorney comes behind and says, "I'm going to indict your officer because this man complained that they tased him 10 times," you've got no proof.

That's what I'm saying.  Is it -- isn't that loss of evidence concern to you?

MR. WAYMIRE:  Objection:  Compound.  Go ahead and answer the last question that he asked.

MR. VILLANI:  Okay.  Well, I'm going to ask it again.

A      (No response.)

BY MR. VILLANI:

Q    Is -- is that -- is any loss of evidence of concern to you?

A    Yes.

Q    Okay.  And do you think that loss of evidence should be -- should have been brought to your attention?

A    It probably should have, yes.

Q    Okay.  And -- and do you believe that your officers are trained that something that serious has to be brought to your attention?

A    Again -- again, like I said, Captain Cherry is the training officer.  He handled all the training.  And, you know...

Q    Okay.  I don't mean to interrupt you, but this has nothing to do with training.  This has to do with evidence.  Okay?

There -- there's a certain way to handle evidence in -- in the sheriff's department; is that correct?

A    Yes.

Q    And the evidence has to be preserved and bagged, identified and placed in the evidence room; is that correct?

A    Yes.

Q    And if that evidence goes missing, you as sheriff want to know why it goes missing?

A    Yes.  If it's brought to my attention,

yes.

Q    Yeah.  But if it's not brought to your attention, that's a failure of somebody down the chain?

A    Yes, I guess it would be.

Q    Okay.  And did you -- now that -- when you became aware of that, did you do an investigation to see where down the chain did this -- this thing snafu?  Where did it -- where did it mess up?  Did you ever do an investigation like that?

A    I don't know if there was one or not.

Q    I mean, but you personally?

A    Oh, no, I did not.

Q    Did you ask one to be done?

A    Not that I remember.

Q    Okay.  And if you had asked one to be done, you would have been able to testify to that at Mr. Hensley's trial?

A    Yes.

Q    And when your officers violate policy, is there a procedure to discipline them?

A    It's according.

Q    I'm sorry?

A    It would be according if the violation was necessary or something that they had to do

because.

Q    Okay.  And is -- is handling -- again, handling of the evidence is important.  So if they mishandled evidence, is that a reason to have them disciplined?

A    Again, like I said, that would be up to the training officer.

Q    Okay.  And would you have any input into that since you're the head of the sheriff's department?

A    If it was brought to my attention.

Q    I'm sorry?

A    If it was brought to my attention.

Q    Okay.  So would you want these type of incidents brought to your attention?

A    Yes, I would like to have known.

Q    Yes.  And the failure to bring this, did you ever find out where the training broke down?

A    No, I don't remember.

Q    And I know this three years ago, a little over three years ago.  But you don't recall making a big deal at a loss of the evidence?

A    I -- I don't remember.

Q    Okay.  And you don't recall sending a memo around to everything:  This better not happen or

heads are going to roll?

A    I don't know.  That's been quite a while back.

Q    And in this -- in your -- in your policy, do you have a specific policy on evidence?

A    We do.

Q    And in that...

A    Or did.

Q    Well, you did, yeah.

And in that evidence policy, was everyone in the -- under your command, were they trained on that policy?

A    Yes, that would have been through Captain Cherry.

Q    I'm sorry?

A    That'd been through Captain Cherry.  He was the training officer.

Q    Okay.  And did they have refresher courses?  All the people under your command, did they have refresher courses?

A    Yes, they had training every year.  Like I said, they had to have so many hours every year.

Q    Okay.  And what about the officers on the patrol?  Did they have like where they have to take twelve hours a year?  How many were they required to

take a year?

    A    Twenty hours training.

    Q    Twenty hours.  Okay.

    A    POST certification.

    Q    Okay.  And part of that 20 hours, did that include Taser?

    A    Yes.

    Q    Taser certification?

    A    Yes, every year.

    Q    Okay.  Every year they had to be recertified for Taser?

    A    Yes.

    Q    And is there anything else that they had to be recertified for every year?

    A    They had deadly force, de-escalation. There were several that was required in the 20 hours that were mandatory.  Firearms training.

    Q    I'm sorry.  One more.  Deadly force, de-escalation?

    A    Firearms training.

    Q    Firearms.

    A    And -- and it's probably several more. Like I said, that -- that would be a question you'd have to ask Captain Cherry 'cause he handled all the training.

Q    Okay.  And then part of the de-escalation training, was that training the officers that:  Here is the first step that you have to do if verbal commands don't work?

A    That would be -- like I said, you're asking questions that I'm -- I'm not a training officer; that you're going to have to talk to Captain Cherry, which is the training officer.

Q    Yeah, but you were in control, and -- and you wrote -- you wrote the policies.  And the policies were over your signature even though your name appears on the policy.

So de-escalation, you would want somebody -- like my grandfather said -- not go around with a sledgehammer and smash everything.  You want him to go:  Hey, talk to the person first, try to calm them down.  Is that correct?

A    If that's necessary.  It might escalate total right opposite.  You might have to go to --

Q    Sure.

A    -- excessive force.

Q    And -- and -- and maybe the second step if they're not listening to talk, was to lay hands on them if that's possible?

A    Yes.

Q    Okay.  And then if laying hands on them -- they have -- out in the field they have a baton, which can hurt like heck.  Then they have the pepper spray.  Is that...

A    Yes.

Q    Okay.  So before they get to the Taser, this de-escalation policy should have kicked in?

A    And again, like I said, it's just according to what the situation is.  They may not started to talking.  They may have walked up and have to draw their gun right off the bat.

Q    Okay.  So you're sitting -- the person is sitting in a -- in a vehicle.  The vehicle is disabled, can't move.  The person doesn't appear to have a weapon in his hand.

Yet, while his back was turned, the Sergeant Amos, he was tased [sic].  Can you explain that?  Is that part of your policy?

MR. WAYMIRE:  Objection:  Misstates evidence.  You can answer to the best of...

A    (No response.)

BY MR. VILLANI:

Q    Well, did -- did -- to your knowledge, did Sergeant Amos tase Mr. Hensley?

A    From watching the video and -- yes, but

56

you've got to...

Q   All right.  You can see the...

MR. WAYMIRE:  Hold on.  You cut him off. You need to let him answer.

MR. VILLANI:  Oh, I'm sorry.  It sounded like he stopped.

MR. WAYMIRE:  You need to let him finish his answer.

THE WITNESS:  No, when the deputy gets out of car, the first deputy gets out of the car, he's got it in reverse and he's revving it up.  At this time it's like a deadly weapon.  So, you know, he's got his firearm drawn.

The situation is not a normal situation. It's -- you've got a person in a vehicle that's got a deadly weapon trying to back up towards you. You got several officers coming up to him.  And then when they do tase him, you can tell that he's geeking out on drugs so...

BY MR. VILLANI:

Q   Well, wait.  I -- no, I object.

MR. WAYMIRE:  You can't cut him off.

MR. VILLANI:  That's nonresponse -- that's nonresponsive.  Certify.  No, it's nonresponsive.  This is my deposition.  That's

nonresponsive.  He's going into...

MR. WAYMIRE:  Fine.  You need to let him answer the question and then offer your objection.

MR. VILLANI:  He's not answering my question.  He's answering your question.

BY MR. VILLANI:

Q    My question was, "Did Sergeant Amos tase Mr. Hensley," and then all the -- all the information that I didn't ask for.

MR. WAYMIRE:  Fine.  You need to let him finish, and then you can make your objection.  But you can't interrupt him in the middle of his answer.

MR. VILLANI:  It was nonresponsive.  But I'm asking that that be stricken.  This is going to be stricken for a nonresponsive answer.

MR. WAYMIRE:  Duly noted.  Duly noted.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  Again, Sheriff, and I don't mean to be loud.  That's my Yankee nature.

Did Sergeant Amos tase Mr. Hensley at the -- at the arrest scene?

A    Yes, he did.

Q    Okay.  And was Sergeant Amos at the

driver's side of Mr. Hensley's vehicle?

A    Yes.

Q    And was officer -- let's -- let's call them West and Newport.  Were they on the passenger side of the vehicle?

A    Yes.

Q    Okay.  And as part of the testimony of these officers, Mr. Hensley's attention was -- Mr. Hensley's attention was directed at them; is that correct?

MR. WAYMIRE:  At who?

MR. VILLANI:  I'm sorry?

MR. WAYMIRE:  At who?  Them?  You said them.

A    (No response.)

BY MR. VILLANI:

Q    Oh, at the -- West and Newport.  Both those officers testified that Mr. Hensley was looking at them when he was tased; is that -- is that correct?

A    I believe so.

Q    Okay.  So Mr. Hensley did not see the officer -- Sergeant Amos fire his Taser?

A    That I wouldn't know.  I -- I wasn't on the scene.

Q    Okay.  And do you know where the prongs struck Mr. Hensley when Sergeant Amos fired?

A    No, sir, I don't -- I don't remember.

Q    Okay.  Now, did you -- are you aware that Sergeant Amos said that he fired the Taser and hit Mr. Hensley in the chest?

A    Seemed like that's what he testified.

Q    And isn't it against Taser policy to fire anywhere -- a Taser anywhere near the heart and chest area?

A    It is recommended, but it's according to what the situation is.  Sometimes that may be the only place that you can tase a person.

Q    Okay.  And when Mr. Hensley was tased, did you notice that the vehicle almost jumped off its -- off the ground?

A    I don't remember that, no.

Q    Did you look at the video?

A    I did.

Q    And did you -- did you see that vehicle jump up and down like it was hit with an earthquake?

A    I -- I didn't pay attention.  I was just watching them fight him.

Q    Well, no, but did you see when -- you said you saw when he was tased?

A     Well, from the body camera, you can't hardly see.  You know that he tased him.

Q     Well, what about from the -- the dashcam?

A     Yeah, you can see him -- Sergeant Amos. And but, like I said, I was looking at them arresting him, him resisting arrest.

Q     Okay.

A     I wasn't paying any attention to the vehicle.

Q     Okay.  Well, when -- when you -- when you see the three of them outside the vehicle, right now he's not resisting arrest.  He's not -- you cannot see him doing anything from the dashcam, can you?

MR. WAYMIRE:  Which dashcam?

MR. VILLANI:  Well, the -- either Newport's or West's dashcam.  You cannot see inside the vehicle?

MR. WAYMIRE:  I'll just tell you, he's only seen West's dashcam and West's body cam. That's all he's seen.

THE WITNESS:  Yeah, that's the only one I've watched.

BY MR. VILLANI:

Q     Yeah, okay.  Well, West's -- West's dashcam you cannot see inside the vehicle?

A    No, not the dashcam.

Q    Okay.  And then when West's dashcam is running, you see the three of them outside the vehicle:  Amos on the driver's side, West and Newport on the passenger side?

A    Yes.

Q    And when they're ready to open the door, you see that vehicle jump very distinguished.  I mean, you couldn't miss it unless you were blind.

A    I really didn't pay that much attention.

Q    Okay.  Well, it's -- it's in the dashcam. And then in the dashcam you'll also see them dragging Mr. Hensley out.

A    Yes.

Q    Okay.  And he's been stunned?

A    Correct.

Q    And he's laying on the floorboard?

A    And they're trying to get him out of the car.

Q    Right.  And you can see his face?

A    Yes, you can see his face.

Q    And his face is like someone who was just stunned with a Taser?

A    Well, to me it looks like he's high on something, geeking out.

Q    Okay.  And -- and -- and you say that on your medical training?

A    My years of dealing with people.

Q    I'm sorry?

A    My years of dealing with arresting people that's on drugs and resisting arrest.

Q    Okay.  So you're saying that Mr. Hensley was on drugs?

A    I said he appeared to be.

Q    Oh, appeared to be.  But he also appeared to be stunned and injured by the Taser.  That's an alternative scenario, would you agree?

A    I don't know.

Q    Well, how could you be so certain that he was on drugs and not certain that his reaction was due to the Taser?

A    Well, again, like I said, just the way he looked to me.

Q    Okay.  But he could also -- could also be -- I mean, you're not 100-percent certain, are you, that he's on drugs?

A    No, absolutely not.

Q    So that he could have been -- it could have been the Taser that caused him to act like that, correct?

63

A    Correct.  He still resisted arrest,
though.

Q    But you -- the Taser could have caused
him to look like that, correct?

A    It's possible.

Q    Okay.  So -- and I hate to jump forward
on this, but let's jump forward to the fact that --
your suspicion that he's on drugs.

Okay.  Did you have him do a urine test,
a blood test, or a breath test to check that he was
DUI on drugs or some sort of alcohol or something?

A    I'm not familiar if they did.

Q    Okay.  And would it -- would it surprise
you that there were no drug tests done on
Mr. Hensley?  There's nothing in the record to show
that any drug test was done on Mr. Hensley.

A    I'm not familiar.  I don't know what --
whether they did or they didn't.

Q    Well, wouldn't -- wouldn't that be
important for you to -- to bolster your -- your
personnel's allegation that Mr. Hensley was on PCP,
angel dust, whatever you call it, crank, whatever --
whatever code name you want to use for it?  Wouldn't
that be important to you to make sure that your
officers are correct?

A   Well, that's -- again, that's up to the officer discretion on that.

Q   Yeah, but they're under your control. Don't -- don't you -- I mean, each officer is not an island unto himself.  He's part of a department.  Is it every officer answers to you, sir?

A   Well, they answer through chain of command.

Q   I'm sorry?

A   They answer through chain of command. They don't answer directly to me.  They answer to their supervisors up.

Q   But they go through you.  Wouldn't -- wouldn't it be important for you to say:  Hey, look, I want to prove that this man was high on drugs because coming down the pike I can see lawsuits sitting out -- out -- out there.  He's going to file a lawsuit against us.

Let's -- let's prove that he was on drugs.  Wouldn't that be important?

A   Well, and again, like I said, that's -- that's up to the captains and the chain of command, the officer.

Q   When someone is arrested on suspicion of using drugs, is it normal procedure to do a drug

test?

A    If they're going to be charging on some driving under the influence of alcohol or drugs, it is.

Q    Well, Mr. Hensley was accused of doing that.  He wasn't a given a citation or a formal accusation, but that's what the testimony of the officer was.  He was driving crazy and he smashed into another car and he smashed into a tree and he was revving back and forth and he was high.  That's what the...

MR. WAYMIRE:  Objection.  Objection.  There's no officer that said he was high and so forth.  I think that...

MR. VILLANI:  That he was on drugs.  He was on -- he was on drugs.

MR. WAYMIRE:  Yes.  So Mr. Hensley is quoted as saying he was on angel dust.  Is that what you mean?

MR. VILLANI:  Yes.

MR. WAYMIRE:  All right.

MR. VILLANI:  And then that's -- and then that's what they're saying.  He -- he was saying:  I'm on angel dust.

MR. WAYMIRE:  All right.  But he wasn't

charged with DUI, right?

MR. VILLANI:  No.

MR. WAYMIRE:  Oh, okay.  Just to make sure we got our facts straight here.  Basically what's your question?

A    (No response.)

BY MR. VILLANI:

Q    So Mr. Hensley, according to your officers, said he was on -- high on angel dust or -- or PCP or whatever you want to call it -- dust or midnight glory or whatever street name they use for it; is that correct?

A    He made that statement.

Q    Yeah.  Is that correct?  Your officers said he made that statement?

A    That's what the report says, yes.

Q    Yeah, they -- they said it?

A    Well...

Q    All right.  And you weren't there?

A    No.

Q    Okay.  And -- and as an officer and -- of long experience, wouldn't you want to have proof of what your officers had told you?  Say:  Hey, look, if he said this, let's make sure we get a drug test so he can't come back and say:  I never said that.

A    Well, again, like I said, that's --
that's up to the officers and their discretion.

Q    Okay.  So that's -- that's another
failure on their part for not backing up their
officers.  Would you agree that's a failure on their
part to have not had a drug test done?

A    Not necessarily.  Again, like I said,
that's -- that's a discretion of them.

Q    Well, the basis of your defense and your
department's defense of Mr. -- using Mr. -- and
beating the living daylights out of Mr. Hensley, is
that he was -- he was high on angel dust and they had
to control him.

MR. WAYMIRE:  Objection:  Argumentative,
and it misstates the basis of our defense.

A    (No response.)

BY MR. VILLANI:

Q    The basis of your defense is that he was
resisting arrest; is that correct?

MR. WAYMIRE:  To which claim?  I mean,
there are various defenses, and I'm not going to
debate them here.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  The reason why your officers claim

they used the Tasers or they were forced to use the Tasers, 'cause he was resisting arrest, correct?

MR. WAYMIRE:  You're talking about the arrest scene now, right?

MR. VILLANI:  Yes.

MR. WAYMIRE:  Okay.  He wants to know if you know why the officers said that they used the Tasers on Mr. Hensley.

THE WITNESS:  Yes, because he was -- it's obvious from the video he was resisting arrest.

BY MR. VILLANI:

Q    Well, when he was tased, you couldn't see him in the video.

A    No.

Q    Okay.  But you didn't -- there was no -- no visual proof that he was resisting arrest?

A    When they were attempting to get him out of the car, there was a -- a visual.

Q    I'm telling before he was tased.

A    And, again, like I told you a while ago, too, is:  He had a deadly weapon, which is a vehicle in reverse, trying to come back towards a patrol car, deputies on the scene.

Q    Well, the thing is that he did not physically have anything in his hand, No. 1.

Number 2, his vehicle is disabled.  He couldn't move it anywhere.

A   They didn't know that.

Q   Sure they did.  They were standing on the side of his car, and they saw his -- his front wheel broken and his car sitting on top of his front wheel.  That car wasn't going anywhere.

MR. WAYMIRE:  Objection.  That misstates the record.  There's no testimony like that.

MR. VILLANI:  There was a testimony, and we'll -- we'll get to that.

MR. WAYMIRE:  All right.  Well, you can cite it and tell us about it if you want.

MR. VILLANI:  No.

A   (No response.)

BY MR. VILLANI:

Q   And is there any allegation that at the scene of the arrest that Mr. Hensley was high on angel dust or any form of drug?

A   I don't know.

Q   Okay.  And if there is such an allegation, would it be important to you as the sheriff to have that verified?

A   Yes, I would -- I -- you know, I'd like to know.

Q   Okay.  And the way we verify it is not vertical or horizontal with watch the eyes vertical or horizontal or -- or walk and turns.  That -- that was impossible at the scene, correct?

A   Yes, I would think so.

Q   Yeah, you couldn't do a -- the -- the roadside, the walk and turn, the lift your leg, you know, whatever test that they do for DUI.  He couldn't do it because of the situation; is that correct?

A   Yes.

Q   So the only way to test Mr. Hensley is to get him to voluntarily pee into a cup or do a breathalyzer, which wouldn't show drugs.  It would only show alcohol.  Or take his blood; is that correct?

A   Yes, that'd be correct.

Q   Okay.  Now, if -- if he refused to give his blood, it would have been quite easy for you to go to the magistrate and get a warrant to get his blood; is that correct?

A   Yes, you could do that.

Q   Okay.  Did anyone to your knowledge get a warrant to get Mr. Hensley's blood?

A   Not to my knowledge, no.

Q    Okay.  So that's another failure in --
in -- in this -- in -- in the system.  They did not
check to see if Mr. Hensley actually was high on
drugs; is that correct?

A    And, again, like I said, I -- I don't
know.  That's the officer's discretion on the cases
on that.

Q    Okay.  And -- and in Mr. Hensley's
indictment, was he indicted for being high on angel
dust?

A    Not that I know of.

Q    And was he indicted for possession of
drugs?

A    Not to my knowledge, no.

Q    Okay.  And the District Attorney's office
if they indicted Mr. Hensley, they would have -- they
indicted him for all the charges that you and your
officers brought against him; is that correct?

A    To my knowledge, yes.

Q    Okay.  And nowhere in any of those
charges are that he was driving under the influence
of alcohol or drugs?

A    Correct, not that I know of.

Q    Okay.  And nowhere in there is there less
safe in -- in -- in the indictment -- less safe to

drive?

A    No.

Q    And nowhere in there is possession of drugs?

A    Not that I know of, no.

Q    And nowhere in there was there a being intoxicated with drugs?

A    Not that I know of, no.

Q    Okay.  So all this -- all this hearsay about angel dust really depends on the truthfulness or the -- how would I put it -- the -- the motive behind your officers saying that he was -- said that he was high on angel dust?

MR. WAYMIRE:  Objection:  Argumentative, and you're -- you're just asking him to what: Make a legal argument or evaluate the credibility of other witnesses?

A    (No response.)

BY MR. VILLANI:

Q    No, I'm asking him that the -- the only, quote unquote, evidence we have that Mr. Hensley was on any kind of drug, angel dust, PCP, is the word of your officers, correct?

A    And his actions.

Q    I'm sorry?

A    His actions.  The way he resisted arrest. He admitted to being on the drugs.

Q    But it's only the words of your officers that he admitted being on drugs or your personnel, the nurse and any other officers, that -- that said that they heard him say that he's on angel dust?

A    Yes, that -- I think they all testified, yes.

Q    Yeah.  And it's on their word on how he was acting inside his vehicle, correct?  'Cause you couldn't see how he was acting inside his vehicle?

A    Correct.

Q    Okay.  And when they got him onto the ground, there is no videotape.  Sergeant Amos's body cam isn't in there.  Newport's body cam is not in -- in -- in evidence.  And there's nothing in there to show what was going on when -- after he's pulled out of the truck.

MR. WAYMIRE:  Objection.  I think you are mischaracterizing the record.  There is no body cam from Newport.  There is no body cam from Amos.

And the body cam that exists does show him being pulled from the truck.  So you're mischaracterizing the record.

A    (No response.)

BY MR. VILLANI:

Q    No, I'm not saying there's nothing that shows him being pulled from the truck.

I'm saying there's nothing to show what was going on once he was pulled from the truck.

MR. WAYMIRE:  Yes, there is.  I think you haven't watched the video.

MR. VILLANI:  Okay.  The video that I couldn't operate?

MR. WAYMIRE:  I don't know.  I don't know what you looked at or what you could or couldn't operate.  But there is video of him being pulled from the truck.

MR. VILLANI:  Okay.  Well, I would ask you to put those three videos into evidence then because I couldn't open them up.  And I would ask you because I couldn't see them, I couldn't -- I couldn't look at them, maybe the court reporter can play them.

MR. WAYMIRE:  Are you asking me to -- you're asking me to play them?

MR. VILLANI:  No, I'm asking -- I'm asking you to give them to the court reporter so she can play them.

MR. WAYMIRE:  I mean, I sent you a video

link.  They're large videos.

MR. VILLANI:  I couldn't -- I could not -- I could not open those videos, and I told you that for two weeks.

MR. WAYMIRE:  Yeah, all right.  Well, I don't know what -- what you have in mind.  I can send the link to the -- to the court reporter if you want me to do that.

MR. VILLANI:  If you could, I would appreciate it.  And then -- and then when we take a break, the court reporter can -- and Mamie could see if they can play them.

If not, we'll just put them into evidence, and maybe -- maybe the Judge will have a computer that can play them.

MR. WAYMIRE:  Okay.  So do you want to take a break right now?  Or do you want to keep going?  Or what do you want to do?

MR. VILLANI:  Well, I -- yeah, sheriff, I'm sorry.  I forgot to tell you that whenever you need a break, let me know.  Just -- just do me one favor.  Don't take a break until you answer the question I just asked.

So you -- are you ready for a break?  I know I might be ready.  I think I had too much

coffee this morning.

THE WITNESS:  That's fine, yeah.

MR. VILLANI:  Counsel, how long do you think it will take you to upload that?

MR. WAYMIRE:  It's not an up -- I mean, it's already uploaded.  I just sent a link to the court reporter.

MR. VILLANI:  Okay.  And then, madame, you're going to send it to Ms. Traynor and to Mamie?

MR. WAYMIRE:  I only have...

MR. VILLANI:  Then maybe she'll send it to Ms. Traynor.

ZOOM HOST:  Right, y'all can just send it to me, Jason, yes, sir.

MR. VILLANI:  Okay.  And then -- and then you're going to see that you can play them, and we'll back in 15 minutes.  Would 15 minutes be enough for you, ma'am?

MR. WAYMIRE:  It's enough for me.  So 10:45?

MR. VILLANI:  Okay.  10:45?  Sheriff, are you okay with that?

THE WITNESS:  Yes, I'm fine.

MR. VILLANI:  All right.  Thank you very

much, and I'm just going to click off.  Thank you very much.

(Brief recess.)

MR. VILLANI:  Have any -- any luck with those videos?

ZOOM HOST:  Yes, sir.  Hold on one second.  I was able to download them, and I just opened the first one to see if it would play and it did play.  So just let me know which one you want me to try to...

MR. VILLANI:  I don't know which one is the first, second or third.

ZOOM HOST:  Okay.  Let me see.  Let me see if I can tell you what I've got here.  Hold on.

MR. VILLANI:  Is this video title -- I really appreciate you doing this.  Thank you.

ZOOM HOST:  Okay.  I see -- oh, I'm sorry.  I didn't mean to interrupt.  West Body Cam One.  West Body Cam Two.  West Dashcam One.  And West Dashcam Two.

MR. VILLANI:  Okay.  So you're got four videos?

ZOOM HOST:  Yes, sir.

MR. VILLANI:  Okay.  Can we start with

West Dashcam One?

ZOOM HOST:  West Dashcam One.  Okay.

BY MR. VILLANI:

Q    And, sheriff, I'll let you know.  These are -- these are going to be the first time I'm seeing these so I don't know if you've seen these yourself already.

(Discussion off the record.)

A    (No response.)

BY MR. VILLANI:

Q    Okay.  We're going to play Dashcam One, and we're going to call it, I guess, Video One.

ZOOM HOST:  Okay.  I'm about to share screen now.

MR. VILLANI:  All right, fantastic.

ZOOM HOST:  Can y'all see that?

MR. VILLANI:  Oh, fantastic.

ZOOM HOST:  Okay.

A    (No response.)

BY MR. VILLANI:

Q    It appears that this is 1845 at 10-26-17, and this is Officer West's dashcam.

(Video 1, West Dashcam One, played.)

Can we stop it there for a second, please?

Okay.  Sheriff, does that appear to you to be

at the scene where the call came in about Mr. Hensley going through somebody's garbage in their truck?

A    Yes, I think he had backed out of the driveway.

Q    Okay.  And so he's sitting in the road right there right now?

A    Correct.

Q    Okay.  You can proceed.

(Video 1, West Dashcam One, played.)
Can we stop it there?  Is there any way to back it up slightly?  I just want to get to the point where Mr. Hensley's truck comes into view.  You have to back it up.  Okay.

Okay.  They lost sight of it there.  Back in view there.  Lost sight of it there.  Okay.

And if you stop it right there, sheriff, do you notice that there's a blue pickup truck to the left of Mr. Hensley's white pickup truck?

A    Yes.

Q    Okay.  And there's quite a bit of space between them, would you agree?

A    Well, I -- I can't tell.  No, what's sitting there you can't tell.

Q    All right.  Let's move it a little bit slower.  A little more.  No, that's a little too far.

Okay.  There it's -- there, just -- just continue it until I tell you when to stop.

(Video 1, West Dashcam One, played.)

Would you agree, sheriff, that that's a kind of bumpy road?

A    Yes, it's a dirt driveway.

Q    Okay.  And is that Officer -- I mean, Mr. West?

A    Yeah, Deputy West, yes.

Q    Okay.  And he's got his weapon drawn.  It's drawn?

A    Yes.

Q    Okay.  And he's walking.  He's standing beside the blue van?

A    Behind the blue pickup?

Q    I mean, blue pickup truck.  I'm sorry.

And you cannot see inside of Mr. Hensley's vehicle?

A    No, not from this angle.

Q    Okay.  And stop it right there.

Do you recognize that officer that just pulled up?  Is that...

A    That's Corporal Newport.

Q    Corporal Newport.  Okay.  Continue it, ma'am.

(Video 1, West Dashcam One, played.)

Hold it right there.  So it looks like -- hold it right there.  It looks like Corporal Newport ran to the right front of Mr. Hensley's pickup truck; is that correct?

          A     Yes.

          Q     And he also has his service revolver or weapon drawn?

          A     That's correct.

          Q     Okay.  Can you run it down, ma'am?

                (Video 1, West Dashcam One, played.)

And he's got the door open now, and -- and there -- hold it, stop there for a second.  Can you go back? Just go back a couple -- couple more frames before he opens his door.

          Okay.  Let him go around.  And I want you to -- hold it.  Stop it for a second.  I want you to pay attention right in front of Officer West.  You can barely see Sergeant Amos coming in -- into the scene.

          Okay.  So you're going to see officer -- I mean, Corporal Newport open the door.  And when he opens the door and starts -- puts his recover into the cab, then you see the truck jump.  I want you to notice that.  Go ahead.  Go up to where the truck jumps.

(Video 1, West Dashcam One, played.) He's got his revolver.  Opens the door, and you barely see -- boom.

A    He took it out of reverse.  His backup lights came off.

Q    I'm sorry?

A    He took it out of reverse and the backup lights came off and it jumped:  The truck.

Q    Yes, okay.  I just wanted -- I just wanted you to see that.  Okay.  All right.  Go ahead, you can go forward.

(Video 1, West Dashcam One, played.) So now this -- it has two officers with the door open on the side.  And it looks like Sergeant West has his hand inside the driver's window open.  And here comes Mr. Webb coming down to talk to West.

And -- and then now he's leaning over, and they're dragging him out after he was tased.  And that's Officer Amos is coming behind -- coming around.  He's taking the cartridge out, and he -- can you back up a little bit?  I just want to -- I want to get to Sergeant Amos coming around the back of the cab.  I just noticed something.

MR. WAYMIRE:  Wait for him to ask you a question.  Don't say anything.

A      (No response.)

BY MR. VILLANI:

Q      Yeah, I'm sorry.  I just wanted you to pay particular attention of Sergeant Amos walking around the back of the vehicle.  All right?  Watch him there.  Watch him there.  Right there.  Did you see that?

MR. WAYMIRE:  See what?

A      (No response.)

BY MR. VILLANI:

Q      Are you watching?  Did you see him toss something into the back of the pickup truck?

A      I -- I didn't pay attention.

Q      Let's back it up again and do that again. Is there -- ma'am, is there any way to do that slow motion or...

ZOOM HOST:  I don't think so.

A      (No response.)

BY MR. VILLANI:

Q      Okay.  Well, let's look at it again.  And on the right back corner it looks like his right hand comes in or right -- no, and he tosses something into the back of the pickup truck.

(Video 1, West Dashcam One, played.)

He's coming there.  He's got two things in his hand,

and it looks like he just threw it.  Did you see that?  It just looked like threw a Taser in the back of the truck.

A    I don't know.  I couldn't -- couldn't tell.  I don't know.

Q    Well, he had the Taser in his right hand. And then when he threw it in the back of the truck, his right hand came out again, and there was nothing in his hand.

Can we just go back and see if we can stop it right in the middle of the back of the truck.

(Video 1, West Dashcam One, played.) And that's Webb coming around, helping them pull him out.  So there's three of them pulling him out right now.  And you can see the officers.  You can see them pulling him out.  Okay.  Okay.  Stop it right there.

He's got -- it looks like he's got something in both hands.  But move it a little bit forward. He's got something in his hands.  Okay, move it forward.  There's something in his hand again.  Move it forward.  And you see he's just throwing something in the back of the truck, and it's from his right hand.  It would be interesting to find out what he threw back there.

Okay.  You can continue.  I'm sorry.  I don't

know if you saw that, sheriff.  Did you see that?

A    I can see him, but I couldn't tell what he's doing.

MR. VILLANI:  Okay.  And, counsel, you have seen this.  Is there any -- other than seeing the sheriff -- the vehicle, is there any -- any -- any shot -- move it forward and see if we can -- if we can see the bodies on the ground.

ZOOM HOST:  You want me to just click through it?

MR. VILLANI:  Yes, go forward.

(Video 1, West Dashcam One, played.)

MR. VILLANI:  See, because I don't think that position changes.  I don't think you can see anything 'cause they -- and they're just out there.  Looks like they're writing a report or doing something out there.

And that's Newport leaving -- or I'm sorry -- getting into his vehicle.

Okay.  There everybody's gone.

And can you stop right there?

BY MR. VILLANI:

Q    There's a vehicle there.  Is that -- next to the right, is that Sergeant Amos's vehicle, do you know?

A    I'm not familiar who that is.

Q    Okay.  During -- during a police stop and an altercation, would they allow anybody to have their vehicle lights on and running while they have a suspect on the ground, for the safety of the officers?

A    Are you talking about the patrol vehicle?

Q    Yeah, the car on the right looks like it's got...

A    That's a patrol car.

Q    That's a patrol car?

A    Yeah, 'cause there's a blue light on top of it.  It's just not on.

Q    Yeah, okay.  So and maybe Sergeant Amos's vehicle?

A    It's -- it's possible.

Q    Okay.  I just want to be sure.  But we have no dashcam for Sergeant Amos?

A    I don't believe so.

Q    Okay.  Okay.  I think that one -- I think that one is...

MR. WAYMIRE:  We have dashcam -- we have dashcam for Amos and...

THE WITNESS:  Body cam, yeah.

MR. WAYMIRE:  There's no body cam, but

there is dashcam from Amos's vehicle.

MR. VILLANI:  And which one is that?

MR. WAYMIRE:  I mean, I sent it to you.

MR. VILLANI:  All right.  I don't have it.

THE WITNESS:  Dashcam from the corporal should be.

MR. VILLANI:  I don't have a dashcam from Amos that -- that I was not able to open up.  Did -- did you send that to the court reporter?

MR. WAYMIRE:  No, I don't have that uploaded.  That's one of the discs that I sent you.  That's the one that will open in the Windows Media Player.

MR. VILLANI:  Do you have that -- that link?

MR. WAYMIRE:  I don't have the link to that one, no.

MR. VILLANI:  Well, how -- how did you send it to me?

MR. WAYMIRE:  I sent it on a disc.  I copied the disc, and I sent it to you in the mail.

MR. VILLANI:  Okay.  Okay.  I couldn't open it at all.  Do you have it -- do you have it on your computer, or is it only on the disc?

MR. WAYMIRE:  Only on the disc, and my computer won't play it.  This computer that I've got here will not play it.

MR. VILLANI:  Okay.  So is there any way that we can get it to play?

MR. WAYMIRE:  No, I have no technology here that will.

MR. VILLANI:  I'm sorry?

MR. WAYMIRE:  I have no technology here that will get it to play in this deposition.

MR. VILLANI:  Is there a computer that it can play?

MR. WAYMIRE:  Well, there may be but not that you can see it.  I mean, you've got the disc, and you told me previously that you could pull it up and see that video.

MR. VILLANI:  I could not pull that one up, no.  The one I was able to pull up was one of the -- the dashcam, was this one:  Video One. That's the only one that would open.

Okay.  Well, we can talk about that later.  Maybe you can get it to the court reporter tomorrow somehow for Sergeant Amos's deposition. Okay.  We'll -- we'll figure that out.

Okay.  Can we look at -- which disc No.

Two is -- it just says Disc One and Disc Two? What are they, counsel -- I mean, madame court reporter?

ZOOM HOST:  Let's see.  Let me pull it back up.  Hold on one second.

MR. VILLANI:  We just played No. 3. We're pulling out Video One.  What is No. 4?  That was West's dashcam, right?

ZOOM HOST:  I believe so.  I'm sorry. It's taking me a second to pull it back up.

MR. VILLANI:  Okay.  Yeah, let's -- let's see if that one shows anything before.

ZOOM HOST:  Okay.  We've got West Dashcam Two is the other dashcam.  You want that one?

MR. VILLANI:  Please.  Let's see what that is.

ZOOM HOST:  Okay.  This is West Dashcam Two.

(Video 2, West Dashcam Two, played.)

MR. WAYMIRE:  I would say that's about all that's on this video to my recollection.

MR. VILLANI:  Yeah, I think that -- I think that's talking to the witnesses.  Okay, we'll leave that.  We'll leave that go for now. At least we started it.  At least we know.

How about Body Cam One for West?

By the way, I'm going to introduce all four of these into evidence.

ZOOM HOST:  Okay.  You want Body Cam One?

MR. VILLANI:  Please.

(Video 3, West Body Cam One, played.)

MR. VILLANI:  The time is 1844 on the body cam.  10-26-17.

Okay.  You can -- no, I'm going to say, if you just -- just move it a little forward until he comes in contact with Mr. Hensley.

ZOOM HOST:  Okay.  I couldn't hear you. I didn't know if Gaye could.

MR. VILLANI:  Just let her run.  Just let her run then.  Okay.  Okay.  Go ahead.  Just let it run till it gets to the spot that says -- thank you.

BY MR. VILLANI:

Q    It's a pretty bumpy driveway, wouldn't you agree, sheriff?

A    Yeah, it's a driveway going to a house. It's dirt.

Q    Yes.

Can you stop it right there?  Would you agree there's quite a bit of space between those two

vehicles, sheriff?

A    As it's parked, now they are.

Q    I'm sorry?

A    The way they're parked now.

Q    Yeah, I mean, what you're looking at right now, there's quite a space between them, would you agree?

A    Yes, it looks like it.

Q    Okay.  And it looks like Mr. Hensley's vehicle is -- is in front of -- he's on the side of him, but his position looks like the back of his pickup truck is even with the front of the Ford, the blue Ford.  Would you agree?

A    Oh, it's hard to tell, but it may be.

Q    Pretty close, though, right?  Would you say that's a pretty close guesstimate?

A    I would say so.

Q    I'm sorry?

A    I would say so.  It's probably close.

Q    Yeah, okay.  All right, continue, ma'am.

(Video 3, West Body Cam One, played.)

Okay.  Stop that for a second.

Stop.  Can you stop it?  Just a little --

I want to see Mr. Hensley's face.  Just click a little bit forward of that.  Now, back up.  Back

up a tad.

Okay.  Just back it up until Hensley's seen coming out of his truck.

(Video 3, West Body Cam One, played.)

All right, good.

He's got his hands up, and he's not -- let stop it right there.

Is he doing anything threatening right there?

A    He's resisting to get out of the vehicle, yes.

Q    Well, look at his actions.  Can you -- have you seen people tased before?

A    Yes.

Q    Okay.  And he could be reacting to the Taser?  He's -- he's laying down on the floorboard.  And that -- that truck has a -- a floor stick shift, doesn't it?

A    Not familiar.

Q    Okay.  And at that -- your deputies are saying that they thought he might have been hung up on it -- on the stick shift when they were trying to pull him out.  Do you recall that?

A    No, I don't.

Q    Okay.  Continue, madame court reporter.

(Video 3, West Body Cam One, played.)

Look at his face.  Stop.

Do you see his eyes are all rolled up in the back?  Do you see that, sheriff?

A    I can see his eyes.

Q    Yeah.  So they're -- they're rolling up.  Is that a sign of some sort of brain trauma or a trauma from the Taser?  Have you witnessed this before when somebody was tased?

A    No.

Q    So you don't -- you've never seen anything like this before or thought that that's --

A    Well, it just looks like --

Q    -- a Taser has been done?

A    -- he's either on drugs or geeking out.

Q    I'm sorry?

A    The way he's acting to me.

Q    I didn't hear what you said.

A    I said, the way he's acting to me and the way he's refused to get out, he's either talking on -- on some type of a drug or something.

Q    Or he got tased, and he's having a bad reaction to the tasing, correct?

A    I don't know.

Q    And you really don't know that he's on -- on drugs or not?

A     No, he said he was, but he just acts like that to me.

Q     Well, he didn't say that to you, did he?

A     No, no.  I never talked to him.

Q     No.  So you're -- you're only going by the word, again, of your employees?

A     Employees.  And then, of course, he made the statement.

Q     Yeah, and but he did not make it to you?

A     No, he did not.

Q     Okay.  And you're assuming that he's on drugs because your employees told you he said he's on angel dust, correct?

A     And just his actions.

Q     Yeah.  And his actions is also consistent with somebody who's got a bad reaction to being tased, correct?

A     Well, I don't know.

Q     Well, when you were tased, you had people around you holding you up, and you were on the mat. And they made sure you didn't fall down and hurt yourself; is that correct?

A     Well, they laid us down.

Q     Yeah, so they made sure you didn't fall down?

A    Correct.

Q    So you were never -- you were never tased the way Mr. Hensley was tased in this situation.  So you don't know how he would react, correct?

A    Well, I don't know.

Q    And so he could very well be having convulsions from the tasing; isn't that true?

A    He could.  I don't know.

Q    Okay.  So you don't know.  So that means that if you don't know if he's acting the way -- that way because he's been tased, then you cannot know if he's acting that way because he's on drugs.

So either way, it's -- it's your best guess 'cause you have no proof.  No tests were done so you don't know for sure if he was on drugs.

MR. WAYMIRE:  Objection.  You're just arguing with him at this point.

MR. VILLANI:  I'm sorry.  I didn't hear you.  I'm sorry, Jason, I didn't hear you.

MR. WAYMIRE:  I'm -- I'm objecting 'cause you're argumentative.  I mean, you're just really arguing with him at this point.  It's inappropriate.

MR. VILLANI:  All right.  I'll take that up.

All right.  Just go forward.

(Video 3, West Body Cam One, played.)

A    (No response.)

BY MR. VILLANI:

Q    Okay.  Okay.  Hold it right there.

Now, do you see -- now, can you just go back up just a tad where Officer Webb goes into the vehicle?

(Video 3, West Body Cam One, played.)

All right.  And Officer Webb's on the left.  He's got his two hands grabbed.  And go ahead.  Looks like Officer Webb -- stop it right there -- climbs into the -- into the truck.  And it looks like he's freeing him from inside the truck.

Would that be your -- your guess, sheriff?

A    I don't know.  I wasn't there.  That's the...

Q    That's fair.  You weren't there so you don't know.  That -- that's fair.  Okay.  Go forward, ma'am.

(Video 3, West Body Cam One, played.)

Okay.  They got him out.  Okay.  Go ahead.  Keep going.  And that is three hands on him.  Three separate hands on him.  Yeah, move it forward.

(Video 3, West Body Cam One, played.)

There.  Now he's being tased again.  There we go.

Back it up a little bit.

        Right there he's being tased, and he's being held.  Right there you can see the sparks.  You see a spark again.  So at 1850 on 10-26 he was -- and you call that a drive stun, don't you, or drive tase?

        A    Yes.

        Q    Okay.  So he's being drive-tased right in the back.

        Okay.  Move it forward, ma'am.

        (Video 3, West Body Cam One, played.)

He's being tased again.  Do you see the spark going out?  Okay.  That's -- that's three so far that I can see.  And they got him down.  He's calm.

        And if you could back it up when Sergeant Amos gets up, it looks like he's -- tosses something on the ground.  Okay.  Just go forward from there.

        And I want you to look at Sergeant Amos's left hand.  It looks like it -- see that?  All right.  And he's got something.  Go ahead, move forward.

        (Video 3, West Body Cam One, played.)

And it looks like he just tossed something on the ground.  I don't -- could be seen looking for something.  But did you see what I saw, sheriff?

        A    I couldn't tell.  It looked like he was

fixing to holster the Taser, but I don't know what he was doing.  Whether he was taking the...

Q    Cartridge out?

A    Off of the end of it.  I don't know.

Q    He could have -- both times when he came around the truck and when he came over here, he could have tossed those cartridges away.

Okay.  That's a matter of opinion.  All right.

All right.  So within six minutes he was under control.  Okay.  Continue it forward, please.

(Video 3, West Body Cam One, played.)
And -- and it looks like right now that he's not fighting or resisting.  They took his shoes off.

He didn't want to be rolled over.  Do you see that?

And that's -- that's Deputy Webb from another county?  Was it...

A    Higgins County.  He lives...

Q    Higgins County, and he's off duty.

A    Yeah.

Q    So all four of them were there, and they got him down on the ground.  All right, keep moving, ma'am.  Let's -- let's run this thing out.

(Video 3, West Body Cam One, played.)

I just want to see.  And the reason they're putting their gloves on, sir?

A    To pat him down.  You don't want to get bodily fluids on you or anything like that or...

Q    Okay.  Okay.  I don't blame them.

A    They're patting him down for drugs or anything like that.

Q    Yes.  Well, do you know if they found any drugs?

A    Not to my knowledge.

Q    Okay.  So there's no drugs on him.  Did they -- keep the video going.  Did they do a forensic of the vehicle to see if there was any drugs in the vehicle?

A    I'm not familiar with -- no, I don't remember.

Q    Okay.  That's fair enough.

Okay.  Go ahead, please, forward.

(Video 3, West Body Cam One, played.)
So he's -- he's -- he's double locked.  They got a handcuff on one hand and a handcuff on the other hand, and they're joined together in the middle; is that correct?

A    Yes.

Q    And that's -- I believe, would you agree

that's a lot more comfortable for a suspect than having their hands with one pair of handcuffs?

A    Yes, that would be.  And while they was fighting him, that may have been the simplest way to...

Q    Sure.  And maybe that's the logical way to do it, just somebody -- somebody handcuff one hand and somebody handcuff the other.  Now, all right, keep going.

(Video 3, West Body Cam One, played.)
He seems fairly compliant right now.  Does he appear to be on drugs now, sheriff?

A    He's calm right now.

Q    Okay.  And he seems -- he is -- the reaction to PCP if -- if you remember your -- your drug training, it's a high set of agitation, isn't it?

A    It -- it varies.

Q    Yeah.  Okay.  Continue.

(Video 3, West Body Cam One, played.)
He's walking fairly well considering he has been just tased a few times and handcuffed and no -- and no shoes on.  He's walking barefooted or with socks.

He's obeying their commands to get into the car.  He's not fighting them.  Looks like they took

the -- the handcuffs off him.

Does it appear -- does it appear that they took the handcuffs off him?

A    No, they shouldn't have.

Q    Well, his arms look like their straight down.  Could you back up 'cause I think they...

(Video 3, West Body Cam One, played.)

A    Remember, he's got double handcuffs on.

Q    Yeah.  Now, with the double handcuffs, his arms are going backward?

A    He's still got them on there.

Q    Okay.  Okay, you're right.  I guess the reason why his arms are going backward is they were holding him, putting his arms back.

And do you know if this is Sergeant Amos's vehicle that they're placing him in or Newport?

A    I think it's Deputy West.

Q    Or Corporal Newport?

A    Corporal Newport had a charger.  This is a Taurus.

Q    Okay.  So it's either Deputy West or Sergeant Amos.  Would that -- would that be correct?

A    Yeah, Amos had a silver one.  This is a charcoal so this is probably going to be West.

Q    Okay.  Okay.  Just keep it going, ma'am.

(Video 3, West Body Cam One, played.)

A    (No response.)

BY MR. VILLANI:

Q    Well, he seemed to be very compliant at that point.  Would you agree, sheriff?

A    He's a little bit argutive [sic], but he's -- he's complying.

Q    Yeah, a little -- a little bit of smirk or mouthing off a little bit, but he was in compliance, right?  He didn't fight them, kick them or do anything, did he?

A    He's finally, I think, putting his feet in.

Q    Okay.  And so from the time they had him on the ground and cuffed, he was fine all the way up to the vehicle so far.  Okay.

Ma'am, can you move it forward, please? Thank you.

(Video 3, West Body Cam One, played.)

A    (No response.)

BY MR. VILLANI:

Q    And who's that right there?  Stop it. That's Sergeant -- that's Sergeant West?

A    That's Sergeant Amos.

Q    Amos.  Yes, okay.  Okay.  See if we fast-forward and see if we get into the Sally Port. Okay, I guess it doesn't get to the Sally Port.

A    (No response.)

MR. VILLANI:  Can we do -- we'll call that Video Three.

Can we do Body Cam Two, please?

ZOOM HOST:  Yes, sir.

MR. VILLANI:  Thank you, ma'am.  So one, two, three and four I'm admitting into evidence for this deposition.

And this is going to be Body Cam Two. Mamie, is this Body Cam No. Two?

ZOOM HOST:  Yes, sir.

MR. VILLANI:  Okay.

ZOOM HOST:  West Body Cam Two.

MR. VILLANI:  Fantastic.

(Video 4, West Body Cam Two, played.)

MR. VILLANI:  Is there -- there's no way to make this so we can see anything on this, counsel?

MR. WAYMIRE:  I don't control the -- you know, what the video shot is originally.  And that's what you're seeing.

MR. VILLANI:  Okay.  All right.  All

right.  Can you just skip forward, see if it gets any better?

(Video 4, West Body Cam Two, played.)

BY MR. VILLANI:

Q    Oh, there we go.  And this appears to be individual witnesses?

A    I believe so.

Q    Okay.  Can you go to the middle of that, skip through that?  We'll introduce this, and I'll play it if I can get it to play.

(Video 4, West Body Cam Two, played.)

Okay.  There's Body Cam Two.

All right.  Let's go from there where he's leaving.  So it appears that -- sheriff, it appears that Body Cam One was of the arrest scene, and Body Cam Two was -- appeared to be interview of the witnesses.

A    That's correct.  That's what I believe.

MR. VILLANI:  Okay.  All right.  We've got Video Three and Video Four will be admitted.  Okay?

MR. WAYMIRE:  Let me just make a comment here that...

MR. VILLANI:  I'm sorry?

MR. WAYMIRE:  Let me make a comment here

that these -- both the dashcam and the body cam, each of those -- each of those is an individual video.

The reason it's -- each is broken up into two videos is because in order to have a format that we could all watch like this --

MR. VILLANI:  Sure.

MR. WAYMIRE:  -- had to make a video of a video.  And my video recorder broke each of those files up into two files.  So we have four files now; whereas, originally there were two.

MR. VILLANI:  Yeah, we can put that -- stipulate that for the record, yes.  And I do appreciate all the work you did over that weekend. I know you better things to do over that weekend. Thank you.

Okay.  Can we take a five-minute break? Too much coffee.

MR. WAYMIRE:  Okay.

MR. VILLANI:  All right, thanks.

MR. WAYMIRE:  So we'll be back at 11:45.

MR. VILLANI:  Yeah -- yeah, it's about eight minutes.  Thank you very much.  Yeah, 11:45.

(Brief Recess.)

BY MR. VILLANI:

Q    Okay.  Sheriff, I just would like your comments on whether you believe the following statements are -- are true or false, to your knowledge, of police procedures and -- and the use of a Taser in -- in -- while your -- during your tenure. Okay?

So I'm going to read a statement to you and just tell me whether it's true or false.

A    Okay.

MR. WAYMIRE:  Well, part of it may be true, and part of it may be false, right?

MR. VILLANI:  He can say that.

MR. WAYMIRE:  Yeah.

MR. VILLANI:  Okay?

BY MR. VILLANI:

Q    Tasers can cause ventricular arrhythmia, sudden circular cardiac arrest and even death.  Is that true or false?

A    That's possible, I guess.

Q    Yes.  Okay.  Possible.  All right. Possible.  I agree with you.

Now, the -- it's a called a modulated electrical current that's being induced by the Taser, correct?

A    Well, a conducted electrical weapon is

what the Taser is.

Q   Yeah, they -- it's a -- it's a -- and -- and it causes neuromuscular incapacitation.  Would you agree to that?

A   Yes.

Q   Okay.  And the use of the Taser may only cause local symptoms or muscular or neuromuscular collapse?  It may -- it may only be localized?

A   Yeah, it's possible.

Q   Between the prongs?

A   Yeah.

Q   In some cases, though, it -- it may -- may cause other neuromuscular damage away from the scene between the two prongs.  Would you agree with that?

A   Now, that I don't know.  I'm -- I'm not that familiar --

Q   Okay.

A   -- with the Tasers.  I don't know.  So like I said before, the training officer is the one handled all that.

Q   Okay.  Do you think it's important for each police officer or deputy while you were the sheriff, to know all the possible effects of using a Taser on an individual?

A    Yes, it was in their training.

Q    Okay.  So if the officer saw a pregnant woman, obviously they would be reluctant to use a Taser unless she had a gun or something was going to kill them.  But, I mean, they wouldn't use -- if she was noncompliant, they wouldn't use a Taser on a pregnant woman, would they?

A    That's correct, we had that in our policy that -- not to use on a pregnant woman.

Q    Okay.  And they wouldn't use a Taser on someone they knew was having an epileptic fit?

A    Should not, yes.

Q    No.  And they wouldn't use somebody -- Taser on somebody who was very old and very frail?

A    It's according to what the situation was.

Q    Well, say a 90-year-old woman was sitting on a porch yelling at the cops and shooting them the bird.  They wouldn't walk up there and tase her, would they?

A    Wouldn't want them to.

Q    Okay.  And so somebody who's -- who's high on drugs and is already having an arrythmia problem, you wouldn't want them to shoot somebody full of a Taser eight or nine times if they're high on drugs?

A    It's according to what the situation is. If they were fighting, had a gun, had a knife.

Q    Okay.  And where the prongs enter the skin, they usually leave marks.  It's called signature marks, small punctures?

A    Yes, yes.

Q    Okay.  And from your own experience, Tasers are painful?

A    That's correct, yes.

Q    And would you -- would you say other than women having childbirth, people shot by them often say that it is the most painful experience in their life.  Would you say that was the most painful experience you had in your life?

A    No, it wasn't that bad.  It just for, you know, five, ten seconds it -- it hurt.

Q    And would you believe -- would you disagree or would you agree that some people say that every inch of their body is like going through excruciating pain when you're tased?

A    It's according to different subjects how it feels.  Mine was just in my legs.

Q    Okay.  And so it depends on your physical makeup and your muscular structure really how much pain and how much debilitation there is because of

the Taser; is that correct?

A   Has a lot to do with it, yes.

Q   Yes.  And so excruciating pain to one may be:  Hey, a mild shock to another.  Would you agree?

A   Correct.

Q   Okay.  And would you agree that a -- the Taser can cause a heart attack?

A   Well, that, I don't know.

Q   Okay.  And would you agree that the Taser may cause heart rhythm problems?

A   I'm not familiar with that either.  Like I said, I'm not that much familiar with a Taser.  I just know what we were trained on.

Q   Okay.  And there was an article in Health Day News that said -- a new study of April 30th, 2021, that tasering can cause serious heart problems.  Would you agree or disagree with that?

A   Well, I have no answer to that 'cause I've not read the article so I haven't seen.

Q   Okay.  Now, you know that -- are you familiar with these fences they have around -- electrified fences they have around for -- for cattle?

A   Oh, yes.

Q   Okay.  And they contain about 8,000

volts; is that correct?

A    Have no idea.

Q    Well, if I told you that they contained 8,000 volts and they're enough to shock cattle so they don't go anywhere near it, would you have any way of disbelieving that?

A    Well, I know growing up we had, you know, cattle.  And the people I've worked with, it's like a pulse.  It's not a solid volt.

Q    Right.

A    And I don't know.  I don't know what it put out, or I have no idea.

Q    Well, it gives cattle a shock.  They don't want to kill the cattle, or they don't want to injure the cattle, correct?  They just want to give them the shock to say:  You come near this fence, and you're going to get another shock.  Is that correct?

A    Yeah, I would say so, yes.

Q    And -- and do you believe that they -- there's 50,000 volts running through those fences?

A    I have no idea.

Q    Okay.  And, now, there's also a study that -- in March 16th of this year that says tasering can cause brain damage.  One Taser shock can cause brain damage.

Do you have any reason not to believe that?

A    Well, I've not -- again, I've not read an article or even heard of this article so.

Q    Yes.  Okay.  That's in -- it's Health Daily News in March 16th, 2020.  And it's also on Medicine.net.  And it can cause brain injury.

Have you heard of or know of Taser deployment that killed anybody?

A    I have not.  Not seen a news article or anything that's said that it has or any of the Taser type.

Q    Would you -- would you know that 47 people have lost their lives to Taser deployment in Georgia to date?

A    I'm not familiar.  I've not heard of it.

Q    Okay.  Do -- do you remember Rodney King and the Ferguson fiasco?  Did you hear about those?

A    Oh, yes.

Q    Okay.  And that was all in response to somebody being tased and beaten.

MR. WAYMIRE:  Rodney King had nothing to do with a Taser and I don't know...

MR. VILLANI:  No, and -- I said and beaten.  Correct?

MR. WAYMIRE:  Yeah, I'm not...

MR. VILLANI:  Okay.  I'll withdraw that.
I'll withdraw that.

MR. WAYMIRE:  Are you saying -- okay.

MR. VILLANI:  I withdraw it.  Okay?

A    (No response.)

BY MR. VILLANI:

Q    Now, the -- what I'd like you to do is
I've had several of these transcripts for the court
reporter.  And, madame court reporter, this is Volume
Two which is, I believe, Exhibit C like in Charlie.

And if you can pull that up, and -- and I
just want to -- yeah, Volume Two.  No, that's the
cover sheet.  Go down.  Volume Two.  We're going to
be using that.  Okay?

And go -- go a couple pages inside to
show that that was the day that -- I think go down.
Next page.  Okay, stop.

You can see that you're listed as a
witness in the case, and you went some -- page 273 --
we'll get that out later -- to page 291.

Is that the deposition testimony that you
read, sir?

A    Yes.

Q    Okay.  All right.  You can -- you can

take that off the screen now.

Let me ask you some -- some questions related to your testimony.  And you said -- you said in your trial testimony that you have a policy over the jail, and you have a policy over patrol and a policy over operations.  And you have a policy for Tasers and things that are handled in the jail; is that correct?

A   Yes.

Q   Okay.  And, again, we talked about batons.  Do the jailers have access to batons?

A   Yes.

Q   Okay.  So as a step before -- as a step before using a Taser, a jailer has the ability to use the baton?

A   That's up to them.

Q   I'm sorry?

A   That's up to the individual.

Q   I -- I didn't hear that.

A   I said:  That's up to them, yes.  They...

Q   I'm sorry, I didn't -- I didn't understand.  It's up to them what they use?

A   Yes, the jailer.  Is that what you're talking about?  Or the deputy?

Q   The -- the -- the jailer, the deputy,

those -- those that are in -- in the jail or how do they have batons?

A   They have -- back then they had the pepper spray and had Taser.  And they had a baton, yes.

Q   Okay.  All right.  So we -- we already settled the fact that they can't use the pepper spray because you were very cognizant of the fact that somebody in the jail at that time was allergic to the pepper spray?

A   Yes, they had a -- I think an inmate that could not -- respiratory problem.

Q   And so there was no prohibition while they were in the jail to use the baton or the Taser?

A   I'm sorry, I didn't hear that question.

Q   Okay.  While they were in the jail, your -- your employees, the deputies and jailers, they were allowed to use batons or Tasers; is that correct?

A   Yes, their discretion.

Q   I'm sorry?

A   It was their discretion which one they needed to use.

Q   Okay.  But it's not an unfettered discretion.  It's a discretion that's controlled by

the parameters that you laid down in your policies?

     A     Well, again, like I said, it's up to them how -- the situation denotes what they need to do.

     Q     Yes.  Well, the thing is, you tell them: Look, here's the guidelines.  And if the situation arrives that aren't covered by these guidelines, use your best judgment as far as you -- as you were trained to do but being mindful that our -- our -- our -- our job here is to serve and protect.  We protect each other.  We protect the public, and we serve the public.

          So you tell them within those guidelines, do what you have to do but don't step over the line; is that correct?

     A     Well, again, like I said, it's according to what happens.

     Q     Okay.

     A     You know, they may have to.

     Q     All right.  And then -- and when the -- and -- and also you have a policy, I believe you call it minor disorder policy in the jail?

     A     I'm not familiar.  I don't remember.

     Q     Okay.  We'll -- we'll get to that, and we'll show you the -- your minor when we get to that when we have it as an exhibit.  And your counsel was

kind enough to send it to me.

Is it -- have you ever -- would -- would there ever be a reason for an officer to say:  To hell with the policy?  I'm going to do what I want to do?

A    No, I hadn't anything like that.

Q    Sorry?

A    I've never had nothing like that happen, no.

Q    And -- and that's because you think that this case that didn't happen; is that correct?

A    No.

Q    Okay.  And the -- was anybody -- anybody that was involved in any way with Mr. Hensley investigated?

A    Not to my knowledge.

Q    Was anybody in any way involved with Mr. Hensley in this case, disciplined in any way?

A    Not to my knowledge, there was not.

Q    And the fact that Levi Amos left shortly after, why did he leave?

A    Levi?

Q    Levi Amos.

A    He went from the jail to patrol, and then from patrol he was terminated.

Q    Okay.  And why was he terminated?

A    He ended up being arrested.

Q    Okay.  Arrested for?

A    I don't remember what the charges was.
It's been so long.

Q    Aggravated assault?

A    May have been.  I don't know.  But he was
terminated.

Q    How -- how soon after this -- the
incident in October of 2017 was he terminated?

A    I couldn't tell you.  I don't remember.

Q    And at the time that he made contact with
Mr. Hensley, was he a jailer or a patrolman?

A    Now, that I don't know either.  I can't
remember if he was still in the jail or if he had
just made patrol.  I'd have to pull all the records
and find out.

Q    And he went -- he went from jailer to
patrol?

A    That's correct, yes.

Q    And that almost immediately he was
terminated from patrol?

A    He was on patrol for a while.  I just
don't remember.  We'd have to pull the records on
that to find out.

Q    Okay.  And when you have these policies, the use of force -- the general use of force policy at the jail and the Taser policy, are your employees given copies of that so they can refresh themselves when they need to?

A    Yes, it's on the -- the computer where they can pull it up on a computer and if they need to go to it on anything.

Q    So they have access to that any time they need it?

A    Yes, our policy, yes.

Q    And if they have a question about it that they can't get to their sergeant or a supervisor, they can do it on their own?

A    That's correct.

Q    And on October 17th, 2019, you gave testimony in the Hensley criminal matter.  Do you agree?

A    I think it was about that time, yes.

Q    Okay.  Yeah.  And that was two years after the incident, correct?

A    Roughly, yes.

Q    And you prepared yourself for that testimony?

A    Yes.

Q    And you prepared yourself by looking at the reports?

A    Correct.

Q    Did you talk to any of the officers or any of your staff in preparation for that testimony?

A    Yes.

Q    And who did you speak to, if you remember, before you gave your testimony in that case?

A    I don't remember.  It's been such a long time.  But it was discussed, and I looked at the report.

Q    Okay.  And would you have talked to any of the witnesses that were also called for testimony?

A    No.

Q    All right.  Did you talk to some of your -- your supervisory staff?

A    Yes.

Q    Okay.  And would that include Mr. Cherry?

A    Yes.

Q    All right.  And -- and does it refresh your memory if I gave the correct name for that policy?  It's called a minor disorder policy.  Do you recall that now?

A    Yes.  I don't remember that much about

it. It's been so long.

Q   Uh-huh. Okay. And, now, Corporal Barnett also left the employ of the sheriff. How come he left?

A   He got another job, but I don't remember what it was.

Q   He wasn't terminated for cause?

A   Not that I remember.

Q   And he wasn't -- and neither one of them were terminated because of this incident?

A   No, no, absolutely. Nobody was terminated on -- on any -- anything to do with this case.

Q   Okay. And -- and you said that you did not believe that any officer violated your policy so you did not have them investigated; is that correct?

A   No, did not.

Q   And so if an officer violates your policy, is there a procedure to have them investigated even if it's a minor violation?

A   It's according -- or Captain Cherry is on internal affairs. Captain Mayo is the top of internal affairs. It's according to what would -- if it was something serious that they needed to look into, then -- then they would have.

Q   But how -- how are minor infractions handled then if it's not investigated?

A   Usually your corporal, sergeant or captain.  If something needs to be investigated or something needs to be brought to the attention, or there may even be a write-up or something like that.

Q   Okay.  So it's -- it's -- and as we used to call it in the Marine Corps:  Standing before -- standing before the post.  You go before the lieutenant, and he chews you out and says:  Don't do it again.  I've looked into this.  And what have you got to say about it?  I'm sorry, sir, I did wrong.  I won't do it again.  Okay, go back to your duty. Something like that?

A   Yeah, we have either like a verbal reprimand or a written reprimand.

Q   Okay.

A   Or something to that effect.

Q   Now, I know it sounds crazy.  But are verbal reprimands written up?

A   Yes, we -- we write it down on a paper. It's -- it's on a paper, but it's considered a verbal.

Q   Okay.

A   A written reprimand, it's written on

paper also, but it's different.  It's -- it's in your file.

When it comes to like promotion time or something like that, a written reprimand will be held maybe against you as far as promotion or whatever for a certain period of time.  A verbal would not.  Of course, it may be changed by now, different -- different chair.

Q    Were any of the officers or personnel involved with Mr. Hensley reprimanded in any way?

A    No.

Q    Were they spoken to by their supervisors about this incident?

A    Not to my knowledge.  I don't know.

Q    Okay.  And if you -- if you found that somebody -- as you did the investigation and IA found that somebody violated one of these policies like use of force, Taser, loss of evidence, could they have been terminated?

A    I don't -- I don't think it would have been terminated.  And, again, we didn't do -- there was no investigation on any of this.

Q    Okay.  Yeah, but I'm saying if it got to the point on these offenses, if it were proven, could cause a possible termination of the employee?

A   Well, I don't know on that part.  That's what I'm saying.  I don't know.

Q   Okay.

A   I just -- it would have been investigated by a captain and then brought to the Chief Deputy and my attention.

Q   Okay.  Is taking out a Taser without signing it out, is that a major offense?

A   Well, no, not really.  Because at the time we just had a few Tasers, and sometimes they would get a call and leave before they got a chance to sign it out.

Q   And is taking cartridges out without signing them out, is that a major offense?

A   Not a major offense, but it didn't need to be done.

Q   Okay.

A   Of course, we -- like I said, we only had a few Tasers at the time.  Now they have Tasers for everybody.  They don't have to worry about that.

Q   Okay.  And your -- your Taser checkout policy is that they check out the Taser, sign out for it and test it to make sure it's in working order.  And -- and then they can use it; is that correct?

A   Yes.

Q    Sergeant Amos did not do that; is that correct?

A    I don't know.  No, I have no idea on that.

Q    Well, there's nothing on any of the -- and we'll get to those later.  There's nothing on any of the sign-out sheets to show that he signed out a Taser or the cartridges?

A    Couldn't tell you on that.  I don't know.

Q    Okay.  But after this incident, did you check to see if any cartridges had gone missing?

A    I didn't.  Like I said, you know, this was not brought to my attention because it goes through the chain of command, was not brought to me.

Q    Okay.  And would you say that the -- the loss of a cartridge is an important event?

A    Yes, they need to try to keep up with them.

Q    And it's something that you would want to know about; that, hey, cartridge -- if cartridges are disappearing out of our locker?

A    Well, the supervisors should know, and then they would hopefully bring it to my attention.

Q    Yeah.  And but they did not bring that to your attention?

A     No, I didn't...

Q     Okay.

A     No.

Q     And, now, there -- there's supposed to be when the Taser is deployed -- whether it's successful or not, there's supposed to be a report written by the officer that deployed the Taser, whether it's by trigger or by prong or drive -- drive stun; is that correct?

A     Yes.

Q     And can you tell me why there was no report on these Taser deployments made?

A     I was told that the reports were done, but they could not find them so...

Q     The reports were lost.  Okay?

      And were the reports on the Hensley case the only reports that were lost, or were there other reports lost?

A     I couldn't tell you.  I don't know.

Q     And are these reports important?

A     Well, it's documents that needs to be kept, and it's part of our policies and procedures.

Q     Okay.  And, in fact, those documents are supposed to be turned over to the State; is that correct?

A     If -- if you have to go to a trial or something, yes.

Q     Yeah.  And so the State didn't get those documents that they were supposed to be?

A     Not that I know of, no.

Q     Okay.  So that -- that's a violation of State policy.  Not only that, of your policy?

A     Well, it's not no State policy that I know of.  It's just when it went to trial, they didn't have all the paperwork to -- to present at the trial.

Q     Yeah.  Well, the thing is that the State has to get a copy of those reports:  The Use of Force Report, the Taser deployment report.  So if you did not have them, then the State couldn't get them; is that correct?

A     That's correct.

Q     No.  So that's a violation of State policy that you have to have those reports?

A     Well, like I said, I don't know if it's a State policy or not.

Q     Okay.  And when you looked at this case, did you at any time feel:  Here we could have done -- we could have done something better?

A     Well, on a lot of cases I think a lot of

128

times you could do better on -- on anything that you do.

Q    Okay.  And if you thought you could have done something better, would you convey that to your -- the supervisors and your deputies, your deputy chief and the -- I'm sorry -- the assistants that you have running the -- the captain over the -- I believe it's Captain Cherry over training?

A    Yes.

Q    And there's -- there's officers over the patrol and detectives.  Would you have conveyed that disappointment to them?

A    It was discussed that we needed to check on different things that -- as far as records and stuff.  This is almost daily that you have to bring stuff up like, you know, in training.

Q    Sure.  And -- and the thing is that -- and that's -- and that's why records are important because you can show somebody:  Hey, look.  Look at the way this report was filled out.  That's horrible. Nobody can tell what happened.

But look at this report.  That's perfect. It tells everything that I need to know in case that officer -- officer dies.  I can read his report, and I could be there.  Isn't that true?  That's why

reports are important?

A    Yeah, they are important, yes.

Q    Yeah.  And that's because the person who did the report may not be around when you look at it?  And you need to know all the facts; is that correct?

A    Yeah, they could have left.

Q    Yeah.  And then -- and the jail officers are responsible for maining [sic] -- maintaining discipline inside the jail?

A    Correct.

Q    And Levi Amos was a jailer at the time that Mr. Hensley was tased in the shower; is that correct?

A    I don't remember if he was a jailer or had made it to the road as a deputy yet.  I don't remember on this case.

Q    Okay.  All right.  And...

A    I think he was still in the jail.

Q    Yeah.  He was what?

A    I say, I think he was still a jailer.

Q    Jailer.

And what about Corporal Barnett?  Was he in charge of supervising the jail?

A    He was a jail supervisor.

Q    Okay.  And was he the one that met

Sergeant Amos at the Sally Port?

A   Now, that I'm not familiar.  I wasn't -- I wasn't there.

Q   Okay.  And let's talk about the Sally Port.  The Sally Port has a -- a video camera, correct?

A   Yeah, there's two in the Sally Port.  Two cameras.

Q   Okay.  And do you know if they retained the -- the record of the day that Mr. Hensley was brought into the Sally Port?

A   They did not.  The camera system every so often, so many months or whatever, will rewrite.  And at the time this was not brought up that they would need to keep for evidence.  And it was never -- the -- the recording was not downloaded.

Q   Okay.  And I think -- I think I forgot who was in charge of those.  Who was in charge of those recordings?

A   Sergeant Stuckey there in the jail handles the recordings.

Q   And I think Sergeant Stuckey said that he thought that they were kept six months or -- or nine months, and then they were over-recorded?

A   And it may be six.  I'm not familiar.

Q    Six, okay.  All right.

And are you familiar with the first lawsuit that Mr. Hensley filed against -- against you and other members of your -- your sheriff's department?

A    The first one?

Q    Yeah, it was March -- somewhere around March 15th, 2018.

A    Yeah, I mean, I'm -- I'm familiar.  Not -- not real familiar with it.  I just remember that he filed.

Q    And -- and that's within that six-month period.  So that lawsuit would have given you notice that he was suing you for actions that you took -- your -- your personnel, not you personally -- took at the scene of the arrest, at the Sally Port and in the shower; is that correct?

MR. WAYMIRE:  Objection.  The date of when it was received by anybody at the sheriff's office is not the same as when it's filed.  So I don't know what the dates are on that.  I don't have it in front of me.  But -- and he doesn't have it in front of him so it's not a record.

A    (No response.)

BY MR. VILLANI:

Q    Yeah, what I'm saying is that a lawsuit like that would have put you on notice that you were being sued for these things, correct?

A    Well, we don't have cameras in the shower.

Q    I'm sorry?

A    We don't have cameras in the shower so there would have been no cameras in there.  There would have just been cameras in the Sally Port and then in the booking area.

Q    In the booking area.  I'm sorry.  Did I say shower?  The booking area, yeah.

And I guess the booking area is the same, six to nine months, and then they're written -- they're wrote up -- written over?

A    Yes.

Q    Okay.  And the -- okay, let's look at -- let's look at the Exhibit C, which is Volume Two. And if the court reporter can turn to page 273?

ZOOM HOST:  Okay.  That looks like it went to page 225 on that one, Mr. Villani.  Let me pull it up again.

MR. VILLANI:  Oh, yeah, I'm sorry.  If you go down to the bottom of the page?  I am sorry.

ZOOM HOST:  Oh, okay.  I see what you're saying.

MR. VILLANI:  Yeah.

ZOOM HOST:  I see what you're saying.

MR. VILLANI:  Yeah, I'm sorry.  I guess 273 would be somewhere...

ZOOM HOST:  Okay.  I see that now.

MR. VILLANI:  Sorry.

ZOOM HOST:  No, that's no problem.  That was my -- my mistake.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  And you could see on page 273 it says -- and Ms. Johnson called you as a -- as a witness, sheriff?

A    Yes.

Q    Okay.  And if you go down to the next page, and -- and it says:  What are your duties as the sheriff?  And could you read your answer, please?

ZOOM HOST:  What -- what line is that?

MR. VILLANI:  If you go back up, you go back, line 8 to 11 he's going to be reading.

THE WITNESS:  Yeah.  You want me to just read this?

BY MR. VILLANI:

Q   Yeah, just read your answer.  I'll -- I'll be...I'll be in this -- I'll do this.

A   Well, to oversee the sheriff's office and jail, maintain the laws of the county -- county ordinances, State ordinances and over the employees of the sheriff's office.

Q   And it says -- and she asked you what kind of policies you had.  Now, go to line 17.

A   Says:  We have a policy basically over the jail, and we also have a policy that we use on patrol.  Then we have a policy over operations as far as like maybe Tasers and things we handle in the jail and uses.

Q   Okay.  And then she asked you about if you have a minor disorder policy, and you wanted to see it.  And if we go to the next page, please, Ms. Court Reporter?

Okay.  And Exhibit 3 that's attached to the trial transcript -- and I'll show it to you in a moment -- and that's from the Georgia Jail Standards, your minor policy; isn't that correct?

A   Yes.

Q   Okay.  And -- and it's a suggestion how to operate, how to handle, and it's a suggestion of rules and regulation within the jail; is that

correct?

A    Yes, yes.

Q    Okay.  And then -- then she asked you on line 10:  When you say suggestion, so if you go to your officers and you say, "I suggest that you do that," is that what you do?  Or do you say, "Do this"?  And what was your answer?

A    Well, it's a policy, and we tell them to go by the policy.

Q    And -- and -- and then line 21 she asked you:  Normally they should go by your policies?  Yes.

A    Yes.

Q    All right.  Then let's go to the next page, please.  Okay.  Let -- let's go from there, madame court reporter, and let's go to Exhibit 1-A.

Okay.  Now, do you recognize who this is?

A    Yes, that's Mr. Hensley:  Willard Todd Hensley.

Q    And he appears to be in an orange jumpsuit?

A    That's correct.

Q    And it looks like it's a mug shot taken on or about August the 27th, 2017?

A    October.

Q    Yeah, October.  Did I say August?  I'm

sorry.  October 27th at 4:31 in the afternoon.

A    That's correct.

Q    Is that correct?

Now, look at his expression.  What can you make out of his expression?  Does he appear drugged out?  Does he appear angry?  Does he appear dazed?  Does he appear stunned?  How does he appear to you?

A    Well, I don't know.  He looks like he may be possibly either under the influence or drugged.

Q    I'm sorry.  He's what?

A    I say:  He possibly may be under the influence.  It sort of looks like it to me.  Or he's on drugs or something.

Q    Okay.  So it looks like he might be under the influence of something.  Is that what you're saying?

A    Yes.

Q    Okay.  And would it also mean that he also might be under the residual effects of a Taser?  In fact, anywhere between 10 and 20 Taser shots, my client's count?

A    Well, that I don't know.  I wasn't there.

Q    Okay.  Let me admit this as 1-A.  And then let's look at 1-B, please.

137

Okay.  And do you recognize who that is?

A    That's Mr. Hensley.

Q    And where is he seated?

A    He's in the -- looks like a restraint chair.

Q    Okay.  And do you have a policy on restraint chairs?

A    They do.

Q    And what is the policy on a restraint chair?

A    Now, it's been so long.  I couldn't tell you.  I don't remember.  I don't have it in front of me here.

Q    Okay.  So restraint chairs are not to be as part of punishment, are they?

A    No, they're not.

Q    And they're not supposed to be punitive, are they?

A    Correct.

Q    They're supposed to restrain someone until they're complying; is that correct?

A    Violent -- if they're violent or fighting or...

Q    Yeah, okay.  And if you can just scroll down a little bit on that, maybe widen it so we can

-- yeah, he appears to be at least naked from the waist up on this?  You can't tell what's going on, on the bottom, but he appears to be naked.

And can you zoom in on his face, please?  Will it go anymore?  One more?  Okay.  There we go.

All right.  Do you see those little pock marks on his face?

A    Yes.

Q    And they look fresh, don't they?

A    Yes.

Q    And those pock marks look like they could have been Taser shots, don't they?

A    No, that's -- not to me it don't look like a Taser shot.  It looks like he was resisting arrest.

Q    And he was tased while he was resisting arrest, correct?

A    Yes.

Q    And it's just a coincidence that while he was resisting arrest, he got marks that just look very much like Taser marks went into his skin?

A    That don't look like a Taser mark to me but...

Q    Okay.  Look at his neck.  Do you see those two down by his neck?  Do they look like Taser

marks?

A   All I see is just wrinkles on his neck.

Q   I'm sorry?

A   I said:  All I see is just wrinkles on his neck.

Q   Well, if you look -- if you look down here, just -- can you move that cursor down a little bit?  And move it up a little bit, the cursor up?  Right there.  No, not there.  A little down.

Those first two marks right there.  Do they look like...

A   That's a lot of scratch marks.

Q   I'm sorry?

A   Looks like scratch marks to me.

Q   Okay.  And -- and let's go up on these other Tasers up on his cheeks, circle these.  None of these look like a Taser mark?

A   Not to me they don't.

Q   Okay.

A   Of course to me, I was not there.

Q   Okay.  Could we go down his body a little bit?  Okay.

And you don't see anything else on his body?

Can we go to -- we're going to introduce

that as 1-B into the record.

Let's go to No. 2.  Okay.  Let's look at that one.  Go down a little bit.  Right there in that big one right there.  Does that look like a Taser mark -- Taser hole?

A    Some of them does.

Q    Some of them do.

Okay.  And then right down around the groin area where you're not supposed to tase somebody.  Don't you have a policy:  Don't tase in the groin area?

A    If you can keep from it.  But in -- in emergency situations, you may end up having to tase them anywhere like that.

Q    Right.  Well, this looks like there's six holes in his stomach.  So at least they had three people must have tased him in the groin area.  So did all three enter his groin?

A    Not familiar.

Q    All right.  Look at his hands.  He's got -- go down to his hand.  Got two big marks on his hand.  Those are Taser marks, aren't they?

A    I wasn't there.  I couldn't tell you.

Q    And let's go to the right a little bit to his leg.  There's a big hole in his leg.  Do you see

that big mark, those two big marks in his leg?  Can you see those right there, those two marks?

    A    Yes.

    Q    Those are Taser marks, aren't they?

    A    Don't know.  Like I said, I was not there when this incident happened.

    Q    Well, let me ask you this, sheriff.  You keep saying, "I don't know," and "I don't remember." But don't you think it's very important for you to know these things as when you were sheriff of the county, how many times this man was tased?

    MR. WAYMIRE:  Look, you're arguing with him.  And simply --

    MR. VILLANI:  No, I'm asking...

    MR. WAYMIRE:  -- he's telling you he wasn't -- he wasn't there.  He wasn't part of -- he wasn't part of the incident.

    MR. VILLANI:  Just make -- just make an objection.  Make an objection.  All right?

    MR. WAYMIRE:  Yeah, I am making an objection, and you're interrupting me.  He's telling you he wasn't there.

    MR. VILLANI:  Okay.  Your objection is -- your objection is argumentative; is that correct?

    MR. WAYMIRE:  That's right.  And he's

telling you he wasn't there and he...

A   (No response.)

BY MR. VILLANI:

Q   All right.  Let me -- I'll ask you the question:  Isn't it important to you to know how many times this man was tased?

A   I know how many times they told me they attempted to tase him and how many times supposedly he was.

Q   Okay.  And would it be important to look at these photographs to see if they were giving you accurate information?

A   My captains did check this out.

Q   But you did not personally?

A   I did not.

Q   Okay.  And you don't feel that it's your responsibility, something serious like this with this much injuries, to have that checked out by yourself?

A   Well, that's what I have employees for.

Q   But how do you know if your employees are -- are doing it correctly if you don't check on it?

A   Well, it was handled.

Q   I'm sorry?

A   I said:  It was handled at the time.

Q   But -- but not you?  You didn't get

involved in it at all?

A    Not until it came time for the trial.

Q    So two years later because you were being called in to testify, that's when you first became involved in this?

A    I was familiar with it, and my captains told me that it was being handled.

Q    But you didn't get personally involved in it?

A    No, I did not.

Q    Okay.  Until the trial?

Okay.  Can we go to -- I'm going to introduce that -- Exhibit No. 3, please?

Okay.  If we can wind it so we can see it.  Yeah.  All right, zoom in on his hand.

Do you see that big hole in his hand?  Is that a Taser?

A    It could be.  I'm -- I'm not familiar. Again, like I said, I was not there.

Q    Okay.  Let's go down a little bit.  Go up a little bit to his chest area.

See that hole right there in his chest just below his nipple?  Is that -- is that a Taser mark at that hole?

A    It's possible.

Q    Okay.  And there's a -- and that's pretty close to his heart, would you agree?

A    That's below his heart.  But, again, like I said...

Q    It's close -- it's closer to his heart than his knee is, correct?

A    Yes.

Q    Okay.  So that it's -- it's close to his heart.  And isn't there a rule not to shoot anywhere near the heart or the chest area?

A    It's the recommendation to not try to hit near the heart or the head or the torso.  But sometimes if they're fighting...

Q    Or the groin?  Or the groin?  Or the groin?

MR. WAYMIRE:  Let him -- let him finish his answer.

MR. VILLANI:  I didn't hear what he said. I thought he said groin.  I'm asking if he said groin.

THE WITNESS:  Yes, I said that sometimes if they're fighting, you -- the prongs goes close to them places, but you can't help it.

BY MR. VILLANI:

Q    Okay.  If you go down a little bit lower,

ma'am?  Go below the waist, please.

If you look right there near the groin, do you see that big -- those -- that black -- not the black mark.  That looks like a blemish there.  If you go next to it, closer to the middle of the groin, just up there.  Right there.  That -- that looks like a Taser, doesn't it?

A    And, again, I don't -- I don't know.  I wasn't there.  I don't know what...

Q    And if you go -- and if you go above the wristband there, there's a black mark.  Does that -- that look like a Taser mark to you?

A    Don't know.  Couldn't tell you.

Q    Okay.  And -- and that's Exhibit No. 3 that's going to be put into the record.

Let's go to Exhibit 4-A, please.

Okay.  Sheriff, can you tell me what this is?

A    That's the shower area.

Q    Okay.  And the shower area is not like a home shower where it's enclosed.  It's -- it's -- it's wide open, isn't it?

A    Well, it's -- has a door to go in, and it's -- and it's where the inmates are first brought in and they're -- they're given showers.

Q    Okay.  And -- and the door to go in the shower, is that connected to the booking area?

A    Yes.

Q    And that -- the shower area, is that monitored at all?

A    No, not inside.  There's no camera.

Q    Okay.  And what about the window where the inmates are given their clothes?  Is that window where you could look into the shower area from that window?

A    I can't remember if you can or not.  It's been so long since I've been back there.

Q    Okay.  And if you notice, there's a mat there underneath the shower?

A    Yes.

Q    Okay.  And that's -- and the reason for the mat, sir?

A    Is to keep from slipping and falling.

Q    Okay.  And that's where Mr. Hensley, to your knowledge, was standing when he was tased?

A    I don't know.  I was not there.

Q    Okay.  And Mr. Hensley was wet and naked at the time?

A    Yes.

Q    And -- and -- and Levi Amos,

Mr. Hensley's testimony said Levi Amos came in, punched him in the face three times and went back out.  Did you -- were you aware of that?

A    I'm not familiar with that.

Q    Okay.  And then do you know how many people came into the shower area with Mr. Hensley?

A    No, I'm not.

Q    And you -- you didn't check on how many people came into the shower area with him?

A    No.

Q    All right.  Who is Mr. -- who is Biggerstaff?

A    He was a jailer on duty that night.

Q    And where is he now?

A    I think he went to work for Whitfield County.

Q    I'm sorry?

A    I think he went to work for Whitfield County Sheriff's Office.

Q    Okay.  So he -- he was transferred out of there?  Out of your office?  Out of your employment?

A    He quit and went to work for Whitfield County.

Q    Okay.  He quit?  Or was he asked to quit?

A    No, he -- he quit.

Q    Okay.  Are you sure?  And did you check with your supervisors if they asked him to quit?

A    No, I'd have to check.  It's been a while back.  I don't know.

Q    Okay.  All right.  But they would have had the authority to fire him or ask him to quit?

A    A supervisor or a captain or the sergeant over the jail would.

Q    Okay.  So they could have asked him to quit because -- then essentially, you think?  You don't know?

A    No, there was no one asked to quit on this incident here.

Q    And you checked?  You checked on that yourself?

A    I know for a fact on that.

Q    How do you know that?

A    Because I'm the sheriff on that part, and I know that nobody was asked on this incident to be terminated or be fired.

Q    Could they have asked them -- could they have told them that without your knowledge?

A    They could have told anything without my knowledge.  That can happen anywhere.

Q    Okay.  And are you aware that Mr. Hensley

had to be taken out of the Whitfield -- I'm sorry, the Murray County Jail and placed into the Whitfield County?  Do you know why?

A    For this incident or a different one?

Q    No.  Do you know why after Mr. Hensley was at your jail, he was transferred to Whitfield County Jail?  Do you know why?

A    I -- I don't remember, no.

Q    All right.  And do -- do you know why he said that he was transferred out because he was being harassed by all the jailers because of this incident?  Did you ever hear?

A    I'm not familiar.

Q    Okay.  And did you ever get a grievance from him about that?

A    No, I did not.

Q    Do you get any of the grievances that come up to you?  Do they go across your desk?

A    Yes, if it's asked to be sent to me, I would -- I would get a grievance.

Q    Okay.  So if he's transferred to Whitfield County and do you know what happened to him at Whitfield County?

A    No.

Q    Do you -- do you know the sheriff in

Whitfield County?

A    Yes.

Q    Do you -- have you talked to the sheriff at all about anything after this incident?

A    No.

Q    And so you don't know that Biggerstaff continued harassing Mr. Hensley at Whitfield County?

A    I'm not familiar.  I've not heard of anything.

Q    And kept making up stories and getting him put in a holding cell?

A    Not familiar.

Q    Okay.  All right.  Now, how big is this room, the shower room?

A    It's not real big.  It's probably 10 foot maybe.

Q    Ten by twelve?

A    Something right there.  If it's rectangular, it would be.

Q    It looks like it's rectangular more than square?

A    Yeah.

Q    Would you agree?  Yeah.  Okay.  And could it easily fit four or five people in there?

A    Yes, you -- you could.

Q   Okay.  And if I were told -- or to tell you that there was five of your employees against Mr. Hensley in that shower, would you have any reason not to believe me?

A   No, no, sir.  He was resisting arrest.

Q   Okay.  So there was Mr. Amos.  Not Sergeant Amos, the -- the young -- young Amos.

And there was Corporal Barnett.  Were you aware that he was in there?

A   I don't remember.

Q   Okay.  And there was nurse -- the nurse was in there.  Do you remember that?

A   The nurse was at -- I think, at the door to it.

Q   Yeah, and there was Biggerstaff.  He was in there.  He made a complaint that Mr. Hensley kicked him.  Do you remember that?

A   I don't remember.

Q   Okay.  And then there was Corporal Newport.

So there was four well-trained deputies against a -- a wet, naked detainee, person who's not yet convicted of a crime, finished taking his shower, standing there naked.  Is that -- is that about the situation?

A    Yes, he was resisting them trying...

Q    Can you -- that's the part I can't understand.  He's standing there naked, buck naked, soaking wet in -- in the air conditioning probably freezing his -- his butt off.

And they've got four well-healed deputies with Tasers, and they gloved up before they went in.  Levi came back out, says:  Let's glove up.  Let's go.  Or Barnett said:  Let's glove up.  What does, "Let's glove up," mean?

A    Put gloves on where you don't have to handle them and get bodily fluids on you.

Q    Okay.

A    Possibly.

Q    So they gloved up and then came into -- and they came in the room shooting the Tasers; is that correct?

A    Not familiar.

Q    Well, their -- their testimony in court said as soon as they walked in the room, they shot.  Some of them shot from the doorway.

I mean, to me this looks like Dodge City, Okay Corral.  Wouldn't you agree?  If -- if you weren't the sheriff and you were looking at this, wouldn't you agree it says:  Four grown men shooting

their Tasers at this naked guy in the shower.
Wouldn't that cause you a pause to look into this?

    A   He shouldn't have been resisting.  He should have listened to them, obey the orders.

    Q   Oh, I'm sorry, he didn't listen to them?  How do you know he didn't listen to them?

    A   It's obvious, ain't it?

    Q   I don't know if it's obvious.  None of this stuff that happened in this case is obvious.

    I mean, how is it obvious to you that he did not listen to them?  You weren't there, correct?

    A   I was not.

    Q   All right.  So you're saying that they tased him because he refused to obey their commands.  He's not listening to them, correct?  Is that what you mean?

    A   That's what the report says.

    Q   Sure.  Okay.  But when you say listening, that doesn't mean he didn't -- he wasn't paying attention to them; he didn't hear them.  It's just that he didn't obey their commands.  I just want to get the terminology down correct.

    So he was not obeying their commands; is that correct?

    A   Yes.

Q    And they were telling him to do what?

A    That I don't know.  It's been so long since I've seen the Incident Reports.

Q    Okay.  And had it something to do with jumpsuit, orange jumpsuit?

A    Yeah, the inmates wear the jumpsuits.

Q    They wanted him to put on a jumpsuit?

A    And he refused to put it on.

Q    Okay.  And -- and isn't it true that he wanted his camouflage clothes back because his mama said she's going to coming pick me up 'cause I didn't do anything wrong?  But if he just...

A    But he didn't have camouflage on him when they arrested him.

Q    Well, he called them camouflage?

A    Right.

Q    Yeah.  So they came in, guns blazing, and they used up seven cartridges.  And these -- those are the cartridges that we know about.  The other cartridges, I guess in the last video, I think, that Sergeant Amos threw away two cartridges:  The one behind the truck and one on the ground.  It looked that way to me.

Is it possible that some of the cartridges that were used weren't on the floor,

weren't saved?

A    I'm not familiar with that.

Q    Okay.  And let's -- you can see those red spots near the carpeting.  Is it -- is that blood right there right in the corner of the carpeting?  Right there.  That looks like blood to me.

A    That may be.  I don't know.

Q    Okay.  That's -- that's not paint.  You didn't decorate it that way, correct?

A    No.

Q    Okay.  And then if you look a bit -- a little bit up from there towards the shoe, it looks like a couple of dots of blood right there.  You passed it.  Go down.  Go down.  Right there.  Right, make a big circle.  Right there.  That looks like more blood?

So -- so it looks like Mr. Hensley was bleeding.  Was -- that wasn't any of your deputies' blood, was it?  Or the nurse's blood?

A    No.  That I don't know.

Q    Okay.  And -- and this is 4-A.  So we're going to admit 1 to 4-A.

Now, do you think as sheriff of the county, that you should have made it your business to know these things I've been asking?  'Cause a lot of

these things:  I don't remember.  I don't know.

Don't you think it was part of your duty as the sheriff to be on top of these things to supervise these people properly?

A    Well, like I said, the captains handles the -- each department, and they answer to the Chief Deputy.  Most of this stuff was gaven [sic] to my Chief Deputy.

And then if it's real, real important, sometimes it's gave to me.  But on a daily basis, it's like any other sheriff's office.  The sheriff let's his employees handle the jail, the patrol, the situations, the detectives.

Q    It's like being a President of the United States.  He doesn't do everything.  He gets the updates seven, eight o'clock in the morning with a briefing, and he's told about everything that's going on.  Is that something to that effect?

A    Sort of, yes.

Q    But you weren't told anything about the Hensley case?

A    Well, I was.  And, like I said, it's been so many years since this has went on, I forgot a whole bunch about this case.

Q    Okay.  Now, when you were told about this

case, did you keep a log book or notes, notes or anything that -- so you can refresh your memory in case you're called to trial or -- or in case you're questioned by the State:  Why didn't you do this? Why didn't you do that?

A    If it's a case that would be going to trial, we would keep everything logged down.  But, like I said, we didn't know this was going to -- anything come out of this until later on.

Q    How many cases like this have you been involved in as sheriff?

MR. WAYMIRE:  Do you mean lawsuits?  Or do you mean criminal prosecutions?

A    (No response.)

BY MR. VILLANI:

Q    No, Section 1983 cases as a sheriff.

MR. WAYMIRE:  The federal civil rights lawsuits?

MR. VILLANI:  Section 1983, abuse -- yeah, please...

THE WITNESS:  Well, I think that maybe one.  Maybe one.  I don't know.

BY MR. VILLANI:

Q    One other than this one?

A    We may have.

Q    And this one?  Only this one or two?

A    We've had -- we've had a couple, yes, in eight years.

Q    You had a couple in eight years?

A    Yes.

Q    And -- and how many is a couple?  Two? Three?  Four?  Five?

A    I don't remember.

Q    Okay.  But more than one?

A    Yes.

Q    Okay.  So then you would be well-versed in what's expected of you when you -- when you testify in one of these cases; is that correct?

A    Yes.

Q    Okay.  And -- and it seems like -- and I don't mean anything disrespectful.  God bless you for your 47 years.  But it looks like you really didn't prepare that much for this deposition?

MR. WAYMIRE:  Well, this is completely inappropriate.  He -- he can prepare any way he wants.

MR. VILLANI:  I'm saying...

MR. WAYMIRE:  You can ask him what he did to prepare, but it's a waste of our time to criticize he didn't prepare enough.

BY MR. VILLANI:

Q    Okay.  Okay.  Can you tell me exactly what you did in preparation of this deposition?  And I don't want you to tell me anything that you said between you and your counsel.  I just want to know what you personally did to prepare for this deposition.

A    Well, I checked -- went over my trial, the -- I read what was in the trial deposition, the -- what -- the Taser log.  I refreshed my memory on that.

Q    Hold on a second.  Hold on a second.  I lost -- I lost you guys.  I don't know what happened.  I got to come back.

MR. WAYMIRE:  He can't hear you.

THE WITNESS:  Oh, well, I refreshed my memory on the policy manuals at the sheriff's office.

BY MR. VILLANI:

Q    Sheriff, sheriff, I'm -- I'm lost.  Hold on.  I'm sorry.  I've -- my thing kicked out.  I do apologize.

All right.  You were saying?  I said: What exactly did you do to prepare for this deposition?

A    Can you hear me now?

Q    Now I can.  Yes, now I'm back.

A    Okay.  I just refreshed my memory on some of the policy manuals and the -- from the trial and stuff like that.

Q    Okay.  So you mostly looked at documents?

A    Yes.

Q    All right.  Did you talk to anyone other than your attorney?

A    No.

Q    Okay.  So you -- you didn't make any consultation with any of the other defendants or any people that were in the department at the time, any of your chiefs or your...

A    No, no.  I think, you know, you've got -- probably fixing to go talk to them, deposition from them.

Q    Okay.  And -- and you did not refer to any notes that -- any contemporary notes that you made at that time during the -- this incident?

A    No.

Q    All right.  Let's -- let's look at Exhibit 4-B, like in boy.  And do you see those items on the ground just outside of the shower area?

A    Yes.

Q    And, sir, what are -- what are those?

A    That's the empty Taser cartridges.

Q    Okay.  And you notice those cartridges are without any prongs and without any wires.  So it's just the cartridges by themselves; is that correct?

A    Yes.

Q    So when the cartridges were put together to be able to put in an evidence bag, it appears that the wires and the prongs weren't included with those cartridges.  Is that -- is that what that looks like?

A    It don't -- I can't tell if they're wrapped around it or if they're not.

Q    All right.  Could you zoom in on that, please?  Just -- I -- I -- I do not see any wires or prongs.  I mean, if you -- if you do, let me know where they are.

A    No, it looks like the empty cartridges.

Q    Okay.  So there's no wires or prongs?

A    I don't see them.

Q    Okay.  And would it -- and it's important as part of your policy that the wires and prongs and a report for each cartridge go into a bag; is that correct?

A    Yes, that's what there's supposed to be.

Q    Okay.

A    That's the prongs that's laying there.

Q    Yeah.  And then -- and then they -- they were under no threat by Mr. Hensley at this time, were they?

A    They what?

Q    Was -- was Mr. Hensley threatening them at this time?

A    I'm not familiar.  I was not back there.

Q    Okay.  Well, once they collect the cartridges, can you assume that Mr. Hensley was already restrained?

A    I'm not familiar.

Q    Okay.  So if Mr. Hensley was still fighting them, why would these cartridges be neatly placed outside the shower area?

A    These were placed here to take pictures.

Q    I'm sorry?

A    These were placed here to -- they took pictures of them to show that they used them in the shower.

Q    Okay.

A    He was resisting.

Q    Now, somebody had to take them out of the shower and place them there, correct?

A     That -- that is right there out -- right at the edge of the shower.

Q     Right at the edge of the shower, that's correct.

A     Yes.

Q     And somebody is standing there, correct? You can see their --

A     Yes.

Q     -- feet and their pants.  And it looks like sheriff's uniform pants; is that correct?

A     Yes.

Q     Okay.  So this would be after Mr. Hensley had been subdued and put in the restraint chair logically, correct?

A     I would think so, yes.

Q     Yes?  I'm sorry.  Yes?

A     Yes, I would think so, yes.

Q     Okay.  So there was no reason, no exigent circumstances where they couldn't follow policy? They -- they weren't under duress.  They weren't under stress.  They weren't under attack.  So there was no reason for them not to follow policy, correct?

A     I can't answer that.  I wasn't there.

Q     Okay.  But policies are deemed to be followed, correct?

A    When you can, yes.

Q    Yeah.  And policies, you can -- you can deviate from policies when you're under duress or -- or at the -- at the -- when you have to make a decision, a split-second decision.  Should I pull the trigger or should I wait and see if it's a gun or a cellphone he's pulling out of his pocket, correct?

A    I would say so, yes.

Q    All right.  But this is not one of the situations.  This is a normal routine ministerial job that they have to do:  Collect the evidence, write a report, put the evidence in the evidence bag and log the evidence into the evidence room.

That's ministerial work.  That has nothing to do with fighting off an individual, fighting a -- a detainee; is that correct?

MR. WAYMIRE:  Objection:  Compound.

A    (No response.)

BY MR. VILLANI:

Q    Is this -- is this going -- handling these cartridges after the incident is over, isn't that a ministerial duty?

MR. WAYMIRE:  Objection to the extent it calls for a legal conclusion.  You can answer.

A    (No response.)

BY MR. VILLANI:

Q    Is it -- is it -- is that a -- is that a duty that everyone is supposed to do?

A    We're supposed to do that.  Why they didn't, I don't know.  Can't tell you.

Q    Okay.  And so they did not do that.  Is that -- okay.  And you have no idea why they did not do that?

MR. WAYMIRE:  Did not do what?

MR. VILLANI:  What we've been talking about:  Bag it up.  Bag these up properly.  They did not take each individual cartridge with their wires and with their prongs and bag them up and put a report in that bag -- evidence bag.  They did not do that.

MR. WAYMIRE:  Do you know whether they did that or not?

THE WITNESS:  I don't know.  I have no idea.

BY MR. VILLANI:

Q    So you don't know whether they did that or not?

A    No, you'll have to ask Captain Cherry that.  He's the one handled that.

Q    Now, would it be important for you to

have these seven cartridges properly placed into evidence?

A    I think it would -- would -- it should have been done, yes.  Okay?

Q    Okay.  But they -- they weren't brought out at trial with the wires and the prongs and the -- the reports for them?

A    I don't know.  I don't remember.

Q    And is -- are these -- are these also lost somewhere?

A    What?

Q    Are they lost objects?

A    I don't know.  I have no idea.

Q    All right.  Are -- are -- were they available to Anna, his...

A    During the trial?  I don't -- I don't know.

Q    And I know she asked for them, and she didn't get them.

MR. WAYMIRE:  Is there a question there?

A    (No response.)

BY MR. VILLANI:

Q    Would -- would somebody -- did somebody not produce them as evidence?

A    I couldn't tell you.  I don't -- I don't

know.

Q    Okay.  All right.  All right.  I'm not --
yeah, okay.

Now, let's look at 5-A, Albert, and 5-B.
Okay.  That looks like a, quote unquote, booking card
for Mr. Hensley.  Do you recognize that?

A    Yes.

Q    Okay.  And then 5-B is just the second
page.  It looks like Mr. Hensley is in a different
type of uniform rather than the orange.

Where does that -- where does that
uniform come from?

A    That's -- we have several different -- or
we did have several different colored uniforms.
Orange, some of them were white.

Q    Okay.  Okay.  So when -- when they tell
Mr. Hensley to get in his orange jumpsuit, they were
talking about a different uniform?

A    This was later on when they took these
pictures.  He was probably in a different uniform
then.

Q    Okay.  So this says this is 10-26, 2134.
So that's nine -- 9:30 at night up -- up on top:
Booking date, time.  Is that -- right just to the
left of the picture:  Booking date, time.  Right

there.  Do you see that?

A    Yes.

Q    10-26, 2134.  That -- that's 9:34 for us civilians?

A    Right.

Q    Okay.  And that's at night?

A    Correct.

Q    So this photograph was allegedly taken at 10-26 -- October 26th, 2017, at 9:34 at night?

MR. WAYMIRE:  Is that right or not?

THE WITNESS:  Yes.

MR. WAYMIRE:  Did you think the photograph was taken at that time?

THE WITNESS:  Well, don't know.  It's very possible.

MR. VILLANI:  I didn't hear what you said.

THE WITNESS:  The photograph may have been taken at a different time and just put with the picture.  I have no idea.

BY MR. VILLANI:

Q    Well, isn't it -- isn't it very important to have the booking card show exactly how the person who's being booked looked at the time they were being booked?

A     Well, sometimes they have to take a picture later on.  If they're still irate or if they're drunk or if they're fighting, they may take the picture three hours later or whatever.

Q     Well, then why isn't the booking time/date changed?

A     That I can't tell you.  I have no idea.

Q     Okay.  So that's another error that they have made.  Okay.

Now, if you look at -- do you have any reason to believe that Mr. -- if you look down where it says below this picture:  Weight 175.  And to the left of that he's six feet tall.  Six feet, 175 pounds?  Do you see that?

A     Yes.

Q     And would you say that Sergeant Amos is at least that?

A     I don't know what his...

Q     Okay.  How about Biggerstaff?  Is he at least that?

A     Biggerstaff is -- he's more heavy.

Q     Okay.

A     I don't know about the tall.  He was just heavier.

Q     How about Corporal Barnett?

170

A    He's -- he was tall.

Q    And how about Levi Amos?

A    He's -- he was skinny, medium size.

Q    Okay.  He was wiry, though.

Okay.  Let's go to the -- you can take that off.

So we're looking at -- we're looking at a man standing in the shower wet and naked and having four well-healed, large officers coming into the shower room with guns blazing.  Is that about -- a little colorful, but is that about what happened?

A    Don't know.  Again, like I said, I was not there.

Q    Okay.  And wouldn't it be important for you as being the ultimate supervisor of all of these employees, to check out and make sure that they did their jobs correctly?

A    Well, that's what I have my captains for and Chief Deputy.

Q    Okay.  And who checks the captains and chief deputies if they're doing their job correctly?

A    They answer to me.

Q    Okay.  So if you do not check out the incidents that happen at the jail, how are you supposed to make sure that who's ever over the jail

is doing their prop -- their job properly?  How do you check it out?

  A Well, I stay in touch or I stayed in touch with them.  And I -- I knew what was going on, on the most day-to-day basis.

  Q Okay.  But not in this case?  You're saying that you didn't do it in Hensley's case?

  A Well, in this case, like I said, the captains was handling it.  The Chief Deputy was handling it.  We knew it was going to go to trial, but until later on we didn't know that he had filed a lawsuit.

  Q So the -- so all you're getting from your supervisors and deputies, your chief, is their impression of what happened after they investigated.  They're telling you:  We looked into this, and X, Y, Z happened.  And you took that at face value?

  A Yes.

  Q Okay.  And you -- and you -- and because of the seriousness of this thing and the seriousness of the charges, you didn't go behind them to look into it any further?

  A No.

  Q And the only time you got, quote unquote, involved in this case is just before your trial

testimony?

A    Yes, that's correct.

MR. VILLANI:  Okay.  All right.  And I hate to do this but -- I'm sorry, but I'm having a little incontinence problem that's embarrassing, and I have to take a five-minute break.  Nature beckons.  I'm sorry.  Thank you.  I'll be back in five minutes.  Thank you.

(Brief recess.)

BY MR. VILLANI:

Q    So we're back on the record.  If -- if the court reporter will pull up Exhibit No. 6?

And if you could look at that, sheriff, and let me know if you recognize what that document is?

A    Yes, that's our policy on the Taser, conducted electrical weapons.

Q    Okay.  And at the very end, Page 4, is -- is your name.  But even though it's not signed, it's by your order, correct?

A    Yes, that was on the computer like that. The reason I didn't have a signature is, it was done on the computer available, you know.

Q    So no -- nobody really gets a hard copy of this, but they have access to this on their

computer?

A    Yes.

Q    Okay.  And during their training, do they get a hard copy of this?

A    During the training?

Q    Yeah, during their training when they get certified for Taser or recertified, do they get a hard copy for their own use?

A    The -- yes, not the whole -- all of the policies, but they were issued a -- a copy of the Taser.

Q    Yeah, that's -- that's what I'm talking about.

A    Yes.

Q    Okay.  When they get recertified for the Taser or when they go into the certification for the Taser --

A    Yes.

Q    -- they have a hard copy that's in their hand?

A    Yes.

Q    And are they allowed to take that hard copy with them?

A    Oh, yes.

Q    Okay.  All right.  Now, you are -- you

are familiar with this, correct?

A    Yes.

Q    And this appears that the date of issue and the effective date is April the 1st, 2016?

A    Correct.

Q    And that would mean that it was in full force and effect in October 26th, 2017, about a year and a half later?

A    That's correct.

Q    Okay.  So and that is a definition:  X26 and X2.  Can you tell me the difference between these two Tasers?

A    Well...

Q    If you -- if you recall?

A    Well, one of them is the -- like the first edition, and the other one is a newer model.  I don't know which is which.  Captain Cherry went to school on that.  He could tell you.

Q    Okay.  And -- and it's a -- it's a battery operated?

A    That's correct.

Q    Okay.  And -- and if you go to page 2? Okay.  And can you make it a little smaller so you can see the whole -- okay, go down so he can read the whole page.  Just bring the page down a little bit.

That's it.  That's good.

Okay.  And -- and it says they can only use approved Tasers; is that correct?

A    Yes.

Q    And only the people who have successfully completed the Taser certification; is that correct?

A    That -- that's correct.

Q    And they're only allowed to carry the Taser in their department-issued holster?

A    Correct, yes.

Q    Okay.  And these holsters are on their duty belt?

A    Yes.

Q    And for a while there, I noticed that some of the officers were confusing the Taser with their -- their VELOCITOR firearm.  So they made a special -- you made a special provision, I think, that was a very good idea; the -- that the Taser is in a location where the officer cannot mistake the Taser for a firearm; is that correct?

A    If it's -- you're carrying the firearm and a Taser, yeah.

Q    Yes.  Okay.

And the Taser, once it's issued to the officer for duty, it has to be fully armed and it has

the safety on at all times unless it's needed for use?

A    Yes.

Q    Okay.  And -- and the -- the No. 6, it says:  The Taser should be inspected and checked prior to each tour of duty.  Is that correct?

A    Yes.

Q    And Sergeant Amos did not inspect or check the Taser when -- when he took -- took it out?

A    That I don't know.

Q    Okay.  Now, No. 7 is very important.  A Use of Force Report should be completed anytime a Taser is used, except in training.  Do you see that?

A    Yes.

Q    That's your own order, correct?

And there's -- can you see of any -- any exception to this order that you put in here?  I'll let you look at the whole document.

Is there any exception to this order except if your life's in danger or -- I mean, that's a useful occasion.  But doing the report, you're in a safe place?

A    Don't know.  I have no idea why the...

Q    You have no idea why the Use of Force Reports weren't done?

A    I have no idea.

Q    Okay.  And -- and you agree with me that 7 has -- 7-A has nine parts -- parts to it.  And it says:  Use of Force Report shall contain a minimum, One -- okay? -- the deputy's approximation of how far he was away from the suspect when he deployed it.

Was that ever provided to you in these -- for these seven cartridges?

A    No.

Q    And the point of impact on the subject. Was that ever provided to you on those seven cartridges we looked at?

A    It was discussed, but I don't remember when.

Q    In the Use of Force Report?

A    Was that...

Q    In -- in a Use of Force Report in writing?

A    What -- what is your question now?

Q    You said it was discussed.  I'm asking you:  Was it put -- was that discussion put in writing in a Use of Force Report for these seven cartridges?

A    I don't know if it was or not.

Q    Okay.

A    It was sent to -- it was sent to -- John Cherry is the one that handled this.  I could not tell you.

Q    Okay.  Did -- did -- on these cartridges, did they -- they have a report in the Use of Force Report the number of five-second cycles that were used for each one of these cartridges?

A    Again, I don't know.  Now, this -- this is a question of Captain Cherry.

Q    Okay.  And -- and you see a Use of Force Report that shows the type of clothing that was pierced with the prongs?

A    I didn't.

Q    Okay.  And then the Use of Force Report, did you see the type of cartridge that was used by these employees of yours?

A    I don't know which one they were carrying.

Q    Okay.

A    Like I say, that's -- Captain Cherry could tell you that.

Q    Did you see the Use of Force Report where they had a probe, a drive stun or both?  Do you know which one where they pulled the trigger, where they made contact with the body?

A    Are you talking about on the scene or in the jail?

MR. WAYMIRE:  He wants to know whether you saw the report.

A    (No response.)

BY MR. VILLANI:

Q    Use -- Use of Force Report.

A    Oh.  No, I'm not -- I did not see the report, no.

Q    Okay.  All right.  Now, Sergeant Amos, you saw him use a probe, a trigger where he shot Mr. Hensley at the scene.  And then you saw him get on top and at least two or three times drive-stun him.

Did he -- did you see a Use of Force Report from Sergeant Amos when he was supervisor?

A    No.

Q    Okay.  And did anyone ever come to you and say:  This drive stun is lousy?  It didn't -- I mean, sorry -- this Taser or these cartridges are no good?  They're not working?

A    No, not to me they did not.

Q    Okay.  And did they in the Use of Force Report or any report that -- did any one of these deputies or personnel that used these Tasers, did

they tell you to write up their actions immediately after they deployed the Tasers?

A   I didn't see it.

Q   Okay.  Now, here's the most important thing that I think everybody has missed.

Any injuries that the deputies are aware suffered by the subject either by himself or use of the device?  And did anyone come up to you or in a Use of Force Report and say:  Mr. Hensley suffered X, T, Z injuries because we deployed our Tasers?

A   No, the nurse checked him that night.

Q   And you have no Use of Force Report from the deputies that shot those Tasers, and they admitted they shot him.  And they -- and they took pictures of the cartridges that they used.

A   No.

Q   Okay.  But nobody -- nobody -- nobody wrote a report saying Mr. Hensley was injured?

A   I don't know.

Q   Okay.  Now, did you see Mr. Hensley down on the floorboard after -- I'm sorry -- sheriff, you're looking at a document?  I don't mind you refreshing your memory.  I just don't want you to read off the document.

A   No, just the Incident -- Incident Report

that jailer Amos done about...

Q    Okay.  But that's not a --

A    And you should have a copy of it.

Q    That's not a Use of Force Report.  That is an Incident Report?

A    No, no, it's the incident.

Q    A Use of Force Report is a report that goes to the State.  And they have all -- you know, Deadly Force, Use of Force Report.  Those are all reports that are required by you as sheriff to send on to the State, correct?

A    Yes.

Q    And so there were none sent to the State?

A    That I don't know.  If Captain Cherry handled it, you'll have to ask him.

Q    And it's your responsibility 'cause you're the sheriff, and the buck stops at your desk, to make sure those reports get to the State; is that not true?

A    They should have been sent in, yes.

Q    Okay.  And so because your -- your employees failed to do it, it's still your responsibility?  Would you agree with that?

MR. WAYMIRE:  Objection to the extent that calls for a legal conclusion.

182

MR. VILLANI:  I'm sorry?  What?

MR. WAYMIRE:  I said:  Objection to the extent you're calling for some kind of legal conclusion.  That's -- you can -- you can answer.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  That's your job to make sure that they do their job; is that correct?

A    It -- it was, yes, sir.

Q    Okay.  And, now, No. 9 on the bottom of page 2, do you see that:  Taser can only be used?

A    Yes.

Q    As you turn the page, okay:  To overcome violent or assaultive behavior or its threat.

All right.  Let's look at -- let's look at the scene.  What assaultive behavior or threat was Mr. Hensley doing at the scene of the -- where he was arrested?

MR. WAYMIRE:  Well, I'll object.  He already told you about six times that he wasn't there so, you know, but you can answer.

BY MR. VILLANI:

Q    Well, what -- what were you told he did if you'll allow...

A    Well, I was told by video he was

resisting arrest.

Q    All right.  He was resisting arrest.  And -- and -- and you're saying that they wanted to control him because they were afraid that he was going to harm them or harm somebody else?

A    Yes.

Q    Okay.  Well, let -- let's see.  The video speaks for itself.  Okay?

The -- No. 10, the use of the Taser under the following circumstances is prohibited unless exigent circumstances are present.  Okay?

He was handcuffed when Sergeant Amos drive-stunned him -- drive-stunned him.  Why -- why was that not a violation of your procedures?

A    They were trying to handcuff him when he drive-stunned him --

Q    Sorry?

A    -- according to the video.

Q    I didn't hear what you said.

A    He was not handcuffed.  They were trying to get his hands to handcuff him is the reason they drive-stunned him.

Q    Okay.

A    It's on the video.

Q    All right.  Okay.  And there were two

deputies there that had their service revolvers drawn; is that correct?

A    Yes.

Q    West and -- and -- okay.

So if Mr. Hensley lunged at one of them, they could have both shot him; is that correct?

A    Wasn't there.  I couldn't tell you.

Q    Okay.  Now, in -- when they're -- and No. 11 says:  A Taser will not -- and it's underlined -- be used under the following circumstances.

Well, they -- they tried to coerce him into doing -- in the shower they tried to coerce him to put his jumpsuit on, and he didn't.  But they used it to coerce him, didn't they?

A    Wasn't there.  Don't know.

Q    And -- and against him 'cause he's only passive resistance.  He's standing there.  Open and closed, he's standing there naked.  He doesn't have a knife, doesn't have a gun, doesn't have a baseball bat, doesn't have a chain.  There's nothing -- no way of coming at them.

He wasn't coming at them.  The nurse even said he was noncombative.  Yet they -- they tased him because he did not want to put on the jumpsuit. That's clearly -- clearly in No. 11, they can't do

that.

MR. WAYMIRE:  Is there a question in there somewhere?

A    (No response.)

BY MR. VILLANI:

Q    I'm asking you, is it -- is that not a violation of their -- your policy?

A    Like I said, I was not there.  I don't know if he was -- they told us that he was resisting. He wouldn't listen to them.  So I don't know.  I wasn't there.  You wasn't there.

Q    But -- but that's the reason why you have a full investigation to find out what really happened, sheriff.  No -- no disrespect.

I mean, they tried to coerce him and intimidate him to put on his -- and that's the only reason.  Nothing in any one of their testimonies says anything else.  He refused to obey orders.  That's their testimony.  And you and I were not there.

MR. WAYMIRE:  Well, you're entitled to ask him questions about what he knows.  But right now you're just making speeches and arguing with him.  Is there -- I mean, he can answer a question.

MR. VILLANI:  I'm going to ask him a

question.

MR. WAYMIRE:  Good.

A  (No response.)

BY MR. VILLANI:

Q  Since you weren't there, did you read where they said he refused to put on his jumpsuit?

A  Yes.

Q  And he refused to follow orders?

A  Yes.

Q  Okay.  Did you see anything where it said:  He lunged -- lunged at us?

A  I don't remember.

Q  Okay.  Did you -- well, the reason why you can't remember, it's not there.  And we'll -- we'll look at those reports.

Was there anywhere in those reports that said that he had a weapon in his hands while he was in the shower?

A  No.

Q  Okay.  Was there anything in there that said:  He grabbed one of us and started choking us or beating on us?

A  No.

Q  In fact, he was tased and went right down to the ground.  Is that not what's in the report?  He

fell to the ground?

MR. WAYMIRE:  No, that's not what it says in the report.

A    (No response.)

BY MR. VILLANI:

Q    Well, I'm just saying, he fell -- somehow he fell to the ground; is that correct?

A    Well, I know they tried several times to tase him, and -- and it didn't make contact.

Q    Okay.  But eventually he was -- he was laying on the ground, on the shower floor?

A    Well, eventually, yes.

Q    Okay.  And he was buck naked and he was wet and he was face down into the floor.  Would you agree?

A    That I don't know.  It's been -- I'd have to read the Incident Report again.

Q    Well, Levi -- Levi says that he -- his face was -- was into the floor face down, and he punched him in the face three times.  So he's on the floor, and there was four people on top of him, including the nurse.  That's five people on top of him.

A    I don't know that the nurse was in there. I don't know.

188

Q    Well, the nurse's testimony said:  I put my arm around his shoulder to try to comfort him and try to calm him down.

Now, is that statement by the nurse consistent with your officer's statement that said he was violent and threatening?

A    I don't know.

Q    I mean, is -- is it -- is it consistent or not consistent?  I mean, she's saying that she had her arm around his shoulder trying to calm him down, and then she felt the shock from the Taser when she was in contact with him while he was on the floor.

A    I -- I didn't read the nurse's report so I couldn't tell you.

Q    Okay.  But if she did say that and if your officer -- if your employees are contending that he was combative and threatening, which story would you believe:  Hers or theirs?

MR. WAYMIRE:  Objection.  There's no contradiction between those two accounts so it's a false dichotomy.  I object on that basis.

MR. VILLANI:  As I said before, counsel, if you want to, we'll swear you in.  You're giving -- you're giving your client...

MR. WAYMIRE:  It's a matter of logic.  So

it's my objection that your question is illogical.

It's a false dichotomy.

MR. VILLANI:  All right.

MR. WAYMIRE:  You're trying to trick the witness, and you're not allowed to do that.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  All right.  Let me ask you this: If the nurse said one -- gave you one account of the incident and your deputies gave you another account of the incident, which one would you favor?

A    I don't know.  Like I said, I've not seen her account so I couldn't tell you.

Q    So you would have to investigate to find out which one was correct; is that correct?

A    Well, again, I don't know.

Q    Well, how would you find out of who was telling the truth or who was -- who was mistaken in that scenario?

MR. WAYMIRE:  Once -- once again, there is no conflict unless you're posing -- I mean, there isn't a real conflict here in the testimony of the people involved.

MR. VILLANI:  Okay.

MR. WAYMIRE:  If you want to say that one

person said the light's red and then one person says the light was green --

MR. VILLANI:  Yeah.

MR. WAYMIRE:  -- a real -- a real conflict, then that -- there would be a question there, but there's really not.

A    (No response.)

BY MR. VILLANI:

Q    Well, your counsel keeps testifying for you, and I appreciate his help -- helping you, but I'd really rather hear it from you.

And you're going to tell me that if the nurse said that she had her arms around his shoulder trying to calm him down and felt the shock of the Taser, is not a true account of what happened?  Are you saying that, if she said that?

A    I don't know.  Like I said, I was -- I was not there.  I don't -- I don't know.

Q    Okay.  I know you weren't there.  And -- and, you know, you can't keep using that -- I'm sorry, but with all due respect, you can't keep using the fact that:  I'm not there.

MR. WAYMIRE:  Absolutely he can.  If that's the answer to the question that he wasn't there and he doesn't know, yeah, that's the answer

to the question.  Sorry.

MR. VILLANI:  No, but -- well, no, it's -- it's not.  Because what I'm asking him to do is, if you're supposed to be supervising these people and making sure that they're properly trained and supervised, the fact is that you don't know the answer to these questions shows to me that you weren't supervising them and you didn't train them properly.

MR. WAYMIRE:  Well, fine.  Then make that argument to the Judge or whoever you want to make that argument to.

MR. VILLANI:  We -- we will.

MR. WAYMIRE:  That's not a question for a witness in a deposition.

MR. VILLANI:  Okay.  Now, I can ask the question I want, and you can object when you want, sir.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  If you look on the -- the page 3 of Exhibit No. 6 -- I'm sorry.  On the bottom, No. 16, you see that?  Could you read that?

A    Use of drive stun is discouraged except in situations where the probe deployment is not

possible.  If initial modification is ineffective, deputies will reassess the situation and consider other available options.  No more than three consecutive five-second deployments should be used.

Q   Okay.  So we saw Sergeant Amos do several -- at least -- at least one drive stun, would you agree?

A   Yes.

Q   Okay.  And he had a baton, would you agree?

A   Should have, yes.

Q   And so he could have used the baton.  I mean, he wasn't in any danger.  He was just coming behind.  If three people were on top of my client, he could -- he could have used the baton?

A   And, again, that's the deputy's discretion.

Q   Okay.  And would you consider what he did subject to that No. 16, following your policy?

A   No, that's his discretion --

Q   All right.

A   -- you know, if he needed to do that.

Q   I didn't hear what you said.

A   I said:  That's his discretion.  If he felt he needed to do that, then that was fine.

Q   Well, if -- if everything is in -- in -- in the officer's discretion, why have a policy anyway?

A   Well, I told you that the Standard Operating Procedure policy is a suggestion and rules to go by, but sometimes you can't follow the rules. You may have to change them.  You may have to add something to them.

Q   Yeah, and -- and sometimes -- and sometimes also, would you agree, that if an officer wants to punish somebody for disobeying them, they can go outside the policy also; is that true?

A   I'm not saying it's true because I don't know.  It could -- it could happen.

Q   Yeah.  Well, can you see with that video running, any reason why Sergeant Amos needed to drive-stun my client two or three times while he was on the ground?

MR. WAYMIRE:  Objection.  The video doesn't show he drive-stunned him two or three times.  It shows it once.

A   (No response.)

BY MR. VILLANI:

Q   Well, at least one time.

A   He was still resisting arrest when he

drive-stunned him, now, for him to get him -- get him to get his hands up to where he could handcuff him.

Q   He -- he was on -- on the ground, and he was being -- he was handcuffed on both wrists and they were trying to get the hand -- the handcuffs to interlock; is that correct?  That's the way they handcuffed him?

MR. WAYMIRE:  No, that's not what...

A   (No response.)

BY MR. VILLANI:

Q   Handcuffs were double locked?

MR. WAYMIRE:  No, you're misrepresenting the evidence.  You're mis...

MR. VILLANI:  I'm asking him a question. I'm not misrepresenting anything.

MR. WAYMIRE:  Sure you are.

MR. VILLANI:  I'm not.

MR. WAYMIRE:  Look at the video.

MR. VILLANI:  I'm not misrepresenting.  I said...

MR. WAYMIRE:  He wasn't handcuffed when the drive-stun stun happened, and the video -- the video shows that.

MR. VILLANI:  All right.  Counsel, I appreciate your helping your client, but I don't

think that's allowed under the rules.

MR. WAYMIRE:  All right.  It's on the video.  Just watch the video.  That's all you've got to do.

MR. VILLANI:  All right.  We all do.

A    (No response.)

BY MR. VILLANI:

Q    All right.  Would you agree with me, sheriff, that two of your deputies, one was on the left hand and one was on the right hand, putting handcuffs -- putting one portion of the handcuff on his wrists?

A    I know they were trying to get the handcuffs on him.

Q    I mean, they got on his wrists.  How did they get on his wrists?

A    He -- he was fighting.  He was resisting, and they were trying to get them on him.

Q    But they had them on -- already on his wrists.  They were just trying to bring them together.

A    And he was still resisting.  Like -- like we said:  The video.  He didn't have the handcuffs on when he was drive-stunned.

Q    Okay.  But as -- as you know, a laser --

I'm sorry -- a Taser can be deadly.  Would you agree?

A    A what?  Taser?

Q    A Taser -- the Taser can be deadly?

A    I guess.  I don't know.

Q    And -- and using it as the first resort rather than the last resort is dangerous, would you agree?

A    Not necessarily.  It's according to the situation.

Q    Well, when somebody's on the ground with three people on top of them, where is he going to go?

A    If he's still fighting and resisting, he could grab one of the officer's guns.

Q    These officers are trained.  They're strong.  Are they too weak to handle a single man?

A    It happens every day when an officer is shot.

Q    I mean, they're sitting on him.  Did you see him get up?  He wasn't -- he couldn't get up.  If you can see him getting up off the ground until they pulled him up...

A    He tried.

Q    Well, did you see him get up off the ground before they pulled him up off the ground?  I didn't.

MR. WAYMIRE:  Well, we'll stipulate that the video shows what it shows.

MR. VILLANI:  Okay.  We'll -- when we do the video, shows what it shows.

A    (No response.)

BY MR. VILLANI:

Q    Now, do you know if when Sergeant Amos arrived with Mr. Hensley, that Sergeant Amos notified everyone at the jail, detention personnel, that Mr. Hensley had been stunned -- drive stunned and also tasered?  So at least twice?

A    No, I did not.  I don't know.

Q    Okay.

A    They normally do, but I don't know if he did.

Q    I'm sorry?

A    They normally tell them that they're on the way in with an irate prisoner or one that they've had problems with that they've tased or something like that, but I don't know if he did.

Q    Okay.  And then, now, did Mr. -- did Mr. Hensley appear to be recovered from this Taser when you saw him getting put into the vehicle?

A    I couldn't tell.

Q    Okay.  And you think that was sufficient

enough for the officer to tell the nurse to evaluate him because there may be something wrong with the deployment of the Taser in Mr. Hensley's case?

A    The nurse any time they bring someone in that they've had to fight or tase, would automatically evaluate the individual.

Q    Okay.  And -- and that's according to No. 20 on page 4.  If you look down to No. 20 on page 4, and Nurse -- Nurse Jenkins is a -- one of the medical personnel that they would have had evaluate Mr. Hensley; is that correct?

A    The nurse at the jail, yes.

Q    Sure.  And then is she an employee of the sheriff's department?

A    Yes.

Q    Okay.  And so she -- other than her expertise as an LPN, as a nurse, she would follow the procedures and policy of the jail; is that correct?

A    Yes.

Q    Now, if Mr. Hensley had been in the restraining chair, was there any reason that you know of that his wounds could not be attended to?

A    No.

Q    And is there any reason why -- and I think I asked this before, but I don't know if I

asked it this way -- where the nurse could have ordered a blood test to see if he's on any drugs?

A   If the officer had requested it.  I don't know that he did.

Q   Okay.  And so it would be up to the officer to request a drug test for Mr. Hensley, not the nurse?

A   No, no.  It'd be the officer.

Q   And would the nurse examine him to see if his eyes -- if you know -- if his eyes were dilated to show that he had something -- a stigma or some sort of -- his pupils were with dilated or they were real narrow and kind of spiked?  'Cause different drugs affect the pupils differently.  Are you aware of that?

A   Yes, the nurse would check.  And then if -- if she felt that he needed further medical, then they would have gotten him transported to the ER.

Q   Okay.  And...

A   Or an ambulance.

Q   And then if -- if he had asked to be taken to the hospital, what's the -- what's the normal procedure when an inmate or detainee or an arrested person asks to be taken to the hospital

'cause they're injured?

A    Well, if they're injured, they check them or either take them to the ER.

Q    Well, can an inmate request that or a detainee request it?

A    They can if they've got a -- an injury that's serious enough.

Q    Do you think that the injuries that you saw on Mr. Hensley were serious?

A    The nurse looked at him so I don't think, you know.

Q    I'm sorry?

A    The nurse looked at him.  So I don't think if -- you know, if she didn't see a reason for him to go, I don't think so.

Q    I know, but I was asking:  Do you as a trained officer and a sheriff whose responsibility is to make sure the inmates and detainees are safe and they're well-cared for, do you feel that his injuries were serious looking at the pictures?

MR. WAYMIRE:  Object to form.  I'm sorry. I didn't hear the last part.

A    (No response.)

BY MR. VILLANI:

Q    Looking at those pictures, did those

injuries look serious to you as the sheriff?

MR. WAYMIRE:  Object to form.  Object to the form:  Vague.  You can answer.

THE WITNESS:  Looking at the pictures that they just took and everything, I don't think they were that serious.  But I'm not a medical personnel.

BY MR. VILLANI:

Q    Correct.  But they were -- they were a little more than just -- would you agree they're a little more than just little scratches?

A    Yeah, he had bruises on his hand and cuts where he'd been fighting.

Q    And it looks like some -- and it looks like several puncture marks?

A    Yes.

Q    Would you agree?

Okay.  And -- and those puncture marks could get infected?

A    No, they clean them.

Q    Okay.  And then is that restraint chair, is that chair sanitized before somebody's put into it?

A    It should be.  Supposed to be, yes.

Q    Okay.  And if somebody's put into that

restraint chair and they have a back injury, is there some sort of protection for their back so their back -- their injuries doesn't come in contact with the chair?  Like some sort of padding or something?

A    If they tell them they have a back injury, I don't think they would put them in the chair.

MR. VILLANI:  Okay.  And I think it's 2:00, and we all agreed that we would -- how long do y'all -- would you like for lunch?  Half hour?  Forty-five minutes?  How long, madame?

COURT REPORTER:  Half hour is fine.

MR. VILLANI:  I've got to have -- I have hypoglycemia so I need -- I need -- you see how my -- my -- my cheeks are flushing really bad so that means I'm -- I'm getting a reaction to not having enough protein in me.  So I'm going to have to take a half hour at least.

Is half hour enough for you, sheriff?

THE WITNESS:  Yes, 'cause I have several things to do this evening.

MR. VILLANI:  Okay.

THE WITNESS:  And as soon as we can get it done.

MR. VILLANI:  Mamie, is half hour good

for you and -- and Gaye?

COURT REPORTER:  Fine with me.

ZOOM HOST:  Yes, sir.  We're fine with whatever you -- whatever everyone wants.

MR. VILLANI:  We'll be in recess until 2:30.  Thank you very much.

(Brief recess.)

BY MR. VILLANI:

Q    Okay.  Could we look at Exhibit No. 7, please?

And what I'm showing you here, sheriff, is a training captain.  You had mentioned John Cherry.  Is he the one on the bottom who's in charge of the training?  His name is on the bottom of the -- of this page.

A    Yes.  Yes, he's the -- the Taser instructor.

Q    Court reporter, I mean, could we move that to the bottom?  There we are.

And you notice that on this session, October 25th, 2016, the only one -- name I recognize is Justin Wayne Vannoy.  Okay?

So these -- these schedules go out, and they tell each one of the deputies when -- when they have to come in for training; is that correct?

A    Yes, they have one year to get all your training in.  In other words, if you were Taser certified May of this year, and by next year you have to be, you know, certified again.

Q    Okay.  And obviously they're going to be staggered because you have people coming in and out of the sheriff's department?

A    Right.

Q    And the only ones really that need -- which one of -- which one of your employees need to have certification?  Is it jailers and the patrolmen or just the patrolmen?

A    We -- we did all of them.  We did the road officers, the deputies and the jailers.

Q    Okay.  And this would be a typical notification to them that, hey, the certification needs to get done?

A    Right.  John has access to all of this and can tell you who -- who is certified.

Q    Okay.  Very good.  And if we look at Exhibit No. 8.  And you -- you segued right into what I'm going to do next.

And these are -- all of these -- look at all of them.  These are all typical Taser training academy certification forms that show that these

people have been certified?

And I see the first one is LaDon West. And then the next one is Levi Adams, Randy Barnett. Dennis Biggerstaff, Jeffery Newport, Brandon Lee Amos. He got two. I don't know why he went under two, but he's got two. And they're all signed by John Cherry; is that correct?

A    Yes.

Q    Okay. So these are all the people that are relative to this action that have been certified.

If you notice on the top of the first one, it says X2. Is that what you were talking about -- Mr. Cherry, page 1 on the top right under where it says copy. X2. See X2 X'd out --

A    Yes.

Q    -- if you look up under the word copy? So that's the laser training that they got: X2?

A    Right.

Q    Okay. So that's the laser you were talking about?

A    Yes, we used the X -- I think it was the 26 and then X2. Ever which one was the oldest one, I think they eventually phased them out.

MR. VILLANI: Okay. All right. And if we go to No. 9, Exhibit No. 9, please?

ZOOM HOST: Okay. That -- that's what's going up. Hold on, let me -- let me look.

MR. VILLANI: That's okay.

ZOOM HOST: Okay.

BY MR. VILLANI:

Q Well, what -- what Exhibit No. 9 was, is the actual certificate that each one of the officers received.

ZOOM HOST: Okay. Give me just a minute, and I'll try it again.

A (No response.)

BY MR. VILLANI:

Q Oh, good. And these are -- these are the actual certificates that the officers receive. And it says -- and each one of them it says: Taser X2.

Okay. So they go through the class, and they each get a certificate like this when they complete the class. Is that correct, sir?

A That's correct.

Q Okay. Then if we go to Exhibit No. 10? And No. 10 -- correct me if I'm wrong -- on the bottom it says Exhibit 10. These are the activation from the -- the uploads from the Tasers themselves; is that correct?

A I believe so. Like I said, John handled

the training, the uploading.

Q    Okay.

A    I seen them before, but I think that's what that is.

Q    So then -- so, for example, right under where it says Zoloft, this is Randy Barnett.  And it says:  Arc, Arc.  That's when the Taser was deployed?

A    Yes.

Q    And it says 26 October 2017, 6:52:26, and 6:52:29.  So there was a one-second deployment, and then they waited two seconds.  Then there was another one-second deployment.

Is that -- and then at 6:54 if you go down a couple spaces, there was another one-second arc.

Now, could you explain why there would be three arcs, one-second bursts done so quickly?

A    No, that's -- that's something that you're going to have to ask Captain Cherry because he -- he did the training.  He went to school on that.

I know we did several different scenarios.  One of them was like a five-second burst.  One of them was just a shoot.  But that's something that you would have to ask him.

Q   Okay.  And...

A   I'm -- I'm in left field on that.

Q   Yeah.  And these three arcs correspond to about the time that Mr. Hensley was in the shower area or at least in and around the booking area? 6:52 p.m. on the 26th of October of 2017?

A   Yeah, this is the download.  This is not the practice -- you know, testing.

Q   I'm sorry?

A   This is -- yeah, this is -- what you're showing here is a copy of where he downloaded.  It's not testing or copy -- you know, like we would do when we were just doing testing.

Q   Yeah, I understand.  It's down with -- from Randy -- Randy Barnett.

A   Yeah, yeah.  This is something that you are going to have to ask him.

Q   Okay.

A   100 percent of it 'cause I have no idea on that.

Q   Okay.  But these -- these do show that there were three arcs coming from Randy Barnett's Taser.  And his Taser number is X29003TDP up on top left-hand corner.  Okay?

So it -- it looked -- it appears that his

Taser was deployed somehow for three one-second shots at Mr. Hensley unless he was shooting at somebody else. I doubt that. But at least without knowing more, this is what it appears to be. Okay? Is that...

A   Like I said, you're looking at something that the officer that does the training, that downloaded this. This is Greek to me.

Q   Okay. Did they have -- they have the ability to download -- they have the ability to download the -- all -- all the times that the laser is used. Okay?

So if you turn over to the next page, page 2, you can see one, two, three, four, five, six times the laser was arced all around the -- the same time.

I -- I apologize. I think one of them -- two of them -- but you can see for some reason Corporal Barnett's Taser was one, two, three, four, five, six, seven, eight, nine. And depending on what date and time -- they're all the same date -- these are -- are nine times that it was deployed. Okay?

And just -- just for your information, you say that you're not sure why it's there, but it's there. It speaks for itself.

Have you ever been shown this document?

A    No.

Q    Okay.  Let's go to the next page, page 3. This is for -- Trujillo.  And I think what happened with Trujillo, is that somebody used his Taser.  And it might have been the Taser that Sergeant West took, just grabbed.  We're not sure.

But if you notice that on Trujillo on the times in question, we wind up with one, two, three, four, five, six.  And on the next page, seven, eight, nine, 10, 11, 12, 13, 14, 15, 16, 16 -- 16 deployments.

And they all look like they're -- sorry, there's some of them aren't on the 26th.  So there's probably about 14 -- 12 or 13 that were on October 26th.

So no one's ever shown you this -- this document, have they?

MR. WAYMIRE:  Has anybody ever shown you these logs?

THE WITNESS:  No.

BY MR. VILLANI:

Q    Okay.  All right.  Now, West.  West has October 27th, an arc at the time that Mr. -- Mr. Hensley was arrested.  He has a deployment, one

deployment.

So it appears that Mr. West -- Deputy West and Deputy -- Sergeant Amos, who -- who deployed it once at least, and then did a drive stun once. And it appears that West also deployed it once. Okay?

And I guess West is going to have to answer that tomorrow why he deployed his Taser when he had his gun drawn.

Okay. And then if you look at Newport, Newport shows no -- no deployment at all until the 31st of October on the bottom. So he did not -- as he testified, he did not deploy his weapon. Okay, so that's consistent to what he said. That's why it's great to have these reports.

Okay. The next one is Brandon Amos. Okay. And he's got one arc here, and then he's got two more arcs on the 20 -- I'm sorry, my bad, my bad. I moved ahead of myself. But looking on page -- page 2. I do apologize.

Okay. At 7:00 he's got three arcs, and at 26th of October at 7 p.m. he's got three -- three deployments, and one deployment is one second. The other deployment is two seconds, and the other one is one second. So they're all within one minute of each

other.

Okay?  And it doesn't show -- it doesn't show the first shot that he made, and that -- that's a problem.  And this is -- this Taser X29003T6W, and this is his -- his Taser.  And it only shows three short arcs within a minute of each other.  But we saw the video where he tased him and then came running around the truck, and that took more than a minute.

So there's -- we've got three arcs so it might have been that he drive-stunned him more than once.  We can't tell, but it would be something to ask him.  And there's no trigger.  Because if you notice that when -- you'll see it later -- but when -- when they shoot it, it's -- it's -- it's a trigger.

And if you look at the next one.  Okay, I'm sorry.  There is none, and I do apologize.  Also on that day, 26th, there's a trigger for five seconds on page 9; an arc for one second, an arc for two seconds, and an arc for one second.  So that's a continuation of, I guess, the page before.

So there was four deployments by him. The first one he triggered when he shot him in the car.  Okay?  And then he came around and -- or he came around when he -- when he was in the car -- when

Mr. Hensley was still in the floorboard, he pressed the button again 'cause you know you can redeploy it by hitting the button again, and it was...

MR. WAYMIRE:  Can I ask you whether there's a question in here somewhere?

A    (No response.)

BY MR. VILLANI:

Q    Yeah, I'm just -- just saying that we have four -- four incidents where Mr. Amos tased Mr. Hensley.  And if these records are accurate, would you agree that there's four occurrences on that date?

A    I don't know.  I just know what I seen on the video.  I -- but, like I said, on this right here, you'll have to get this from Captain --

Q    Sure.

A    -- Cherry because he's -- he's the one that can tell you what this means.

Q    And I'm very sorry that no one ever showed you these during the investigation.

But you notice that on 26 October 2017, it says:  Trigger.  Do you know what that means at the event when you trigger some Taser?

A    Do I know what it means?

Q    Right on top of page 9.

A    Yeah.  I know it says trigger that deployed.  I don't know if that means that you actually pulled it and shot somebody.

Q    Well, it says five seconds.  Duration in seconds, five.  Is that the normal duration when you pull the trigger and they deploy these prongs?

A    Yes, it's -- it's for five seconds.

Q    Okay.  And it's -- would that be consistent with seeing Mr. Hensley on the floorboard after he got hit with five seconds worth of 50,000 volts?

A    That's something you'll have to ask him.

Q    Okay.

A    I wasn't there.

Q    All right.  And then shortly thereafter it appears that while the prongs were still in, Sergeant Amos reactivated it, reenergized it three more times.  One for one second, one for two seconds, and one for one second again.  And that was all done within one minute.

So Mr. Hensley was, by looking at this if you would agree, four something happened to him within one minute.  And you're not sure, and I'm not sure what this was.  But it appears like these were Taser shots.  And if you don't know, you don't know.

A    I don't.

Q    Okay.  And -- and I do apologize.  No one ever showed you this before.  Okay?

And the other ones that were -- other ones that were used were -- none of them appears on the next couple pages that have been used on the 26th of October.

So when you see all these other -- other Tasers that were signed out, none of them were deployed other than it appears West and Amos.  I'm sorry, Amos and West.  Okay?

I just wanted to bring that to your attention that -- and I -- and I apologize that no one ever showed you this before.  They should have.

Okay.  If we look at No. 11, okay, 11 appears to be a Murray County Sheriff's Office Sign Out Roster for new Taser cartridges.  Okay?

And Sergeant Amos, if you look at the third line down, and he took out -- he took out cartridge number C6203EYIX replacing cartridge C6202A176.  Did you see that third line down? Sergeant Amos?

A    Yes.

Q    Okay.  And it's for Willard Todd Hensley, and it lists -- Taster unit is 3T6W.  Does

that -- does that make any sense?

He had to have a cartridge to replace that cartridge C6202A176, which there should have been a report on, and these are the only reports on the cartridges. And you notice that there was no report on C6202A176. So do you know where that cartridge went?

A   No, I didn't.

Q   Did you report it?

Could that -- I'm just speculating. You can say yes or no. Did your -- could that be one of the cartridges that it looked like he was throwing away behind the -- in the truck or on the ground? I mean, that's what I saw. I know you didn't see that. And I'm sure your counsel didn't see it.

But it looked like he was -- had something in his hand that was thrown in the back of Mr. Hensley's truck?

A   I have no idea. That's something you'll have to ask Sergeant Amos.

Q   Okay. I'm going talk to Sergeant Amos about that.

And, again, I'm really surprised that they didn't show you these reports because you should have all the information that's available to you to

make a decision. 'Cause actually...

MR. WAYMIRE: Well, will you just ask him questions? He really needs to get out of here. If you're going to ask him questions, then go for it.

MR. VILLANI: Okay. All right. Well, if you stop interrupting, we'll get out of here a lot faster.

A    (No response.)

BY MR. VILLANI:

Q    My question was, don't you think it's better that you receive all of the information available so that you can make an informed decision?

A    Well, again, like I said, I had a Chief Deputy that the information was gave to him, and this could have been handled. I am seeing stuff that I have not seen so, you know, I can't answer that.

Q    Okay. Again, I was just -- I'm sorry, but I was just curious why you didn't see this report. I mean, nevermind.

Can we go to Exhibit No. 12? Okay. And that appears to be a report by John Cherry. Do you see that?

And is there a report that Mr. Cherry says he makes up when a -- when a Taser, a cartridge

is taken out of service?

Okay.  Do you know if Mr. Cherry -- Captain Cherry made a report on those missing cartridges and a missing Taser in -- in the Hensley matter?

A    I do not.

Q    Okay.  By the way, did -- did anyone ever show you this report that you see here?

A    No, I've not seen this one.  This is the first time.

Q    And I'm sorry about that, too.

Okay.  If we could turn to Exhibit 13, it's -- it's a three-part exhibit.  And we'll do the 13-A first.

Okay.  Can we -- if you look at the bottom of 13-A, you see that Newport and Amos signed out Tasers, X2 Tasers.  Is that your understanding of what this roster is?

A    Yes.  At the time we didn't have enough Tasers so they had to take turns signing them out.

Q    Okay.

A    Each shift.

Q    Okay.  And it looks like Newport signed his out on the 25th at 6:00 at night and sent this back -- turned it back in 5:45 in the morning the

next day.  Does that look like that to you?

        A    Yes.

        Q    Okay.  And Amos -- and I'm not sure if it's Sergeant Amos or Amos -- on 10-26-17, time out was 6:00 in the morning about and returned at 6:00 at night?

        A    That would have been Sergeant Amos.

        Q    I'm sorry?

        A    That would have been Sergeant Amos, yes.

        Q    Okay.  All right.  So were you ever shown this report?

        A    No, I've not seen this one.  I've looked at these reports when they sign them out, but I don't know if I've ever seen this one.

        Q    Okay.  And then 13-B and 13 -- 13-B is the same kind of report but at a later date.  And you see two more on the top on 13-B that's signing out.

            West signed out a laser at 10:26 at 0923 and turned it back in at 11:45.  And I believe that that would be in the morning.  Would you agree with me that...

        A    Probably.  It's 11:45.  That would probably be.

        Q    Yeah, 11:45 in the morning, though?  It's not p.m. 'cause that would be 2345, correct?

A    Right.

Q    Okay.  So West signed out his -- his laser -- his Taser just before noon and never took another one out, at least never signed out for one. But we can see by that other shoot that he used one.

So do you know where he got that other Taser that he didn't sign out for?

A    I do not.

Q    Okay.  And I'm sorry that you do not. Okay.  13-C, please.

Do you see that?  That's another Taser sign out sheet.  Do you see that?  And there's two -- there's -- there's one, two, three, five people that signed out Tasers on the 26th.  Do you see that on the bottom, towards the bottom of the -- and they're Trujillo, Vannoy.  Looks like L. Amos or Amos, Barnett and Biggerstaff.  Okay?

And you could see the times they signed them out and the times they signed them back in.  And it looks like Biggerstaff signed his out on the -- just after midnight on the 26th and returned his just after lunch.  Does that look that way to you? Biggerstaff is five from the bottom.

A    Okay.

Q    Could you -- yeah, could you just make

that a little bigger?

A    Biggerstaff?

Q    No, no, make it a little smaller so he can see 'cause the pictures are cutting off the end. Okay.  There you are.  Biggerstaff right there?

A    Yeah.

Q    Five from the bottom.  He signed it back at 12:30, but he admitted to tasing somebody.  So where is the Taser that he used -- that he used if he signed it back in at 12:30?

A    That's -- well, it's according to if he put 12:30 at midnight.  He should have but...

Q    Okay.  But he did.  12:30.  They -- they normally refer the time.

And you can see Barnett up on top.  He signed his out at 0545, which is five o'clock in the morning.  And he signed it back out at 7:47.  So that's -- that's...

MR. WAYMIRE:  What's your question?

A    (No response.)

BY MR. VILLANI:

Q    No, I'm saying, do you -- do you agree with that?

MR. WAYMIRE:  With what?

A    (No response.)

BY MR. VILLANI:

Q    That Corporal Barnett signed out his Taser at 0545 a.m. on the 26th and signed it back in at 7:47 p.m., which is -- sorry, 5:47 p.m.?

MR. WAYMIRE:  Barnett says 5:45 to 1800.

A    (No response.)

BY MR. VILLANI:

Q    Barnett sixth from the bottom.  Going across, 5:45 to 1747.

MR. WAYMIRE:  Okay.  0545 to 1747, yes. We'll stipulate to that.  That's what it says.

MR. VILLANI:  Okay.

MR. WAYMIRE:  Yes.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  Could you -- can you tell me if he had signed his Taser back in at 7 -- at 5:47 at night and he tased Mr. Hensley around 6:30, quarter to 7 at night, where did he get that Taser from?

A    I have no idea.  I wasn't there with him.

Q    Okay.  If you go up one more, Mr. Amos, Junior, if you go up to the right, he signed his out at the same time:  0545.  And signed his back at 5:53, just a little bit after Biggerstaff.  Do you see that?

A   Yes.

Q   Okay.  You agree with those times?  That's 5:53 at night?

A   Well, I can see what is on here.  I don't know.

Q   Okay.  And Levi admitted tasing or -- or deploying his Taser at least twice at Hensley.  Where did he get the Taser?  He signed his Taser back in.

A   I don't know.  I wasn't there.

Q   Okay.  And Vannoy signed his out at 2200, and returned it back at 1700.  So he -- but he didn't use it.

And Trujillo signed his out, do you agree, at 1701 and returned it 6:00 the next morning.  But he wasn't involved in this incident, was he?

A   I don't think so.

Q   So the three, Biggerstaff, Barnett and Mr. Amos -- Levi -- Levi Amos, tased with Tasers that were already signed back in.

Okay.  Well, that's 13-C.

Can we go to 14, please?  And could you load that -- the first page?  And that -- that's an Evidence Custody Receipt.

Are you familiar with this, sheriff?

A   Yes.

Q   Okay.  And if you look at this, there's the -- it's 14, I believe.  One, two, three, four, five, six, seven, eight, nine, 10, 11, 12, 13, 14, 15 and 7 and 6 -- 21, 21 deployed cartridges that were logged in.

But there's no -- no information whose cartridges they belong to, when they were deployed, the date it was collected, whose cartridges they were, and it doesn't have a cartridge number.  It doesn't have that it was deployed.  It has no information on that.

That -- that's -- is this the kind of Evidence Custody Receipt you expect in the sheriff's office, something with very little detail on it?

A   Well, I can't tell you on that because she answers to Captain Cherry.  That's handled through him.  That's something you're going to ask him.

Q   Okay.  I agree.  And, again, I'm sorry you didn't -- and the other stuff.  The stuff, the second page on 14.  Can you go to the second page?

He's the one that received it, and these are -- Sheena Marshall received it.  Okay.  So he's the one that put it into evidence custody, and then she's the one that received them:  Sheena Marshall?

It appears that way.  On the second page it says that they were received from Herbert Stuckey and received by Sheena Marshall.

MR. WAYMIRE:  We didn't hear you.  You froze somewhere in between there.  What's your question?

A    (No response.)

BY MR. VILLANI:

Q    No, I'm saying, is that -- am I reading that correctly?

MR. WAYMIRE:  Well, we -- well, we didn't hear your question so we don't know what you were reading.

A    (No response.)

BY MR. VILLANI:

Q    Okay.  This Evidence Custody Sheet shows that evidence on all of these were received from Herbert Stuckey, HS09, and was received by Sheena Marshall, SM47.  Am I reading that correctly?

A    Yes.

Q    And there's no further information about why they were received or what they were received for?

A    Well, the item to the left is -- that number, they can pull it up, and it tells what it is.

Q    Okay.  And -- okay, let's look at No. 15. And I'll try to get through this as quickly as possible.

Now, do you recognize No. 15?

A    Use of Force, yes.  General Policy Manual.

Q    Yeah, Use of Force Policy?

And do you -- do you agree -- and if you'd scroll through the 16 pages, make sure he realized that this -- this is the Use of Force Policy that he approved.  Don't go too fast 'cause I want him -- I want him to be able to -- if you could shrink it just a tad.  There you go.

Do you agree that that is -- is -- is your -- what you have intended for all the employees under your jurisdiction, Use -- Use of Force Policy? That is yours that was implemented on April the 1st?

A    What year?

Q    This is 2016.

A    Yes, yes.

Q    Okay.  So that is yours?

A    Yes, that's it.

Q    Okay.  Now, if we look at page 2 under the title, "Less Than Lethal Force," could you read that into the record, please, the definition of less

than lethal force?

        A    Less than lethal force.

        Q    Yes.  If you can make it a little smaller, madame court reporter, because the pictures are blocking it out.  Okay, good.

        A    Force which is neither likely nor intending to cause great bodily harm.  Less than lethal force shall include but not be limited to physical strength, physical skill, the use of chemical agents, Tasers, the use of less lethal ammunition, i.e., pepper balls, beanbag rounds, rubber bullets, et cetera, or the use of authorized baton as approved and in accordance with Murray County Sheriff's Office guidelines and training.

        Q    Okay.  And then on page 3 it gives you some option before you use a baton or a Taser.  If you go down to the bottom of the page, okay.

             And could you just read off just the title part -- the officer -- the force -- less than lethal force options?  Start off with officer presence.  Do you see that?

        A    Yes.

        Q    Okay.  So just read those -- those -- those titles off.  Like officer presence, verbal commands.  Could you read those off?

A     Officer presence, verbal commands, interaction communications, hand-control compliance and restraint.

Q     Okay.  And hand control is soft hands and hard hands.  And soft hands, do you have a definition for soft hands?

A     Yeah, it's just -- you know.

Q     Just grabbing somebody?

A     Yeah.

Q     Punching them in the face?

A     Right.

Q     Hard hands is...

A     If you got to...

Q     Okay.  And then their -- their requested use:  Queen -- Queen of Marksbury rules?

And then hard hands.

And then if you look at the next schedule, temporary incapacitation.  Do you know what that -- and what are the forms of temporary incapacitation?

A     Polarizing, caps gun, sprayer foam.

Q     Okay.

A     Batons, Taser X26 or X2.

Q     Okay.  So before we get to the Taser, X26 or X2, we can go through officer being -- his mere

presence, verbal commands and communication.

Hand-control compliance is soft hands and hard hands.

And then the -- the spray foam, batons. And then finally we get to Taser.

Would you agree that under normal circumstances, that the chain of command or the chain of events that should go through an officer's mind?

A   Well, that's -- that's a matter of discretion.

Q   Okay.

A   A situation if we're using -- when they first stopped him, verbal commands for him to get out of the vehicle.  That didn't work.

He was in a deadly-weapons-vehicle type situation.  So it's officer's discretion to go to the Taser if they needed to.

Q   Okay.  But you -- you agree -- you agree that they should at least attempt to go through all these?

A   I agree that it's up to the officer's discretion on how they think.

Q   Okay.  Well, not for anything.  But you're -- you're talking about the area where he was arrested.  I'm talking more or less in the shower area.

230

A    And, again, I wasn't there so I can't tell you the situation and how it progressed.

Q    Okay.  I -- I could -- I can sympathize with that.

Okay.  If you look on page 10, medical assistance.  Okay?  And the officers are required or should ensure that appropriate medical aid is given after a use-of-force incident.  Okay?

And do you -- based on the situation in part B, restraining devices may be required in order to appropriately control an injured subject before aid and medical assistance can be provided.

So Mr. -- they put him in a restraint chair, and no medical aid was given.  Isn't it the -- no medical assistance was given to him even though he asked -- according to his testimony, even though he asked to go to a hospital?

A    He was checked by the nurse.

Q    I'm sorry?  I'm sorry?

A    He was checked by the nurse, the on-duty nurse.

Q    He was -- I'm sorry, say this again?

A    He was checked by the nurse that was working that night.

Q    Oh, yeah.  And she said she checked.  "I

checked his vitals."  She checked his pulse and his blood pressure, and I don't know what else.  She said:  I checked his vitals.

Do you know anything else that vitals cover?

A    I -- I don't know.  You'd have to ask her.

Q    Okay.  I will.  I will.  I will ask her. I'm glad you reminded me.

Okay.  And then -- and do you believe that it's the supervisor's responsibility, whoever the supervisor is of that deputy, to ensure that all of these forms are filled out and all -- all of your -- your policies are filed -- followed?

A    Yes, it should be.

Q    Okay.  And -- and then on page 12: Reporting uses of force at the bottom.  Okay.  It looks like your deputies did an Incident Report, but they didn't do a Use of Force Report.

So this way -- this document says that they're not -- they're not mutually exclusive.  In fact, they should also be done.  So that if a deputy does an Incident Report, he's also required to do a Use of Force Report.  Is that what that Section C is saying?

A    Yes.

Q    Okay.  And then they said that the Incident Report should contain one through seven in Roman -- small Roman numerals.  And do you agree with one through seven; that they all must be included on the Incident Report?

A    Well, it should be completed.

Q    Okay.  And then part D, it says:  Each officer present or assisting in the incident requiring the use of force should submit a supplemental report describing the incident.

Do you know if every single officer issued a supplemental report?

A    I don't think every one of them did.  I don't know why.

Q    Okay.  And -- and obviously that's a violation of your written policy?

A    Yes, they need to.

Q    Okay.  And then the shift supervisor gets the report.  And then F, put up F.  And -- and then within one day -- this is on page 13, same page.

At 13-F, the shift supervisor will forward the Use of Force Report within one day to the Division Commander.  So who would be your Division Commander for the fact that the incident happened at

233

the -- at the vehicle?  Who -- who was the Division Commander for that?

A    For patrol, that would be Captain Goins. In the jail, it would be Captain Cherry.

Q    Okay.  And that's in the Sally Port and the shower?

A    Yes.

Q    Okay.  And do you know if these -- these reports were submitted to them as -- as required?

A    I do not.

Q    Okay.  Okay.  And then on here on page 14 -- okay, I'm sorry, did I say 14?  I meant 16, the last page.

And administrative review.  The Use of Force Report, the Incident Report with supplemental reports along with other related documentation will be reviewed by the shift supervisor for completeness and then submitted to the Division Commander and Chief Deputy.

That's part of your administrative review, isn't that?

A    Yes.

Q    Okay.  And -- and normally the Chief Deputy let's you know if there was something serious?

A    Yes.

Q    Okay.  And then B, you said you didn't know whether it was required by the State.  If you look at B, it says:  A copy of the Use of Force Report and all supporting documentation shall be forwarded to the Office of Professional Standard.

A    Yes.

Q    That's POST.  That's POST, isn't it?

A    Right.

Q    Okay.  So Plaintiff's Exhibit 15 accurately reflects what your intentions were and what your orders were to all your personnel, your guidance for use of force?

A    I'm sorry, I didn't hear you.

Q    Okay.  This 16-page document is that document which all personnel under your command had to abide by?

A    Yes.

Q    Okay.  Let's look at No. 16.  And -- and 16 is another form filled out, and it appears that's a training form.  And it appears on the bottom there's a Michael Scott Casey.  And who is Michael Scott Casey?

A    He is a sergeant over training.  He assists Captain Cherry.

Q    Okay.  So he's Sergeant Casey.

And it says -- and I noticed that Brandon Amos, No. 1. And then going down the list, you were at that session. And then going down, Newport was at that session.

And I believe you were the only three defendants at that particular session for use of force and de-escalation techniques; is that correct?

A    I was what? I didn't hear that.

Q    The training course title if you go up -- if you go to the top of the document, it says: Use of force and de-escalation?

A    Yes.

Q    Okay. So that's the training course that you attended along with Brandon Amos and what's his name? I just lost it. Jeff -- Jeffery Newport?

A    Yes.

Q    Okay. All right. If you look at 17, I know -- I know you're not a lawyer, but if you notice that the -- the State issued OCGA 35-8-26, which is quote unquote, the Taser law.

And it says the Taser and Electronic Control Weapons Act. And that's something that you as the Sheriff who follows all the rules and regulations of the laws of the State of Georgia would have to follow; is that correct?

A    Yes.

Q    Okay.  And let's go to No. 18, 18-A.  And 18-A appears to have been a report made by Deputy West on the lower left-hand corner at 10-26-2017.  Do you see that?

A    Yes.

Q    And it was reviewed by Jeffery Newport, who I believe at that time was the supervisor over Mr. West or Deputy West?

A    Yes, he was on duty that day.

Q    Okay.  So have you read through this report?

A    Yes.

Q    Okay.  And if you look at 18-A, does that truly represent Mr. -- I'm sorry -- Deputy West's report?

A    Yes, it does.

Q    Okay.  'Cause I want to use that tomorrow for Deputy West.

Okay.  And if you look at 18-B, like in boy, and this is an Incident Report.  And this reporting officer is Amos, and this is at booking?

A    Yes.

Q    All right.  Have you had a chance to read that report?

A    I did.

Q    And those three pages, do they accurately -- accurately reflect Mr. Amos's report?

A    It does.

Q    Okay.  And then if we go to No. 19, and this is the Minor Disorderly Policy.  And I'll give you time to look at it to make sure that's the one that you put into effect.

And I don't have a date on this.  Oh, 6-1-2013.

Okay.  Does that appear to be your Jail Operations Division Minor Disorder Policy?

A    For the jail, yes, sir.

Q    Yeah.  Okay.  And if you look at -- well, page -- I guess it's 474 at the bottom.

Okay.  If you look at towards the top of Section E, it says:  Detention officers may use their fist, foot, riot baton or similar weapons only when one or more of the following circumstances exist and then only to the extent that such force is reasonable.

Do you agree that that's what that says?

A    Yes.

Q    Okay.  Let's look at No. 1.  Did Mr. Hensley try to escape?

A    Not to my knowledge.

Q    Okay.  Were there two or more inmates or detainees who were trying to assault one officer?  It says:  When two or more persons assault an officer. There was only one Mr. Hensley.  He wasn't two people, was he?

A    That's correct.

Q    Okay.  So and then No. 3:  When an individual of obviously physical superiority or aggressiveness assaults an officer.

Did Mr. Hensley in the shower before he was tased, did he assault an officer?

A    Not to my knowledge.

Q    Okay.  And No. 4:  When Mr. Hensley was in the shower, did he commit or attempt to commit an attack on any third party that wasn't an officer? Like on the nurses?  Did he try to beat up the nurse or somebody else?

A    Not that I know of.

Q    So Section E says you can't use your fist, foot, riot baton or similar weapons -- assuming that's the Taser -- if one or more of the following exist.

Those did not exist so they violated your policy by going in and tasing him when he -- he

wasn't trying to escape.  He wasn't part of a group that was trying to beat up an officer.  He wasn't physical superiority or aggressiveness assaulting an officer.  And he wasn't committing or attempting to commit an assault on a third person.

So what reason in your mind did they have for violating this policy?

A    Again, like I said earlier, it's the officer's discretion on how they decide what situation they're going to have to handle the inmate or a violator on the road.

Q    Okay.

MR. WAYMIRE:  I got to -- let me -- let me point out here that it looks like -- well, the first page of this exhibit is 6.3-1.  And then the other pages are 6.2-2 and 6.2-3.

So it looks like these -- these policies are mixed up or somehow combined or something. Are you trying to trick the witness?  What are -- what are you doing here?

MR. VILLANI:  Well, no, no.  These -- these were given to me, and these were presented in the trial.  And the...

MR. WAYMIRE:  So the other lawyer was trying to trick the witness?

MR. VILLANI:  And -- and the sheriff was asked questions on this at 472, 473, 474 and 475. These are admitted into evidence at the trial, and these are -- if we could look at the very top of 19, it says:  Defendant's Exhibit 3.  I'm not trying to trick anyone.  I saw that, and I was wondering why.  That was my next question.

MR. WAYMIRE:  Okay.

MR. VILLANI:  I notice there's a...

MR. WAYMIRE:  Looks like we've got two different policies that are --

MR. VILLANI:  Yes, yeah.

MR. WAYMIRE:  -- combined into one exhibit here.

MR. VILLANI:  Yeah, and that's what I was going to say.

A    (No response.)

BY MR. VILLANI:

Q    Do you know where this 6.2 and 6.2-3 come from?  Do you know what policy that is?

A    The -- part of it's from the Georgia Jail Standards Policy, and then we several -- several years ago updated it.  But that's the thing about it. I don't know if there's two different ones here --

Q    Okay.

A    -- or what it is.

Q    Okay.  Now, on the last page 475.  Now, in the event the officer is accused of using excessive force, the jail administrator is to assign an officer uninvolved with the incident to investigate the incident and report his findings to the sheriff.

Do you agree that that is part of your policies in the jail?

A    To my knowledge, it is.

Q    Okay.  And would you agree that Mr. Hensley accused your officers of assaulting -- assault and battering him and using excessive force on him?

A    It was not told to me.

Q    That's what -- was it -- do you know if he voiced that through your officers and/or subordinates?

A    No, I don't have any information on that.

Q    Okay.  And did you notice that in his lawsuit back in March of 2018, he alleged that your officers used excessive force on him?

So after that allegation in the lawsuit, did you -- your supervisor, the jail administrator, did he initiate a -- an investigation?  And did that

findings of that investigation come across your desk?

A   No, I did not have any.

Q   So they -- they did not -- they did not follow your policies again?

MR. WAYMIRE:  Well, hold on.  I don't think we've established that they even got a copy of that first handwritten lawsuit.  So I don't know that he ever got that.  Maybe you need to ask him that.

A   (No response.)

BY MR. VILLANI:

Q   Those -- those people in the lawsuit that were involved in the lawsuit would have been -- would have seen the...

MR. WAYMIRE:  I think it was dismissed without prejudice.  It may have never been sent to the sheriff's office.  I don't know if it ever made it past frivolity review and so forth.

A   (No response.)

BY MR. VILLANI:

Q   Well, we'll -- we can see who was served on that lawsuit, but they should have -- the people that were served on that lawsuit, would you agree, sheriff, that they would have seen the lawsuit?

A   I don't know.

Q    And I believe that they can read English and be able to read it?

MR. WAYMIRE:  I think he can probably only testify about what he received and, you know...

MR. VILLANI:  Yeah.  But -- but I just need -- I mean, it's common sense.  If I get a lawsuit, I'm going to read it.

MR. WAYMIRE:  Well, sure.  But the question is, did they ever get it?  Because with an inmate lawsuit --

MR. VILLANI:  No, I'm saying...

MR. WAYMIRE:  -- if you submitted it for frivolity review, it's not automatically served.

MR. VILLANI:  No.  Counsel, don't -- don't -- don't make up a question for me.

A    (No response.)

BY MR. VILLANI:

Q    My question was, would you agree that the people who received Mr. Hensley's first lawsuit and the lawsuit that I -- that I filed, would have gotten a copy served to them personally?  Would you agree to that?

MR. WAYMIRE:  And so I -- I object to the predicate of the question --

MR. VILLANI:  Okay.

MR. WAYMIRE:  -- because it tends to be -- hold on, let me get my objection out.  It assumes that the first lawsuit was served on anybody, which is not necessarily correct.

MR. VILLANI:  Let's give you that.  Let's give you that.

A    (No response.)

BY MR. VILLANI:

Q    What about the -- the -- the second lawsuit?  Are you saying, sheriff, as we sit here right now, there are some people on that -- in that lawsuit that were not served with that lawsuit?

A    I -- I don't know.

Q    Well, did anyone make a motion to dismiss under 12 (b) (6) for lack of service?

MR. WAYMIRE:  He's -- he's not going to know that.  I mean, I don't think making a motion...

A    (No response.)

BY MR. VILLANI:

Q    Okay.  Well, answer.  You did not -- you did not file a 12 (b) (6) motion and so...

MR. WAYMIRE:  It's in the lawsuit.

MR. VILLANI:  Wait a minute.  Let me

finish.

MR. WAYMIRE:  You're right.  I agree.

MR. VILLANI:  It's useless of you to say that we don't know these people were served or not and you were their attorney and you know they were all served personally.

MR. WAYMIRE:  Yeah, I'm talking about the first lawsuit.

MR. VILLANI:  I'm talking about the second one now.  We're talking about that one.

MR. WAYMIRE:  Okay, that lawsuit.

A      (No response.)

BY MR. VILLANI:

Q      But as of the second -- as of the second lawsuit, did anyone form a committee or investigation to see if what Mr. Hensley was saying was true?  And did they write a report, and did that report land on your desk?  Yes or no?

A      I've not seen it.

Q      You've not seen it.  Okay.

And just -- just one more thing.  Okay?  Mr. Hensley was put in the restraint chair naked and wet.  Would you agree with that?

A      I guess, again, I wasn't back there.  I seen the pictures where, you know, he was in it,

didn't have clothes on.  I don't know about being naked or wet.

Q    But he just came out of the shower.  He was on the shower floor, and they stuck him in.  Did anybody dry him off before they put him in that chair?

A    I don't know.  Couldn't answer that.

Q    All right.  And the air conditioning was running in the -- in the jail -- in the room, the booking area?  Air conditioning running in the booking area?

A    Yes, it would have been.

Q    Okay.  So what I'm trying to say is that he's naked.  He's wet.  Air conditioning is running so he must have been freezing his butt off.  Okay?

Would you agree if somebody's naked, wet and with the air conditioning blowing on them, they're going to be cold?

A    I'm sure they probably would be.

Q    Okay.  And he was in that chair for 3 1/2 hours or thereabouts.  Would you agree with that?

A    I don't know on that.  I don't know how long he was in it.

Q    Well, wouldn't it be important for you to have checked that out, that -- his complaint so that

he was -- in his complaint he said he was kept in that chair for 3 1/2 hours?

MR. WAYMIRE:  Which complaint?

THE WITNESS:  Yeah, I've not received a complaint from him.

BY MR. VILLANI:

Q    I'm sorry?

A    I didn't receive a complaint from him.

Q    I'm saying his complaint, the second complaint.  You received that.  You read it.

A    The second lawsuit?

Q    Yes, the second lawsuit.  And you answered it.

A    And, again, like I said, my captain over at the jail is the one that handles the investigations.

Q    But -- but did you see that portion in the lawsuit after reading it that he was stark naked, soaking wet with the air conditioning running on in that -- in that restraint chair for about three, 3 1/2 hours?  Did you read that allegation in that lawsuit?

A    Yeah, I read it.

Q    Okay.  At that time did you call down to your chief and say:  Where is that report that he was

stuck in that restraint chair that long?

A    I did not.

Q    No, you did not.

Are you aware -- one last question, and -- and I hope this is the end of it.

Were you aware that the -- oh -- oh, by the way, Exhibit E.  I just want to get in Exhibit E into this.  Exhibit E is the -- if we can do Exhibit E?

Exhibit E is Mr. Todd Hensley's, and it says:  Sheriff Gary Langford, et al.  And...

MR. WAYMIRE:  You said E as in Edward?

MR. VILLANI:  E like in Edward.

ZOOM HOST:  Did you send me that one, Mr. Villani?  I don't see it.

MR. VILLANI:  Yeah, I did.

ZOOM HOST:  Okay.  I'm -- I'm looking. Let me...

MR. VILLANI:  Maybe it was -- maybe it was sent under a separate cover.

ZOOM HOST:

Okay, let me check my e-mails again.

MR. VILLANI:  I'm sorry about this.  I'm sorry.  I thought you had it.

MR. WAYMIRE:  It's an exhibit to your

Complaint?

MR. VILLANI:  And what it is, counsel, is the -- the Notice of Removal that you filed in this case.

MR. WAYMIRE:  Yeah, okay.

MR. VILLANI:  Document one.  And -- and it's part of the record, but I just wanted to show him that, the Civil Rights Complaint.

And it says:  Sheriff Gary Langford, et al.  And he included as part of Attachment A the list of all the people he was suing.  So it speaks for itself, the lawsuit.

MR. WAYMIRE:  Are you talking about that's a copy of his -- his -- Mr. Hensley's first lawsuit it comes from?

MR. VILLANI:  Yes, yes.  Yes, sir.  Yes, sir.

MR. WAYMIRE:  Well, if it's in the record, it's in the record.

MR. VILLANI:  Under Attachment A it says as follows:  Captain John Cherry, Sergeant Brandon Amos, Corporal Jeffery Newport, Sergeant Mitchum Desayer, Officer LaDon West, Officer Levi Amos, Officer Randy Barnett, Officer Justin Vannoy, Officer Dennis Biggerstaff, Officer Elizabeth

Silvers, Officer David Joshua Webb, and Nurse Carolyn Jenkins.  Twelve people plus the sheriff.

MR. WAYMIRE:  Yes, I think your -- so far as the service of that, if that ever happened, I think you're just...

MR. VILLANI:  No, but the suit was filed, and we will go back and look at the service documents and -- and see who was actually served.

If not -- if not, then the lawsuit that I filed, 4:19-CV-00267-TWT, which you removed to this court, that is attached to it.

So if -- if not, then all these -- all these people and the sheriff would have been on notice that this is what my client was complaining in his first lawsuit that he did by himself, and these are the people he was saying that abused him, used excessive force, tased him multiple times, refused him medical treatment.

MR. WAYMIRE:  All right.  Do you have a question for the sheriff?

MR. VILLANI:  Yeah.  So I just want to have Exhibit E, even though it's part of -- part of the record already as Notice of Removal, I just want to have that -- that portion of the Notice of Removal entered in the record as well as all these

other Exhibits 1 through 9.

Exhibit No. 20 is the Nurse Jenkins's report, but I'm going to talk to her about that.

A    (No response.)

BY MR. VILLANI:

Q    So, sheriff, I do appreciate it.  I don't know if you're -- oh, one last thing.

Are you aware of -- do you know the Clayton County Sheriff Hill?

A    Yes.

Q    I'm sorry?

A    Yes.

Q    Do you know that in April he was indicted for keeping some inmates in a retraining chair two, three, four hours at a time?

A    I seen it on TV.

Q    And that's a federal indictment so the federal -- federal rules in violation of their civil rights are quite serious about a punishment for an inmate.  Would you agree?

A    Yeah.

Q    Now, and if Mr. -- if Mr. Hensley is right that he was kept in the restraint chair for three to 3 1/2 hours, that's undue punishment under the 14th, the 8th and the...

MR. WAYMIRE:  I object to the -- object to legal conclusion.

A    (No response.)

BY MR. VILLANI:

Q    Would you agree...

MR. WAYMIRE:  And it's unsubstantiated.

MR. VILLANI:  All right.  All right.

A    (No response.)

BY MR. VILLANI:

Q    I said there's one question.  Would you agree that keeping somebody in a restraint chair for 3 1/2 hours naked, wet is -- is -- is punishment?

A    It's according to what's the circumstances.  It's just according, you know, what's happened.

Q    Okay.  So if he's screaming and yelling and tossing and turning while he's in the restraint chair, he should be kept in it?  Is that what you're saying?

A    I'm not saying that.

Q    Well, what conditions would somebody -- what -- what conditions would you say somebody should be kept in the restraint chair for 3 1/2 hours naked and wet --

MR. WAYMIRE:  Objection:  Calls for

speculation.

A    (No response.)

BY MR. VILLANI:

Q    -- with the air conditioning?
Assuming -- assuming he was wet, naked and the air conditioning running for 3 1/2 hours, what could he have done?  What could he have done to get that punishment?

A    Like I said, it's -- it's according to what they determine certain if his terms answers were.

Q    All right.  And who would have the authority to keep him in that restraint chair for 3 1/2 hours?

A    Your supervisor that's over the shift.

Q    All right.  Who was the supervisor at that time?

A    Barnett, I think.  Corporal Barnett.

Q    When Barnett's gone, what about Amos?
Was he under him or anybody under Barnett?

A    Well, all the other officers were under Barnett.

Q    Okay.  And Barnett is no longer working?

A    No, he quit and went to some other job.

Q    Okay.  Okay.  I'm -- I'm finished, and I

thank you very much for taking all this time.  I know it lasted three hours more than I wanted it to.  And I appreciate your -- your patience, sir.  Thank you.

A    All right.

MR. WAYMIRE:  Sheriff will read and sign.

MR. VILLANI:  Do you have any questions, counsel?

MR. WAYMIRE:  No.

MR. VILLANI:  Okay.

MR. WAYMIRE:  Sheriff will read and sign. We're done.

MR. VILLANI:  I'm sorry.  One time?

MR. WAYMIRE:  I said:  The sheriff will read and sign, and we are done.

MR. VILLANI:  Oh, yeah, with the sheriff. Yes, that's the other question I was going to ask you:  Read and sign.

MR. WAYMIRE:  That's good.

MR. VILLANI:  And do you -- do you want to do at 4:00 Nurse Jenkins, or does she need longer to get here?

MR. WAYMIRE:  I'll try to get her for four.  Okay?

MR. VILLANI:  All right.  How -- how about make it 4:15, and this way give you a half

an hour?

MR. WAYMIRE:  That's okay with me.

MR. VILLANI:  All right.  We'll do it at 4:15:  Nurse Jenkins.

Yes, ma'am?

ZOOM HOST:  I just wanted to say, I did find Exhibit E.  I did have that so I'll send it to the court reporter and to Jason.  Okay?

MR. VILLANI:  And then did you -- counsel, did you need Exhibit E the way I had it set up to look at it?

MR. WAYMIRE:  I mean, it can't hurt to show it to me.  But if it's already in the record, then I won't have any trouble.

MR. VILLANI:  Okay.  So we've got Exhibits C.  And what was the last one?  C?

ZOOM HOST:  And then 19.

MR. VILLANI:  C, E and then 1 to 20.

ZOOM HOST:  Yes, sir.

MR. VILLANI:  Okay.  Counsel, do you need copies of those before you leave?

MR. WAYMIRE:  The court reporter sent me copies as I think 1 through 21.

MR. VILLANI:  Okay.

MR. WAYMIRE:  And I think I...

MR. VILLANI:  Guys, I'm sorry.  I forgot to ask.  Would you mind if I introduced 21?  He's left already.  I forgot 21.

MR. WAYMIRE:  What is 21?  Let me -- hold on.

COURT REPORTER:  I had a question, too, but he's gone, right?

MR. VILLANI:  I'll tell you what, I'll -- I'll save 21 tomorrow.

MR. WAYMIRE:  Okay.  What's -- what's -- what's your question, madame court reporter?  I might be able to get you an answer.  A name spelling or something?

(Discussion off the record.)

ZOOM HOST:  Okay.  So we're on a break until 4:15?

(Deposition Concluded at 3:56 p.m.)

**J U R A T**

_____

GARY LANGFORD

Sworn to and subscribed before me

_____,

Notary Public, this _____ day of

_____, _____.

My commission expires: _____

C E R T I F I C A T E

GEORGIA:

FAYETTE COUNTY:

I hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption, and the colloquies, questions and answers were reduce to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of BULL AND ASSOCIATES, INC., Certified Court Reporters, and the signature and original seal is attached thereto.

I further certify that I am not a relative, employee, attorney or counsel of the parties, nor am I a relative or employee of such attorney or of any party, nor am I financially interested in the outcome of the action.

This 12th day of July, 2021.

_____
GAYE D. TRAYNOR, RPR
Certified Court Reporter and
and Notary Public.  My commission
expires March 31, 2022.

259

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of BULL AND ASSOCIATES, INC.

Bull and Associates, Inc. was contacted to provide court reporting services for this deposition. Bull and Associates, Inc. will not be taking this deposition under any contract that is prohibited by O.C.G.A 9-11-28 (c)., O.C.G.A. 15-14-37(a) and (b).

Bull & Associates, Inc. has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Bull & Associates, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

OFFICIAL CODE OF GEORGIA ANNOTATED 15-14-37

(a)    Contracts for court reporting services, not related to a particular case or reporting incident, between a certified court reporter or any person with whom a certified court reporter has a principal and agency relationship and any attorney at law, party to an action, or party having a financial interest in an action, are prohibited. Attorneys shall not be prohibited from negotiating or bidding reasonable fees for services on a case-by-case basis.

(b)    In order to comply with subsection (a) of this Code Section, each certified Court Reporter shall make inquiry regarding the nature of the contract for his or her services directed to the employer or the person or entity regarding said Court Reporter's services as an independent contractor.

**[**

**[sic] (4)**
55:17;102:7;129:8;
156:7

**A**

**abide (1)**
234:16
**ability (3)**
114:14;209:10,10
**able (12)**
7:18;15:19;27:14;
33:25;50:17;77:7;
87:9;88:18;161:9;
226:12;243:2;256:12
**above (2)**
21:14;145:10
**absolutely (4)**
7:16;62:22;121:11;
190:23
**abuse (2)**
47:21;157:19
**abused (1)**
250:16
**academy (1)**
204:25
**access (6)**
34:23;35:2;114:11;
119:9;172:25;204:18
**accordance (1)**
227:13
**according (21)**
26:19;35:19;50:22,
24;55:9;59:11;66:8;
108:15;109:1,21;
116:15;121:21,23;
183:18;196:8;198:7;
221:11;230:16;
252:13,14;253:9
**account (4)**
189:9,10,13;
190:15
**accounts (1)**
188:20
**accurate (2)**
142:12;213:10
**accurately (3)**
234:10;237:3,3
**accusation (1)**
65:7
**accused (4)**
47:21;65:5;241:3,
12
**accusing (1)**
20:3
**across (3)**
149:18;222:9;
242:1
**act (2)**
62:24;235:22

**acting (6)**
73:10,11;93:16,18;
95:10,12
**action (1)**
205:10
**actions (7)**
72:24;73:1;92:11;
94:14,15;131:14;
180:1
**activation (1)**
206:22
**acts (1)**
94:1
**actual (2)**
206:7,14
**actually (7)**
12:14;17:2;31:24;
71:3;214:3;217:1;
250:8
**Adams (1)**
205:3
**add (2)**
10:6;193:7
**administrative (3)**
11:11;233:14,20
**administrator (4)**
11:2,3;241:4,24
**admit (2)**
136:24;155:22
**admitted (7)**
73:2,4;104:20;
180:14;221:8;223:6;
240:3
**admitting (1)**
103:10
**affairs (2)**
121:22,23
**affect (1)**
199:14
**afraid (1)**
183:4
**afternoon (1)**
136:1
**again (67)**
12:25;27:3;34:8,
10;39:22;40:21;
43:24;46:3,14,25;
48:11,21;49:9,9;51:2,
6;55:8;57:20;62:17;
64:1,21;67:1,7;
68:20;71:5;83:14,14,
20;84:8,20;94:6;
97:1,5,12;112:3;
114:10;116:2,15;
122:11,13;123:21;
132:22;143:19;
144:3;145:8;170:12;
178:8;187:17;
189:16,20;192:16;
204:4;206:10;213:2,
3;214:19;216:23;
217:14,18;224:19;
230:1,22;239:8;

**242:4;245:24;
247:14;248:22**
**against (12)**
8:5;45:23,23;59:8;
64:18;71:18;123:5;
131:3,3;151:2,22;
184:16
**agents (1)**
227:10
**Aggravated (1)**
118:6
**aggressiveness (2)**
238:10;239:3
**agitation (1)**
100:16
**ago (6)**
7:24;15:21;51:20,
21;68:20;240:23
**agree (67)**
24:14;33:17;39:13;
47:9,16;48:9;62:12;
67:5;79:21;80:4;
90:20,25;91:7,13;
99:25;102:6;106:21;
107:4,14;109:18;
110:4,6,9,17;119:18;
144:2;150:23;
152:23,25;177:2;
181:23;187:15;
192:7,10;193:10;
195:8;196:1,7;
201:10,17;213:11;
214:22;219:20;
221:22;223:2,14;
224:19;226:8,14;
229:5,17,17,20;
232:4;237:22;241:8,
11;242:23;243:19,
22;245:2,23;246:16,
21;251:20;252:5,11
**agreed (1)**
202:9
**agreeing (2)**
44:19,24
**ahead (9)**
48:19;81:24;82:10;
90:15;96:11,22;
97:20;99:18;211:19
**aid (3)**
230:7,12,14
**ain't (1)**
153:7
**air (8)**
152:4;246:8,10,14,
17;247:19;253:4,5
**al (2)**
248:11;249:10
**Albert (1)**
167:4
**alcohol (4)**
63:11;65:3;70:15;
71:22
**allegation (5)**

**63:21;69:17,22;
241:23;247:21**
**alleged (1)**
241:21
**allegedly (1)**
168:8
**allergic (2)**
25:6;115:9
**allow (2)**
86:3;182:24
**allowed (6)**
4:18;115:18;
173:22;175:8;189:5;
195:1
**almost (5)**
12:8;22:3;59:15;
118:21;128:15
**along (4)**
41:4,5;233:16;
235:14
**altercation (1)**
86:3
**alternative (1)**
62:12
**ambulance (1)**
199:21
**ammunition (1)**
227:11
**Amos (78)**
28:9;29:17;32:13;
35:1;39:20;55:17,24;
57:7,22,25;58:23;
59:2,5;60:4;61:4;
73:21;81:19;82:19,
22;83:4;86:18,23;
87:9;97:15;101:23,
24;102:25;103:1;
117:20,23;125:1;
129:11;130:1;
146:25;147:1;151:6,
7,7;154:21;169:16;
170:2;176:8;179:10,
16;181:1;183:12;
192:5;193:16;197:7,
8;205:5;211:3,16;
213:9;214:17;
215:10,11,18,22;
216:20,21;218:16;
219:3,4,4,7,9;220:16,
16;222:21;223:18,
18;235:2,14;236:22;
249:22,23;253:19
**Amos's (8)**
73:14;85:24;86:14;
87:1;88:23;97:18;
101:16;237:3
**and/or (1)**
241:17
**angel (12)**
63:22;65:18,24;
66:9;67:12;69:19;
71:9;72:10,13,22;
73:6;94:13

**angle (1)**
80:19
**angry (1)**
136:6
**Anna (2)**
42:22;166:15
**answered (6)**
19:12,13,14,18;
46:9;247:13
**anymore (1)**
138:5
**apologize (9)**
8:18,23;12:17;
159:22;209:17;
211:20;212:17;
215:2,13
**appear (12)**
55:14;78:25;
100:11;101:2,2;
136:5,6,6,7,7;197:22;
237:11
**appeared (4)**
62:9,10,10;104:16
**appears (24)**
54:12;78:21;104:5,
14,14;135:19;138:1,
3;161:9;174:3;
208:25;209:4;211:2,
5;214:16,24;215:5,
10,16;217:22;225:1;
234:19,20;236:3
**appreciate (7)**
75:10;77:17;
105:14;190:10;
194:25;251:6;254:3
**approaching (1)**
26:11
**appropriate (1)**
230:7
**appropriately (1)**
230:11
**approved (3)**
175:3;226:11;
227:13
**approximately (1)**
28:11
**approximation (1)**
177:5
**April (4)**
110:15;174:4;
226:17;251:13
**Arc (8)**
207:7,7,15;210:24;
211:17;212:19,19,20
**arced (1)**
209:15
**arcs (7)**
207:17;208:3,22;
211:18,21;212:6,9
**area (26)**
34:6;59:10;132:10,
11,12,13;140:9,11,
17;143:21;144:10;

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 261 of 284
Willard Todd Hensley v.                                                    30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                                    June 10, 2021

145:19,20;146:2,4,9;
147:6,9;160:24;
162:16;208:5,5;
229:23,25;246:10,11
**arguing (4)**
95:17,22;141:12;
185:22
**argument (3)**
72:16;191:11,12
**Argumentative (4)**
67:14;72:14;95:21;
141:24
**argutive (1)**
102:7
**arm (3)**
26:4;188:2,10
**armed (1)**
175:25
**arms (6)**
16:13;101:5,10,13,
14;190:13
**around (27)**
24:20;26:22;30:7;
51:25;54:14;81:16;
82:20,22;83:5;84:13;
94:20;98:6;110:21,
22;129:4;131:7;
140:8;161:13;188:2,
10;190:13;208:5;
209:15;212:8,24,25;
222:18
**arrest (28)**
12:13;22:13,17;
26:12;28:2,2;57:23;
60:6,12;62:6;63:1;
67:19;68:2,4,10,16;
69:18;73:1;104:15;
106:17;131:16;
138:15,17,20;151:5;
183:1,2;193:25
**arrested (9)**
14:11;64:24;118:2,
3;154:14;182:18;
199:25;210:25;
229:24
**arresting (2)**
60:5;62:5
**arrhythmia (1)**
106:16
**arrived (2)**
18:17;197:8
**arrives (1)**
116:6
**arrythmia (1)**
108:22
**article (5)**
110:14,19;112:4,4,
10
**assault (6)**
118:6;238:3,4,12;
239:5;241:13
**assaulting (2)**
239:3;241:12

**assaultive (2)**
182:14,16
**assaults (1)**
238:10
**assign (1)**
241:4
**assigned (1)**
33:18
**assistance (3)**
230:6,12,15
**assistants (1)**
128:6
**assisting (1)**
232:9
**assists (1)**
234:24
**assume (1)**
162:11
**assumes (1)**
244:4
**assuming (4)**
94:11;238:21;
253:5,5
**AT&T (2)**
8:19,22
**attached (6)**
4:2;5:22,22,25;
134:18;250:11
**Attachment (2)**
249:10,20
**attack (3)**
110:7;163:21;
238:16
**attempt (2)**
229:18;238:15
**attempted (2)**
38:3;142:8
**attempting (4)**
30:8,9;68:17;239:4
**attended (2)**
198:22;235:14
**attention (23)**
47:5;49:4,8,25;
50:3;51:11,13,15;
58:8,9;59:22;60:8;
61:10;81:18;83:4,13;
122:5;124:6;125:13,
23,25;153:20;215:13
**attorney (5)**
22:8;42:23;48:12;
160:9;245:5
**Attorney's (1)**
71:15
**August (2)**
135:23,25
**authority (3)**
47:22;148:6;
253:13
**authorized (1)**
227:12
**automatically (2)**
198:6;243:14
**available (5)**

166:15;172:23;
192:3;216:25;217:13
**aware (14)**
12:7;18:20;37:25;
46:10;50:7;59:4;
147:3;148:25;151:9;
180:6;199:14;248:4,
6;251:8
**away (5)**
98:7;107:13;
154:21;177:6;216:13

---

## B

**back (88)**
6:2,17;8:13;14:18;
15:3;18:7;32:19;
37:15,19,24;39:3;
40:15;42:11;45:13;
52:3;55:16;56:16;
65:10;66:25;68:22;
76:18;79:10,13,14;
81:13,14;82:21,22;
83:5,12,14,21,23;
84:2,7,10,11,22,24;
89:5,10;91:11,25,25;
92:2;93:3;96:7;97:2,
9,15;101:6,14;
105:21;115:3;
122:13;133:21,22;
146:12;147:2;148:4;
152:8;154:10;
159:14;160:2;162:9;
172:7,11;202:1,2,2,5;
216:17;218:25,25;
219:19;220:19;
221:7,10,17;222:3,
17,23;223:8,11,19;
241:21;245:24;250:7
**backed (1)**
79:3
**backing (1)**
67:4
**backup (3)**
30:8;82:4,7
**backward (2)**
101:10,13
**bad (6)**
93:21;94:16;
109:15;202:15;
211:18,18
**bag (10)**
40:16;41:4;161:9,
23;164:12;165:11,11,
13,14,14
**bagged (3)**
41:3,8;49:20
**balls (1)**
227:11
**barefooted (1)**
100:23
**barely (2)**
81:19;82:3

**Barnett (20)**
121:3;129:22;
151:8;152:9;169:25;
205:3;207:6;208:15;
220:17;221:15;
222:2,5,8;223:17;
249:24;253:18,18,20,
22,23
**Barnett's (3)**
208:22;209:19;
253:19
**base (1)**
42:4
**baseball (1)**
184:19
**based (1)**
230:9
**basically (3)**
14:17;66:4;134:9
**basis (6)**
67:9,15,18;156:10;
171:5;188:21
**bat (2)**
55:11;184:20
**baton (12)**
25:22;55:3;114:15;
115:4,14;192:9,12,
15;227:13,16;
237:18;238:21
**batons (6)**
114:11,11;115:2,
18;228:23;229:3
**battering (1)**
241:13
**battery (1)**
174:20
**beanbag (1)**
227:11
**beat (2)**
238:17;239:2
**beaten (2)**
112:21,25
**beating (2)**
67:11;186:22
**became (2)**
50:7;143:4
**beckons (1)**
172:7
**become (1)**
7:17
**behalf (1)**
19:15
**behavior (2)**
182:14,16
**behind (9)**
16:7;48:12;72:12;
80:15;82:19;154:22;
171:21;192:14;
216:13
**beI'll (1)**
134:2
**belong (1)**
224:7

**below (4)**
143:23;144:3;
145:1;169:12
**belt (1)**
175:12
**beside (1)**
80:14
**best (3)**
55:20;95:13;116:7
**better (7)**
51:25;104:2;
105:15;127:24;
128:1,4;217:12
**big (12)**
28:13;51:22;140:4,
21,25;141:1,1;
143:16;145:3;
150:13,15;155:15
**bigger (2)**
28:23;221:1
**Biggerstaff (14)**
147:12;150:6;
151:15;169:19,21;
205:4;220:17,20,23;
221:2,5;222:24;
223:17;249:25
**bird (2)**
27:21;108:18
**bit (29)**
15:11;21:20;28:25;
32:19;39:4;43:19;
79:20,24;82:21;
84:18;90:25;91:25;
97:2;102:7,9,10;
137:25;139:8,8,22;
140:3,24;143:20,21;
144:25;155:11,12;
174:25;222:24
**black (3)**
145:3,4,11
**blame (1)**
99:5
**blazing (2)**
154:17;170:10
**bleeding (1)**
155:18
**blemish (1)**
145:4
**bless (3)**
7:12;22:6;158:16
**blind (1)**
61:9
**blocking (1)**
227:5
**blood (13)**
63:10;70:15,19,21,
24;155:4,6,13,16,19,
19;199:2;231:2
**blowing (1)**
246:17
**blue (6)**
79:17;80:14,15,16;
86:12;91:13

Willard Todd Hensley v.
Hon. Gary Langford, Sheriff, et al.

30(b)(6) of Gary Langford
June 10, 2021

**bodies (1)**
85:8
**bodily (3)**
99:4;152:12;227:7
**body (48)**
27:12;60:1,19;
73:14,15,20,21,22;
77:19,20;86:24,25;
90:1,4,6,8;91:21;
92:4,25;96:2,9,21,25;
97:11,21;98:12,25;
99:19;100:10,20;
101:7;102:2,20;
103:7,12,13,16,18;
104:3,11,12,15,15;
105:1;109:19;
139:21,24;178:25
**bolster (1)**
63:20
**book (1)**
157:1
**booked (2)**
168:24,25
**booking (14)**
132:10,11,12,13;
146:2;167:5,24,25;
168:23;169:5;208:5;
236:22;246:10,11
**boom (1)**
82:3
**both (9)**
5:10;30:1;58:17;
84:18;98:5;105:1;
178:23;184:6;194:4
**bottom (19)**
132:24;138:3;
182:10;191:22;
203:13,14,19;206:22;
211:12;218:16;
220:15,15,23;221:7;
222:8;227:17;
231:17;234:20;
237:15
**boy (2)**
160:23;236:21
**brain (4)**
93:6;111:24,25;
112:7
**brand (1)**
35:20
**Brandon (5)**
205:4;211:16;
235:1,14;249:21
**break (8)**
75:11,17,21,22,24;
105:17;172:6;256:15
**breath (1)**
63:10
**breathalyzer (1)**
70:14
**breathing (1)**
25:8
**Brief (4)**

77:3;105:24;172:9;
203:7
**briefing (1)**
156:17
**bring (8)**
51:17;125:23,24;
128:15;174:25;
195:20;198:4;215:12
**broke (3)**
32:24;51:18;105:9
**broken (2)**
69:6;105:4
**brought (19)**
12:15;14:18;47:5;
49:3,8,25;50:2;51:11,
13,15;71:18;122:5;
124:5;125:13,14;
130:11,14;145:24;
166:5
**bruises (1)**
201:12
**buck (4)**
9:14;152:3;181:17;
187:13
**bullets (1)**
227:12
**bumpy (2)**
80:4;90:19
**bunch (1)**
156:24
**burst (1)**
207:23
**bursts (1)**
207:17
**business (2)**
12:8;155:24
**bust (1)**
24:3
**butt (2)**
152:5;246:15
**button (2)**
213:2,3

**C**

**C6202A176 (3)**
215:21;216:3,6
**C6203EYIX (1)**
215:20
**cab (2)**
81:23;82:23
**call (13)**
14:4;18:14;58:3;
63:22;66:10;78:12;
79:1;97:6;103:5;
116:20;122:8;
124:11;247:24
**called (8)**
106:22;109:4;
120:14,23;133:14;
143:4;154:15;157:3
**calling (1)**
182:3

**calls (5)**
46:3,7;164:24;
181:25;252:25
**calm (6)**
54:17;97:14;
100:13;188:3,10;
190:14
**cam (43)**
27:12;60:19;73:15,
15,21,21,22;77:19,
20;86:24,25;90:1,4,6,
8;91:21;92:4,25;
96:2,9,21,25;97:11,
21;98:12,25;99:19;
100:10,20;101:7;
102:2,20;103:7,12,
13,16,18;104:3,11,
12,15,16;105:1
**camcorder (1)**
5:22
**came (20)**
16:7;39:13;79:1;
82:5,8;84:8;98:5,6;
143:2;147:1,6,9;
152:8,15,16;154:17;
212:7,24,25;246:3
**camera (4)**
60:1;130:5,12;
146:6
**cameras (5)**
130:8;132:4,7,8,9
**camouflage (3)**
154:10,13,15
**can (184)**
4:8,20,21,22;5:6,7,
10,13;6:3,4;13:11;
17:24;18:9;24:3,16;
25:19;28:8;35:11;
37:8;45:23;48:10;
55:3,17,20;56:2,18;
57:11;59:13;60:4,13;
61:20,21;64:16;
69:12;74:19,24;75:6,
11,12,15;76:14,17;
77:14,25;78:16,24;
79:8,10;81:10,13,18;
82:11,20;84:10,10,
15,15,25;85:2,7,8,14,
21;88:5,12,14,21,22,
25;90:9,24;91:23;
92:11;93:4;96:6;
97:4,13;102:18;
103:5,7,20;104:1,8,
10;105:12,17;106:12,
16;110:7,16;111:24,
24;112:7;113:12,19,
25,25;119:4,7,14;
124:24;126:11;
128:19,21,24;132:19;
136:4;137:24,25;
138:4;139:7,25;
140:12;141:1;
143:12,14,14;145:17;

146:11;148:24;
152:2;155:3;157:2;
158:20,23;159:2;
160:1,2;162:11;
163:7;164:1,2,2,24;
170:5;174:11,23,24,
24;175:2;176:16;
182:4,4,11,21;
185:23;190:23;
191:16,17;193:12,15;
196:1,3,20;200:4,6;
201:3;202:23;
204:19;209:14,18;
213:2,4,18;216:11;
217:13,21;218:15;
220:5;221:4,15;
222:16;223:4,21;
224:21;225:25;
227:3;228:25;230:3,
12;242:21;243:1,3;
248:8
**caps (1)**
228:21
**captain (37)**
20:12,12,13;21:14;
36:19;40:2,3;44:8;
46:21;47:1;49:9;
52:13,16;53:24;54:7;
121:21,22;122:4;
124:5;128:7,8;148:7;
165:23;174:17;
178:9,20;181:14;
203:12;207:19;
213:15;218:3;
224:16;233:3,4;
234:24;247:14;
249:21
**captains (11)**
9:10;10:5;11:21;
20:11;64:22;142:13;
143:6;156:5;170:18,
20;171:9
**car (16)**
30:23;56:10,10;
61:19;65:9;68:18,22;
69:5,6,7;86:8,10,11;
100:25;212:24,25
**card (2)**
167:5;168:23
**cardiac (1)**
106:17
**Carolyn (1)**
250:2
**carpeting (2)**
155:4,5
**carry (1)**
175:8
**carrying (3)**
15:22;175:21;
178:18
**cartridge (20)**
35:4,5,18;40:18;
41:5;48:4;82:20;

98:3;125:16,20;
161:23;165:12;
178:15;215:20,20;
216:2,3,7;217:25;
224:9
**cartridges (59)**
33:25;34:1,6,16,
22;35:9,10,24;36:11,
13,17;37:1,4,25;
38:13,18;40:16;41:3,
7,12,23;43:12,13;
48:3,4;98:7;124:13;
125:8,11,20;154:18,
19,20,21,25;161:2,3,
5,8,11,18;162:11,15;
164:21;166:1;177:8,
12,23;178:4,7;
179:20;180:15;
215:17;216:5,12;
218:4;224:4,7,8
**case (32)**
8:1,5,16;38:1,21;
43:23;44:2;45:24;
47:15,15;113:20;
117:11,18;120:9;
121:13;126:16;
127:22;128:23;
129:16;153:9;
156:21,24;157:1,3,3,
6;171:6,7,8,25;198:3;
249:4
**cases (7)**
8:10;71:6;107:12;
127:25;157:10,16;
158:13
**Casey (3)**
234:21,22,25
**cattle (6)**
110:23;111:4,8,13,
14,15
**cause (39)**
4:25;5:11;35:14;
53:24;68:2;73:10;
85:15;86:12;95:14,
20;101:6;106:16;
107:7,13;110:7,10,
16,18;111:24,24;
112:7;121:7;123:25;
153:2;154:11;
155:25;181:16;
184:16;199:13;
200:1;202:20;
208:19;213:2;217:1;
219:25;221:4;
226:11;227:7;236:18
**caused (2)**
62:24;63:3
**causes (1)**
107:3
**cell (1)**
150:11
**cellphone (1)**
164:7

center (1)
    10:25
certain (9)
    24:12;47:10,14;
    49:15;62:14,15,20;
    123:6;253:10
certificate (2)
    206:7,17
certificates (1)
    206:14
certification (9)
    14:24;15:7;53:4,8;
    173:16;175:6;
    204:11,16,25
certified (11)
    15:19;21:3,6,9;
    32:21;173:7;204:3,4,
    19;205:1,10
Certify (1)
    56:24
cetera (1)
    227:12
chain (9)
    50:4,8;64:7,10,22;
    125:14;184:20;
    229:6,6
chair (23)
    123:8;137:5,10;
    163:13;198:21;
    201:21,22;202:1,4,7;
    230:14;245:22;
    246:6,20;247:2,20;
    248:1;251:14,23;
    252:11,18,23;253:13
chairs (2)
    137:7,14
chance (2)
    124:11;236:24
change (2)
    10:6;193:7
changed (2)
    123:7;169:6
changes (2)
    10:4;85:14
charcoal (1)
    101:25
charge (5)
    39:25;129:23;
    130:18,18;203:13
charged (3)
    12:15;14:9;66:1
charger (1)
    101:20
charges (4)
    71:17,21;118:4;
    171:21
charging (1)
    65:2
Charlie (1)
    113:11
check (21)
    20:23;33:12;37:3;
    44:8;63:10;71:3;

124:22;125:11;
    128:13;142:13,21;
    147:8;148:1,3;
    170:16,23;171:2;
    176:9;199:16;200:2;
    248:22
checked (16)
    20:20;33:6;142:18;
    148:14,14;159:8;
    176:5;180:11;
    230:18,20,23,25;
    231:1,1,3;246:25
checkout (1)
    124:21
checks (3)
    32:22;33:4;170:20
cheeks (2)
    139:16;202:15
chemical (1)
    227:10
Cherry (34)
    20:4;36:19;40:2,3;
    44:9;46:22;47:1;
    49:10;52:14,16;
    53:24;54:8;120:19;
    121:21;128:8;
    165:23;174:17;
    178:2,9,20;181:14;
    203:13;205:7,13;
    207:19;213:17;
    217:22,24;218:2,3;
    224:16;233:4;
    234:24;249:21
Cherry's (1)
    37:2
chest (5)
    59:6,9;143:21,22;
    144:10
chews (1)
    122:10
Chief (16)
    11:24;12:5;20:19,
    20;124:5;128:6;
    156:6,8;170:19,21;
    171:9,14;217:14;
    233:19,23;247:25
chiefs (1)
    160:14
childbirth (1)
    109:11
choking (1)
    186:21
CID (1)
    31:16
circle (2)
    139:16;155:15
circular (1)
    106:17
circumstances (9)
    11:19;16:5;163:19;
    183:10,11;184:10;
    229:6;237:19;252:14
CIS (1)

31:16
citation (1)
    65:6
cite (1)
    69:13
citizen (1)
    24:20
City (1)
    152:22
civil (5)
    45:24;47:15;
    157:17;249:8;251:18
civilians (1)
    168:4
claim (2)
    67:20,25
clapped (1)
    16:15
class (3)
    15:16;206:16,18
classes (2)
    12:19;15:15
Clayton (1)
    251:9
clean (1)
    201:20
clearly (2)
    184:25,25
clerk (1)
    47:18
click (3)
    77:1;85:9;91:24
client (9)
    4:13;5:6;6:4,20;
    188:24;192:14;
    193:17;194:25;
    250:14
client's (3)
    4:18;6:3;136:22
climbs (1)
    96:12
close (7)
    91:15,16,19;144:2,
    5,8,22
closed (1)
    184:18
closer (2)
    144:5;145:5
clothes (3)
    146:8;154:10;
    246:1
clothing (1)
    178:11
code (1)
    63:23
coerce (4)
    184:11,12,14;
    185:15
coffee (2)
    76:1;105:18
cognizant (1)
    115:8
coincidence (1)

138:19
cold (1)
    246:18
collapse (1)
    107:8
collect (3)
    39:17;162:10;
    164:11
collected (6)
    38:1,13,17;39:19,
    24;224:8
colonels (1)
    9:10
colored (1)
    167:14
colorful (1)
    170:11
combat (1)
    26:8
combative (1)
    188:17
combined (2)
    239:18;240:13
comfort (1)
    188:2
comfortable (1)
    100:1
coming (17)
    56:17;64:16;81:19;
    82:16,19,19,22;
    83:25;84:13;92:3;
    154:11;170:9;
    184:21,22;192:13;
    204:6;208:22
command (9)
    29:16;52:11,19;
    64:8,10,22;125:14;
    229:6;234:15
Commander (4)
    232:24,25;233:2,
    18
commands (11)
    30:2,3;54:4;
    100:24;153:14,21,23;
    227:25;228:1;229:1,
    12
comment (3)
    4:21;104:22,25
comments (2)
    6:19;106:2
commission (1)
    257:17
commit (3)
    238:15,15;239:5
committee (2)
    12:3;245:15
committing (1)
    239:4
common (1)
    243:7
communicate (1)
    4:19
communication (2)

4:20;229:1
communications (1)
    228:2
company (1)
    7:17
complained (1)
    48:14
complaining (1)
    250:14
complaint (14)
    11:23;19:13,20;
    20:2;151:16;246:25;
    247:1,3,5,8,9,10;
    249:1,8
Complaints (1)
    19:9
complete (1)
    206:18
completed (3)
    175:6;176:12;
    232:7
completely (1)
    158:19
completeness (1)
    233:17
compliance (3)
    102:11;228:2;
    229:2
compliant (2)
    100:11;102:5
complying (2)
    102:8;137:21
Compound (2)
    48:18;164:17
computer (14)
    5:23,25;8:21;
    10:15;75:15;87:25;
    88:2,2,11;119:6,7;
    172:21,23;173:1
concern (2)
    48:17,25
concerned (1)
    38:24
Concluded (1)
    256:17
conclusion (6)
    46:4,8;164:24;
    181:25;182:4;252:2
conditioning (8)
    152:4;246:8,10,14,
    17;247:19;253:4,6
conditions (2)
    252:21,22
conducted (3)
    20:18;106:25;
    172:17
confetti (3)
    35:13,16,17
conflict (3)
    189:21,22;190:5
conflicting (1)
    29:11
confusing (1)

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 264 of 284
Willard Todd Hensley v.                                    30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                    June 10, 2021

175:15
**connected (1)**
  146:2
**consecutive (1)**
  192:4
**consider (2)**
  192:2,18
**considered (1)**
  122:22
**considering (1)**
  100:21
**consistent (7)**
  24:9;94:15;188:5,
  8,9;211:14;214:9
**constitutional (2)**
  13:14,24
**consultation (1)**
  160:12
**contact (7)**
  42:1;90:11;118:12;
  178:25;187:9;
  188:12;202:3
**contain (3)**
  110:25;177:4;
  232:3
**contained (1)**
  111:3
**contemplative (1)**
  37:11
**contemporary (1)**
  160:19
**contending (1)**
  188:16
**continuation (1)**
  212:21
**continue (7)**
  80:2,24;84:25;
  91:20;92:24;98:11;
  100:19
**continued (1)**
  150:7
**contradiction (1)**
  188:20
**control (9)**
  54:9;64:3;67:13;
  98:11;103:22;183:4;
  228:4;230:11;235:22
**controlled (1)**
  115:25
**conversation (1)**
  43:14
**convey (1)**
  128:4
**conveyed (1)**
  128:11
**convicted (5)**
  13:3,9;14:9,12;
  151:23
**conviction (1)**
  14:10
**convulsions (1)**
  95:7
**copied (1)**

87:22
**copies (3)**
  119:4;255:21,23
**cops (1)**
  108:17
**copy (16)**
  127:13;172:24;
  173:4,8,10,19,23;
  181:3;205:14,16;
  208:11,12;234:3;
  242:6;243:22;249:14
**corner (4)**
  83:21;155:5;
  208:24;236:4
**Corporal (21)**
  28:15,16,17;29:23;
  80:23,24;81:3,21;
  87:6;101:19,20;
  121:2;122:3;129:22;
  151:8,19;169:25;
  209:19;222:2;
  249:22;253:18
**Corps (1)**
  122:8
**Corral (1)**
  152:23
**correctly (6)**
  39:17;142:21;
  170:17,21;225:10,19
**correspond (1)**
  208:3
**counsel (17)**
  4:12;13:10;76:3;
  85:4;89:2;103:21;
  116:25;159:5;
  188:22;190:9;
  194:24;216:15;
  243:15;249:2;254:7;
  255:10,20
**count (1)**
  136:22
**County (24)**
  7:5;9:11;21:23;
  28:5;98:18,19,20;
  134:4,4;141:11;
  147:16,19,23;149:2,
  3,7,22,23;150:1,7;
  155:24;215:16;
  227:14;251:9
**couple (13)**
  7:22;29:13;34:1;
  38:4;81:14,14;
  113:16;155:13;
  158:2,4,6;207:14;
  215:6
**course (9)**
  10:4;29:2;34:4;
  94:7;123:7;124:18;
  139:20;235:9,13
**courses (3)**
  23:6;52:19,20
**court (29)**
  6:18,23;13:12;

19:20;74:18,23;75:7,
11;76:7;87:10;88:22;
89:2;92:24;113:9,10;
132:19;134:17;
135:15;152:19;
172:12;202:12;
203:2,18;227:4;
250:11;255:8,22;
256:6,11
**cover (3)**
  113:14;231:5;
  248:20
**covered (1)**
  116:6
**crank (1)**
  63:22
**crazy (2)**
  65:8;122:19
**credibility (1)**
  72:16
**crime (1)**
  151:23
**criminal (8)**
  42:23,25;43:1,2,7;
  47:15;119:17;157:13
**critical (1)**
  47:22
**criticize (1)**
  158:25
**cropped (1)**
  6:14
**cuffed (1)**
  102:16
**cup (1)**
  70:13
**curious (1)**
  217:19
**current (1)**
  106:23
**cursor (2)**
  139:7,8
**Custody (4)**
  223:23;224:13,24;
  225:16
**cut (2)**
  56:3,22
**cuts (1)**
  201:12
**cutting (1)**
  221:4
**cycles (1)**
  178:6

## D

**Daily (3)**
  112:6;128:15;
  156:10
**damage (5)**
  30:15,23;107:13;
  111:24,25
**danger (2)**
  176:20;192:13

**dangerous (1)**
  196:6
**dashcam (39)**
  60:3,13,14,16,19,
  25;61:1,2,11,12;
  77:20,21;78:1,2,11,
  22,23;79:9;80:3;
  81:1,11;82:1,12;
  83:24;84:12;85:12;
  86:18,22,23;87:1,6,8;
  88:19;89:8,13,14,17,
  19;105:1
**date (12)**
  112:15;131:18;
  167:24,25;174:3,4;
  209:21,21;213:12;
  219:16;224:8;237:9
**dates (1)**
  131:21
**David (1)**
  250:1
**day (11)**
  18:11;110:15;
  113:17;130:10;
  196:16;212:18;
  219:1;232:21,23;
  236:10;257:14
**daylights (1)**
  67:11
**day-to-day (1)**
  171:5
**dazed (1)**
  136:7
**deadly (11)**
  27:1;30:10;31:23;
  53:15,18;56:12,16;
  68:21;181:9;196:1,3
**deadly-weapons-vehicle (1)**
  229:14
**deal (1)**
  51:22
**dealing (2)**
  62:3,5
**death (1)**
  106:17
**debate (1)**
  67:22
**debilitation (1)**
  109:25
**decide (2)**
  6:23;239:9
**decided (1)**
  5:5
**decides (2)**
  8:19,19
**decision (4)**
  164:5,5;217:1,13
**decorate (1)**
  155:9
**deemed (1)**
  163:24
**de-escalation (7)**
  53:15,19;54:1,13;

55:7;235:7,11
**defendants (2)**
  160:12;235:6
**Defendant's (1)**
  240:5
**defense (6)**
  42:25;47:23;67:9,
  10,15,18
**defenses (1)**
  67:21
**definition (4)**
  14:7;174:10;
  226:25;228:5
**Dennis (2)**
  205:4;249:25
**denotes (1)**
  116:3
**department (20)**
  8:6;9:2,6,9,12,25;
  11:5;21:13;24:8;
  34:7;35:12;45:24;
  49:16;51:10;64:5;
  131:5;156:6;160:13;
  198:14;204:7
**department-issued (1)**
  175:9
**department's (1)**
  67:10
**depending (1)**
  209:20
**depends (2)**
  72:10;109:23
**deploy (2)**
  211:13;214:6
**deployed (19)**
  37:1;42:1,3;126:5,
  7;177:6;180:2,10;
  207:7;209:1,22;
  211:3,5,8;214:2;
  215:10;224:4,7,10
**deploying (1)**
  223:7
**deployment (12)**
  112:9,14;127:14;
  191:25;198:3;
  207:10,12;210:25;
  211:1,11,23,24
**deployments (5)**
  126:12;192:4;
  210:12;211:23;
  212:22
**deposed (1)**
  7:23
**deposition (16)**
  4:12,20;5:1;56:25;
  88:10,23;103:11;
  113:22;158:18;
  159:3,7,9,25;160:16;
  191:15;256:17
**deputies (22)**
  9:9;14:24;18:16;
  21:9;68:23;92:19;
  115:17;128:5;

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 265 of 284

Willard Todd Hensley v.
Hon. Gary Langford, Sherriff, et al.

30(b)(6) of Gary Langford
June 10, 2021

151:21;152:6;
170:21;171:14;
179:25;180:6,13;
184:1;189:10;192:2;
195:9;203:24;
204:14;231:18
**deputies' (1)**
155:18
**deputy (44)**
8:13;11:24;12:5;
18:16;19:5;20:19,20;
22:4;25:17;28:5;
29:6,22,22;30:7;31:3,
10;32:4;56:9,10;
80:9;98:17;101:18,
22;107:23;114:24,
25;124:5;128:5;
129:15;156:7,8;
170:19;171:9;211:2,
3;217:15;231:12,22;
233:19,24;236:3,9,
15,19
**deputy's (4)**
30:12;31:1;177:5;
192:16
**Desayer (1)**
249:23
**describing (1)**
232:11
**designated (1)**
20:13
**desk (5)**
9:15;149:18;
181:17;242:1;245:18
**detail (1)**
224:14
**detain (1)**
12:12
**detainee (11)**
12:9,11,12;13:8,
15;14:10,19;151:22;
164:16;199:24;200:5
**detainees (5)**
12:20;13:3;17:16;
200:18;238:3
**detectives (6)**
11:13;20:13;23:1;
31:15;128:11;156:13
**detention (3)**
10:25;197:9;
237:17
**determine (1)**
253:10
**deviate (1)**
164:3
**device (3)**
5:12,24;180:8
**devices (1)**
230:10
**dichotomy (2)**
188:21;189:2
**dies (1)**
128:24

**difference (8)**
12:9,10,21;13:14;
14:7,12,16;174:11
**different (17)**
35:10;109:21;
123:1,7,8;128:14;
149:4;167:9,13,14,
18,20;168:19;
199:13;207:22;
240:11,24
**differently (1)**
199:14
**dilated (2)**
199:10,12
**direct (1)**
17:1
**directed (1)**
58:9
**directly (1)**
64:11
**dirt (2)**
80:6;90:22
**disabled (2)**
55:14;69:1
**disagree (3)**
5:7;109:18;110:17
**disappeared (3)**
40:6,11,13
**disappearing (1)**
125:21
**disappointment (1)**
128:12
**disbelieving (1)**
111:6
**disc (8)**
87:21,22,25;88:1,
14,25;89:1,1
**discipline (2)**
50:21;129:9
**disciplined (3)**
46:24;51:5;117:18
**disclosure (1)**
4:1
**discouraged (1)**
191:24
**discovery (7)**
42:15,20;44:25;
45:1,1,7,12
**discretion (16)**
64:2;67:2,8;71:6;
115:20,22,25,25;
192:17,20,24;193:2;
229:9,15,21;239:9
**discs (1)**
87:12
**discussed (4)**
120:11;128:13;
177:13,20
**Discussion (3)**
78:8;177:21;
256:14
**dismiss (1)**
244:15

**dismissed (1)**
242:15
**disobeying (1)**
193:11
**disorder (4)**
116:21;120:23;
134:15;237:12
**Disorderly (1)**
237:6
**disrespect (1)**
185:14
**disrespectful (1)**
158:16
**distinction (2)**
13:4,24
**distinguished (1)**
61:8
**District (2)**
48:12;71:15
**Division (5)**
232:24,24;233:1,
18;237:12
**document (14)**
4:15;45:8,12;
172:14;176:18;
180:22,24;210:1,18;
231:20;234:14,15;
235:10;249:6
**documentation (2)**
233:16;234:4
**documents (8)**
18:10,20,23;
126:21,23;127:4;
160:6;250:8
**Dodge (1)**
152:22
**done (37)**
10:1,14;16:10;
20:24;21:18;30:22,
24;35:7;38:20,22;
42:6;44:12;50:14,17;
63:14,16;67:6;93:13;
95:14;124:16;
126:13;127:23,24;
128:4;166:4;172:22;
176:25;181:1;
202:24;204:17;
207:17;214:19;
231:22;253:7,7;
254:11,14
**door (11)**
29:18;61:7;81:12,
15,21,22;82:2,13;
145:23;146:1;151:13
**doorway (1)**
152:21
**dots (1)**
155:13
**double (4)**
99:20;101:8,9;
194:11
**doubt (1)**
209:3

**down (60)**
17:3;24:6,6;50:3,8;
51:18;54:17;59:21;
64:16;81:10;82:16;
92:15;94:21,23,25;
97:14;98:23;99:3,6;
101:6;113:14,17;
116:1;122:21;
132:24;133:17;
137:25;138:25;
139:6,7,9,21;140:3,8,
21;143:20;144:25;
153:22;155:14,14;
157:7;169:11;
174:24,25;180:20;
186:24;187:14,19;
188:3,10;190:14;
198:8;207:14;
208:14;215:19,21;
227:17;235:2,3;
247:24
**download (4)**
77:7;208:7;209:10,
11
**downloaded (3)**
130:16;208:11;
209:8
**dragging (2)**
61:12;82:18
**draw (2)**
10:5;55:11
**drawn (6)**
56:13;80:10,11;
81:8;184:2;211:9
**drive (13)**
42:3,3;72:1;97:6,6;
126:8,8;178:23;
179:19;191:24;
192:6;197:10;211:4
**driver's (4)**
29:18;58:1;61:4;
82:15
**drive-stun (3)**
179:13;193:17;
194:22
**drive-stunned (8)**
183:13,13,16,22;
193:20;194:1;
195:24;212:10
**drive-tased (1)**
97:8
**driveway (4)**
79:4;80:6;90:19,21
**driving (3)**
65:3,8;71:21
**drug (10)**
63:14,16;64:25;
66:24;67:6;69:19;
72:22;93:20;100:16;
199:6
**drugged (2)**
136:6,10
**drugs (36)**

56:19;62:6,8,15,
21;63:8,11;64:15,20,
25;65:3,15,16;70:14;
71:4,13,22;72:4,7;
73:2,4;93:14,25;
94:12;95:12,15;99:6,
9,11,13;100:12;
108:22,25;136:14;
199:2,14
**drunk (1)**
169:3
**dry (1)**
246:5
**due (3)**
13:10;62:16;
190:21
**DUI (3)**
63:11;66:1;70:8
**duly (3)**
4:4;57:17,17
**duration (3)**
16:19;214:4,5
**duress (2)**
163:20;164:3
**during (14)**
4:19;15:6;30:13;
38:1;42:23;86:2,2;
106:5;160:20;
166:16;173:3,5,6;
213:20
**dust (13)**
63:22;65:18,24;
66:9,10;67:12;69:19;
71:10;72:10,13,22;
73:6;94:13
**duties (1)**
133:18
**duty (10)**
98:20;122:13;
147:13;156:2;
164:22;165:3;
175:12,25;176:6;
236:10

**E**

**earlier (1)**
239:8
**earthquake (1)**
59:21
**easier (1)**
6:22
**easily (1)**
150:24
**easy (1)**
70:19
**edge (2)**
163:2,3
**edition (1)**
174:16
**Edward (2)**
248:12,13
**effect (5)**

23:8;122:18;
156:18;174:7;237:8
**effective (2)**
10:12;174:4
**effects (2)**
107:24;136:20
**Eight (12)**
8:11;21:24;22:1,2;
105:23;108:24;
156:16;158:3,4;
209:20;210:10;224:3
**either (18)**
7:16;14:16;16:14;
30:14;42:1,3;47:14;
60:15;93:14,19;
95:13;101:22;
110:11;118:14;
122:15;136:10;
180:7;200:3
**elbow (1)**
26:8
**elected (1)**
9:16
**electrical (3)**
106:23,25;172:17
**electrified (1)**
110:22
**Electronic (1)**
235:21
**Elizabeth (1)**
249:25
**else (10)**
12:4;30:19;53:13;
139:23;183:5;
185:18;209:3;231:2,
4;238:18
**e-mails (1)**
248:22
**embarrassing (1)**
172:5
**emergency (1)**
140:13
**employ (1)**
121:3
**employee (4)**
9:6,9;123:25;
198:13
**employees (19)**
10:2;16:12;17:15;
94:6,7,12;115:17;
119:3;134:5;142:19,
20;151:2;156:12;
170:16;178:16;
181:22;188:16;
204:10;226:15
**employer (1)**
9:1
**employment (1)**
147:21
**empty (2)**
161:2,18
**enacted (1)**
10:3

**enclosed (1)**
145:21
**end (7)**
36:15,16;98:4;
140:13;172:18;
221:4;248:5
**ended (3)**
15:11;21:20;118:2
**ending (1)**
45:1
**enforcement (1)**
15:8
**English (1)**
243:1
**enjoy (1)**
7:18
**enjoying (2)**
7:9,21
**enough (14)**
7:11;33:8,22;
76:19,20;99:17;
111:4;117:1;158:25;
198:1;200:7;202:17,
19;218:19
**ensure (4)**
20:8,10;230:7;
231:12
**enter (2)**
109:3;140:18
**entered (1)**
250:25
**entitled (2)**
5:5;185:20
**epileptic (1)**
108:11
**ER (2)**
199:19;200:3
**error (1)**
169:8
**escalate (1)**
54:18
**escape (2)**
237:25;239:1
**essentially (1)**
148:10
**established (1)**
242:6
**et (3)**
227:12;248:11;
249:9
**evaluate (4)**
72:16;198:1,6,10
**even (13)**
31:11;54:11;91:12;
106:17;112:4;
121:20;122:6;
172:19;184:22;
230:15,16;242:6;
250:22
**evening (1)**
202:21
**event (3)**
125:16;213:23;

241:3
**events (1)**
229:7
**eventually (3)**
187:10,12;205:23
**everybody (7)**
12:4;20:14;30:2;
33:9,11;124:20;
180:5
**everybody's (1)**
85:20
**everyone (8)**
9:8,22;20:22,22;
52:10;165:3;197:9;
203:4
**evidence (69)**
30:25;34:20,20;
38:1,20;39:17,18,23;
40:1,6,10,13,16;41:4,
8,12,17;43:22;44:1,
12,19;45:20,23;
46:17;47:7,8,14,18,
18,22,24;48:17,24;
49:3,14,16,19,20,23;
51:3,4,22;52:5,10;
55:20;72:21;73:16;
74:15;75:14;90:3;
103:10;123:18;
130:15;161:9;
164:11,12,12,13,13;
165:14;166:2,24;
194:13;223:23;
224:13,24;225:16,17;
240:3
**exact (1)**
48:9
**exactly (4)**
22:16;159:2,24;
168:23
**EXAMINATION (1)**
4:6
**examine (1)**
199:9
**examined (1)**
4:4
**example (1)**
207:5
**except (4)**
39:8;176:13,20;
191:24
**exception (2)**
176:17,19
**excessive (5)**
54:21;241:4,13,22;
250:17
**exclusive (1)**
231:21
**excruciating (2)**
109:20;110:3
**exhibit (36)**
33:14,15;113:11;
116:25;132:18;
134:18;135:15;

143:13;145:14,16;
160:23;172:12;
191:22;203:9;
204:21;205:25;
206:6,20,22;217:21;
218:12,13;234:9;
239:15;240:5,14;
248:7,7,8,8,10,25;
250:22;251:2;255:7,
10
**Exhibits (2)**
251:1;255:16
**exigent (2)**
163:18;183:11
**exist (3)**
237:19;238:23,24
**exists (1)**
73:22
**expect (1)**
224:13
**expected (1)**
158:12
**experience (4)**
66:22;109:7,12,14
**expertise (1)**
198:17
**expires (1)**
257:17
**explain (2)**
55:17;207:16
**explanation (1)**
40:5
**expression (2)**
136:4,5
**extent (8)**
11:15;46:7;47:10,
14;164:23;181:24;
182:3;237:20
**extenuating (1)**
11:19
**extra (2)**
34:22;36:13
**eyes (5)**
70:2;93:2,4;
199:10,10

**F**

**face (14)**
61:20,21,22;91:24;
93:1;138:4,7;147:2;
171:17;187:14,19,19,
20;228:10
**facility (1)**
12:15
**fact (15)**
20:2;30:13;31:22;
63:7;115:7,8;117:20;
126:23;136:21;
148:16;186:24;
190:22;191:6;
231:22;232:25
**facts (2)**

66:4;129:5
**failed (1)**
181:22
**failure (6)**
20:4;50:3;51:17;
67:4,5;71:1
**fair (3)**
96:18,19;99:17
**fairly (2)**
100:11,21
**fall (4)**
17:3,11;94:21,24
**falling (1)**
146:18
**falls (2)**
11:4,8
**false (6)**
106:3,8,11,18;
188:21;189:2
**familiar (34)**
17:12;42:8;46:21,
25;47:2;63:12,17;
86:1;92:18;99:15;
107:17;110:11,12,21;
112:16;116:22;
130:2,25;131:2,9,10;
140:19;143:6,18;
147:4;149:13;150:8,
12;152:18;155:2;
162:9,13;174:1;
223:24
**fantastic (4)**
6:7;78:15,17;
103:17
**far (10)**
18:10;79:25;97:13;
102:17;116:7;123:5;
128:14;134:11;
177:5;250:3
**fast (1)**
226:11
**faster (1)**
217:8
**fast-forward (1)**
103:2
**favor (2)**
75:22;189:11
**federal (5)**
19:20;157:17;
251:17,18,18
**feel (3)**
127:23;142:16;
200:19
**feels (1)**
109:22
**feet (4)**
102:13;163:9;
169:13,13
**fell (3)**
187:1,6,7
**felt (4)**
188:11;190:14;
192:25;199:17

Willard Todd Hensley v.
Hon. Gary Langford, Sheriff, et al.
30(b)(6) of Gary Langford
June 10, 2021

**fence (1)**
111:16
**fences (3)**
110:21,22;111:20
**Ferguson (1)**
112:18
**few (3)**
100:22;124:10,19
**fiasco (1)**
112:18
**field (2)**
55:2;208:2
**fight (3)**
59:23;102:11;
198:5
**fighting (14)**
98:14;100:4,25;
109:2;137:22;
144:13,22;162:15;
164:15,16;169:3;
195:17;196:12;
201:13
**figure (1)**
88:24
**file (3)**
64:17;123:2;
244:23
**filed (11)**
19:20,22;131:3,11,
20;171:11;231:14;
243:21;249:3;250:6,
10
**files (3)**
105:10,10,10
**filled (3)**
128:20;231:13;
234:19
**final (1)**
10:7
**finally (2)**
102:13;229:4
**find (9)**
51:18;84:23;
118:17,25;126:14;
185:13;189:14,17;
255:7
**findings (2)**
241:6;242:1
**fine (11)**
14:5;57:2,10;76:2,
24;102:16;191:10;
192:25;202:12;
203:2,3
**finish (4)**
56:7;57:11;144:16;
245:1
**finished (2)**
151:23;253:25
**fire (4)**
9:19;58:23;59:8;
148:6
**firearm (4)**
56:13;175:16,20,

21
**Firearms (3)**
53:17,20,21
**fired (3)**
59:2,5;148:20
**first (36)**
4:4;15:18;18:16;
26:20;27:2;28:2;
33:7,21;54:3,16;
56:10;77:8,12;78:5;
131:2,6;139:10;
143:4;145:24;
174:16;196:5;205:2,
11;212:3,23;218:10,
14;223:22;229:12;
239:15;242:7;
243:20;244:4;245:8;
249:14;250:15
**fist (2)**
237:18;238:21
**fit (2)**
108:11;150:24
**five (22)**
16:20,21;30:18;
109:16;150:24;
151:2;158:7;172:8;
187:22;209:14,20;
210:10;212:18;
214:4,5,7,10;220:13,
23;221:7,16;224:3
**five-minute (2)**
105:17;172:6
**five-second (4)**
16:18;178:6;192:4;
207:23
**fixing (2)**
98:1;160:16
**fled (1)**
30:7
**floor (8)**
92:16;154:25;
187:11,14,19,21;
188:12;246:4
**floorboard (5)**
61:17;92:15;
180:21;213:1;214:9
**fluids (2)**
99:4;152:12
**flushing (1)**
202:15
**foam (2)**
228:21;229:3
**follow (9)**
24:12,18;163:19,
22;186:8;193:6;
198:17;235:25;242:4
**followed (3)**
39:7;163:25;
231:14
**following (9)**
31:3,11;45:16;
106:2;183:10;
184:10;192:19;

237:19;238:22
**follows (3)**
4:5;235:23;249:21
**foot (3)**
150:15;237:18;
238:21
**force (57)**
22:21,25;24:8;
26:7;53:15,18;54:21;
119:2,2;123:18;
127:13;174:7;
176:12,24;177:4,15,
17,22;178:5,10,14,
22;179:7,15,23;
180:9,12;181:4,7,9,9;
226:5,7,10,16,24;
227:1,2,6,8,19,20;
231:17,19,24;232:10,
23;233:15;234:3,12;
235:7,11;237:20;
241:4,13,22;250:17
**forced (1)**
68:1
**Ford (2)**
91:12,13
**forensic (3)**
31:14,17;99:12
**forensics (1)**
30:22
**forget (1)**
30:17
**forgot (5)**
75:20;130:17;
156:23;256:1,3
**form (10)**
17:17,23;40:8;
69:19;200:21;201:2,
3;234:19,20;245:15
**formal (1)**
65:6
**format (1)**
105:5
**forms (3)**
204:25;228:19;
231:13
**forth (3)**
65:10,14;242:18
**Forty-five (1)**
202:11
**forward (21)**
63:6,7;82:11;
84:18,20,21;85:7,11;
90:10;91:25;96:1,19,
24;97:10,17,20;
98:11;99:18;102:18;
104:1;232:23
**forwarded (1)**
234:5
**found (4)**
29:14;99:8;123:15,
16
**foundation (1)**
40:10

**four (26)**
28:6;29:8;77:22;
90:3;98:22;103:10;
104:20;105:10;
150:24;151:21;
152:6,25;158:7;
170:9;187:21;
209:14,19;210:10;
212:22;213:9,9,11;
214:22;224:2;
251:15;254:23
**frail (1)**
108:14
**frames (1)**
81:14
**freeing (1)**
96:14
**freezing (2)**
152:5;246:15
**fresh (1)**
138:9
**frivolity (2)**
242:18;243:14
**front (13)**
31:24;32:1,5,7;
69:5,6;81:4,18;91:10,
12;131:22,23;137:12
**froze (6)**
34:8,10;37:5;
40:19,22;225:5
**frozen (1)**
37:8
**full (3)**
108:24;174:6;
185:13
**fully (1)**
175:25
**further (3)**
171:22;199:17;
225:21

**G**

**garbage (1)**
79:2
**GARY (5)**
4:3,10;248:11;
249:9;257:7
**G-A-R-Y (1)**
4:10
**gave (11)**
8:16;10:7;26:18;
42:22;119:16;120:8,
22;156:10;189:9,10;
217:15
**gaven (1)**
156:7
**Gaye (2)**
90:13;203:1
**geeking (3)**
56:19;61:25;93:14
**general (2)**
119:2;226:5

**gentleman (1)**
37:12
**Georgia (7)**
8:13;15:9;21:2;
112:15;134:20;
235:24;240:21
**gets (8)**
56:9,10;90:16;
97:16;104:1;156:15;
172:24;232:19
**given (10)**
24:2;65:6;119:4;
131:13;145:25;
146:8;230:7,14,15;
239:22
**gives (2)**
111:13;227:15
**giving (3)**
142:11;188:24,24
**glad (1)**
231:9
**glory (1)**
66:11
**glove (3)**
152:8,9,10
**gloved (2)**
152:7,15
**gloves (3)**
16:23;99:2;152:11
**God (3)**
7:12;22:6;158:16
**goes (6)**
49:23,24;96:7;
125:13;144:22;181:8
**Goins (1)**
233:3
**good (10)**
92:5;175:1,18;
179:21;186:2;
202:25;204:20;
206:13;227:5;254:18
**grab (2)**
34:1;196:13
**grabbed (3)**
96:11;186:21;
210:7
**grabbing (1)**
228:8
**grandfather (2)**
26:21;54:14
**grandkids (1)**
7:21
**granted (1)**
34:23
**great (2)**
211:15;227:7
**Greek (1)**
209:8
**green (1)**
190:2
**grievance (2)**
149:14,20
**grievances (1)**

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 268 of 284
Willard Todd Hensley v.                                                      30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                                      June 10, 2021

149:17
**groin (11)**
140:9,11,17,18;
144:14,14,15,19,20;
145:2,5
**ground (21)**
59:16;73:14;85:8;
86:5;97:17,23;98:23;
102:16;154:22;
160:24;186:25;
187:1,7,11;193:18;
194:3;196:10,20,24,
24;216:13
**groundwork (1)**
43:20
**group (1)**
239:1
**growing (1)**
111:7
**grown (1)**
152:25
**guess (18)**
20:4;35:24;37:8;
50:5;78:12;95:14;
96:15;101:12;103:3;
106:19;132:13;
133:5;154:20;196:4;
211:7;212:21;
237:15;245:24
**guesstimate (1)**
91:16
**guidance (1)**
234:12
**guideline (4)**
23:25;24:2,3,11
**guidelines (8)**
22:25;24:17,18;
39:5;116:5,6,12;
227:14
**gun (8)**
24:25;55:11;108:4;
109:2;164:6;184:19;
211:9;228:21
**guns (4)**
32:16;154:17;
170:10;196:13
**guy (1)**
153:1
**guys (3)**
9:11;159:13;256:1

## H

**half (7)**
174:8;202:10,12,
18,19,25;254:25
**hand (31)**
26:22;27:15,18,24;
31:24;32:14;55:15;
68:25;82:15;83:21,
25;84:6,8,9,20,23;
97:19;99:21,22;
100:7;140:21,22;

143:15,16;173:20;
194:5;195:10,10;
201:12;216:17;228:4
**hand-control (2)**
228:2;229:2
**handcuff (8)**
99:21,21;100:7,8;
183:15,21;194:2;
195:11
**handcuffed (6)**
100:22;183:12,20;
194:4,7,21
**handcuffs (10)**
100:2;101:1,3,8,9;
194:5,11;195:11,14,
23
**handle (9)**
20:14;36:20;49:15;
134:12,24;152:12;
156:12;196:15;
239:10
**handled (17)**
41:17;46:22;47:1;
49:10;53:24;107:21;
114:7;122:2;142:22,
24;143:7;165:24;
178:2;181:15;
206:25;217:16;
224:16
**handles (4)**
44:9;130:21;156:5;
247:15
**handling (5)**
51:2,3;164:20;
171:9,10
**hands (23)**
26:14;32:16;54:23;
55:1;84:18,19;92:6;
96:11,23,24;100:2;
140:20;183:21;
186:17;194:2;228:4,
5,5,6,12,16;229:2,2
**hand-to-hand (1)**
26:8
**handwritten (1)**
242:7
**happen (7)**
46:14;51:25;117:8,
11;148:24;170:24;
193:14
**happened (24)**
11:16;18:3;39:2,
19,24;41:21;47:3,19;
128:21;141:6;
149:22;153:9;
159:13;170:11;
171:15,17;185:14;
190:15;194:22;
210:4;214:22;
232:25;250:4;252:15
**happening (1)**
39:16
**happens (2)**

116:16;196:16
**happy (1)**
6:6
**harassed (1)**
149:11
**harassing (1)**
150:7
**hard (10)**
91:14;172:24;
173:4,8,19,22;228:5,
12,16;229:2
**hardly (1)**
60:2
**harm (3)**
183:5,5;227:7
**harmful (1)**
27:2
**hate (3)**
18:18;63:6;172:4
**head (3)**
17:14;51:9;144:12
**heads (1)**
52:1
**health (4)**
17:14,20;110:14;
112:5
**hear (25)**
27:9;39:21;44:20,
23;90:12;93:17;
95:18,19;112:18;
114:19;115:15;
144:18;149:12;
153:20;159:15;
160:1;168:16;
183:19;190:11;
192:23;200:22;
225:4,12;234:13;
235:8
**heard (5)**
73:6;112:4,8,16;
150:8
**hearing (1)**
19:6
**hearsay (1)**
72:9
**heart (10)**
59:9;110:7,10,16;
144:2,3,5,9,10,12
**heavier (1)**
169:24
**heavy (1)**
169:21
**heck (1)**
55:3
**heighten (1)**
37:2
**held (2)**
97:4;123:4
**hell (1)**
117:4
**Hello (1)**
37:5
**help (2)**

144:23;190:10
**helping (3)**
84:13;190:10;
194:25
**helps (1)**
10:5
**Hensley (99)**
17:7;20:3;27:15;
28:23,24;29:1,5,9;
30:3,5;31:23;55:24;
57:8,22;58:18,22;
59:2,6,14;61:13;
62:7;63:15,16,21;
65:5,17;66:8;67:11;
68:8;69:18;70:12;
71:3,16;72:21;79:1;
90:11;95:3;117:14,
18;118:13;119:17;
123:10;126:16;
129:12;130:10;
131:3;135:17,18;
137:2;146:19,22;
147:6;148:25;149:5;
150:7;151:3,16;
155:17;156:21;
162:4,7,11,14;
163:12;167:6,9,17;
179:12;180:9,18,20;
182:17;184:5;197:8,
10,22;198:11,20;
199:6;200:9;208:4;
209:2;210:25;213:1,
10;214:9,21;215:25;
218:4;222:18;223:7;
237:25;238:5,11,14;
241:12;245:16,22;
251:22
**Hensley's (23)**
19:9;30:23;42:22;
50:18;58:1,8,9;
70:24;71:8;79:12,18;
80:18;81:4;91:9,24;
92:2;147:1;171:7;
198:3;216:18;
243:20;248:10;
249:14
**Herbert (2)**
225:2,18
**here's (2)**
116:5;180:4
**hereto (1)**
4:2
**Hey (7)**
54:16;64:14;66:23;
110:4;125:20;
128:19;204:16
**Higgins (2)**
98:19,20
**high (13)**
61:24;64:15;65:10,
13;66:9;67:12;69:18;
71:3,9;72:13;100:16;
108:22,24

**highest (1)**
11:22
**Hill (1)**
251:9
**himself (5)**
17:11;31:3;64:5;
180:7;250:15
**hire (1)**
9:18
**hit (7)**
17:1;31:2,10;59:5,
21;144:11;214:10
**hitting (2)**
22:7;213:3
**Hold (18)**
23:11;44:18;56:3;
77:6,14;81:2,2,13,17;
89:5;96:5;159:12,12,
20;206:2;242:5;
244:3;256:4
**holding (7)**
16:8,12,22;17:7;
94:20;101:14;150:11
**hole (5)**
140:5,25;143:16,
22,24
**holes (1)**
140:16
**holster (2)**
98:1;175:9
**holsters (1)**
175:11
**home (1)**
145:21
**hope (3)**
7:8,18;248:5
**hopefully (1)**
125:23
**horizontal (2)**
70:2,3
**horrible (1)**
128:20
**hospital (3)**
199:23,25;230:17
**HOST (40)**
37:7,13,17;76:14;
77:6,13,18,24;78:2,
13,16,18;83:17;85:9;
89:4,9,13,17;90:4,12;
103:8,14,16;132:20;
133:1,4,7,9,20;203:3;
206:1,4,9;248:14,17,
21;255:6,17,19;
256:15
**hour (6)**
202:10,12,18,19,
25;255:1
**hours (23)**
15:10,13;21:4,12,
15,17;52:22,25;53:2,
3,5,16;169:4;246:21;
247:2,21;251:15,24;
252:12,23;253:6,14;

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 269 of 284

Willard Todd Hensley v.
Hon. Gary Langford, Sherriff, et al.

30(b)(6) of Gary Langford
June 10, 2021

254:2
**house (1)**
    90:21
**housed (3)**
    12:19,21;17:21
**HS09 (1)**
    225:18
**hung (1)**
    92:20
**hurt (7)**
    16:9;17:3,11;55:3;
    94:21;109:16;255:12
**hypoglycemia (1)**
    202:14

### I

**IA (1)**
    123:16
**idea (17)**
    41:24;111:2,12,21;
    125:3;165:7,19;
    166:13;168:20;
    169:7;175:18;
    176:23,24;177:1;
    208:19;216:19;
    222:20
**identified (1)**
    49:20
**ie (1)**
    227:11
**illogical (1)**
    189:1
**immediately (2)**
    118:21;180:1
**impact (1)**
    177:10
**implemented (1)**
    226:17
**importance (1)**
    36:4
**important (30)**
    36:7,8,12;41:17;
    45:15,20;48:7;51:3;
    63:20,24;64:14,20;
    69:22;107:22;
    125:16;126:20;
    128:18;129:1,2;
    141:9;142:5,10;
    156:9;161:21;
    165:25;168:22;
    170:14;176:11;
    180:4;246:24
**impossible (1)**
    70:4
**impression (1)**
    171:15
**inappropriate (2)**
    95:23;158:20
**incapacitation (3)**
    107:3;228:18,20
**inch (1)**
    109:19

**incident (42)**
    11:16;18:4,12,21;
    22:11;36:25;38:2;
    118:10;119:21;
    121:10;123:13;
    125:10;141:6,17;
    148:13,19;149:4,11;
    150:4;154:3;160:20;
    164:21;180:25,25;
    181:5,6;187:17;
    189:10,11;223:15;
    230:8;231:18,23;
    232:3,6,9,11,25;
    233:15;236:21;
    241:5,6
**incidents (4)**
    22:12;51:15;
    170:24;213:9
**include (3)**
    53:6;120:19;227:8
**included (3)**
    161:10;232:5;
    249:10
**includes (1)**
    9:9
**including (1)**
    187:22
**incontinence (1)**
    172:5
**indict (1)**
    48:13
**indicted (6)**
    47:21;71:9,12,16,
    17;251:13
**indictment (3)**
    71:9,25;251:17
**individual (10)**
    16:12;25:15;104:6;
    105:2;107:25;
    114:18;164:15;
    165:12;198:6;238:9
**individually (1)**
    41:7
**induced (1)**
    106:23
**ineffective (1)**
    192:1
**infected (1)**
    201:19
**influence (5)**
    65:3;71:21;136:10,
    13,16
**information (11)**
    48:10;57:8;142:12;
    209:23;216:25;
    217:12,15;224:6,11;
    225:21;241:19
**informed (1)**
    217:13
**infractions (1)**
    122:1
**initial (2)**
    7:23;192:1

**initiate (1)**
    241:25
**injure (1)**
    111:15
**injured (5)**
    62:11;180:18;
    200:1,2;230:11
**injuries (7)**
    142:18;180:6,10;
    200:8,19;201:1;
    202:3
**injury (4)**
    112:7;200:6;202:1,
    6
**inmate (16)**
    11:23;12:9,11,14;
    13:7,8,14;14:8,19;
    25:7;115:11;199:24;
    200:4;239:10;
    243:11;251:20
**Inmates (8)**
    12:20;17:16;
    145:24;146:8;154:6;
    200:18;238:2;251:14
**in-person (1)**
    4:20
**input (1)**
    51:8
**Inside (11)**
    25:10;60:17,25;
    73:10,11;80:17;
    82:15;96:14;113:16;
    129:9;146:6
**inspect (2)**
    19:3;176:8
**inspected (1)**
    176:5
**instead (1)**
    21:15
**instruct (1)**
    5:14
**instructor (1)**
    203:17
**intended (1)**
    226:15
**intending (1)**
    227:7
**intentions (1)**
    234:10
**interaction (1)**
    228:2
**interesting (1)**
    84:23
**interlock (1)**
    194:6
**internal (6)**
    11:7,10;44:11,14;
    121:22,23

**interrupting (2)**
    141:21;217:7
**interview (1)**
    104:16
**intimidate (1)**
    185:16
**into (62)**
    14:18;18:20;24:8;
    34:23;38:20;41:8,12;
    44:6;51:8;57:1;65:9,
    9;70:13;74:15;75:13;
    79:12;81:19,22;
    83:12,22;85:19;90:3;
    96:7,12,13;100:24;
    103:2,10;105:4,10;
    121:25;122:11;
    130:11;138:21;
    140:1;145:15;146:9;
    147:6,9;149:2;
    152:15;153:2;
    161:23;164:13;
    166:1;170:9;171:16,
    22;173:16;184:12;
    187:14,19;197:23;
    201:22,25;204:21;
    224:24;226:25;
    237:8;240:3,13;
    248:8
**intoxicated (1)**
    72:7
**introduce (4)**
    90:2;104:9;139:25;
    143:13
**introduced (1)**
    256:2
**inventoried (1)**
    36:22
**inventory (1)**
    36:16
**investigate (2)**
    189:14;241:6
**investigated (8)**
    29:14;117:15;
    121:16,20;122:2,4;
    124:4;171:15
**investigation (15)**
    11:7,10,17;44:6,11,
    15;50:7,10;123:16,
    22;185:13;213:20;
    241:25;242:1;245:15
**investigations (1)**
    247:16
**involved (13)**
    11:16;46:16;
    117:14,17;123:10;
    143:1,5,8;157:11;
    171:25;189:23;
    223:15;242:13
**irate (2)**
    169:2;197:18
**island (1)**
    64:5
**issue (1)**

174:3
**issued (6)**
    33:9;36:5;173:10;
    175:24;232:13;
    235:19
**issuing (1)**
    33:7
**item (1)**
    225:24
**items (2)**
    44:6;160:23

### J

**jail (66)**
    10:18,19;11:11;
    12:18,20,22;13:6,8,
    13;14:8,10,15,18;
    17:16,22;18:25;19:1;
    20:12;23:20;25:4,5,
    10,13,19;30:18;
    114:5,7;115:1,9,14,
    16;116:21;117:24;
    118:15;119:3;129:7,
    9,18,23,24;130:20;
    134:4,10,12,20,25;
    148:8;149:2,6,7;
    156:12;170:24,25;
    179:2;197:9;198:12,
    18;233:4;237:11,13;
    240:21;241:4,9,24;
    246:9;247:15
**jailer (11)**
    114:14,23,25;
    118:13,18;129:11,14,
    20,21;147:13;181:1
**jailers (5)**
    114:11;115:17;
    149:11;204:11,14
**January (2)**
    7:6,8
**Jason (3)**
    76:15;95:19;255:8
**Jeff (1)**
    235:15
**Jeffery (4)**
    205:4;235:15;
    236:7;249:22
**Jenkins (4)**
    198:9;250:2;
    254:20;255:4
**Jenkins's (1)**
    251:2
**job (9)**
    8:25;116:9;121:5;
    164:10;170:21;
    171:1;182:7,8;
    253:24
**jobs (1)**
    170:17
**John (7)**
    178:1;203:12;
    204:18;205:7;

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 270 of 284
Willard Todd Hensley v.
Hon. Gary Langford, Sheriff, et al.

30(b)(6) of Gary Langford
June 10, 2021

206:25;217:22;
  249:21
**Johnson (3)**
  42:22;43:10;
  133:14
**joined (1)**
  99:22
**Joshua (1)**
  250:1
**Judge (2)**
  75:14;191:11
**judgment (1)**
  116:7
**jump (5)**
  59:21;61:8;63:6,7;
  81:23
**jumped (2)**
  59:15;82:8
**jumps (1)**
  81:25
**jumpsuit (8)**
  135:20;154:5,5,7;
  167:17;184:13,24;
  186:6
**jumpsuits (1)**
  154:6
**Junior (1)**
  222:22
**jurisdiction (1)**
  226:16
**jury (1)**
  30:14
**Justin (2)**
  203:22;249:24

**K**

**keep (17)**
  36:10;75:17;96:22;
  98:23;99:12;100:9;
  102:1;125:17;
  130:15;140:12;
  141:8;146:18;157:1,
  7;190:20,21;253:13
**keeping (2)**
  251:14;252:11
**keeps (1)**
  190:9
**kept (10)**
  10:2;34:6,16;
  126:22;130:23;
  150:10;247:1;
  251:23;252:18,23
**key (1)**
  34:19
**kick (1)**
  102:11
**kicked (4)**
  37:14;55:7;151:17;
  159:21
**kicking (1)**
  26:7
**kill (3)**

26:15;108:5;
  111:14
**killed (1)**
  112:9
**kind (13)**
  8:1;13:2;25:8;
  35:11,13;72:22;80:4;
  117:1;134:8;182:3;
  199:13;219:16;
  224:12
**King (2)**
  112:17,22
**knee (1)**
  144:6
**knew (3)**
  108:11;171:4,10
**knife (2)**
  109:2;184:19
**knowing (1)**
  209:3
**knowledge (24)**
  14:14;17:6,8,9;
  29:13;31:18;36:1;
  38:12;55:23;70:23,
  25;71:14,19;99:10;
  106:4;117:16,19;
  123:14;146:20;
  148:22,24;238:1,13;
  241:10
**known (1)**
  51:16
**knows (2)**
  13:13;185:21

**L**

**lack (1)**
  244:16
**LaDon (4)**
  28:19,20;205:2;
  249:23
**laid (2)**
  94:23;116:1
**land (1)**
  245:17
**LANGFORD (5)**
  4:3,10;248:11;
  249:9;257:7
**L-A-N-G-F-O-R-D (1)**
  4:10
**laptop (1)**
  5:22
**large (2)**
  75:1;170:9
**laser (8)**
  35:15;195:25;
  205:17,19;209:11,15;
  219:18;220:3
**lasers (1)**
  37:3
**last (10)**
  24:24;48:19;
  154:20;196:6;

200:22;233:13;
  241:2;248:4;251:7;
  255:16
**lasted (1)**
  254:2
**later (13)**
  33:9;88:22;113:21;
  125:6;143:3;157:9;
  167:19;169:2,4;
  171:11;174:8;
  212:13;219:16
**law (3)**
  15:8,9;235:20
**laws (2)**
  134:4;235:24
**lawsuit (33)**
  64:18;131:3,13;
  132:1;171:12;
  241:21,23;242:7,12,
  13,22,23,24;243:8,
  11,20,21;244:4,11,
  13,13,24;245:8,11,
  15;247:11,12,18,22;
  249:12,15;250:9,15
**lawsuits (3)**
  64:16;157:12,18
**lawyer (2)**
  235:18;239:24
**lawyers (2)**
  19:14,22
**lay (3)**
  26:14;43:20;54:23
**laying (5)**
  55:1;61:17;92:15;
  162:2;187:11
**leaning (1)**
  82:17
**least (22)**
  27:1,1,1;37:1;
  89:25,25;138:1;
  140:16;169:17,20;
  179:13;192:6,6;
  193:24;197:11;
  202:18;208:5;209:3;
  211:4;220:4;223:7;
  229:18
**leave (7)**
  30:9;89:24,24;
  109:4;117:21;
  124:11;255:21
**leaving (2)**
  85:18;104:14
**Lee (1)**
  205:4
**left (14)**
  6:3;79:18;96:10;
  97:18;117:20;121:3,
  4;129:6;167:25;
  169:13;195:10;
  208:2;225:24;256:3
**left-hand (2)**
  208:24;236:4
**leg (4)**

70:7;140:25,25;
  141:1
**legal (8)**
  13:2;46:4,7;72:16;
  164:24;181:25;
  182:3;252:2
**legs (1)**
  109:22
**less (10)**
  10:12;71:24,25;
  226:24,25;227:2,7,
  10,19;229:24
**Lethal (6)**
  226:24;227:1,2,8,
  10,20
**Levi (15)**
  117:20,22,23;
  129:11;146:25;
  147:1;152:8;170:2;
  187:18,18;205:3;
  223:6,18,18;249:23
**lieutenant (1)**
  122:10
**life (5)**
  24:20,20,21;
  109:13,14
**life's (1)**
  176:20
**lift (1)**
  70:7
**light (2)**
  86:12;190:2
**lights (4)**
  30:9;82:5,8;86:4
**light's (1)**
  190:1
**likely (1)**
  227:6
**limited (1)**
  227:8
**line (8)**
  116:13;133:20,22;
  134:8;135:4,10;
  215:19,21
**link (5)**
  75:1,7;76:6;87:16,
  17
**list (2)**
  235:2;249:11
**listed (1)**
  113:19
**listen (4)**
  153:5,6,11;185:10
**listened (1)**
  153:4
**listening (3)**
  54:23;153:15,18
**lists (1)**
  215:25
**little (44)**
  28:25;29:7;32:19;
  35:16,17;39:4;51:20;
  79:24,25,25;82:21;

84:18;90:10;91:23,
  25;97:2;102:7,9,9,10;
  137:25;138:6;139:7,
  8,9,21;140:3,24;
  143:20,21;144:25;
  155:12;170:11;
  172:5;174:23,25;
  201:10,11,11;221:1,
  3;222:24;224:14;
  227:3
**lives (2)**
  98:19;112:14
**living (1)**
  67:11
**load (1)**
  223:22
**local (1)**
  107:7
**localized (1)**
  107:8
**location (2)**
  34:17;175:19
**locked (3)**
  34:18;99:20;
  194:11
**locker (1)**
  125:21
**log (3)**
  157:1;159:10;
  164:12
**logged (2)**
  157:7;224:5
**logic (1)**
  188:25
**logical (1)**
  100:6
**logically (1)**
  163:14
**logs (1)**
  210:20
**long (15)**
  8:4;22:8;48:5;
  66:22;76:3;118:5;
  120:10;121:1;
  137:11;146:12;
  154:2;202:9,11;
  246:23;248:1
**longer (2)**
  253:23;254:21
**look (91)**
  6:16;24:11;36:23;
  37:8;43:6;59:18;
  63:4;64:14;66:23;
  74:18;83:20;88:25;
  92:11;93:1;97:18;
  101:5;116:5;121:24;
  128:19,19,22;129:4;
  132:17,18;136:4,25;
  138:9,11,13,20,22,24,
  25;139:6,6,11,17;
  140:2,4,20;141:12;
  142:10;145:2,12;
  146:9;153:2;155:11;

160:22;167:4;
169:10,11;171:21;
172:13;176:18;
182:15,15;186:15;
191:21;194:18;
198:8;201:1;203:9;
204:20,23;205:16;
206:2;210:13;
211:10;212:16;
215:15,18;218:15;
219:1;220:22;224:1;
226:1,23;228:17;
230:5;234:3,18;
235:17;236:14,20;
237:7,14,16,24;
240:4;250:7;255:11
**looked (21)**
19:21;27:20;31:1;
62:18;74:11;84:2;
97:25;120:11;
122:11;127:22;
154:22;160:6;
168:24;171:16;
177:12;200:10,13;
208:25;216:12,16;
219:12
**looking (17)**
29:3;58:18;60:5;
91:5;97:23;120:1;
152:24;170:7,7;
180:22;200:20,25;
201:4;209:6;211:19;
214:21;248:17
**looks (54)**
37:10,13;61:24;
81:2,3;82:14;83:21;
84:1,17;85:16;86:8;
91:8,9,11;93:12;
96:11,13;97:16,19,
22;98:13;100:25;
132:20;135:22;
136:9,13,15;137:4;
138:14;139:14;
140:15;145:4,6;
150:20;152:22;
155:6,12,15,17;
158:17;161:11,18;
163:9;167:5,9;
201:14,14;218:23;
220:16,20;231:18;
239:14,17;240:10
**Lord (1)**
8:3
**loss (14)**
43:12,13,13;44:12,
15;47:7,8;48:3,17,24;
49:2;51:22;123:18;
125:16
**lost (15)**
43:22;44:1,6;
79:14,15;112:14;
126:15,17,18;159:13,
13,20;166:10,12;

235:15
**lot (10)**
7:14;13:20;21:16;
100:1;110:2;127:25,
25;139:12;155:25;
217:7
**loud (1)**
57:21
**lousy (1)**
179:19
**lower (2)**
144:25;236:4
**LPN (1)**
198:17
**luck (1)**
77:4
**lunch (2)**
202:10;220:22
**lunged (3)**
184:5;186:11,11

## M

**ma'am (13)**
76:19;80:25;81:10;
83:15;91:20;96:20;
97:10;98:24;102:1,
18;103:9;145:1;
255:5
**Mace (1)**
25:3
**madame (8)**
76:8;89:2;92:24;
113:10;135:15;
202:11;227:4;256:11
**magistrate (1)**
70:20
**mail (1)**
87:22
**maining (1)**
129:8
**maintain (1)**
134:4
**maintaining (1)**
129:8
**major (3)**
124:8,14,15
**makes (2)**
8:20;217:25
**makeup (1)**
109:24
**making (6)**
51:21;141:20;
150:10;185:22;
191:5;244:18
**mama (1)**
154:10
**Mamie (5)**
37:5;75:11;76:10;
103:13;202:25
**man (8)**
28:13,13;48:14;
64:15;141:11;142:6;

170:8;196:15
**mandatory (1)**
53:17
**manual (2)**
36:23;226:6
**manuals (2)**
159:17;160:4
**many (14)**
8:7;48:5;52:22,25;
130:13;141:11;
142:5,7,8;147:5,8;
156:23;157:10;158:6
**March (5)**
111:23;112:6;
131:7,8;241:21
**Marine (1)**
122:8
**mark (8)**
138:22;139:17;
140:5;141:1;143:24;
145:4,11,12
**markers (1)**
35:13
**marks (17)**
109:4,5;138:7,11,
20,21;139:1,10,12,
14;140:21,22;141:1,
2,4;201:15,18
**Marksbury (1)**
228:15
**Marshall (4)**
224:23,25;225:3,
19
**mat (6)**
16:9,11;17:10;
94:20;146:13,17
**matches (2)**
30:23;35:17
**matter (7)**
13:5;18:6;98:8;
119:17;188:25;
218:5;229:8
**may (45)**
4:14;13:1,1,3,8,9;
24:13;29:3;32:8;
39:11;55:9,10;59:12;
88:13;91:14;100:4;
106:10,11;107:6,8,8,
12,13;110:3,10;
116:18;118:7;122:6;
123:7;129:4;130:25;
136:9,12;140:13;
155:7;157:25;
168:18;169:3;193:7,
7;198:2;204:3;
230:10;237:17;
242:16
**maybe (22)**
12:13,16;24:6;
29:12;35:11;54:22;
74:18;75:14,14;
76:12;86:14;88:22;
100:6;123:5;134:12;

137:25;150:16;
157:21,22;242:8;
248:19,19
**Mayo (1)**
121:22
**mean (53)**
26:16;42:20,21;
47:13,14;49:12;
50:12;57:20;61:9;
62:20;64:4;65:19;
67:20;74:25;76:5;
77:19;80:7,16;81:21;
87:3;88:14;89:2;
91:5;95:21;108:5;
131:9;136:19;
152:10,22;153:10,16,
19;157:12,13;
158:16;161:16;
174:6;176:20;
179:20;185:15,23;
188:8,9;189:21;
192:13;195:15;
196:18;203:18;
216:14;217:20;
243:7;244:18;255:12
**means (6)**
95:9;202:16;
213:18,22,24;214:2
**meant (1)**
233:12
**Media (1)**
87:14
**medical (10)**
62:2;198:10;
199:17;201:6;230:5,
7,12,14,15;250:18
**Medicinenet (1)**
112:7
**Medium (5)**
28:14,20,21,22;
170:3
**members (1)**
131:4
**memo (1)**
51:25
**memory (7)**
43:17;120:22;
157:2;159:10,17;
160:3;180:23
**men (2)**
28:6;152:25
**mentioned (2)**
20:2;203:12
**mentions (1)**
38:15
**mere (1)**
228:25
**mess (1)**
50:9
**met (1)**
129:25
**Michael (2)**
234:21,21

**middle (9)**
16:6;32:25;40:20,
22;57:12;84:11;
99:22;104:8;145:5
**midnight (3)**
66:11;220:21;
221:12
**might (9)**
54:18,19;75:25;
92:20;136:15,20;
210:6;212:10;256:12
**mild (1)**
110:4
**mind (11)**
14:3,4,6,7;36:4,8;
75:6;180:22;229:7;
239:6;256:2
**mindful (1)**
116:8
**Mine (1)**
109:22
**minimum (3)**
15:10,13;177:4
**ministerial (3)**
164:10,14,22
**minor (9)**
116:21,24;120:23;
121:20;122:1;
134:15,21;237:6,12
**minute (8)**
42:17;206:9;
211:25;212:6,8;
214:20,23;244:25
**minutes (6)**
76:18,18;98:10;
105:23;172:8;202:11
**mis (1)**
194:13
**mischaracterizing (2)**
73:20,24
**mishandled (1)**
51:4
**misplaced (1)**
44:7
**misrepresenting (3)**
194:12,15,19
**miss (1)**
61:9
**missed (1)**
180:5
**missing (8)**
37:4;45:20;46:17;
49:23,24;125:11;
218:3,4
**Misstates (3)**
55:19;67:15;69:8
**mistake (2)**
133:10;175:19
**mistaken (1)**
189:18
**Mitchum (1)**
249:22
**mixed (1)**

239:18

**model (1)**
174:16

**modification (1)**
192:1

**modulated (1)**
106:22

**moment (1)**
134:20

**monitor (1)**
5:23

**monitored (1)**
146:5

**months (5)**
30:18;130:13,23,
24;132:14

**more (33)**
6:2;15:11,13;
21:17,20;28:25;
53:18,22;79:25;
81:14;100:1;138:5;
150:20;155:16;
158:9;169:21;192:3;
201:10,11;209:4;
211:18;212:8,10;
214:18;219:17;
222:21;229:24;
237:19;238:2,4,22;
245:21;254:2

**morning (8)**
76:1;156:16;
218:25;219:5,20,24;
221:17;223:14

**most (8)**
11:24;21:18;26:3;
109:12,13;156:7;
171:5;180:4

**mostly (1)**
160:6

**motion (4)**
83:16;244:15,19,
23

**motive (1)**
72:11

**motor (1)**
30:9

**mouthing (1)**
102:10

**move (18)**
6:2,2,4;55:14;69:2;
79:24;84:18,19,20;
85:7;90:10;96:24;
97:10,20;102:18;
139:7,8;203:18

**moved (1)**
211:19

**movie (1)**
6:15

**moving (1)**
98:23

**much (18)**
28:10,10;37:20;
61:10;75:25;77:1,2;

105:18,23;109:24,25;
110:12;120:25;
138:21;142:18;
158:18;203:6;254:1

**mug (1)**
135:22

**multiple (1)**
250:17

**Murray (6)**
7:5;9:11;21:23;
149:2;215:16;227:13

**muscular (2)**
107:7;109:24

**must (5)**
32:22;33:5;140:17;
232:5;246:15

**mutually (1)**
231:21

**myself (4)**
10:1;12:5,16;
211:19

**N**

**naked (19)**
138:1,3;146:22;
151:22,24;152:3,3;
153:1;170:8;184:18;
187:13;245:22;
246:2,14,16;247:18;
252:12,23;253:5

**name (11)**
4:8,9;54:12;63:23;
66:11;120:22;
172:19;203:14,21;
235:15;256:12

**narrow (1)**
199:13

**nature (2)**
57:21;172:6

**near (7)**
59:9;111:5,16;
144:10,12;145:2;
155:4

**neatly (1)**
162:15

**necessarily (3)**
67:7;196:8;244:5

**necessary (2)**
50:25;54:18

**neck (4)**
138:24,25;139:2,5

**need (28)**
5:17,18;6:13;
18:19;56:4,7;57:2,
10;75:21;116:3;
119:5,7,10;124:15;
125:17;128:23;
129:5;130:15;
202:14,14;204:9,10;
232:18;242:8;243:7;
254:20;255:10,20

**needed (10)**

12:1;115:23;
121:24;128:13;
176:1;192:22,25;
193:16;199:17;
229:16

**needs (5)**
122:4,5;126:21;
204:17;217:3

**neither (2)**
121:9;227:6

**neuromuscular (3)**
107:3,7,13

**nevermind (1)**
217:20

**new (2)**
110:15;215:17

**newer (1)**
174:16

**Newport (29)**
28:15,16,16,17;
29:23,25;32:15;58:4,
17;61:4;73:21;80:23,
24;81:3,21;85:18;
101:17,19,20;151:20;
205:4;211:10,11;
218:16,23;235:3,15;
236:7;249:22

**Newport's (2)**
60:16;73:15

**News (3)**
110:15;112:6,10

**next (21)**
4:13;24:24;85:23;
113:18;133:17;
134:16;135:13;
145:5;204:3,22;
205:3;209:13;210:3,
10;211:16;212:16;
215:6;219:1;223:14;
228:17;240:7

**nice (1)**
37:11

**night (12)**
7:17;147:13;
167:23;168:6,9;
180:11;218:24;
219:6;222:17,19;
223:3;230:24

**nine (9)**
108:24;130:23;
132:14;167:23;
177:3;209:20,22;
210:11;224:3

**nipple (1)**
143:23

**Nobody (7)**
121:11;128:21;
148:19;172:24;
180:17,17,17

**noise (1)**
8:20

**noncombative (1)**
184:23

**noncompliant (1)**
108:6

**none (7)**
37:4;139:16;153:8;
181:13;212:17;
215:5,9

**nonresponse (1)**
56:23

**nonresponsive (5)**
56:24,25;57:1,14,
16

**noon (1)**
220:3

**nor (1)**
227:6

**normal (6)**
56:14;64:25;
164:10;199:24;
214:5;229:5

**normally (6)**
4:19;135:11;
197:14,17;221:14;
233:23

**Notary (1)**
257:14

**note (2)**
5:6;6:12

**noted (2)**
57:17,17

**notes (6)**
4:15;6:19;157:1,1;
160:19,19

**notice (21)**
10:10;59:15;79:17;
81:24;131:13;132:2;
146:13;161:3;
203:20;205:11;
210:8;212:13;
213:21;216:5;
235:18;240:9;
241:20;249:3;
250:14,23,24

**noticed (3)**
82:23;175:14;
235:1

**notification (1)**
204:16

**notified (1)**
197:8

**nowhere (4)**
71:20,24;72:3,6

**number (9)**
33:6;35:17,18;
69:1;178:6;208:23;
215:20;224:9;225:25

**numerals (1)**
232:4

**nurse (32)**
73:5;151:11,11,13;
180:11;184:22;
187:22,24;188:4;
189:9;190:13;198:1,
4,9,9,12,17;199:1,7,9,

16;200:10,13;230:18,
20,21,23;238:17;
250:1;251:2;254:20;
255:4

**nurses (1)**
238:17

**nurse's (3)**
155:19;188:1,13

**nuts (1)**
7:16

**O**

**obey (4)**
153:4,14,21;
185:18

**obeying (2)**
100:24;153:23

**object (14)**
12:23;17:17,23;
46:7;56:21;182:19;
188:21;191:17;
200:21;201:2,2;
243:24;252:1,1

**objecting (1)**
95:20

**objection (31)**
4:16;5:6;7:1;
13:21;40:8;48:18;
55:19;57:3,11;65:12,
12;67:14;69:8;72:14;
73:19;95:16;131:18;
141:19,19,21,23,24;
164:17,23;181:24;
182:2;188:19;189:1;
193:19;244:3;252:25

**objects (1)**
166:12

**obvious (5)**
68:10;153:7,8,9,10

**obviously (4)**
108:3;204:5;
232:16;238:9

**occasion (1)**
176:21

**occurred (1)**
29:12

**occurrence (1)**
45:19

**occurrences (1)**
213:11

**OCGA (1)**
235:19

**o'clock (2)**
156:16;221:16

**October (19)**
18:4;33:16;34:15;
118:10;119:16;
135:24,25;136:1;
168:9;174:7;203:21;
207:9;208:6;210:15,
24;211:12,22;
213:21;215:7

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 273 of 284
Willard Todd Hensley v.                                                    30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                                      June 10, 2021

**off (40)**
7:4;8:19,21,22,22;
10:13;31:24;32:6;
37:14;55:11;56:3,22;
59:15,16;77:1;78:8;
82:5,8;98:4,14,20;
101:1,3;102:10;
114:1;152:5;164:15;
170:6;180:24;
196:20,23,24;221:4;
227:18,20,24,25;
246:5,15;256:14
**off-duty (2)**
28:3,5
**offense (3)**
124:8,14,15
**offenses (1)**
123:24
**offer (1)**
57:3
**office (14)**
9:12;71:15;131:20;
134:3,6;147:19,21;
156:11;159:18;
215:16;224:14;
227:14;234:5;242:17
**officer (81)**
6:18;24:15,19,23;
25:14;32:21;39:8,10;
42:2,7,10;45:16;
47:20;48:13;49:10;
51:7;52:17;54:7,8;
58:3,23;64:2,4,6,23;
65:8,13;66:21;78:22;
80:7,21;81:18,20;
82:19;96:7,10,12;
107:20,23;108:2;
117:3;121:15,18;
126:7;128:24,24;
175:19,25;188:16;
193:10;196:16;
198:1;199:3,6,8;
200:17;209:7;
227:19,20,24;228:1,
25;232:9,12;236:22;
238:3,4,10,12,16;
239:2,4;241:3,5;
249:23,23,24,24,25,
25;250:1
**officers (58)**
7:14;15:8;21:3,5;
23:1,2;24:17;25:3;
28:1,3;29:15;36:5,6;
38:8;39:16;46:16;
47:17;48:10;49:7;
50:20;52:23;54:2;
56:17;58:8,18;63:25;
66:9,14,23;67:2,5,25;
68:7;71:18;72:12,23;
73:3,5;82:13;84:15;
86:6;120:4;123:9;
128:10;129:7;135:5;
170:9;175:15;

196:14;204:14;
206:7,14;230:6;
237:17;241:12,17,22;
253:21
**officer's (10)**
47:23;48:7;71:6;
188:5;193:2;196:13;
229:7,15,20;239:9
**official (1)**
9:16
**often (3)**
36:22;109:11;
130:13
**old (1)**
108:14
**oldest (1)**
205:22
**once (12)**
14:20;26:21;74:5;
162:10;175:24;
189:20,20;193:21;
211:4,4,5;212:11
**on-duty (1)**
230:20
**one (208)**
10:7;14:13,16;
36:20;40:16;41:2,20,
22;44:9,17;45:22;
50:11,14,16;53:18;
60:21;75:21;77:6,8,9,
11,20,20;78:1,2,11,
12,23;79:9;80:3;
81:1,11;82:1,12;
83:24;84:12;85:12;
86:20,21;87:2,12,13,
18;88:17,18,18,19,
19,20;89:1,5,7,12,14;
90:1,4,6;91:21;92:4,
25;96:2,9,21,25;
97:11,21;98:12,25;
99:19,21;100:2,7,10,
20;101:7,24;102:2,
20;103:9;104:15;
107:20;110:3;
111:24;115:22;
121:9;123:17;
129:25;131:6;
132:21;138:5;140:3,
4;148:12;149:4;
154:21,22;157:22,22,
24,24;158:1,1,9,13;
164:9;165:24;
174:15,16;177:5;
178:2,7,17,24;
179:24;184:5;
185:17;186:21;
189:9,9,11,15,25;
190:1;192:6;193:24;
195:9,10,11;196:13;
197:18;198:9;
203:13,21,24;204:1,
10,10;205:2,3,12,22,
22;206:7,15;207:23,

24;209:14,17,19;
210:9,25;211:16,17,
23,23,24,25,25;
212:16,19,20,23;
213:17,19;214:18,18,
18,19,19,20,23;
215:2,14;216:11;
218:9;219:12,14;
220:4,4,5,13;222:21;
224:2,22,24,25;
232:3,5,14,21,23;
237:7,19;238:3,5,22;
240:13;245:10,10,21;
247:15;248:4,14;
249:6;251:7;252:10;
254:12;255:16
**ones (7)**
9:4;21:8;36:2;
204:9;215:4,5;
240:24
**one's (1)**
210:17
**one-second (6)**
16:19;207:10,12,
14,17;209:1
**only (40)**
17:15;26:23;36:1;
38:4,8,8;59:13;60:19,
21;70:12,15;72:20;
73:3;76:11;87:25;
88:1,20;94:5;107:6,
8;124:18;126:17;
127:7;158:1;171:24;
175:2,5,8;182:11;
184:16;185:16;
203:21;204:9;212:5;
216:4;235:5;237:18,
20;238:5;243:4
**onto (1)**
73:13
**open (14)**
7:16;61:7;74:16;
75:3;81:12,21;82:13,
15;87:9,13,24;88:20;
145:22;184:17
**opened (1)**
77:8
**opens (3)**
81:15,22;82:2
**operate (3)**
74:9,12;134:24
**operated (1)**
174:20
**operating (2)**
23:23;193:5
**operation (1)**
19:1
**operations (3)**
114:6;134:11;
237:12
**opinion (1)**
98:8
**opposite (1)**

54:19
**option (2)**
27:3;227:16
**options (4)**
16:14;26:18;192:3;
227:20
**orange (5)**
135:19;154:5;
167:10,15,17
**order (7)**
105:5;124:23;
172:20;176:15,17,19;
230:10
**ordered (1)**
199:2
**orders (4)**
153:4;185:18;
186:8;234:11
**ordinances (2)**
134:5,5
**ordinary (1)**
44:25
**originally (2)**
103:23;105:11
**out (139)**
6:14;25:22;27:18;
29:15;30:6;31:15,16;
32:22,23;33:5,5,6,12,
19,22;34:2,4,19;35:5,
13,15;36:7;37:3;
51:18;55:2;56:10,10,
19;61:13,18,25;
64:17,17,17;67:11;
68:17;73:17;79:3;
82:4,7,18,20;84:8,14,
14,16,23;85:15,17;
88:24;89:7;92:3,9,
22;93:14,19;96:22;
97:13;98:3,24;
111:12;113:21;
118:17,25;122:10;
124:7,8,12,13,14,22,
22;125:7,21;128:20;
136:5,6;142:13,18;
147:3,20,21,21;
149:1,10;152:8;
157:9;159:21;
162:24;163:1;164:7;
166:6;170:16,23;
171:2;176:9;185:13;
189:15,17;203:23;
204:6;205:14,23;
215:9,17,19,19;
217:3,7;218:1,17,20,
24;219:4,13,17,18;
220:2,4,4,7,12,14,19,
20;221:16,17;222:2,
22;223:10,13;227:5;
229:12;231:13;
234:19;239:14;
244:3;246:3,25
**outside (11)**
25:13,19;29:18;

32:12;44:22,25;
60:11;61:3;160:24;
162:16;193:12
**over (37)**
10:2;18:24;19:2,4;
20:12,12,13,23;
36:19;51:21;54:11;
82:17;98:6,15;
105:14,15;114:4,5,6;
116:13;126:24;
128:7,8,10;132:15;
134:5,9,11;148:8;
159:8;164:21;
170:25;209:13;
234:23;236:8;
247:14;253:15
**Overbroad (1)**
17:23
**overcome (1)**
182:13
**over-recorded (1)**
130:24
**oversee (1)**
134:3
**own (9)**
7:16;33:11;36:5;
38:25;41:8;109:7;
119:14;173:8;176:15
**owner (1)**
30:17

---

**P**

---

**padding (1)**
202:4
**page (48)**
113:18,20,21;
132:19,21,24;133:13,
18;134:16;135:14;
167:9;172:18;
174:22,25,25;182:11,
13;191:21;198:8,8;
203:15;205:13;
209:13,14;210:3,3,
10;211:19,19;212:19,
21;213:25;223:22;
224:21,21;225:1;
226:23;227:15,17;
230:5;231:16;
232:21,21;233:11,13;
237:15;239:15;241:2
**pages (5)**
113:16;215:6;
226:9;237:2;239:16
**pain (4)**
6:10;109:20,25;
110:3
**painful (3)**
109:8,12,13
**paint (2)**
30:23;155:8
**pair (1)**
100:2

pants (2)
    163:9,10
paper (3)
    122:21,22;123:1
paperwork (1)
    127:10
parameters (3)
    24:2,5;116:1
paramount (1)
    47:16
parked (2)
    91:2,4
part (31)
    44:10;53:5;54:1;
    55:18;58:7;64:5;
    67:4,6;106:10,11;
    124:1;126:22;
    137:15;141:16,17;
    148:18;152:2;156:2;
    161:22;200:22;
    227:19;230:10;
    232:8;233:20;239:1;
    240:21;241:8;249:7,
    10;250:22,22
particular (2)
    83:4;235:6
parts (2)
    177:3,3
party (1)
    238:16
pass (3)
    4:14;5:15;6:19
passed (1)
    155:14
passenger (4)
    29:23,25;58:4;61:5
passive (1)
    184:17
past (1)
    242:18
pat (1)
    99:3
patience (1)
    254:3
Patrol (28)
    8:13;10:22,24;
    11:8,9,12,12,13;
    20:12;21:8;23:21;
    25:22;52:24;68:22;
    86:7,10,11;114:5;
    117:24,25;118:16,19,
    22,23;128:11;
    134:11;156:12;233:3
patrolman (3)
    28:4;29:22;118:13
patrolmen (2)
    204:11,12
patting (1)
    99:6
pause (1)
    153:2
pay (5)
    59:22;61:10;81:17;

83:4,13
paying (2)
    60:8;153:19
PCP (4)
    63:21;66:10;72:22;
    100:15
pee (1)
    70:13
people (42)
    9:1;12:19;16:8,22;
    17:21;29:16;52:19;
    62:3,5;92:12;94:19;
    109:11,18;111:8;
    112:14;140:17;
    147:6,9;150:24;
    156:4;160:13;175:5;
    187:21,22;189:23;
    191:5;192:14;
    196:11;204:6;205:1,
    9;220:13;238:6;
    242:12,22;243:20;
    244:12;245:4;
    249:11;250:2,13,16
pepper (9)
    25:3,9,19,25;55:4;
    115:4,7,10;227:11
Pepper-spray (1)
    26:14
percent (2)
    24:14;208:19
perfect (2)
    6:5;128:22
period (2)
    123:6;131:13
person (14)
    12:12;20:24;54:16;
    55:12,14;56:15;
    59:13;129:3;151:22;
    168:23;190:1,1;
    199:25;239:5
personally (7)
    50:12;131:15;
    142:14;143:8;159:6;
    243:22;245:6
personnel (18)
    10:18,20,23;11:11,
    12;19:5;20:8;23:18;
    26:25;73:4;123:9;
    131:15;179:25;
    197:9;198:10;201:7;
    234:11,15
personnel's (1)
    63:21
persons (2)
    13:3;238:4
phased (1)
    205:23
phone (2)
    8:19,21
photograph (3)
    168:8,13,18
photographs (1)
    142:11

physical (7)
    26:7;30:25;109:23;
    227:9,9;238:9;239:3
physically (1)
    68:25
pick (1)
    154:11
Pickens (1)
    28:5
pickup (8)
    79:17,18;80:15,16;
    81:4;83:12,23;91:12
picture (5)
    167:25;168:20;
    169:2,4,12
pictures (12)
    30:21;31:19;
    162:17,20;167:20;
    180:15;200:20,25;
    201:4;221:4;227:4;
    245:25
pierced (1)
    178:12
pike (1)
    64:16
place (3)
    59:13;162:25;
    176:22
placed (8)
    40:16;41:12;49:20;
    149:2;162:16,17,19;
    166:1
places (1)
    144:23
placing (1)
    101:16
Plaintiff's (1)
    234:9
play (16)
    74:19,21,24;75:12,
    15;76:17;77:8,9;
    78:11;88:2,3,5,10,12;
    104:10,10
played (33)
    78:23;79:9;80:3;
    81:1,11;82:1,12;
    83:24;84:12;85:12;
    89:6,19;90:6;91:21;
    92:4,25;96:2,9,21,25;
    97:11,21;98:12,25;
    99:19;100:10,20;
    101:7;102:2,20;
    103:18;104:3,11
Player (1)
    87:14
please (25)
    4:8,9;34:11;78:24;
    89:15;90:5;98:11;
    99:18;102:18;103:7;
    133:19;134:16;
    135:14;136:25;
    138:4;143:13;145:1,
    16;157:20;161:15;

203:10;205:25;
    220:10;223:21;
    226:25
plus (1)
    250:2
pm (6)
    208:6;211:22;
    219:25;222:4,4;
    256:17
pock (2)
    138:6,11
pocket (1)
    164:7
point (8)
    4:15;79:11;95:17,
    22;102:6;123:24;
    177:10;239:14
Polarizing (1)
    228:21
police (4)
    7:14;86:2;106:4;
    107:23
policies (26)
    10:11;18:25,25;
    22:24;23:7,8,19,20,
    23;54:10,11;116:1;
    119:1;123:17;
    126:22;134:8;
    135:11;163:24;
    164:2,3;173:10;
    231:14;239:17;
    240:11;241:9;242:4
policy (100)
    10:3,6,8,12,17,19,
    19,22,24;11:2,4,6;
    14:12,16,21;15:12,
    24;19:1,1;21:13;
    22:20,21;23:19,24;
    32:20,20,23;33:3,17;
    36:21,23;38:15,25;
    39:4,12,12;41:9;
    50:20;52:4,5,10,12;
    54:12;55:7,18;59:8;
    108:8;114:4,5,6,6;
    116:20,21;117:4;
    119:2,3,11;120:23,
    23;121:15,19;
    124:22;127:7,7,8,19,
    21;134:9,10,11,15,
    21;135:8,9;137:6,9;
    140:10;159:17;
    160:4;161:22;
    163:19,22;172:16;
    185:7;192:19;193:2,
    5,12;198:18;226:5,7,
    10,16;232:17;237:6,
    12;238:25;239:7;
    240:20,22
policymaker (1)
    9:24
porch (1)
    108:17
Port (12)

22:13,17;103:2,3;
    130:1,5,5,7,11;
    131:16;132:9;233:5
portion (3)
    195:11;247:17;
    250:24
portions (1)
    20:1
posing (1)
    189:21
position (2)
    85:14;91:11
possession (2)
    71:12;72:3
possible (16)
    25:1;33:21;54:24;
    63:5;86:16;106:19,
    20,21;107:9,24;
    123:25;143:25;
    154:24;168:15;
    192:1;226:3
possibly (4)
    11:25;136:10,12;
    152:14
POST (9)
    15:4,6;21:2,5,9;
    53:4;122:9;234:7,7
pounds (1)
    169:14
practice (2)
    13:6;208:8
predicate (1)
    243:25
pregnant (3)
    108:2,7,9
prejudice (1)
    242:16
preparation (2)
    120:5;159:3
prepare (6)
    158:18,20,24,25;
    159:6,24
prepared (2)
    119:23;120:1
presence (4)
    227:21,24;228:1;
    229:1
present (3)
    127:10;183:11;
    232:9
presented (3)
    4:1;39:8;239:22
preserved (1)
    49:19
President (1)
    156:14
pressed (1)
    213:1
pressure (1)
    231:2
pretrial (1)
    13:2
pretty (5)

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 275 of 284

Willard Todd Hensley v.                                                    30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                                   June 10, 2021

14:21;90:19;91:15,
16;144:1
**previously (1)**
88:15
**prior (1)**
176:6
**prisoner (2)**
14:19;197:18
**Probably (14)**
28:25;49:5;53:22;
91:19;101:25;
150:15;152:4;
160:16;167:20;
210:15;219:22,23;
243:3;246:19
**probation (1)**
19:6
**probe (3)**
178:23;179:11;
191:25
**problem (11)**
4:12,25;25:8;
26:23;27:2;40:24;
108:23;115:12;
133:9;172:5;212:4
**problems (3)**
110:10,16;197:19
**procedure (6)**
23:24;50:21;64:25;
121:19;193:5;199:24
**procedures (7)**
39:4,7;45:16;
106:4;126:22;
183:14;198:18
**proceed (3)**
5:7,8;79:8
**process (1)**
14:24
**processing (1)**
14:20
**produce (1)**
166:24
**Professional (1)**
234:5
**progressed (1)**
230:2
**prohibited (1)**
183:10
**prohibition (1)**
115:13
**promotion (2)**
123:3,5
**prong (1)**
126:8
**prongs (19)**
38:16;40:17;41:4;
59:1;107:10,14;
109:3;144:22;161:4,
10,16,19,22;162:2;
165:13;166:6;
178:12;214:6,16
**proof (5)**
30:12;48:15;66:22;

68:16;95:14
**prop (1)**
171:1
**properly (10)**
20:9,10;41:12,18;
156:4;165:11;166:1;
171:1;191:5,9
**prosecutions (1)**
157:13
**protect (4)**
24:19;116:9,10,10
**protection (1)**
202:2
**protein (1)**
202:17
**prove (2)**
64:15,19
**proven (1)**
123:24
**provide (2)**
44:19,25
**provided (3)**
177:7,11;230:12
**provision (1)**
175:17
**public (4)**
48:8;116:10,11;
257:14
**pull (16)**
84:13;88:15,17,18;
89:4,10;92:22;
113:12;118:16,24;
119:7;132:22;164:5;
172:12;214:6;225:25
**pulled (10)**
73:17,23;74:3,5,
12;80:22;178:24;
196:21,24;214:3
**pulling (4)**
84:14,16;89:7;
164:7
**pulse (2)**
111:9;231:1
**punched (2)**
147:2;187:20
**punching (2)**
26:7;228:10
**puncture (2)**
201:15,18
**punctures (1)**
109:5
**punish (1)**
193:11
**punishment (5)**
137:15;251:19,24;
252:12;253:8
**punitive (1)**
137:17
**pupils (2)**
199:12,14
**purposes (1)**
46:13
**put (40)**

10:15;24:7;38:20;
41:8;72:11;74:15;
75:13;105:12;
111:12;132:2;
145:15;150:11;
152:11;154:7,8;
161:8,9;163:13;
164:12;165:14;
168:19;176:17;
177:21,21;184:13,24;
185:16;186:6;188:1;
197:23;201:22,25;
202:6;221:12;
224:24;230:13;
232:20;237:8;
245:22;246:5
**puts (1)**
81:22
**putting (7)**
27:17,18;99:1;
101:14;102:13;
195:10,11

## Q

**quarter (1)**
222:18
**Queen (2)**
228:15,15
**quickly (2)**
207:17;226:2
**quit (9)**
147:22,24,24,25;
148:2,6,10,12;253:24
**quite (10)**
12:8;15:11;21:20;
47:8;52:2;70:19;
79:20;90:25;91:6;
251:19
**quote (7)**
39:11;40:10;46:17;
72:21;167:5;171:24;
235:20
**quoted (1)**
65:18

## R

**rammed (5)**
30:13,19,25;31:1,2
**Ramsey (1)**
18:15
**ran (1)**
81:3
**Randy (6)**
205:3;207:6;
208:15,15,22;249:24
**rank (1)**
11:22
**ranks (1)**
9:11
**rather (3)**
167:10;190:11;

196:6
**react (1)**
95:4
**reacting (1)**
92:14
**reaction (5)**
62:15;93:22;94:16;
100:15;202:16
**reactivated (1)**
214:17
**read (32)**
19:7;106:7;110:19;
112:3;113:23;
128:24;133:19,24;
134:1;159:9;174:24;
180:24;186:5;
187:17;188:13;
191:23;226:24;
227:18,23,25;236:11,
24;243:1,2,8;247:10,
21,23;254:5,10,14,17
**reading (5)**
133:22;225:9,13,
19;247:18
**ready (3)**
61:7;75:24,25
**real (8)**
131:10;150:15;
156:9,9;189:22;
190:4,4;199:13
**realized (1)**
226:10
**really (17)**
27:22;61:10;72:10;
77:17;93:24;95:21;
109:24;124:9;
158:17;172:24;
185:13;190:6,11;
202:15;204:9;
216:23;217:3
**reason (24)**
6:13;51:4;67:25;
99:1;101:13;105:4;
112:1;117:3;146:16;
151:3;163:18,22;
169:11;172:22;
183:21;185:12,17;
186:13;193:16;
198:21,24;200:14;
209:18;239:6
**reasonable (1)**
237:21
**reasons (1)**
45:22
**reassess (1)**
192:2
**recall (10)**
15:18,23;16:1,4;
44:1;51:21,24;92:22;
120:24;174:14
**Receipt (2)**
223:23;224:13
**receive (3)**

206:14;217:12;
247:8
**received (17)**
18:14;42:9;131:19;
206:8;224:22,23,25;
225:2,2,17,18,22,22;
243:4,20;247:4,10
**recertification (3)**
15:15,16;23:6
**recertifications (1)**
23:10
**recertified (5)**
23:18;53:11,14;
173:7,15
**recess (5)**
77:3;105:24;172:9;
203:5,7
**recognize (7)**
80:21;135:16;
137:1;167:6;172:14;
203:21;226:4
**recollection (1)**
89:21
**recommendation (1)**
144:11
**recommended (1)**
59:11
**record (23)**
4:9,21;20:23;36:9;
63:15;69:9;73:20,24;
78:8;105:13;130:10;
131:23;140:1;
145:15;172:11;
226:25;249:7,19,19;
250:23,25;255:13;
256:14
**recorder (1)**
105:9
**recording (1)**
130:16
**recordings (2)**
130:19,21
**records (10)**
18:5;20:17,21;
44:14,16;118:16,24;
128:14,18;213:10
**recover (1)**
81:22
**recovered (1)**
197:22
**rectangular (2)**
150:19,20
**red (2)**
155:3;190:1
**redeploy (1)**
213:2
**reenergized (2)**
48:6;214:17
**refer (5)**
22:12,15;23:14;
160:18;221:14
**reflect (1)**
237:3

**reflects (1)**
234:10
**refresh (4)**
43:16;119:4;
120:21;157:2
**refreshed (3)**
159:10,16;160:3
**refresher (2)**
52:18,20
**refreshing (1)**
180:23
**refused (9)**
30:6;70:18;93:19;
153:14;154:8;
185:18;186:6,8;
250:18
**regulation (1)**
134:25
**regulations (1)**
235:24
**reimplemented (1)**
23:7
**related (2)**
114:3;233:16
**relates (1)**
43:23
**relative (1)**
205:10
**relevant (1)**
44:1
**reluctant (1)**
108:3
**remember (55)**
8:3,7;20:5,6;28:8;
31:21;32:9,10;33:10;
40:7;41:10;42:12,14;
43:4,10,14,22;44:3,
13;50:15;51:19,23;
59:3,17;99:16;
100:15;101:8;
112:17;116:22;
118:4,11,15,24;
120:8,10,25;121:5,8;
129:14,16;131:10;
137:12;141:8;
146:11;149:8;
151:10,12,17,18;
156:1;158:8;166:8;
177:13;186:12,14
**reminded (3)**
23:19,22;231:9
**Removal (3)**
249:3;250:23,25
**removed (1)**
250:10
**repeat (1)**
34:11
**rephrase (2)**
23:12,17
**replace (1)**
216:2
**replacing (1)**
215:20

**report (85)**
35:8;40:17;41:5,6;
42:2,6;66:16;85:16;
120:12;126:6,12;
127:14,14;128:20,22,
24;129:4;153:17;
161:23;164:12;
165:14;176:12,21;
177:4,15,17,22;
178:5,6,11,14,22;
179:4,7,9,16,24,24;
180:9,12,18,25;
181:4,5,7,7,9;186:25;
187:3,17;188:13;
216:4,6,9;217:20,22,
24;218:3,8;219:11,
16;231:18,19,23,24;
232:3,6,11,13,20,23;
233:15,15;234:4;
236:3,12,16,21,25;
237:3;241:6;245:17,
17;247:25;251:3
**reporter (25)**
6:23;13:12;74:18,
23;75:7,11;76:7;
87:10;88:22;89:3;
92:24;113:10,10;
132:19;134:17;
135:15;172:12;
202:12;203:2,18;
227:4;255:8,22;
256:6,11
**Reporter's (1)**
4:1
**Reporting (2)**
231:17;236:22
**reports (32)**
11:17;18:6;19:3;
42:9,15,16,22;43:12;
44:5;120:2;126:13,
15,16,17,18,20;
127:13,19;129:1;
154:3;166:7;176:25;
181:10,18;186:15,16;
211:15;216:4,24;
219:13;233:9,16
**represent (1)**
236:15
**reprimand (4)**
122:16,16,25;
123:4
**reprimanded (1)**
123:10
**reprimands (1)**
122:20
**request (3)**
199:6;200:4,5
**requested (2)**
199:3;228:14
**requests (2)**
45:8,12
**required (12)**
14:23;21:14;23:5;

41:8;52:25;53:16;
181:10;230:6,10;
231:23;233:9;234:2
**requirement (2)**
15:23;33:4
**requires (1)**
15:9
**requiring (1)**
232:10
**residual (1)**
136:20
**resistance (1)**
184:17
**resisted (2)**
63:1;73:1
**resisting (23)**
60:6,12;62:6;
67:19;68:2,10,16;
92:9;98:14;138:14,
16,20;151:5;152:1;
153:3;162:23;183:1,
2;185:9;193:25;
195:17,22;196:12
**resort (2)**
196:5,6
**respect (2)**
13:11;190:21
**respiratory (1)**
115:12
**responded (2)**
18:16;19:11
**response (72)**
13:25;17:18;23:15;
31:7;33:1;34:12;
37:21;40:25;42:18;
46:11;48:1,22;55:21;
57:18;58:15;66:6;
67:16,23;69:15;
72:18;73:25;78:9,19;
83:1,9,18;96:3;102:3,
21;103:4;112:20;
113:6;131:24;
133:11;142:2;
157:14;164:18,25;
166:21;179:5;182:5;
185:4;186:3;187:4;
189:6;190:7;191:19;
193:22;194:9;195:6;
197:5;200:23;
206:11;213:6;217:9;
221:20,25;222:6,14;
225:7,14;240:17;
242:10,19;243:17;
244:8,20;245:12;
251:4;252:3,8;253:2
**responses (1)**
45:1
**responsibility (9)**
9:21;20:8,16;37:3;
142:17;181:16,23;
200:17;231:11
**responsible (4)**
17:13,20;18:1;

129:8
**rest (1)**
8:12
**restrain (1)**
137:20
**restrained (1)**
162:12
**restraining (2)**
198:21;230:10
**restraint (17)**
137:4,7,9,14;
163:13;201:21;
202:1;228:3;230:13;
245:22;247:20;
248:1;251:23;
252:11,17,23;253:13
**restriction (1)**
25:12
**restrictions (1)**
25:18
**retained (1)**
130:9
**retaining (1)**
40:1
**retire (1)**
7:15
**retired (1)**
7:6
**retirement (2)**
7:9,19
**retrained (1)**
46:18
**retraining (2)**
46:13;251:14
**returned (5)**
35:6;219:5;220:21;
223:11,14
**reverse (4)**
56:11;68:22;82:4,7
**review (9)**
11:23,24;12:6;
19:9;27:14;233:14,
21;242:18;243:14
**reviewed (14)**
12:4;18:5,5,7,10,
23;19:12,13,18;
22:10;27:7,10;
233:17;236:7
**reviewing (4)**
11:17;12:3,4;20:17
**revolver (3)**
32:16;81:7;82:2
**revolvers (1)**
184:1
**revving (2)**
56:11;65:10
**rewrite (1)**
130:13
**rhythm (1)**
110:10
**rigamarole (1)**
5:20
**right (199)**

4:22;5:3;6:5,8;
9:15,18;12:2;22:5;
31:24,25;32:5,7;
33:3;39:25;40:15;
41:2,2;43:3,6,21;
54:19;55:11;56:2;
60:11;61:20;65:21,
25;66:1,19;68:4;
69:12;75:5,17;76:14,
25;78:15;79:6,6,16,
24;80:20;81:2,3,4,18;
82:10;83:5,6,21,21,
22;84:6,8,11,14,16,
22;85:21,24;86:8;
87:4;89:8;90:24;
91:6,15,20;92:5,7,8;
95:24;96:1,5,10,12;
97:3,4,8,19;98:9,10,
13,23;100:8,11,13;
101:12;102:11,23;
103:25;104:1,13,19;
105:20;106:11,20;
111:10;113:25;
115:6;116:19;
120:16,21;129:17;
131:1;135:13;138:6;
139:9,10;140:3,4,8,
15,20,24;141:2,19,
25;142:4;143:15,22;
145:2,6;147:11;
148:5;149:9;150:13,
18;153:13;154:16;
155:5,5,6,13,14,14,
15;159:23;160:8,22;
161:14;163:1,1,3;
164:9;166:14;167:2,
2,24,25;168:5,10;
172:3;173:25;
179:10;182:15;
183:2,25;185:21;
186:24;189:3,8;
192:21;194:24;
195:2,5,8,10;204:8,
18,21;205:13,18,24;
207:5;210:23;
213:14,25;214:15;
217:6;219:10;220:1;
221:5;222:22;
228:11;234:8;
235:17;236:24;
244:12;245:2;246:8;
250:19;251:23;
252:7,7;253:12,16;
254:4,24;255:3;
256:7
**rights (4)**
13:14;157:17;
249:8;251:19
**ring (1)**
8:20
**riot (2)**
237:18;238:21
**Road (6)**

18:15;79:5;80:5;
129:15;204:14;
239:11
**roadside (1)**
70:7
**Rodney (2)**
112:17,22
**roll (1)**
52:1
**rolled (2)**
93:2;98:15
**rolling (1)**
93:5
**Roman (2)**
232:4,4
**room (14)**
4:16,24;5:6,18;
16:6;35:2;49:20;
150:14,14;152:16,20;
164:13;170:10;246:9
**rooms (1)**
34:20
**Roster (2)**
215:17;218:18
**Roughly (1)**
119:22
**rounds (1)**
227:11
**routine (1)**
164:10
**rubber (1)**
227:12
**rule (1)**
144:9
**rules (7)**
134:25;193:5,6;
195:1;228:15;
235:23;251:18
**run (5)**
81:10;90:14,15,16;
98:24
**running (11)**
61:3;86:4;111:20;
128:7;193:16;212:7;
246:9,10,14;247:19;
253:6

### S

**safe (4)**
71:25,25;176:22;
200:18
**safety (6)**
17:15,21;48:8,8;
86:5;176:1
**Sally (12)**
22:13,17;103:2,3;
130:1,4,5,7,11;
131:16;132:9;233:5
**same (15)**
4:16;5:5,18;6:3;
14:18,21;28:23;29:4;
131:20;132:13;

209:15,21;219:16;
222:23;232:21
**sanitized (1)**
201:22
**save (1)**
256:9
**saved (1)**
155:1
**saw (15)**
32:2;59:25;69:5;
85:1;97:24;108:2;
179:4,11,12;192:5;
197:23;200:9;212:6;
216:14;240:6
**saying (39)**
28:22;48:16;62:7;
65:18,23,23;72:12;
74:2,4;92:20;113:4;
123:23;124:2;132:1;
133:2,4;136:17;
141:8;153:13;
158:22;159:23;
171:7;180:18;183:3;
187:6;188:9;190:16;
193:13;213:8;
221:22;225:9;
231:25;243:12;
244:11;245:16;
247:9;250:16;
252:19,20
**scenario (2)**
62:12;189:19
**scenarios (1)**
207:23
**scene (21)**
12:13;22:17;27:5,
17;28:2;29:9;57:23;
58:25;68:4,23;69:18;
70:4;79:1;81:19;
104:15;107:14;
131:16;179:1,12;
182:16,17
**schedule (1)**
228:18
**schedules (1)**
203:23
**school (3)**
21:19;174:18;
207:20
**Scott (2)**
234:21,22
**scratch (2)**
139:12,14
**scratches (1)**
201:11
**screaming (1)**
252:16
**screen (2)**
78:14;114:1
**scroll (2)**
137:24;226:9
**searched (1)**
15:4

**seated (1)**
137:3
**second (30)**
37:9,14;54:22;
77:7,12;78:24;81:13,
17;89:5,10;91:22;
159:12,12;167:8;
211:23,25;212:19,20;
214:18,19;224:21,21;
225:1;244:10;
245:10,14,14;247:9,
11,12
**seconds (12)**
16:20,21;109:16;
207:11;211:24;
212:18,20;214:4,5,7,
10,18
**Section (5)**
157:16,19;231:24;
237:17;238:20
**security (1)**
7:17
**seeing (5)**
78:6;85:5;103:24;
214:9;217:16
**Seemed (2)**
59:7;102:5
**seems (3)**
100:11,14;158:15
**segued (1)**
204:21
**send (11)**
45:11;75:7;76:9,
12,14;87:10,20;
117:1;181:10;
248:14;255:7
**sending (1)**
51:24
**senior (1)**
24:7
**sense (3)**
13:20;216:1;243:7
**sent (16)**
21:1;74:25;76:6;
87:3,12,21,22;
149:19;178:1,1;
181:13,20;218:24;
242:16;248:20;
255:22
**separate (4)**
11:6;22:11;96:24;
248:20
**separately (2)**
40:17;41:3
**Sergeant (63)**
28:9;29:17,21;
32:13;35:1;39:20;
55:17,24;57:7,22,25;
58:23;59:2,5;60:4;
73:14;81:19;82:14,
22;83:4;85:24;86:14,
18;88:23;97:15,18;
101:15,23;102:24,24,

25;119:13;122:3;
125:1;130:1,20,22;
148:7;151:7;154:21;
169:16;176:8;
179:10,16;183:12;
192:5;193:16;197:7,
8;210:6;211:3;
214:17;215:18,22;
216:20,21;219:4,7,9;
234:23,25;249:21,22
**sergeants (1)**
11:20
**serious (14)**
47:4,6,8;49:7;
110:16;121:24;
142:17;200:7,9,20;
201:1,6;233:24;
251:19
**seriousness (2)**
171:20,20
**serve (2)**
116:9,11
**served (9)**
242:21,23;243:14,
22;244:4,13;245:4,6;
250:8
**service (7)**
32:15;81:7;184:1;
218:1;244:16;250:4,
7
**session (4)**
203:20;235:3,4,6
**set (4)**
24:6,6;100:16;
255:11
**settled (1)**
115:7
**seven (16)**
37:1,25;38:3,12,
12;154:18;156:16;
166:1;177:8,11,22;
209:20;210:10;
224:3;232:3,5
**seventies (2)**
8:14;22:4
**several (18)**
7:24;10:1,10;
15:21;24:7;53:16,22;
56:17;113:9;167:13,
14;187:8;192:5;
201:15;202:20;
207:22;240:22,22
**shall (3)**
177:4;227:8;234:4
**share (1)**
78:13
**Sheena (4)**
224:23,25;225:3,
18
**sheet (4)**
33:5;113:14;
220:12;225:16
**sheets (1)**

125:7
**sheriff (88)**
7:2,5,5;8:11,11,25,
25;9:17;10:2;13:13;
14:3,4,6,22;17:14;
18:18;21:23,24;22:4,
18;29:22;31:10;
45:17;49:24;57:20;
69:23;75:19;76:22;
78:4,25;79:16;80:4;
85:1,6;90:20;91:1;
93:3;96:15;97:24;
100:12;102:6;
104:14;106:1;
107:24;121:3;
133:15,19;141:7,10;
145:17;148:18;
149:25;150:3;
152:24;155:23;
156:3,11;157:11,16;
159:20,20;172:13;
180:21;181:10,17;
185:14;195:9;
200:17;201:1;
202:19;203:11;
223:24;235:23;
240:1;241:7;242:24;
244:11;248:11;
249:9;250:2,13,20;
251:6,9;254:5,10,13,
15
**sheriffs (1)**
7:15
**sheriff's (27)**
8:5;9:2,6,8,12,25;
21:20;24:8;34:7;
35:12;45:24;49:16;
51:9;131:4,19;134:3,
6;147:19;156:11;
159:17;163:10;
198:14;204:7;
215:16;224:13;
227:14;242:17
**shift (9)**
33:23;36:15;92:16,
21;218:22;232:19,
22;233:17;253:15
**shock (8)**
110:4;111:4,13,16,
17,24;188:11;190:14
**shocked (1)**
16:24
**shoe (1)**
155:12
**shoes (3)**
24:15;98:14;
100:23
**shoot (8)**
16:16;35:13,15;
108:23;144:9;
207:24;212:14;220:5
**shooting (5)**
27:20;108:17;

Case 4:19-cv-00267-TWT   Document 78   Filed 03/03/22   Page 278 of 284
Willard Todd Hensley v.                                                    30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                                    June 10, 2021

152:16,25;209:2

**short (1)**
212:6

**shortly (2)**
117:20;214:15

**shot (16)**
16:14;85:7;103:23;
109:11;135:22;
138:14;152:20,21;
179:11;180:13,14;
184:6;196:17;212:3,
23;214:3

**shots (4)**
136:21;138:12;
209:1;214:25

**shoulder (4)**
4:22;188:2,10;
190:13

**shouting (3)**
30:2,2,3

**show (25)**
35:16;48:4;63:15;
70:14,15;73:17,22;
74:4;113:17;116:24;
125:7;128:19;
134:19;162:20;
168:23;193:20;
199:11;204:25;
208:21;212:2,3;
216:24;218:8;249:7;
255:13

**showed (4)**
33:15;213:20;
215:3,14

**shower (39)**
22:14,18;38:2;
129:12;131:17;
132:5,7,12;145:19,
20,21;146:2,4,9,14;
147:6,9;150:14;
151:3,23;153:1;
160:24;162:16,21,25;
163:2,3;170:8,10;
184:12;186:18;
187:11;208:4;
229:24;233:6;
238:11,15;246:3,4

**showers (1)**
145:25

**showing (2)**
203:11;208:11

**shown (4)**
210:1,17,19;
219:10

**shows (13)**
74:3;89:12;178:11;
191:7;193:21;
194:23;197:2,2,4,4;
211:11;212:5;225:16

**shrink (1)**
226:13

**side (12)**
10:25;11:8;26:4;

29:23,25;58:1,5;61:4,
5;69:5;82:14;91:10

**sight (4)**
4:17,24;79:14,15

**sights (1)**
35:15

**sign (20)**
32:22,23;33:5,19,
19,22;34:2,3;36:6;
93:6;124:12,22;
215:16;219:13;
220:7,12;254:5,10,
14,17

**signals (1)**
5:15

**signature (5)**
10:11,16;54:11;
109:5;172:22

**signed (28)**
10:13;35:5;125:7;
172:19;205:6;215:9;
218:16,23;219:18;
220:2,4,14,18,19,20;
221:7,10,16,17;
222:2,3,17,22,23;
223:8,10,13,19

**sign-in (1)**
33:15

**signing (4)**
124:8,14;218:20;
219:17

**sign-out (2)**
33:16;125:7

**silver (1)**
101:24

**Silvers (1)**
250:1

**similar (3)**
15:8;237:18;
238:21

**simplest (1)**
100:4

**simply (1)**
141:13

**single (2)**
196:15;232:12

**sit (5)**
4:13;14:3;43:21,
25;244:11

**site (3)**
22:13;28:2,2

**sitting (11)**
31:25;32:6,11;
55:12,13;64:17;69:6;
79:5,23;108:16;
196:18

**situation (24)**
26:19,19;27:7,8;
39:8,13;55:9;56:14,
14;59:12;70:9;95:3;
108:15;109:1;116:3,
5;151:25;192:2;
196:9;229:11,15;

230:2,9;239:10

**situations (6)**
24:12;41:19;
140:13;156:13;
164:10;191:25

**six (13)**
98:10;130:23,25;
131:1;132:14;
140:15;169:13,13;
182:20;209:14,20;
210:10;224:3

**six-month (1)**
131:12

**sixth (1)**
222:8

**size (5)**
28:14,20,23;29:4;
170:3

**skill (1)**
227:9

**skin (2)**
109:4;138:21

**skinny (2)**
28:18;170:3

**skip (2)**
104:1,9

**sledgehammer (2)**
26:22;54:15

**slightly (2)**
6:4;79:11

**slipping (1)**
146:18

**slow (1)**
83:15

**slower (1)**
79:25

**SM47 (1)**
225:19

**small (4)**
28:13;29:6;109:5;
232:4

**smaller (5)**
28:23;29:7;174:23;
221:3;227:4

**smash (2)**
26:23;54:15

**smashed (2)**
65:8,9

**smirk (1)**
102:9

**snafu (1)**
50:9

**snapped (2)**
31:24;32:6

**soaking (2)**
152:4;247:19

**socks (1)**
100:23

**soft (5)**
17:10;228:4,5,6;
229:2

**solid (1)**
111:9

**solution (2)**
26:23;27:2

**somebody (37)**
16:7;20:23;24:23;
25:5;30:19;50:3;
54:14;93:8;94:16;
100:7,7,8;108:13,14,
21,23;112:21;115:9;
123:16,17;128:19;
140:10;162:24;
163:6;166:23,23;
183:5;193:11;209:2;
210:5;214:3;221:8;
228:8;238:18;
252:11,21,22

**somebody's (5)**
79:2;196:10;
201:22,25;246:16

**somehow (4)**
88:23;187:6;209:1;
239:18

**someone (7)**
26:12;34:21;61:22;
64:24;108:11;
137:20;198:4

**sometimes (11)**
8:20;12:17;59:12;
124:10;144:13,21;
156:10;169:1;193:6,
9,10

**somewhere (7)**
31:6;131:7;133:6;
166:10;185:3;213:5;
225:5

**soon (3)**
118:9;152:20;
202:23

**sorry (102)**
6:9,10;18:18,18;
23:1;25:16;27:9;
29:21;34:9,14;37:23;
40:21,23;42:20;
43:24;44:20;46:20;
50:23;51:12;52:15;
53:18;56:5;58:12;
62:4;64:9;72:25;
75:20;77:19;80:16;
82:6;83:3;84:25;
85:19;88:8;89:9;
91:3,18;93:15;95:18,
19;104:24;114:17,
21;115:15,21;117:7;
122:12;128:6;132:6,
11,23,25;133:5,8;
136:1,11;139:3,13;
142:23;147:17;
149:1;153:5;159:21;
162:18;163:16;
172:4,7;179:20;
180:21;182:1;
183:17;190:21;
191:1,22;196:1;
197:16;200:12,21;

208:9;210:13;
211:18;212:17;
213:19;215:11;
217:18;218:11;
219:8;220:9;222:4;
224:19;230:19,19,22;
233:12;234:13;
236:15;247:7;
248:23,24;251:11;
254:12;256:1

**sort (8)**
27:15;63:11;93:6;
136:13;156:19;
199:12;202:2,4

**sounded (1)**
56:5

**sounds (1)**
122:19

**space (3)**
79:20;90:25;91:6

**spaces (1)**
207:14

**spark (2)**
97:5,12

**sparks (1)**
97:4

**speak (1)**
120:7

**speaks (3)**
183:8;209:25;
249:11

**special (4)**
34:6,16;175:17,17

**specific (3)**
22:25;33:18;52:5

**specifically (1)**
38:16

**speculating (1)**
216:10

**speculation (1)**
253:1

**speeches (1)**
185:22

**spell (1)**
4:9

**spelling (1)**
256:13

**spending (1)**
14:9

**spiked (1)**
199:13

**split-second (1)**
164:5

**spoken (1)**
123:12

**spoliation (1)**
45:23

**spot (1)**
90:16

**spots (1)**
155:4

**spray (9)**
25:3,9,19,25;55:4;

Willard Todd Hensley v.
Hon. Gary Langford, Sheriff, et al.

30(b)(6) of Gary Langford
June 10, 2021

115:4,7,10;229:3
**sprayer (1)**
228:21
**square (1)**
150:21
**staff (3)**
24:7;120:5,17
**staggered (1)**
204:6
**standard (3)**
23:23;193:4;234:5
**Standards (2)**
134:20;240:22
**standing (15)**
16:9,11;24:15;
32:12;69:4;80:13;
122:8,9;146:20;
151:24;152:3;163:6;
170:8;184:17,18
**star (1)**
6:15
**stark (1)**
247:18
**start (3)**
7:4;77:25;227:20
**started (5)**
15:21;33:7;55:10;
89:25;186:21
**starts (1)**
81:22
**state (21)**
4:8;8:13;21:1;
22:3;126:24;127:3,7,
8,12,15,18,21;134:5;
157:4;181:8,11,13,
18;234:2;235:19,24
**statement (6)**
66:13,15;94:8;
106:7;188:4,5
**statements (1)**
106:3
**States (1)**
156:15
**stay (1)**
171:3
**stayed (1)**
171:3
**step (7)**
24:24,24;54:3,22;
114:13,13;116:13
**steps (3)**
26:13,16,17
**stick (2)**
92:16,21
**stigma (1)**
199:11
**still (15)**
7:5;23:8;63:1;
101:11;118:15;
129:18,20;162:14;
169:2;181:22;
193:25;195:22;
196:12;213:1;214:16

**stipulate (3)**
105:13;197:1;
222:11
**stomach (1)**
140:16
**stop (21)**
78:24;79:10,16;
80:2,20;81:13,17;
84:11,16;85:21;86:2;
90:24;91:22,23,23;
92:7;93:1;96:12;
102:23;113:18;217:7
**stopped (3)**
9:14;56:6;229:12
**stops (1)**
181:17
**stories (1)**
150:10
**story (1)**
188:17
**straight (2)**
66:4;101:5
**street (2)**
24:16;66:11
**strength (1)**
227:9
**stress (1)**
163:21
**stricken (2)**
57:15,16
**strong (1)**
196:15
**struck (1)**
59:2
**structure (1)**
109:24
**stuck (2)**
246:4;248:1
**Stuckey (4)**
130:20,22;225:2,
18
**study (2)**
110:15;111:22
**stuff (9)**
11:25;128:15,16;
153:9;156:7;160:5;
217:16;224:20,20
**stun (9)**
42:3;97:6;126:8;
178:23;179:19;
191:24;192:6;
194:22;211:4
**stunned (6)**
61:15,23;62:11;
136:7;197:10,10
**subdued (1)**
163:13
**subject (4)**
177:10;180:7;
192:19;230:11
**subjects (1)**
109:21
**submit (1)**

232:10
**submitted (3)**
233:9,18;243:13
**subordinates (1)**
241:18
**subscribed (1)**
257:11
**successful (3)**
38:5,7;126:5
**successfully (1)**
175:5
**sudden (1)**
106:17
**sued (1)**
132:3
**suffered (2)**
180:7,9
**sufficient (1)**
197:25
**suggest (1)**
135:5
**suggestion (4)**
134:23,24;135:4;
193:5
**suing (2)**
131:14;249:11
**suit (1)**
250:6
**superiority (2)**
238:9;239:3
**supervise (2)**
9:22;156:4
**supervised (1)**
191:6
**supervising (3)**
129:23;191:4,8
**supervisor (18)**
20:3;34:19,24;
35:2;36:19;119:13;
129:24;148:7;
170:15;179:16;
231:12;232:19,22;
233:17;236:8;
241:24;253:15,16
**supervisors (11)**
9:10;11:20;15:12;
21:11;23:2;64:12;
123:12;125:22;
128:5;148:2;171:14
**supervisor's (1)**
231:11
**supervisory (1)**
120:17
**supplemental (3)**
232:11,13;233:15
**supply (1)**
44:16
**supported (1)**
17:3
**supporting (2)**
17:7;234:4
**supposed (18)**
8:21;34:3;38:17;

41:3;42:2;126:4,6,
24;127:4;137:17,20;
140:9;161:25;165:3,
4;170:25;191:4;
201:24
**supposedly (1)**
142:8
**supposition (2)**
30:12;31:1
**sure (45)**
20:14,21,24;21:2;
24:8,14;35:22;37:4;
45:8,15;46:10;54:20;
63:24;66:4,24;69:4;
86:17;94:21,24;
95:15;100:6;105:7;
124:23;128:17;
148:1;153:18;
170:16,25;181:18;
182:7;191:5;194:16;
198:13;200:18;
209:24;210:7;
213:16;214:23,24;
216:15;219:3;226:9;
237:7;243:9;246:19
**surprise (1)**
63:13
**surprised (1)**
216:23
**suspect (5)**
14:11;24:21;86:5;
100:1;177:6
**suspicion (2)**
63:8;64:24
**suspicious (1)**
18:15
**swear (2)**
13:12;188:23
**sworn (3)**
4:4;8:15;257:11
**sympathize (1)**
230:3
**symptoms (1)**
107:7
**system (2)**
71:2;130:12

**T**

**tad (3)**
92:1;96:7;226:13
**talk (13)**
15:14;54:7,16,23;
82:16;88:21;120:4,
16;130:4;160:8,16;
216:21;251:3
**talked (4)**
94:4;114:10;
120:13;150:3
**talking (24)**
12:18;18:11;22:16;
29:15;42:24;47:25;
55:10;68:3;86:7;

89:23;93:19;114:24;
165:10;167:18;
173:12;179:1;
205:12,20;229:23,24;
245:7,9,10;249:13
**tall (6)**
28:9,10,17;169:13,
23;170:1
**taped (1)**
16:16
**Tase (15)**
26:15;38:4;55:24;
56:18;57:7,22;59:13;
97:6;108:18;140:9,
10,13;142:8;187:9;
198:5
**tased (44)**
15:24;16:1,5,7;
17:7;48:14;55:17;
58:19;59:14,25;60:2;
68:12,19;82:18;
92:12;93:8,21;94:17,
19;95:2,3,11;97:1,3,
12;100:22;109:20;
112:21;129:12;
138:16;140:17;
141:11;142:6;
146:20;153:14;
184:23;186:24;
197:19;212:7;213:9;
222:18;223:18;
238:12;250:17
**Taser (165)**
15:16,19,23;16:15,
15,17;19:1;22:21,24;
23:7,19,20;26:2;
32:14,20,22,22,23;
33:3,5,6,6,9,18;
34:22;35:25;36:5,7,
10;38:12;41:25;47:2;
53:6,8,11;55:6;
58:23;59:5,8,9;
61:23;62:11,16,24;
63:3;84:2,6;92:15;
93:7,13;98:1;106:5,
23;107:1,6,25;108:4,
6,10,14,24;110:1,7,9,
12;111:24;112:8,11,
14,23;114:14;115:4,
14;119:3;123:18;
124:7,21,22;125:8;
126:5,7,12;127:14;
136:20,21;138:12,14,
21,22,25;139:17;
140:4,5,22;141:4;
143:17,23;145:7,12;
159:10;161:2;
172:16;173:7,11,16,
17;175:6,9,15,18,20,
22,24;176:5,9,13;
179:20;182:11;
183:9;184:9;188:11;
190:15;196:1,2,3,3;

197:22;198:3;
203:16;204:2,24;
206:15;207:7;
208:23,23;209:1,19;
210:5,6;211:8;212:4,
5;213:23;214:25;
215:17;217:25;
218:4;220:3,7,11;
221:9;222:3,17,19;
223:7,8,8;227:16;
228:23,24;229:4,16;
235:20,21;238:22
**tasered (1)**
197:11
**tasering (2)**
110:16;111:23
**Tasers (44)**
15:22;24:9;33:7,
19;34:5,15,16;35:12,
14,24;36:17;38:4;
43:11,13;68:1,2,8;
106:16;107:19;
109:8;114:7;115:18;
124:10,19,19;134:12;
139:16;152:7,16;
153:1;174:12;175:3;
179:25;180:2,10,13;
206:23;215:9;
218:17,17,20;220:14;
223:18;227:10
**tases (1)**
24:23
**tasing (5)**
93:22;95:7;221:8;
223:6;238:25
**Taster (1)**
215:25
**Taurus (1)**
101:21
**teaching (1)**
22:8
**techniques (1)**
235:7
**technology (3)**
40:23;88:6,9
**telling (10)**
13:16,17,21;68:19;
141:15,22;142:1;
154:1;171:16;189:18
**tells (2)**
128:23;225:25
**temporary (2)**
228:18,19
**ten (2)**
109:16;150:17
**tends (1)**
244:2
**tenure (1)**
106:5
**terminated (11)**
117:25;118:1,8,10,
22;121:7,10,12;
123:19,21;148:20

**termination (1)**
123:25
**terminology (2)**
13:2;153:22
**terms (2)**
8:11;253:10
**test (12)**
63:9,10,10,16;
65:1;66:24;67:6;
70:8,12;124:23;
199:2,6
**testified (6)**
4:4;32:4;58:18;
59:7;73:7;211:13
**testify (5)**
13:11;50:17;143:4;
158:13;243:4
**testifying (1)**
190:9
**testimonies (1)**
185:17
**testimony (24)**
8:16;19:4,7;29:11;
43:7;58:7;65:7;69:9,
10;113:22;114:3,4;
119:17,24;120:5,8,
14;147:1;152:19;
172:1;185:19;188:1;
189:22;230:16
**testing (3)**
208:8,12,13
**tests (2)**
63:14;95:14
**thanks (1)**
105:20
**That'd (2)**
52:16;70:17
**theirs (1)**
188:18
**thereabouts (1)**
246:21
**thereafter (1)**
214:15
**third (5)**
77:12;215:19,21;
238:16;239:5
**though (10)**
54:11;63:2;91:15;
107:12;170:4;
172:19;219:24;
230:15,16;250:22
**thought (6)**
92:20;93:11;128:3;
130:23;144:19;
248:24
**threat (3)**
162:4;182:14,16
**threatening (5)**
39:15;92:8;162:7;
188:6,17
**three (50)**
21:19;22:11;28:3;
34:1;51:20,21;60:11;

61:3;74:15;84:14;
96:23,23;97:13;
103:6,10;104:20;
140:16,18;147:2;
158:7;169:4;179:13;
187:20;192:3,14;
193:17,20;196:11;
207:17;208:3,22;
209:1,14,19;210:9;
211:21,22,22;212:5,
9;214:17;220:13;
223:17;224:2;235:5;
237:2;247:20;
251:15,24;254:2
**three-part (1)**
218:13
**threw (5)**
84:1,2,7,24;154:21
**throughout (1)**
24:9
**throwing (2)**
84:21;216:12
**thrown (1)**
216:17
**till (1)**
90:16
**time/date (1)**
169:6
**times (29)**
21:19;38:3;48:5,
14;98:5;100:22;
108:24;128:1;
141:11;142:6,7,8;
147:2;176:1;179:13;
182:20;187:8,20;
193:17,21;209:11,15,
22;210:9;214:18;
220:18,19;223:2;
250:18
**tire (4)**
31:24;32:1,6,7
**title (4)**
77:16;226:24;
227:19;235:9
**titles (1)**
227:24
**today (3)**
18:9;43:25;45:2
**Todd (3)**
135:17;215:24;
248:10
**together (4)**
38:18;99:22;161:8;
195:21
**told (28)**
23:8;31:12,13;
39:18,23;41:19,22;
66:23;68:20;75:3;
88:15;94:12;111:3;
126:13;142:7;143:7;
148:22,23;151:1;
156:17,20,25;182:20,
23,25;185:9;193:4;

241:15
**tomorrow (5)**
45:2;88:23;211:8;
236:18;256:9
**took (20)**
10:2;82:4,7;98:14;
100:25;101:3;
131:14,15;162:19;
167:19;171:17;
176:9,9;180:14;
201:5;210:6;212:8;
215:19,19;220:3
**top (19)**
69:6;86:12;121:22;
156:3;167:23;
179:13;187:21,22;
192:14;196:11;
205:11,13;208:23;
213:25;219:17;
221:15;235:10;
237:16;240:4
**torso (1)**
144:12
**toss (1)**
83:11
**tossed (2)**
97:22;98:7
**tosses (2)**
83:22;97:16
**tossing (1)**
252:17
**total (1)**
54:19
**totaled (2)**
22:5,5
**touch (2)**
171:3,4
**tour (1)**
176:6
**towards (5)**
56:16;68:22;
155:12;220:15;
237:16
**trail (1)**
35:16
**train (3)**
9:22;20:4;191:9
**trained (14)**
20:9,10,15,22;
26:13,17,25;49:7;
52:11;110:13;116:8;
191:6;196:14;200:17
**training (55)**
15:7,10;20:14,17,
18,20,23,25;21:3,12,
15,20;26:6;39:11;
46:22;47:2;49:10,11,
13;51:7,18;52:17,21;
53:2,17,20,25;54:2,2,
6,8;62:2;100:16;
107:20;108:1;128:8,
16;173:3,5,6;176:13;
203:12,14,25;204:2,

24;205:17;207:1,20;
209:7;227:14;
234:20,23;235:9,13
**transcript (1)**
134:19
**transcripts (1)**
113:9
**transferred (4)**
147:20;149:6,10,
21
**transported (1)**
199:18
**trauma (2)**
93:6,7
**Traynor (2)**
76:9,13
**treated (2)**
14:8,17
**treatment (1)**
250:18
**tree (2)**
31:2;65:9
**trial (26)**
19:6;30:13;42:21,
23;43:1,2,7;50:18;
114:4;127:1,9,11;
134:19;143:2,11;
157:3,7;159:8,9;
160:4;166:6,16;
171:10,25;239:23;
240:3
**trick (4)**
189:4;239:19,25;
240:6
**tried (5)**
184:11,12;185:15;
187:8;196:22
**trigger (13)**
42:1,3;126:8;
164:6;178:24;
179:11;212:12,15,18;
213:22,23;214:1,6
**triggered (1)**
212:23
**trooper (1)**
22:3
**trouble (1)**
255:14
**truck (30)**
73:18,23;74:3,5,
13;79:2,12,17,18;
80:16;81:4,23,24;
82:8;83:12,23;84:3,7,
11,22;91:12;92:3,16;
96:13,14;98:6;
154:22;212:8;
216:13,18
**true (13)**
8:16;95:7;106:3,8,
11,18;128:25;154:9;
181:19;190:15;
193:12,13;245:16
**Trujillo (5)**

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 281 of 284
Willard Todd Hensley v.
Hon. Gary Langford, Sheriff, et al.
30(b)(6) of Gary Langford
June 10, 2021

210:4,5,8;220:16;
223:13
**truly (1)**
236:15
**Truman (1)**
9:14
**trust (1)**
5:14
**truth (1)**
189:18
**truthfulness (1)**
72:10
**try (12)**
30:9;54:16;77:10;
125:17;144:11;
188:2,3;206:10;
226:2;237:25;
238:17;254:22
**trying (24)**
6:10;12:13;13:4;
56:16;61:18;68:22;
92:21;152:1;183:15,
20;188:10;189:4;
190:14;194:5;
195:13,18,20;238:3;
239:1,2,19,25;240:6;
246:13
**turn (5)**
70:7;132:19;
182:13;209:13;
218:12
**turned (6)**
39:20;47:17;55:16;
126:24;218:25;
219:19
**turning (1)**
252:17
**turns (2)**
70:3;218:20
**TV (1)**
251:16
**twelve (3)**
52:25;150:17;
250:2
**Twenty (2)**
53:2,3
**twice (2)**
197:11;223:7
**two (81)**
8:11;12:11,19,21;
16:11,14;19:9;29:18;
43:14;45:22;75:4;
77:20,21;82:13;
83:25;89:1,1,14,18,
19;90:25;96:11;
103:7,10,12,13,16,
18;104:3,11,12,16;
105:5,10,11;107:14;
113:11,13,14;119:20;
130:7,7;132:18;
138:25;139:10;
140:21;141:1,2;
143:3;154:21;158:1,

6;174:12;179:13;
183:25;188:20;
193:17,20;195:9;
205:5,6,6;207:11;
209:14,18,19;210:9;
211:18,24;212:19;
214:18;219:17;
220:12,13;224:2;
238:2,4,5;240:10,24;
251:14
**type (7)**
51:14;93:20;
112:12;167:10;
178:11,15;229:14
**typical (2)**
204:15,24

## U

**ultimate (1)**
170:15
**unclear (1)**
12:16
**under (44)**
9:4,22;10:5;11:4,5,
8,12;16:12;17:10;
20:9,11;52:11,19;
64:3;65:3;71:21;
98:11;136:10,12,15,
20;162:4;163:20,21,
21;164:3;183:9;
184:10;195:1;205:5,
13,16;207:5;226:16,
23;229:5;234:15;
244:16;248:20;
249:20;251:24;
253:20,20,21
**underlined (1)**
184:9
**underneath (1)**
146:14
**undue (1)**
251:24
**unfettered (1)**
115:24
**uniform (5)**
163:10;167:10,12,
18,20
**uniforms (1)**
167:14
**uninvolved (1)**
241:5
**unique (2)**
39:10,12
**unit (1)**
215:25
**United (1)**
156:14
**unless (7)**
11:18;61:9;108:4;
176:1;183:10;
189:21;209:2
**unquote (6)**

39:11;46:17;72:21;
167:5;171:24;235:20
**unsubstantiated (1)**
252:6
**unto (1)**
64:5
**up (131)**
10:6;11:20;15:3,
11,16:8;21:20;24:17;
25:14,17,20;32:19,
24;34:10,18;36:10,
18;37:5;39:3,10,13;
50:9;51:6;55:10;
56:11,16,17;59:21;
64:1,12,22;67:2,4;
74:16;76:5;79:10,13;
80:22;81:24;82:21;
83:14;87:9;88:16,18,
18;89:5,10;91:25;
92:1,2,6,20;93:2,5;
94:20;95:25;96:7;
97:2,15,16;101:6;
102:16;105:4,10;
108:18;111:7;
113:12;114:16,18,20,
22;116:2;118:2;
119:7;122:20;
125:17;128:16;
130:14;132:15,22;
133:21;138:2;139:8,
8,15,16;140:13;
143:20;145:6;
149:18;150:10;
152:7,8,9,10,15;
154:11,18;155:12;
165:11,11,13;167:23,
23;172:12;180:1,8;
194:2;196:19,19,20,
21,23,24;199:5;
205:16;206:2;
208:23;210:9;
217:25;221:15;
222:21,22;225:25;
229:20;232:20;
235:9;238:17;239:2,
18;243:16;255:11
**update (1)**
10:4
**updated (3)**
10:3,14;240:23
**updates (1)**
156:16
**upload (1)**
76:4
**uploaded (2)**
76:6;87:12
**uploading (1)**
207:1
**uploads (1)**
206:23
**up-to-date (1)**
20:21
**urine (1)**

63:9
**USB (1)**
5:24
**use (86)**
6:23;15:19;22:21,
24;24:9;25:4,9,19;
26:7;27:1;32:21;
39:11;41:5;63:23;
66:11;68:1;106:4;
107:6;108:3,5,6,9,10,
13;114:14,22;115:7,
14,18,23;116:6;
119:2,2;123:17;
124:24;127:13;
134:10;173:8;175:3;
176:2,12,24;177:4,
15,17,22;178:5,10,
14,22;179:7,7,11,15,
23;180:7,9,12;181:4,
7,9;183:9;191:24;
223:12;226:5,7,10,
16,16;227:9,10,12,
16;228:15;231:19,
24;232:10,23;
233:14;234:3,12;
235:6,10;236:18;
237:17;238:20
**used (38)**
6:13;35:5,7,10,12;
36:2;41:6,6;45:23;
48:4,5;68:1,7;122:7;
154:18,25;162:20;
176:13;178:7,15;
179:25;180:15;
182:11;184:10,13;
192:4,12,15;205:21;
209:12;210:5;215:5,
6;220:5;221:9,9;
241:22;250:17
**useful (1)**
176:21
**useless (1)**
245:3
**use-of-force (1)**
230:8
**uses (2)**
134:13;231:17
**using (16)**
13:2;24:24;25:13;
36:6,12;64:25;67:10;
107:24;113:15;
114:14;190:20,21;
196:5;229:11;241:3,
13
**usually (7)**
11:18;12:5;15:11;
20:20;41:19;109:4;
122:3

## V

**vague (2)**
17:24;201:3

**value (1)**
171:17
**van (1)**
80:14
**Vannoy (4)**
203:22;220:16;
223:10;249:24
**varies (1)**
100:18
**various (1)**
67:21
**vehicle (56)**
18:15;29:9,24;
30:5,6,8,10,13,16,18,
20,22,22;31:2,10,25,
25;32:6,13;55:13,13;
56:15;58:1,5;59:15,
20;60:9,11,17,25;
61:4,8;68:21;69:1;
73:10,11;80:18;83:5;
85:6,19,23,24;86:4,7,
15;87:1;91:10;92:9;
96:8;99:13,14;
101:16;102:17;
197:23;229:13;233:1
**vehicles (4)**
29:19;31:17,19;
91:1
**VELOCITOR (1)**
175:16
**ventricular (1)**
106:16
**verbal (9)**
54:3;122:15,20,23;
123:6;227:24;228:1;
229:1,12
**verified (1)**
69:23
**verify (1)**
70:1
**versus (1)**
13:3
**vertical (2)**
70:2,2
**video (82)**
5:10,20;6:13,14,15,
24;29:3,4;32:3;
55:25;59:18;68:10,
13;74:7,8,12,25;
77:16;78:12,23;79:9;
80:3;81:1,11;82:1,
12;83:24;84:12;
85:12;88:16,19;89:7,
19,21;90:6;91:21;
92:4,25;96:2,9,21,25;
97:11,21;98:12,25;
99:12,19;100:10,20;
101:7;102:2,20;
103:6,18,23;104:3,
11,20,20;105:3,8,9,9;
130:5;154:20;
182:25;183:7,18,24;
193:15,19;194:18,22,

Case 4:19-cv-00267-TWT    Document 78    Filed 03/03/22    Page 282 of 284
Willard Todd Hensley v.                                          30(b)(6) of Gary Langford
Hon. Gary Langford, Sheriff, et al.                                          June 10, 2021

23;195:3,3,23;197:2,
4;212:7;213:14
**videos (9)**
27:7,10,13;74:15;
75:1,3;77:5,23;105:5
**videotape (1)**
73:14
**view (2)**
79:12,15
**viewed (1)**
11:19
**VILLANI (283)**
4:7,11;5:9,16,21;
6:1,7,9,16,22,25;
12:25;13:10,18,22;
14:1;17:19;18:2;
19:17,25;23:12,16;
31:8;33:2;34:13;
37:10,16,19,22;
40:12,14,20,21;41:1;
42:19;43:1,5;44:20,
23;45:3,7,10,13,14;
46:5,9,12;47:7,12;
48:2,20,23;55:22;
56:5,20,23;57:4,6,14,
19;58:12,16;60:15,
23;65:15,20,22;66:2,
7;67:17,24;68:5,11;
69:10,14,16;72:19;
74:1,8,14,22;75:2,9,
19;76:3,8,12,16,22,
25;77:4,11,16,22,25;
78:3,10,15,17,20;
83:2,10,19;85:4,11,
13,22;87:2,4,8,15,19,
23;88:4,8,11,17;89:6,
11,15,22;90:5,7,14,
18;95:18,24;96:4;
102:4,22;103:5,9,15,
17,19,25;104:4,19,
24;105:7,12,20,22,
25;106:12,14,15;
112:24;113:2,5,7;
131:25;132:21,23;
133:3,5,8,12,21,25;
141:14,18,23;142:3;
144:18,24;157:15,19,
23;158:22;159:1,19;
164:19;165:1,10,20;
166:22;168:16,21;
172:3,10;179:6;
182:1,6,22;185:5,25;
186:4;187:5;188:22;
189:3,7,24;190:3,8;
191:2,13,16,20;
193:23;194:10,14,17,
19,24;195:5,7;197:3,
6;200:24;201:8;
202:8,13,22,25;
203:5,8;205:24;
206:3,5,12;210:22;
213:7;217:6,10;
221:21;222:1,7,12,

15;225:8,15;239:21;
240:1,9,12,15,18;
242:11,20;243:6,12,
15,18;244:1,6,9,21,
25;245:3,9,13;247:6;
248:13,15,16,19,23;
249:2,6,16,20;250:6,
21;251:5;252:4,7,9;
253:3;254:6,9,12,15,
19,24;255:3,9,15,18,
20,24;256:1,8
**violate (2)**
39:11;50:20
**violated (3)**
121:15;123:17;
238:24
**violates (1)**
121:18
**violating (1)**
239:7
**violation (10)**
19:6;38:25;50:24;
121:20;127:6,18;
183:14;185:7;
232:17;251:18
**violator (1)**
239:11
**violent (4)**
137:22,22;182:14;
188:6
**visual (2)**
68:16,18
**vitals (3)**
231:1,3,4
**voiced (1)**
241:17
**volt (1)**
111:9
**volts (4)**
111:1,4,20;214:11
**Volume (4)**
113:10,13,14;
132:18
**voluntarily (1)**
70:13

## W

**waist (2)**
138:2;145:1
**wait (7)**
39:21,21;42:17;
56:21;82:24;164:6;
244:25
**waited (1)**
207:11
**walk (4)**
26:22;70:3,7;
108:18
**walked (2)**
55:10;152:20
**walking (4)**
80:13;83:4;100:21,

23
**wants (7)**
19:19,23;68:6;
158:21;179:3;
193:11;203:4
**warrant (2)**
70:20,24
**waste (1)**
158:24
**watch (6)**
5:19;70:2;83:5,6;
105:6;195:3
**watched (2)**
60:22;74:7
**watching (4)**
37:17;55:25;59:23;
83:11
**watchmen (1)**
7:17
**way (45)**
6:2,17;46:24;
49:15;62:17;70:1,12;
73:1;79:10;83:15;
88:4;90:2;91:4;
93:16,18,19;95:3,10,
11,12,13;100:4,6;
102:16;103:19;
111:6;117:14,17,18;
123:10;128:20;
154:23;155:9;
158:20;184:20;
194:6;197:18;199:1;
218:7;220:22;225:1;
231:20;248:7;
254:25;255:10
**WAYMIRE (194)**
5:3,11,17,24;6:6,8,
12,21;12:23;13:1,16,
19,23;17:17,23;
19:14,19;23:11,14;
31:5;32:24;34:10;
37:20;40:8,19,22;
42:17,24;43:3;44:18,
22,24;45:5,9,11;46:3,
6;47:6,24;48:18;
55:19;56:3,7,22;57:2,
10,17;58:11,13;
60:14,18;65:12,17,
21,25;66:3;67:14,20;
68:3,6;69:8,12;
72:14;73:19;74:6,10,
20,25;75:5,16;76:5,
11,20;82:24;83:8;
86:22,25;87:3,11,17,
21;88:1,6,9,13;89:20;
95:16,20;103:22;
104:22,25;105:8,19,
21;106:10,13;
112:22;113:1,4;
131:18;141:12,15,20,
25;144:16;157:12,
17;158:19,23;
159:15;164:17,23;

165:9,16;166:20;
168:10,12;179:3;
181:24;182:2,19;
185:2,20;186:2;
187:2;188:19,25;
189:4,20,25;190:4,
23;191:10,14;
193:19;194:8,12,16,
18,21;195:2;197:1;
200:21;201:2;
210:19;213:4;217:2;
221:19,24;222:5,10,
13;225:4,11;239:13,
24;240:8,10,13;
242:5,15;243:3,9,13,
24;244:2,17,24;
245:2,7,11;247:3;
248:12,25;249:5,13,
18;250:3,19;252:1,6,
25;254:5,8,10,13,18,
22;255:2,12,22,25;
256:4,10
**Wayne (1)**
203:22
**weak (1)**
196:15
**weapon (15)**
24:25;27:15,16,23;
30:10;31:23;55:15;
56:12,16;68:21;
80:10;81:8;106:25;
186:17;211:13
**weapons (4)**
172:17;235:22;
237:18;238:21
**wear (2)**
16:23;154:6
**Webb (7)**
29:2;82:16;84:13;
96:7,12;98:17;250:1
**Webb's (1)**
96:10
**week (1)**
36:16
**weekend (2)**
105:14,15
**weeks (1)**
75:4
**weighed (2)**
28:10,11
**weight (2)**
28:25;169:12
**welcome (1)**
5:4
**well-cared (1)**
200:19
**well-healed (2)**
152:6;170:9
**well-trained (1)**
151:21
**well-versed (1)**
158:11
**weren't (20)**

33:18;36:5;38:5,6;
66:19;96:18;152:24;
153:11;154:25;
155:1;156:20;
161:10;163:20,20,21;
166:5;176:25;186:5;
190:19;191:8
**West (77)**
28:19,19;29:21,22;
32:15;58:4,17;61:4;
77:19,20,20,21;78:1,
2,23;79:9;80:3,8,9;
81:1,11,18;82:1,12,
14,16;83:24;84:12;
85:12;89:13,17,19;
90:1,6;91:21;92:4,
25;96:2,9,21,25;
97:11,21;98:12,25;
99:19;100:10,20;
101:7,18,22,25;
102:2,20,24;103:16,
18;104:3,11;184:4;
205:2;210:6,23,23;
211:2,3,5,7;215:10,
11;219:18;220:2;
236:4,9,9,19;249:23
**West's (9)**
60:16,19,19,24,24;
61:2;78:22;89:8;
236:15
**wet (13)**
146:22;151:22;
152:4;170:8;187:14;
245:23;246:2,14,16;
247:19;252:12,24;
253:5
**what's (16)**
66:5;79:22;138:2;
158:12;186:25;
199:23,23;206:1;
221:19;225:5;
235:14;252:13,14;
256:10,10,11
**wheel (2)**
69:5,6
**whenever (1)**
75:20
**whereas (1)**
105:11
**white (2)**
79:18;167:15
**Whitfield (10)**
147:15,18,22;
149:1,2,6,22,23;
150:1,7
**whole (5)**
156:24;173:9;
174:24,25;176:18
**who's (12)**
14:8,10;26:12;
36:12;94:16;102:23;
108:21,21;151:22;
168:24;170:25;

203:13

**whose (3)**
200:17;224:6,8

**wide (1)**
145:22

**widen (1)**
137:25

**Willard (2)**
135:17;215:24

**wind (2)**
143:14;210:9

**window (5)**
27:18;82:15;146:7,
8,10

**Windows (1)**
87:13

**wires (10)**
38:16;40:17;41:4;
161:4,10,15,19,22;
165:13;166:6

**wiry (1)**
170:4

**withdraw (3)**
113:2,3,5

**within (13)**
4:17,17,24;98:10;
116:12;131:12;
134:25;211:25;
212:6;214:20,23;
232:21,23

**without (8)**
124:7,13;148:22,
23;161:4,4;209:3;
242:16

**witness (32)**
5:15;17:25;19:16,
24;43:4;47:10;56:9;
60:21;68:9;76:2,24;
86:24;87:6;113:20;
133:15,23;144:21;
157:21;159:16;
165:18;168:11,14,18;
189:5;191:15;201:4;
202:20,23;210:21;
239:19,25;247:4

**witnessed (1)**
93:7

**witnesses (5)**
72:17;89:23;104:6,
17;120:14

**woman (4)**
108:3,7,9,16

**women (1)**
109:11

**wondering (2)**
29:12;240:7

**word (6)**
6:18;38:8;72:22;
73:9;94:6;205:16

**words (2)**
73:3;204:2

**work (7)**
54:4;105:14;

147:15,18,22;164:14;
229:13

**worked (3)**
9:1,4;111:8

**working (6)**
13:7;22:9;124:23;
179:21;230:24;
253:23

**world (1)**
39:9

**worry (1)**
124:20

**worth (1)**
214:10

**wounds (1)**
198:22

**Wow! (1)**
22:6

**wrapped (1)**
161:13

**wrinkles (2)**
139:2,4

**wristband (1)**
145:11

**wrists (5)**
194:4;195:12,15,
16,20

**write (4)**
122:21;164:11;
180:1;245:17

**write-up (1)**
122:6

**writing (3)**
85:16;177:18,22

**written (11)**
38:25;39:12;
122:16,20,25,25;
123:4;126:6;132:14,
15;232:17

**wrong (4)**
122:12;154:12;
198:2;206:21

**wrote (4)**
54:10,10;132:15;
180:18

### X

**X2 (10)**
174:11;205:12,14,
14,17,22;206:15;
218:17;228:23,25

**X26 (3)**
174:10;228:23,24

**X29003T6W (1)**
212:4

**X29003TDP (1)**
208:23

**X'd (1)**
205:14

### Y

**y'all (5)**
19:18;22:20;76:14;
78:16;202:10

**Yankee (1)**
57:21

**year (20)**
7:7;15:10,13,21;
21:2,12,19;52:21,22,
25;53:1,9,10,14;
111:23;174:7;204:1,
3,3;226:18

**years (24)**
7:10,24;8:8,11;
12:8;15:21;21:23,25;
22:1,2,5,7,8;51:20,
21;62:3,5;119:20;
143:3;156:23;158:3,
4,17;240:23

**yelling (2)**
108:17;252:16

**young (2)**
151:7,7

### Z

**Zoloft (1)**
207:6

**Zoom (44)**
4:12;37:7,13,17;
76:14;77:6,13,18,24;
78:2,13,16,18;83:17;
85:9;89:4,9,13,17;
90:4,12;103:8,14,16;
132:20;133:1,4,7,9,
20;138:4;143:15;
161:14;203:3;206:1,
4,9;248:14,17,21;
255:6,17,19;256:15

### 0

**0545 (4)**
221:16;222:3,10,
23

**0923 (1)**
219:18

### 1

**1 (18)**
68:25;78:23;79:9;
80:3;81:1,11;82:1,
12;83:24;84:12;
85:12;155:22;
205:13;235:2;
237:24;251:1;
255:18,23

**1/2 (8)**
246:20;247:2,21;
251:24;252:12,23;
253:6,14

**10 (12)**
22:5;48:14;135:4;

136:21;150:15;
183:9;206:20,21,22;
210:11;224:3;230:5

**10:26 (1)**
219:18

**10:45 (2)**
76:21,22

**100 (2)**
24:14;208:19

**100-percent (1)**
62:20

**10-26 (4)**
97:5;167:22;168:3,
9

**10-26-17 (3)**
78:21;90:8;219:4

**10-26-2017 (1)**
236:4

**11 (7)**
133:22;184:9,25;
210:11;215:15,15;
224:3

**11:45 (5)**
105:21,23;219:19,
22,24

**12 (7)**
210:11,15;217:21;
224:3;231:16;
244:16,23

**12:30 (4)**
221:8,10,12,13

**13 (6)**
210:11,15;218:12;
219:15;224:3;232:21

**13-A (2)**
218:14,16

**13-B (3)**
219:15,15,17

**13-C (2)**
220:10;223:20

**13-F (1)**
232:22

**14 (8)**
210:11,15;223:21;
224:2,3,21;233:12,12

**14th (1)**
251:25

**15 (7)**
76:18,18;210:11;
224:3;226:1,4;234:9

**15th (1)**
131:8

**16 (9)**
191:23;192:19;
210:11,11,11;226:9;
233:12;234:18,19

**16-page (1)**
234:14

**16th (2)**
111:23;112:6

**17 (2)**
134:8;235:17

**1700 (1)**

223:11

**1701 (1)**
223:14

**1747 (2)**
222:9,10

**175 (2)**
169:12,13

**17th (1)**
119:16

**18 (1)**
236:2

**1800 (1)**
222:5

**1844 (1)**
90:7

**1845 (1)**
78:21

**1850 (1)**
97:5

**18-A (3)**
236:2,3,14

**18-B (1)**
236:20

**19 (3)**
237:5;240:5;
255:17

**1983 (2)**
157:16,19

**1-A (2)**
135:15;136:24

**1-B (2)**
136:25;140:1

**1st (3)**
7:6;174:4;226:17

### 2

**2 (8)**
69:1;89:19;140:2;
174:22;182:11;
209:14;211:20;
226:23

**2:00 (1)**
202:9

**2:30 (1)**
203:6

**20 (12)**
15:10;21:14,15,17;
53:5,16;136:21;
198:8,8;211:18;
251:2;255:18

**2016 (3)**
174:4;203:21;
226:19

**2017 (12)**
18:4;33:13,16;
34:15;42:12;118:10;
135:23;168:9;174:7;
207:9;208:6;213:21

**2018 (2)**
131:8;241:21

**2019 (1)**
119:16

**2020 (1)**
112:6
**2021 (1)**
110:16
**21 (8)**
135:10;224:4,4;
255:23;256:2,3,4,9
**2134 (2)**
167:22;168:3
**2200 (1)**
223:10
**225 (1)**
132:21
**2345 (1)**
219:25
**25 (1)**
22:8
**25th (2)**
203:21;218:24
**26 (3)**
205:22;207:9;
213:21
**26th (13)**
18:4;33:16;168:9;
174:7;208:6;210:14,
16;211:22;212:18;
215:6;220:14,21;
222:3
**27 (1)**
22:3
**273 (4)**
113:20;132:19;
133:6,13
**27th (3)**
135:23;136:1;
210:24
**291 (1)**
113:21

---

**3**

**3 (35)**
89:6;90:6;91:21;
92:4,25;96:2,9,21,25;
97:11,21;98:12,25;
99:19;100:10,20;
101:7;102:2,20;
134:18;143:13;
145:14;191:21;
210:3;227:15;238:8;
240:5;246:20;247:2,
20;251:24;252:12,
23;253:6,14
**3:56 (1)**
256:17
**30 (1)**
22:7
**30th (1)**
110:15
**31st (1)**
211:12
**35-8-26 (1)**
235:19

**37 (1)**
21:23
**3T6W (1)**
215:25

---

**4**

**4 (8)**
89:7;103:18;104:3,
11;172:18;198:8,9;
238:14
**4:00 (1)**
254:20
**4:15 (3)**
254:25;255:4;
256:16
**4:19-CV-00267-TWT (1)**
250:10
**4:31 (1)**
136:1
**40 (6)**
12:8;15:13;21:12,
14,18,21
**47 (4)**
7:10;22:5;112:13;
158:17
**472 (1)**
240:2
**473 (1)**
240:2
**474 (2)**
237:15;240:2
**475 (2)**
240:2;241:2
**4-A (3)**
145:16;155:21,22
**4-B (1)**
160:23

---

**5**

**5:45 (3)**
218:25;222:5,9
**5:47 (2)**
222:4,17
**5:53 (2)**
222:24;223:3
**50,000 (2)**
111:20;214:10
**5-A (1)**
167:4
**5-B (2)**
167:4,8

---

**6**

**6 (6)**
172:12;176:4;
191:22;224:4;
244:16,23
**6.2 (1)**
240:19
**6.2-2 (1)**

239:16
**6.2-3 (2)**
239:16;240:19
**6.3-1 (1)**
239:15
**6:00 (4)**
218:24;219:5,5;
223:14
**6:30 (1)**
222:18
**6:52 (1)**
208:6
**6:52:26 (1)**
207:9
**6:52:29 (1)**
207:10
**6:54 (1)**
207:13
**6-1-2013 (1)**
237:10

---

**7**

**7 (7)**
176:11;177:3;
203:9;211:22;
222:17,18;224:4
**7:00 (1)**
211:21
**7:47 (2)**
221:17;222:4
**7-A (1)**
177:3

---

**8**

**8 (2)**
133:22;204:21
**8,000 (2)**
110:25;111:4
**8th (1)**
251:25

---

**9**

**9 (7)**
182:10;205:25,25;
206:6;212:19;
213:25;251:1
**9:30 (1)**
167:23
**9:34 (2)**
168:3,9
**90-year-old (1)**
108:16
**9-1-1 (1)**
18:14