IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| WILLARD TODD HENSLEY, | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | 4:19-CV-00267-TWT |
| BRANDON AMOS, *et al.*, | ) | |
| Defendants. | **)** | |

## OFFICER DEFENDANTS' SUMMARY JUDGMENT BRIEF

COME NOW DEFENDANTS BRANDON AMOS, LaDON WEST and JEFFREY NEWPORT, and file this Brief in Support of their Motion for Summary Judgment as follows:

## INTRODUCTION

Plaintiff filed this lawsuit under 42 U.S.C. § 1983 based on an incident where he was arrested following a traffic stop. Defendants are deputy sheriffs involved in Plaintiff's arrest; Sergeant Amos used a Taser. Plaintiff sues for excessive force and related claims under state law.

The facts are set forth in *Defendants' Joint Statement of Material Facts*, filed contemporaneously and abbreviated here.[1] Critically, much of the relevant incident is on video. So, regardless of anything any witness says, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record [as with a video recording of the incident], so that no reasonable jury could believe it, a court

---

[1]   Defendants Amos, West and Newport are referenced throughout as "Defendants."

1

should not adopt that version of the facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

<b>SUMMARY OF PERTINENT FACTS</b> [2]

In response to a call about a trespasser (*i.e.*, Plaintiff), Murray County Deputy LaDon West drove to the scene. West Dep. at 9:20-23. Deputy West spotted Plaintiff's white pickup truck in front of the residence where the call originated. West Dep. at 9-10; West DashcamVideo at 1:25 *et seq*. Soon Plaintiff started driving away. West Dep. at 11; West DashcamVideo at 1:30 *et seq*. Officer West turned on his blue lights but Plaintiff accelerated more. West DashcamVideo at 1:40 *et seq*.

Soon Plaintiff turned into a dirt driveway and drove quickly up to a trailer a few hundred feet off the road. West Dep. at 13:1-5; West DashcamVideo at 1:50 *et seq*. Plaintiff's vehicle struck a parked truck and then stopped.

<b>PLAINTIFF RESISTS DETENTION</b>

Deputy West followed, parked, got out of his vehicle with his gun drawn and repeatedly yelled for Plaintiff to get out of his truck. West Bodycam Video at 3:20 *et seq*. Plaintiff refused to exit the vehicle, shouted at Officer West and "flipped him off several times." West Dep. at 18:12-14, 88:12-16; West Bodycam Video at 3:25 *et seq*. Plaintiff also revved the engine, and several times he put the truck in reverse and tried to back up. West Bodycam Video at 3:25 *et seq*.

---

[2] The material facts with record citations, viewed as if Plaintiff's account is accurate, are voluminous and set forth in *Defendants' Statement of Material Facts*. Because of page limitations, only an abbreviated set of facts is set forth here.

### DEPUTIES AMOS AND NEWPORT ARRIVE

Soon Sergeant Brandon Amos and Corporal Jeffrey Newport arrived.  West Dep. at 20:4-7. Sergeant Amos went to the driver side of Hensley's vehicle with his Taser drawn. Brandon Amos Dep. at 41-42, 59, 63; West Dashcam Video at 4:00 *et seq*. Plaintiff continued to try to back up the truck, and the officers did not know whether Plaintiff had a weapon.  Brandon Amos Dep. at 74. Officers continued to give Plaintiff verbal commands, and Plaintiff did not comply. Brandon Amos Dep. at 63, 74:19-22, 77:22-25; West Bodycam Video at 4:45 *et seq*.

Corporal Newport went to the passenger side and drew his gun. West Dashcam Video at 5:35 *et seq*. He banged on the passenger window, opened the door and got Plaintiff's attention. Newport Dep. at 69; B. Amos Dep. at 47.

### SERGEANT AMOS USES HIS TASER

Not long after that, Sergeant Amos fired his Taser through the open driver's side window, causing Plaintiff to fall onto the truck's passenger side floorboard. Newport Dep. at 55; B. Amos Dep. at 212:12-22; West Bodycam Video at 5:10 *et seq*. This Taser deployment cycled for five seconds. Brandon Amos Dep. at 190:1-14. Plaintiff's memory is "blank" about the Taser deployment in the truck and being on the floorboard. Hensley Dep. (Vol. 1) at 50. Indeed, Plaintiff has significant "holes in [his] memory from that day." Hensley Dep. (Vol. 1) at 41. Officers continued to command Plaintiff to show his hands. B. Amos Dep. at 82, 194; West

Bodycam Video at 5:00 *et seq*. Plaintiff made unintelligible statements with a crazed look on his face. West Bodycam Video at 5:00 *et seq*. Still in the truck, Plaintiff resisted officer attempts to grab his hands. West Bodycam Video at 5:20 *et seq*.

To overcome Plaintiff's resistance to being pulled from the truck, Deputy Amos twice triggered the Taser again, once for one second and once for a two-second time frame. Brandon Amos Dep. at 82, 206, 213-214; West Bodycam Video at 5:05 *et seq*. David Webb, an off-duty Pickens County deputy who lived nearby, helped pry Plaintiff's legs from inside the vehicle. West Bodycam Video at 5:30 *et seq*. (Mr. Webb wore a black shirt. West Bodycam Video at 5:30 *et seq*.)

Finally Deputies West and Newport were able to pull Plaintiff from the vehicle and onto the ground. Newport Dep. at 61; West Bodycam Video at 5:30 *et seq*. Plaintiff resisted handcuffing, refusing officer commands to give up his hands. West Bodycam Video at 5:40 *et seq*. While Plaintiff was on the ground and still resisting, Deputy Amos used the Taser in drive stun mode on Plaintiff's back. Hensley Dep. at 61; West Bodycam Video at 6:00 *et seq*.; Brandon Amos Dep. at 126, 176. After the drive stun Plaintiff's back, the officers were able to get Plaintiff's hands cuffed behind his back. West Bodycam Video at 6:00 *et seq*.

Video reveals that no officer "slammed," kicked, punched or otherwise struck Plaintiff. West Bodycam Video at 5:30 *et seq*. Eventually Sergeant Amos drove Plaintiff to the Sheriff's Office and turned him over to the jail staff. Amos Dep. at

Exhibit 18B (report) at 1 ("Narrative"); Hensley Dep. (Vol. 2) at 49.

## PLAINTIFF'S ALLEGED INJURIES AND MEDICAL TREATMENT

Plaintiff claims that his physical injuries from this incident were scrapes on his arms and torso, "knots" on his head and bruising.  Hensley Dep. (Vol. 1) at 53:8-9, 55.  Video shows Plaintiff had abrasions on his right cheek. West Bodycam Video at 9:50 *et seq*. Many of Plaintiff's injuries were from wrestling on gravel.  Hensley Dep. (Vol. 1) at 55:18-21.

Later at the jail Plaintiff told the nurse he was high on "angel dust." Criminal trial transcript (Nurse Jenkins) at 232. Plaintiff was given over the counter pain medications and treated with topical antibiotic ointment. Hensley Dep. (Vol. 2) at 95; Jenkins Dep. at Exhibit 20 p. 2 (Hensley medical notes). Plaintiff's injuries healed without any further medical treatment. Hensley Dep. (Vol. 1) at 213-214. Plaintiff says his injuries were still visible a few weeks later, and healed within a few weeks after the incident. Hensley Dep. (Vol. 1) at 42. Any bruising healed within a week. Hensley Dep. (Vol. 1) at 43. Plaintiff did not seek or receive any treatment for emotional distress. Hensley Dep. (Vol. 1) at 212:3-10.

## PLAINTIFF'S OBSTRUCTION CONVICTIONS

Regarding the incident in this case, Plaintiff was charged and convicted for obstruction of Deputies Amos, West and Newport. Hensley Dep. at 25 & Exhibit 12. Plaintiff also was convicted for fleeing to elude Deputy West. Hensley Dep. at 25 &

Exhibit 12. The convictions were not overturned or vacated. Hensley Dep. at 25 & Exhibit 12.

**ARGUMENTS AND CITATION TO AUTHORITY**

**I. HECK v. HUMPHREY BARS PLAINTIFF'S EXCESSIVE FORCE CLAIMS**

Plaintiff's excessive force claim is an implicit collateral attack on his conviction under O.C.G.A. § 16-10-24(b) for obstruction of Defendants.[3] Under Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364 (1994),

> [I]n order to recover damages for … harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

Heck, 512 U.S. at 486-87 (1994) (emphasis in original).

Here, Plaintiff was convicted of obstruction, based on his resistance to the officers' attempts to arrest him. Specifically, a jury convicted Plaintiff on the following charge:

---

[3] O.C.G.A. § 16-10-24(b) provides that a person who "knowingly and willfully resists, obstructs, or opposes any law enforcement officer … in the lawful discharge of his or her official duties by offering or doing violence to the person of such officer" is guilty of a felony.

[K]nowingly and willfully obstruct LaDon West, Brandon Amos, and Jeffrey Newport, of the Murray County Sheriff's Office, a law enforcement officer [*sic*] in the lawful discharge of his official duties, by refusing to obey the reasonable and lawful commands of said officer and physically resisting said officer … .

Hensley Dep. at Ex. 12 – Indictment & Conviction, *State v. Hensley.*

In Heck, the Supreme Court provided an example of a § 1983 suit that would be barred by the Heck doctrine:

A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest .... He then brings a § 1983 action against the arresting officer seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. … [T]he § 1983 action will not lie.

Id. at 487 n. 6, 114 S.Ct. 2364 (citations omitted) (emphasis in original).

Like the example in Heck, here Plaintiff's conviction was based on his obstruction during the *lawful discharge* of the deputies' duties. Plaintiff's claim arises out of the altercation that led to the obstruction convictions. As in the Heck example, a successful excessive force claim in this action would invalidate the "lawful discharge" element of Plaintiff's conviction under O.C.G.A. § 16-10-24(b). Plainly the use of excessive force, which is what Plaintiff claims in this case, contradicts the "lawful discharge" element of Plaintiff's conviction.[4] That is, success

---

[4]   See Heck, 512 U.S. at 487 n. 6; Clark v. State, 271 Ga. 27, 29, 518 S.E.2d 117, 119 (1999) ("excessive force or unlawful force while acting in self defense is not justifiable"); Green v. State, 240 Ga.App. 774, 775 (1999) (lawful police conduct is essential element for obstruction conviction based on resistance to arrest); Webb v. State, 159 Ga.App. 403, 403-404, 283 S.E.2d 636, 637 (1981) ("[A]n officer making

in this claim would contradict Plaintiff's conviction for obstructing Defendants.

Following Heck, many federal courts have barred § 1983 claims similar to Plaintiff's, where the plaintiff was convicted under state law that included lawful conduct as an element of the crime.[5] As in those cases, Plaintiff's conviction forecloses his excessive force claim against these Defendants.

## II.    DEFENDANTS DID NOT USE EXCESSIVE FORCE

Regardless of the Heck doctrine, Plaintiff cannot sustain his Fourth Amendment excessive force claim.[6] This claim is measured for "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." Beshers v. Harrison, 495 F.3d 1260, 1266 (11th Cir.2007). For excessive force claims, "objective reasonableness" is the test. Zivojinovich v. Barner, 525 F.3d 1059,

---

an arrest for a misdemeanor violation may not use extreme or deadly force merely to effect the arrest or to prevent the escape of the person."); O.C.G.A. § 16-3-20 (1) (justification defense, which includes self defense against unlawful force); O.C.G.A. § 16-3-21 (permitting use of force in self-defense).

[5] See, e.g., Cummings v. City of Akron, 418 F.3d 676, 682  (6th Cir. 2005) (Heck, in conjunction with assault conviction, barred excessive force claim); Smith v. Hill, 2006 WL 717151, at *3-5 (S.D.Ga.2006) (obstruction conviction conclusively established lawful discharge which was contradicted by claim of excessive force); Nuno v. County of San Bernardino, 58 F.Supp.2d 1127, 1134 (C.D.Cal. 1999) (barring excessive force claim under Heck, where claim would imply unlawful police action and contradict the "performance of police duties" element of criminal statute under which plaintiff was convicted); Franklin v. County of Riverside, 971 F.Supp. 1332, 1335-36 (C.D.Cal. 1997) (same).

[6] To the extent that Plaintiff asserts a claim based on the Fourteenth Amendment, "due process" analysis is not appropriate in a case where the claim is covered by the Fourth Amendment. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708 (1998). Accordingly, Defendants are entitled to summary judgment to the extent that Plaintiff sues them under the Fourteenth Amendment.

1072 (11th Cir.2008).

> But we have noted some secondary factors to consider: " '(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.'" Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir.2004) (quoting Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir.2002)). The nature and degree of force needed is measured by such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 109 S.Ct. at 1872; *see also* Lee, 284 F.3d at 1198 ("[T]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.").
>
> The Supreme Court teaches that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Graham, 109 S.Ct. at 1872 (internal quotation marks omitted) (alteration in original). Instead, we must "slosh our way through the factbound morass of 'reasonableness.'" Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1778, 167 L.Ed.2d 686 (2007); *see also* Graham, 109 S.Ct. at 1872 ("[P]roper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case...."). As we have said before, courts must "look[ ] to the 'totality of circumstances' to determine whether the manner of arrest was reasonable." Draper, 369 F.3d at 1277.

Buckley v. Haddock, 292 Fed.Appx. 791, 793-794 (11th Cir.2008).

Importantly, an officer's actions are viewed from the "'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Beshers, 495 F.3d at 1266 (quoting Graham, 490 U.S. at 396-97).

9

Application of these rules leads to the conclusion that Defendants' use of force was not even arguably excessive. As discussed below, the record demonstrates that Plaintiff continually refused officer orders and resisted lawful arrest in a context that presented great potential danger to the officers. Defendants used only minimal force and Plaintiff did not suffer more than *de minimis* injury.

### 1.   Defendants Had the Right to Use Force, Including the Taser

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir.2002). Here, there was probable cause that Plaintiff fled to elude and obstructed officers. Hensley Dep. at Ex. 12. Video reflects Plaintiff refusing to obey multiple officer orders and physically resisting which plainly was obstruction.[7] Consequently, some force was justified to make Plaintiff comply with arrest.

### a.   Plaintiff Refused Numerous Commands, Was In Control of a Dangerous Vehicle and Potentially Had a Weapon(s)

Deputy West pulled up behind Plaintiff's vehicle and ordered him to get out of the truck. Deputy West yelled over and over for Plaintiff to get out and show his hands. Plaintiff remained in the truck and tried to engage it to back up into Deputy

---

[7] Mayhew v. State, 299 Ga. App. 313, 317, 682 S.E.2d 594, 598 (2009) (affirming obstruction conviction where defendant refused lawful commands); Imperial v. State, 218 Ga.App. 440, 441, 461 S.E.2d 596 (1995) (refusal to obey lawful command as officer attempted to secure crowded area was sufficient for obstruction conviction); Hall v. State, 201 Ga. App. 328, 328, 411 S.E.2d 274, 275 (1991) (sustaining conviction for ignoring requests by the officer to produce driver's license).

West. West Bodycam Video at 3:25 *et seq*.

Deputies Newport and Amos arrived about that time. Because Plaintiff refused to leave his truck and remained in control of a running vehicle, the officers had to figure out a way to get Plaintiff out and eliminate any threat from the truck. Additionally, the officers did not know whether Plaintiff was armed, which would present additional danger. All officers recognized that Plaintiff was physically resisting arrest, and this situation plainly called for use of force.

### b.  Plaintiff Continued Resisting Handcuffing and Refused Orders

After the first Taser deployment, Plaintiff resisted getting out of the truck. Therefore, Sergeant Amos triggered two very short Taser shocks (one lasting two seconds, the other lasting one second). This was reasonable force to overcome Plaintiff's resistance, and it helped other officers remove Plaintiff from the vehicle.

After he was pulled from the truck Plaintiff continued resistance. Plaintiff refused to submit to handcuffing behind his back. Instead, contrary to officer orders Plaintiff wrestled and refused to give up his hands. That is what Plaintiff was doing when Deputy Amos applied the Taser to Plaintiff's back in drive stun mode. Plaintiff's refusal to obey orders and his continued resistance supported basic hands-on use of force techniques and using the Taser as a "drive stun" device. The Eleventh

11

Circuit repeatedly has upheld use of force that involves wrestling with a resisting suspect, and also a "drive stun" Taser deployment, to secure an arrestee.[8]

As for the Taser, this case presents a stronger justification for use of a Taser than Buckley, *supra*, where the Eleventh Circuit ruled that an officer acted reasonably when he applied a Taser *three times* to drive stun a passively resisting, handcuffed man during a traffic stop. Unlike Plaintiff, the man allowed himself to be handcuffed. Buckley, 292 F. App'x at 792. After that, he sat down behind his car and began sobbing. *Id.*

The officer asked the man to stand up several times, but he refused and remained limp when the officer tried to lift him to his feet. *Id*. Like Deputy Amos in this case, after numerous lawful orders and "after giving Plaintiff some time to comply, the deputy discharged the taser. The taser was used for approximately five seconds in the "stun gun" mode." *Id*. at 792-793. The officer in Buckley used the Taser twice more. *Id*.

---

[8]    **Charles v. Johnson**, 18 F.4th 686 (11th Cir. 2021) (affirming summary judgment to officers who tackled and wrestled with resisting suspect and applied drive stun to accomplish handcuffing, where suspect resisted handcuffing, "ignored at least thirteen commands ... and had gone nearly a minute without complying."); Marantes v. Miami-Dade Cty., 776 F. App'x 654, 656 (11th Cir. 2019) (finding no excessive force where officers repeatedly kicked and wrestled with resisting suspect to get him handcuffed); **Mobley v. Palm Beach Cty. Sheriff Dep't**, 783 F.3d 1347, 1351, 1355 (11th Cir. 2015) (concluding officers' use of force in striking, kicking, and tasing suspect was not excessive where the suspect, though pinned on the ground, was "refusing to surrender his hands to be cuffed"); Crosby v. Monroe Cty., 394 F.3d 1328, 1334-35 (11th Cir. 2004) (concluding officer's use of force was not excessive where suspect, though lying facedown on the ground "had not yet been handcuffed" and "was able to wrestle his hand loose and push [the officer's] foot away").

Buckley held that the officer's Taser use was reasonable under the Fourth Amendment.  *Id.* at 796.  The court explained why using the Taser multiple times was justified:

> [T]he incident occurred at night on the side of a highway with considerable passing traffic. Second, the deputy could not complete the arrest—that is, truly control Plaintiff—because Plaintiff was resisting. Third, the deputy resorted to using the taser only after trying to persuade Plaintiff to cease resisting, after attempting to lift Plaintiff, and after repeatedly and plainly warning Plaintiff that a taser would be used and then giving Plaintiff some time to comply.

Buckley, 292 F. App'x at 794. The court also viewed the plaintiff's minimal injuries —small burns from the Taser—as militating in favor of the officer's use of force. *Id.* at 795.

Here, as in Buckley, Plaintiff was an able-bodied, non-compliant suspect who was subject to arrest. In contrast to Buckley, Plaintiff physically resisted handcuffing. As in Buckley, Plaintiff refused multiple, clear officer commands before he was Tasered. Therefore, just as in Buckley, Sergeant Amos was authorized to use the Taser to force compliance, arrest Plaintiff and bring the situation under control.

### 2.  Use of Force Was Proportional to Plaintiff's Resistance

Plaintiff refused to get out of his truck even after he was Tased.  After officers fished him out of the truck Plaintiff wrestled on the ground and refused to give up his hands for handcuffing. The only "use of force" by Deputies West and Newport involved pulling Plaintiff from the vehicle to the ground and then trying to get him handcuffed. Only after a drive stun Tase did Plaintiff stop resisting.  Use of force to

pull Plaintiff from the vehicle and handcuff him plainly was a reasonable way to accomplish the lawful purpose of arresting Plaintiff. Given Plaintiff's conviction for obstructing the officers, there is no real question that Defendants West and Newport acted lawfully in this incident. See § I above.

Sergeant Amos used his Taser multiple times. Each use was justified under the circumstances. The last Taser deployment was in "drive stun" mode.[9] Under the circumstances, Amos was entitled to conclude that he was dealing with a potentially dangerous and certainly resisting suspect who probably was under the influence of drugs. The Eleventh Circuit has upheld use of Tasers in far less serious circumstances.[10] As discussed in the previous subsection, the Taser was an

---

[9] Use of a Taser in "drive stun" mode involves pressing the Taser against a subject's body rather than firing electrified prongs. Use of the Taser in drive stun mode does not break the skin. As the Eleventh Circuit has recognized, drive stun mode has a less serious effect on a subject than use of the Taser prongs. Hoyt v. Cooks, 672 F.3d 972, 976 n.5 (11th Cir.2012) (recognizing "a stark contrast between the prong mode (which overrides the central nervous system and disrupts muscle control) and the much less serious dry stun [sic] mode (which results merely in pain, a burning sensation)."

[10] Charles v. Johnson, 18 F.4th 686, 701 (11th Cir. 2021) (finding no constitutional violation where drive stun Taser was used to overcome resistance to handcuffing); Hoyt v. Cooks, 672 F.3d 972 (11th Cir.2012) (granting qualified immunity to officers who repeatedly used Taser to subdue mentally deranged suspect); Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir.2008) ("use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force."); Chaney v. City of Orlando, FL, 291 Fed.Appx. 238, 244 (11th Cir 2008) (granting immunity to officer who physically grabbed detainee, pulled him out of his car, threw him to the pavement, handcuffed him, used his Taser on arrestee's back, and put his foot on arrestee's head); Buckley v. Haddock, 292 Fed.Appx. 791, 796 (11th Cir. 2008) (finding no constitutional violation where officer used Taser three times on handcuffed detainee who offered only passive resistance to arrest during a traffic

appropriate way to neutralize Plaintiff's threat to use his vehicle (and any weapon that he might have), force Plaintiff's compliance and finally get him handcuffed behind his back.

### 3.  There Was a Strong Need For Application of Force

The need to use force is measured by weighing "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Davis v. Williams, 451 F.3d 759, 767 (11th Cir.2006) (internal quotations omitted); Draper, 369 F.3d at 1278 n. 13.  And, as noted above, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Lee, 284 F.3d at 1197.

Before any use of force, Plaintiff was apparently a deranged, able-bodied man in control of a truck, he was not restrained, and he refused officer commands. Plaintiff acted erratically, he was agitated, and he resisted for a significant period of time. Given the situation, Defendants'attempts to gain compliance were completely reasonable and appropriate.  In fact, it took four deputies to get Plaintiff in handcuffs. In regard to the Taser, Sergeant Amos reasonably believed that he needed to use the Taser to neutralize any threat from Plaintiff, force compliance, bring Plaintiff under control, accomplish handcuffing, and end the situation.

---

stop); Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004) (upholding use of Taser on belligerent, noncompliant suspect, even in absence of flight or aggression); Pierre v. Gruler, 2009 WL 383352, 7 (M.D.Fla.2009) (dismissing Taser excessive force claim where motorist resisted traffic stop and arrest).

Defendants had a strong need to get control of the situation, take Plaintiff into custody, and ensure that Plaintiff was fully secured, all without serious harm to anyone. Under the totality of these circumstances, the minimal force measures used here were the most reasonable way to bring this situation under control, and ensure that Plaintiff was taken into custody without anyone being seriously injured. As it turned out, the Taser was the key to securing Plaintiff's arrest.

### 4.  The Amount of Force Used Was Reasonable In the Situation

Instead of allowing the tense situation to escalate further or engaging in a serious fight with a man in control of a vehicle who could have a weapon, Deputy Amos used his Taser to incapacitate Plaintiff and force compliance. The Taser neutralized Plaintiff and allowed other deputies to work more safely to remove the still-resisting Plaintiff from the vehicle.

The Eleventh Circuit repeatedly has granted qualified immunity to officers who use Tasers when faced with non-compliant, resisting or fleeing suspects.[11] This case fits squarely into that body of case law, and there is no binding case that defined Deputy Amos's Taser use as clearly illegal so as to bar qualified immunity. As in various similar Eleventh Circuit cases, from Sergeant Amos's point of view the Taser brought a resisting suspect under control and tended to defuse a tense situation. The Taser deployment did not create serious injury, and it effectively subdued a resisting, belligerent suspect. Under the totality of the circumstances and under binding

---

[11] Please see the previous footnote for case citations.

16

precedent, Sergeant Amos's use of his Taser was reasonable.

### 5. Defendants' Use of Force Was "*de minimis*"

Defendants' use of force was well below the quantum of force authorized by the Eleventh Circuit in connection with legitimate arrests. "[T]he application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir.2000). The Eleventh Circuit repeatedly has found that the use of force involving some measure of rough contact in an attempt to subdue a detainee—such as pushing, shoving, or using a knee or a chokehold—is *de mimimis* force.[12]  That covers the involvement of Deputies West and Newport in this incident. Similarly, Deputy Amos's Taser deployments was low level force. See Abbott v. Sangamon Cty., 705 F.3d 706, 726 (7th Cir. 2013)(Taser "falls somewhere in the middle of the nonlethal-force spectrum.").

Last, the "drive stun" Taser left no significant injury and overcame Plaintiff's

---

[12] See Gomez v. U.S., 601 Fed.Appx. 841, 850 (11th Cir.2015); Sullivan v. City of Pembroke Pines, 161 Fed.Appx. 906, 910 (11th Cir.2006)(finding *de minimis* force, where officer "grabbed detainee's arm, pulled her arms behind her back, forced her to the ground, placed his knee on her back, and handcuffed her."); Nolin v. Isbell, 207 F.3d 1253, 1258, n. 4 (11th Cir.2000)(officer grabbed plaintiff, shoved him against a vehicle, pushed his knee into Plaintiff's black, searched his groin in an uncomfortable manner, and handcuffed him); Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir.1997)(two officers "slammed" suspect against wall, kicked his legs apart, required him to raise his arms, and pulled his wallet from his pants); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556 (11th Cir.1993) (officer placed plaintiff in chokehold and handcuffed him, took him outside, and pushed him against a wall when he continued speaking after being told to "shut up"); Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir.1994) (*de minimis* injury can serve as conclusive evidence that *de minimis* force was used), *cert. denied,* 115 S.Ct. 909 (1995).

resistance. This is well within the bounds of clearly established law. The Eleventh Circuit has ruled that use of a Taser in drive stun mode on a handcuffed detainee was "*de minimis*" force. In Bien-Aime v. Vice, a woman "resisted the [male] officers' attempts to execute a valid arrest warrant." Bien-Aime v. Vice, 624 F.Appx. 726, 727 (11th Cir.2015). The officers threw the plaintiff—a nurse at a medical facility—"to the floor, handcuff[ed] her tightly and then tas[ed] her while handcuffed." *Id*.

The court ruled that this use of force did not violate clearly established law, in light of the nurse's "repeated refusal to comply with the officers' directive, and the *de minimus* force used." *Id*. *A fortiori*, the same conclusion applies here, where Plaintiff repeatedly refused to comply with officers, offered physical resistance, was *not* handcuffed, remained belligerent, and the same level of *de minimis* force was applied.

In sum, Defendants' *de minimis* use of force in the course of dealing with Plaintiff was both reasonable and necessary, did not violate the Fourth Amendment, and alternatively, did not violate clearly established law.

### 6. Plaintiff Can Show No More Than *De Minimis* Injury

Finally, Plaintiff has no objective evidence that the nature or extent of injury from the Defendants' actions was more than *de minimis*. The Eleventh Circuit has long recognized a typical detention "involves some force and injury." Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir.2002). For example, in Hernandez v. City of Hoover, 212 F.Appx. 774, 774-75 (11th Cir.2006), an officer used a "tibia strike" on

18

the plaintiff, resulting in a torn ligament and fractured ankle. The court held that the force was appropriate under the circumstances and necessary after the plaintiff refused verbal commands to sit down. *Id.* Even substantial injuries flowing from *de minimis* force cannot support an excessive force claim. Rodriguez, 280 F.3d at 1351-52 (finding *de minimis* force in handcuff maneuver, even though handcuffing resulted in extensive surgery to claimant's arm, which ultimately required amputation below the elbow).

Here, in regard to injuries allegedly sustained from the arrest incident, Plaintiff claims only superficial physical injuries that healed within a short time without significant medical care. Hensley Dep. (Vol. 1) at 42-43, 53, 55, 213-214, Vol. 2 at 95; c*f.* Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (noting that the taser shock did not cause any serious injury and left the suspect "coherent" and "calmed" shortly after the shock).

The only objective evidence that Plaintiff suffered any significant injury from use of force allegedly employed by the deputies during the arrest is a small red patch on Plaintiff's face, visible on video. Because the available objective evidence reveals nothing more than *de minimis* injury, Plaintiff's excessive force claim should be dismissed.

### 7.  Plaintiff Has No "Failure to Intervene" Claim

Plaintiff asserts that each Defendant is liable for "failure to intervene." For that type of claim an officer must have had actual knowledge of unconstitutional use of

force, the physical ability and opportunity to intervene, and failed to do so. See

Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir.1998).

Here, all use of force was reasonable, justified and largely *de minimis*. Plaintiff

was not seriously injured. Moreover, Plaintiff cannot support any clear violation by a

Defendant where a separate Defendant had an opportunity to intervene.[13]

Accordingly, Defendants cannot be liable for failure to intervene. See Sanders v. City

of Union Springs, 207 Fed.Appx. 960, 966 (11th Cir.2006) ("[G]iven that the plaintiffs

are unable to establish a constitutional violation, their claim for failure to intervene

must fail.").

## III.   QUALIFIED IMMUNITY BARS PLAINTIFF'S FEDERAL CLAIM(S)

### A. Qualified Immunity Standards

"Qualified immunity gives government officials breathing room to make

reasonable but mistaken judgments about open legal questions. When properly

applied, it protects 'all but the plainly incompetent or those who knowingly violate

the law.'" Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2085 (2011).

One of those categories can be eliminated immediately. "There is no

suggestion in this case that [Defendants Amos or Thacker] knowingly violated the

Constitution; the question is whether, in light of precedent existing at the time,

[either] was 'plainly incompetent' in" the violation of a clear constitutional standard.

---

[13]  For example, if hypothetically a Taser deployment by Sergeant Amos while Plaintiff was in the truck is held excessive, video plainly shows that no other Defendant had the capability to intervene in that use of force.

Stanton v. Sims, 134 S.Ct. 3, 5 (2013); Ashcroft, 131 S.Ct. at 2085 (2011) (eliminating "knowing violation of the law" and focusing solely on "plain incompetence" as potential ground to deny qualified immunity). As discussed next, Defendants acted within their discretionary authority and did not violate clearly established federal law.

**B. Defendants Acted Within Their Discretionary Authority**

For qualified immunity, Defendants must show they acted "within the scope of [their] discretionary authority" for the acts in question. Hudgins v. City of Ashburn, 890 F.2d 396, 404 (11th Cir. 1989). Defendants were deputies sued for apprehension of a suspect, which meets the "discretionary authority" element.[14] Therefore, qualified immunity protects these Defendants, unless Plaintiff can show that (1) Defendants violated his constitutional rights, and (2) Defendants violated clearly established law under the facts and circumstances presented. As discussed in § II above, Plaintiff cannot prove a Fourth Amendment violation.  As discussed next, he cannot show a violation of clearly established law.

**C. Defendants Did Not Violate Clearly Established Law**

Plaintiff bears the "the burden ... to show that [Defendants are] not entitled to qualified immunity." Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir.2003). To meet his burden, Plaintiff must show that "existing precedent … placed the statutory or

_____

[14]   See Buckley v. Haddock, 292 F. App'x 791, 796–97 (11th Cir. 2008) (granting qualified immunity to officer who used Taser on passively resisting suspect).

21

constitutional question ***beyond debate***." Stanton v. Sims, 134 S.Ct. 3, 5 (2013) (emphasis added); Reichle v. Howards, 132 S.Ct. 2088, 2089 (2012) (same standard); Brosseau v. Haugen, 543 U.S. 194, 201 (2004) (granting qualified immunity where prior precedents "taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case. None of them squarely governs the case here… .").

Here, there is no binding precedent that even suggests that officers similarly situated to these Defendants can be liable under the Fourth Amendment for their actions in this incident. In fact, binding case law supports these Defendants. See § II, *supra*.[15] Because there is no Eleventh Circuit case that holds similarly situated police officers liable under federal law under like circumstances, the question in this case is not settled "beyond debate" in Plaintiff's favor. See Stanton v. Sims, 134 S.Ct. 3, 5 (2013) (for denial of qualified immunity the constitutional question must be settled "beyond debate" and adversely to the defendant officer). Put differently, no binding authority provided Defendants with fair and clear warning that their conduct would violate the federal constitution. It follows that qualified immunity bars Plaintiff's federal claim(s) against Defendants.

––––––––––––––––––

[15] As for any Fourteenth Amendment due process claim, "the measure of what is conscience-shocking is no calibrated yard stick," and that standard is far too vague to defeat qualified immunity. Lewis, 118 S.Ct. at 1717; Manners v. Cannella, 891 F.3d 959, 968 (11th Cir. 2018) ("The Supreme Court has repeatedly admonished the courts that the inquiry into whether law was "clearly established" is not defined at a high level of generality.").

## IV.   OFFICIAL IMMUNITY BARS PLAINTIFF'S STATE LAW CLAIMS

Under Georgia law, official immunity bars a lawsuit against a police officer for use of force unless the officer acted with actual malice, *i.e.*, an actual intent illegally to cause injury. See Ga. Const. of 1983, Art. I, Sec. 2, Par. IX (d); Selvy v. Morrison, 292 Ga. App. 702, 705, 665 S.E.2d 401, 405 (2008)(holding officers who use force in detaining a suspect are engaged in a discretionary function).

Even if the Court were to rule that any Defendant's conduct was improper in some respect, that is something far different from the "actual malice" required to pierce official immunity. Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir.2016) (explaining standard and stating "Even recklessly illegal conduct does not support an inference of actual malice.").

Given the high standard for "actual malice" and the facts of this case, Plaintiff cannot overcome official immunity. The record reflects that Defendants were officers who reasonably tried to arrest a resistant and largely irrational suspect.  They used minimal, lawful force and inflicted minimal injury without "actual malice." Therefore, official immunity entitles Defendants to summary judgment.

## V.   PLAINTIFF'S STATE LAW CLAIMS FAIL

Plaintiff asserts an intentional infliction of emotional distress claim and some unspecified claim under the Georgia Constitution. These roughly duplicate the excessive force claims, and they fail for the same reasons.[16]

---

[16]   The Georgia Constitution's search and seizure provision "contains the same language as the Fourth Amendment, [so] it 'is [to be] applied in accord with the

Here, Plaintiff was subject to arrest and he constantly resisted.  Defendants had the authority to use force to gain compliance. See O.C.G.A. § 17-4-20; <u>Selvy v. Morrison</u>, 292 Ga. App. 702, 706, 665 S.E.2d 401, 405–06 (2008) (stating "'[t]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' ").

Plaintiff cannot show that Defendants' actions were unreasonable or unjustified. Defendants acted well within their legal authority to use reasonable force, so there is no viable tort claim under Georgia law.

## VI.    THE JUSTIFICATION DOCTRINE SHIELDS DEFENDANTS FROM LIABILITY

Under the justification doctrine there is no tort liability "[i]f the defendant in a tort action was authorized to do the act complained of."   O.C.G.A. § 51-11-1.[17] Georgia law provided the deputies with authority to use reasonable force to gain Plaintiff's compliance under these circumstances. Defendants' conduct was lawfully justified under Georgia law, which bars civil liability.

## VII.    PLAINTIFF'S INTENTIONAL INFLICTION CLAIM FAILS

---

Fourth Amendment.'" <u>Olevik v. State</u>, 302 Ga. 228, 234 n.3, 806 S.E.2d 505, 512 (2017) (citing <u>Williams v. State</u>, 296 Ga. 817, 818 n.5, 771 S.E.2d 373, 374 (2015). So, because Plaintiff loses under the Fourth Amendment, he also loses under the Georgia Constitution.

[17]   See <u>Stewart v. Williams,</u> 243 Ga. 580, 582(2), 255 S.E.2d 699 (1979) (justification defense to false arrest claim); <u>Bell v. Smith</u>, 227 Ga.App. 17, 18, 488 S.E.2d 91 (1997) (person is legally justified in using force against another to the extent he reasonably believes such force is necessary under the circumstances); O.C.G.A. § 17-4-20 (right to arrest and use force in detention or arrest); O.C.G.A. § 35-8-2(8)(A) (peace officer powers).

The intentional infliction of emotional distress claim fails because Defendants acted lawfully rather than outrageously, Plaintiff did not seek treatment for, or suffer, any "severe emotional distress," and the emotional distress claim is subsumed within the use of force claim.[18] Therefore, Defendants are entitled to summary judgment.

## VIII.   DEFENDANTS CANNOT BE LIABLE FOR PUNITIVE DAMAGES

Plaintiff pleads for punitive damages. Under Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640 (1983), to recover punitive damages a Plaintiff must show "conduct … motivated by evil motive or intent, or … reckless or callous indifference to the federally protected rights of others." The undisputed facts here reveal that Plaintiff cannot show a Fourth Amendment violation, much less "callous indifference" to his federally protected rights. *See* Memphis Community School District, 477 U.S. 299, 307 n.9, 106 S.Ct. 2537, 2542 n.9 (1986) (discussing requisite culpable subjective intent required for punitive damages).

Likewise, there is no evidence that meets the even higher standard for state law punitive damages under O.C.G.A. § 51-12-5.1(b) (requiring clear and convincing evidence). Accordingly, Defendants are entitled to summary judgment on Plaintiff's punitive damages claim.

---

[18]  See Northside Hospital v. Ruotanen, 246 Ga. App. 433, 435, 541 S.E.2d 66 (2000) ("extreme and outrageous" standard higher than punitive damages standard); Heath v. Peachtree Parkwood Hosp., 200 Ga. App. 118, 120 (5), 407 S.E.2d 406 (1991); Jones v. Warner, 301 Ga.App. 39, 43(3), 686 S.E.2d 835 (2009) (dismissing claim where "anxiety, nervousness, sleeplessness, and irritability," with no medical or psychiatric treatment sought, was not sufficiently severe).

## CONCLUSION

For each of the foregoing reasons, Defendants are entitled to summary judgment. Should the Court dismiss fewer than all Defendants or claims, Defendants respectfully request the Court to certify any dismissal as a final order under Fed. R. Civ. P. 54.

Respectfully submitted,

WILLIAMS, MORRIS & WAYMIRE, LLC

/s/ Jason C. Waymire
JASON C. WAYMIRE
Georgia Bar No. 742602
Attorney for Defendants

Building 400, Suite A
4330 South Lee Street, NE
Buford, Georgia 30518
(678) 541-0790
(678) 541-0789
jason@wmwlaw.com

## CERTIFICATION OF COMPLIANCE WITH L.R. 5.1(B).

Counsel for Defendants certifies that the foregoing Brief complies with the font and point size requirements of Local Rule 5.1(B).

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the foregoing **BRIEF** upon all parties by electronic filing through the CM/ECF system in accordance with the United States District Court rules.

This March 4, 2022.

*/s/ Jason Waymire*